IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )    CASE NO.  3:06cr83/MCR
vs.                                )
                                   )
KENT E. HOVIND                     )    Pensacola,Florida
and JO D. HOVIND,                  )    November 1, 2006
                                   )    8:01 A.M.
                                   )
          Defendants.              )
_____)

VOLUME VIII

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS,
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE PLAINTIFF:          MICHELLE M. HELDMYER, ESQUIRE
                            Assistant United States Attorney
                            21 East Garden Street, Suite 400
                            Pensacola, Florida 32502

FOR THE DEFENDANT           ALAN S. RICHEY, ESQUIRE
KENT E. HOVIND:             Alan Richey, P.A.
                            331 Sentinel Firs Road, #A
                            Port Hadlock, Washington 98330

FOR THE DEFENDANT           JEROLD W. BARRINGER, ESQUIRE
JO D. HOVIND:               Jerold W. Barringer,P.A.
                            102 South Pine Street
                            Nokomis, Illinois 62075

7:55AM

I N D E X

WITNESSES:                                                              PAGE

SCOTT SCHNEIDER (CONTINUED)

  Cross-Examination By Mr. Barringer:                              21
  Redirect Examination By Ms. Heldmyer:                            50


JENNIFER JOHNSON

  Direct Examination By Ms. Heldmyer:                             81
  Cross-Examination By Mr. Richey:                                91
  Cross-Examination By Mr. Barringer:                             96
  Redirect Examination By Ms. Heldmyer:                           98


FREDERICK CHARLES EVANS

  Direct Examination By Ms. Heldmyer:                             99
  Cross-Examination By Mr. Richey:                               152
  Cross-Examination By Mr. Barringer:                            171
  Redirect Examination By Ms. Heldmyer:                          185


  CERTIFICATE                                                    229

7:55AM 1  (Court in session.)

2  (Defendants present.)

3       THE COURT:  Good morning.

4       MS. HELDMYER:  Good morning.

5       MR. BARRINGER:  Good morning.

6       MR. RICHEY:  Good morning.

7       THE COURT:  All right.  I have on the bench what I

8  believe has been proposed by Mr. Richey on behalf of

9  Mr. Hovind, and that is a special verdict form.  Is that

10  correct, Mr. Richey?  I haven't had a chance to look at it.  I

11  just see it.

12       MR. RICHEY:  Your Honor, it's substantially the same

13  one that we proposed earlier.  It's just on page 12, and it

14  included the different prongs under 7212, under Count 58.

15       THE COURT:  All right.  Thank you.

16       Ms. Heldmyer, do you wish to be heard any further on

17  that issue?

18       MS. HELDMYER:  On the issue of the special verdict

19  form?  I do, Your Honor.  I haven't had a chance to look at the

20  one that's been proposed, but I have done some research and I

21  probably have that up here with me somewhere.  Yes, Your Honor,

22  I do.  We are going to be -- as I said, I haven't read it yet,

23  so I'll couch my comments in terms of, there may be no problem

24  with that.  But, generally speaking, I do not believe a special

25  verdict form is appropriate in this case.  I believe that this

8:02AM 1  case, that Count 58, the jury can be dependent upon to follow

2  the jury -- the Court's instructions with regard to finding a

3  specific act by which they can convict.

4        The problem that we have in this particular case, Your

5  Honor, is that not all of the obstructive acts, the impairing

6  and impeding acts, are listed in the indictment.  So to fashion

7  a special verdict form to ask the jury to find one particular

8  obstructive act that they all agree upon and listed for the

9  Court, it would be a very difficult thing to do.  The

10  indictment says that he committed obstructive acts, including

11  those listed in the indictment.  That is not an all inclusive

12  list.  So what if they decide that the obstructive act that

13  they find, that they agree upon, is an obstructive act that is

14  not listed in the indictment, and I'm assuming it's not listed

15  in Mr. Richey proposed verdict form.  So I think that's an

16  issue as to counted 58.  What obstructive acts do you put in

17  the laundry list of things that they can find unanimously.  So

18  I think that's an issue.  I do not believe under the case

19  law -- let me make sure I've pulled the right case law, here.

20        Your Honor, the citation that I'm going to be relying

21  upon is the Supreme Court case of Griffin versus United States,

22  which is found at 502 U.S. 46.  It's a 1991 case.  It is a

23  multi-object conspiracy case, which I believe is analogous to

24  the situation here, and it holds that a general a general

25  guilty verdict and a multi-object conspiracy is adequate for

8:04AM

1    the jury to find a defendant guilty in a multi-object

2    conspiracy, and I think it's analogous to the situation here

3    and we would generally -- I'm fairly confident that I will be

4    opposing a special verdict form.

5              THE COURT:  Mr. Richey.

6              MR. RICHEY:  Yes, Your Honor, in addition to that

7    then, what I would propose is that the Court could put a line

8    down at the bottom that says other and they could fill it in,

9    but the Court is asking the jury to make a unanimous decision

10   regarding some act.  Further, Your Honor, in regard to

11   allegations just made, there are other things not in the

12   indictment and that would go specifically against my

13   defendant's right -- or my client's right to be informed of the

14   charges that are accused against him.

15             THE COURT:  He has been informed of the charge, Mr.

16   Richey and I think you know that the government is not required

17   to put every single act in the indictment.

18             MR. RICHEY:  In order to properly defend against a

19   specific act, then I believe he would need to be informed of

20   that.

21             THE COURT:  I disagree.  I think he's been adequately

22   put on notice of the charges against him and the conduct at

23   issue, and that was the ruling that I made earlier in the case.

24             All right.  Well, I will continue to consider this

25   matter of the special verdict form.

8:06AM 1          All right.  Let me address a couple of other things

2    with you before we get started with the jury.  All right.  I've

3    reviewed this issue of the Paperwork Reduction Act.  And as I

4    have felt from the beginning of the trial or the case when this

5    was raised, the Paperwork Reduction Act is not a defense and

6    not a bar to criminal tax prosecutions, and it does not

7    absolve -- or violations of that act do not absolve a taxpayer

8    from fulfilling his or her tax obligation.  The 1995 amendments

9    to the PRA did not affect the holdings of several cases which

10   stand for the proposition that I just related, and that is a

11   violation of the PRA did not absolve a taxpayer from his or her

12   obligations.  The amendments just simply are not applicable on

13   that issue.

14          Mr. Barringer did bring up the point about section

15   5313 not creating the duty to report transactions above $10,000

16   and that instead that duty was created through regulations

17   issued by the Secretary of the Treasury.  However, those

18   regulations were issued based on expressed grant of statutory

19   authority from Congress, which does exist in 5313.  Therefore,

20   I find that argument not valid and the PRA will simply not be a

21   part of this trial nor a part of the jury instructions in this

22   case.

23          Mr. Richey.

24          MR. RICHEY:  Yes, Your Honor.  I believe that -- and

25   maybe it's just been my unartfulness, but the PRA is not coming

8:07AM 1 in regarding the tax liability or the tax portion.  What it's

2 come in under is Counts 13 through 57, which deal with

3 specifically the Form 43789.

4   THE COURT:  That's what I just addressed, which was in

5 relation to Mr. Barringer's argument, about that form, the duty

6 to file the report with transactions above $10,000 and to do so

7 on the Form 4789.  Is that what you're referring to?

8   MR. RICHEY:  Yes, that it doesn't go to Count 1

9 through 12, rather it goes to Counts 13 through 57, based on

10 the form that was required.

11   THE COURT:  All right.  And I disagree, as far as if

12 there was any violation with respect to that form.  Whether

13 that's a defense to a defendant on a structuring charge, I find

14 that it is not, and also, the duty does exist.  It exists

15 through the statutory -- expressed statutory grant of authority

16 in 5313 that Congress gave to the Secretary, and so I don't

17 find any issue there as far as there not being a duty present

18 in the statute.  I'm not going to instruct the jury on a PRA or

19 any requirement that the bank follow the regulations or the

20 form not on the charge that they face.

21   MR. RICHEY:  I'm sorry.  I just wanted to clarify so

22 that I didn't misunderstand.

23   THE COURT:  Well, did you not -- I think at some point

24 in this trial you have raised the PRA as a defense to the

25 overall charges, the tax charges.

8:09AM 1          MR. RICHEY:  It was just the Counts 13 through 57, and

2    I may have -- again, I may have just been inartful.

3          THE COURT:  It may be my misunderstanding.  But we did

4    discuss the Neff line of cases and then the amendments to the

5    statute yesterday.  Anyway, I've addressed it, and I'm not

6    going to discuss it any further.  That's my ruling and you have

7    the benefit of it.

8          As to, again, 13 through 57, we'll focus on those

9    charges and counts.  The issue of avoidance and evasion, I

10   think I addressed this the other day, but let me restate as to

11   13 through 57, I find that there is no -- no way, no legal way

12   anyway for someone to avoid the currency transaction

13   requirements or to avoid acting in a manner to evade them if

14   you know about -- if the person knows about the currency

15   transaction requirements.  And again, I think it would be

16   confusing to the jury to instruct them on avoidance versus

17   evasion, and I decline to do so.

18         MR. RICHEY:  Your Honor, based on that then, based on

19   what the Court just said, there is no legal way to avoid a CTR

20   if you know about it.  That raises the whole issue then

21   someone -- even if they know about it, could come in and take

22   out 1,000 one day and 2,000 the next day and 8,000 the next day

23   because by that mere statement now, they've committed a crime.

24         THE COURT:  They've committed a crime if they act with

25   the intent to avoid that -- or evade, excuse me, that

8:11AM 1   requirement.

2          MR. RICHEY:  Then based on that knowledge, that

3   becomes very pertinent now on the jury instruction that

4   knowledge be included in those.

5          There is not going to be an instruction that the

6   defendants or that the government must prove that the

7   defendants knew that the conduct was illegal.  There is not

8   going to be an instruction in that regard.

9          MR. RICHEY:  Then I'm going to voice my objection with

10   the Court then as making two very distinct determinations here

11   that go in opposite directions.

12          THE COURT:  Okay.  Your objection is noted and it's on

13   the record.

14          All right.  Evasion, you've requested a definition in

15   the instructions of evasion and I decline to give that

16   instruction as well.  Evasion is not defined in the Tax Code.

17   It's not defined in the Bankruptcy Code.  It is to be given its

18   ordinary plain meaning.  And I do not find that there is any

19   need to define for this jury the term evasion.  Also, it does

20   not appear, the definition does not appear in the pattern jury

21   instruction for these counts and charges, and I am going to

22   give the pattern jury instruction.

23          You have been given -- I'm not going to ask you to

24   address this right now, but I did want to hand you several

25   instructions.  You have -- these are modifications of specific

8:13AM 1    instructions.  There is a modification to the 404(b)

2    instruction.

3           Ms. Heldmyer, I was not -- I did not have my notes

4    with me when I was drafting this or redrafting it.  Did the

5    evidence about the Escambia County clerk document come in

6    through Agent Schneider or was it another witness?

7           MS. HELDMYER:  It was Agent Schneider, Your Honor.

8           THE COURT:  Any comments about this instruction?  The

9    only thing that's been added is, you see there, to file a

10   document with the Escambia County clerk's office by power of

11   attorney and revocation of signature.

12          MS. HELDMYER:  No, Your Honor.  I think that's

13   sufficient.

14          THE COURT:  Mr. Barringer.

15          MR. BARRINGER:  Thank you, Your Honor.  I agree.  I

16   think that's sufficient.

17          THE COURT:  I did tell you I'm not going to ask you to

18   address these and here I am asking you to address them.  I

19   apologize for that.  But let me tell you what else I've given

20   you, and then we'll discuss these on a break or over the lunch

21   hour.

22          The next instruction has to do with an employer being

23   required under the law to deduct and withhold taxes, and I have

24   added the sentence at the end regarding churches, and I think

25   it is entirely appropriate in this case based on the evidence

8:14AM 1    that has been introduced and admitted during the trial.  I'll

2    hear from you about it later if you wish to be heard.

3         The next instruction is the willfulness instruction.

4    It has been reorganized somewhat, rearranged, if you will, some

5    of the language.  I did add in the first paragraph, you will

6    see the specific requirements that the government must

7    establish to prove willfulness and that is proof beyond a

8    reasonable doubt that the law imposed a duty on the defendant,

9    the defendant knew of the duty and that the defendant

10   voluntarily and intentionally violated the duty.  That is

11   something new added to this instruction.

12        You'll see in the second paragraph that there is a

13   strike through as far as the actual knowledge.  I don't think

14   this is necessary and I think it's somewhat confusing.  I moved

15   the sentence regarding the burden of proof and just put it in a

16   different location.  You'll see that.

17        I did add, Mr. Richey, your requested bonafide, the

18   term bonafide, to good faith misunderstanding.  I'm not sure

19   that it's necessary, but I don't think -- I don't think it

20   hurts, and I don't have any specific objection to including

21   that.

22        I'll hear from Ms. Heldmyer later if she wishes to be

23   heard about that.

24        MS. HELDMYER:  I don't have any objection to that.

25        THE COURT:  Thank you.  There was language in the

8:16AM 1    prior instruction about the statute.  This is down at the

2    bottom -- I'm sorry -- of page 2.  I'm continuing over to page

3    3 about the statute being unconstitutional or the tax code

4    being unconstitutional, and I changed that just to the law is

5    unconstitutional or should not apply.  Then I did add in the

6    next sentence, a defendant who knows what the law is and

7    disagrees with it does not have a bonafide good faith

8    misunderstanding defense even if the defendant believes that

9    his disagreement with the law is mandated by his religion or

10   faith.  Based on the evidence that's been presented during this

11   trial, I think this language is appropriate.  That's why it's

12   inserted.  Especially after yesterday's cross-examination, I

13   think it's appropriate.

14        And I will tell you now that one of the pieces of

15   evidence that causes me to -- or caused me to consider

16   inserting that language was OBS-74-A, which was the affidavit

17   of Mr. Hovind.  I believe this is a quote from the affidavit:

18   Since neither the church or I are liable for the tax to begin

19   with.  That's just one example of what I am beginning to

20   perceive as an argument by the defense that Mr. Hovind has a

21   defense if he believed that based on his faith he was not

22   subject to the law.

23        All right.  And I did omit or delete the willful

24   blindness instruction.  That will not be given and the rest is

25   the same as you have before, and I'll hear from you again later

8:18AM 1   on this.

2          The next instruction is the structuring or evading

3   currency transaction reporting requirements instruction, Counts

4   13 through 57.  The only change to this from -- the only

5   changes to this from the pattern instruction aside from the,

6   you know, the first sentence is we did add purposely.  Based on

7   Mr. Richey's request, that was inserted.  So it's to knowingly

8   and purposely evade, and that is not -- purposely is not in the

9   pattern jury instruction.  However, I feel that it should be

10  and that's why that's included.  Unless you convince me

11  otherwise, I am going to leave the first paragraph following

12  the elements, which is on the second page of the instruction

13  alone unless -- and here it says each involving 10,000 or less

14  individually.  The pattern instruction says less than 10,000.

15  I really don't think this is an issue in this case and not a

16  big deal, but I'll hear from you if you wish this to read

17  differently.  Let me go back.  I am not going to change the

18  cash or currency language in the pattern instruction and add

19  coins.  It's going to remain cash or currency, per the pattern

20  instruction.  And I did delete in that last paragraph as far as

21  knowledge, I don't think it's necessary to tell the jury that

22  the government doesn't have to prove that the defendant had

23  knowledge of the law against structuring transactions.  All

24  right.  So you can have time to think about these and we'll

25  discuss them again later today at some point.

8:21AM 1          I am going to go ahead and have my law clerk make the

2    other changes that we discussed yesterday as far as jury

3    instructions and these are just the minor, the typos, adding

4    the word Medicare.  I think there were a couple other minor

5    non-substantive-type changes.  Unless you wish to see another

6    draft, I would prefer to go ahead and get these into a more

7    final version.  Any objection to that?

8          MS. HELDMYER:  No objection, Your Honor.

9          MR. RICHEY:  No.

10         THE COURT:  And you'll have copies and we can look at

11   them again before instructions are given, certainly.

12         All right.  Anything else before the jury comes in at

13   8:30?  Mr. Richey.

14         MR. RICHEY:  Yes, Your Honor.  One thing, as we were

15   leaving last night, a copy of a transcript from Agent Schneider

16   was provided, and in that I believe there are a few pertinent

17   things that I would request the opportunity to question him

18   about.

19         THE COURT:  Okay.  Ms. Heldmyer.

20         MS. HELDMYER:  Your Honor, we found another time, it's

21   a ten-page-long transcript, another time that Special Agent

22   Schneider testified about this case.  I apologize.  I didn't

23   know about it.  It was another A.U.S.A.  So it was not

24   something that I had done.  However, we did provide it last

25   night and I don't have any objection as long as we stick -- I

8:23AM 1    don't have any objection reopening it with Mr. Richey as long

2    as we stick with just questions about the transcript.

3              THE COURT:  Well, certainly.  That would be the rule.

4              MR. RICHEY:  Certainly.  And I don't know when the

5    Court would like to do that since Mr. Barringer is already

6    questioning.

7              THE COURT:  No, I think we'll finish with Mr.

8    Barringer's examination and then allow you an opportunity

9    before redirect to question.

10             Is everybody okay with that?

11             MS. HELDMYER:  Yes, Your Honor.

12             THE COURT:  Anything else?

13             MS. HELDMYER:  There is one other thing, Your Honor.

14   Yesterday during cross-examination in response to questions

15   posed by Mr. Richey to Special Agent Schneider, Special Agent

16   Schneider testified -- he was asked about the reasons why he

17   believed that Mr. Stoll basically was not a genuine fixture at

18   CSE and was not running the CSE, Glen Stoll was the Remedies at

19   Law that took over in the year of 2002, 2003.

20             THE COURT:  Was it Mr. Stoll or Mr. Mooneyhan?

21             MS. HELDMYER:  Mr. Monneyham was before that.  Mr.

22   Stoll is the one that's more resent at Remedies at Law.  During

23   the course of the answer responsive to Mr. Richey's questions,

24   Special Agent Schneider testified that Mr. Stoll is currently

25   under an injunction for his Remedies at Law, a corporation

8:24AM 1 sole.  We have a certified copy of that injunction.  I intend

2 to introduce it in my case in chief during the course of the

3 trial, and I wanted to bring it up because I didn't know

4 whether there would be an objection to it.

5    THE COURT:  Mr. Richey.

6    MR. RICHEY:  Yes, Your Honor.  I haven't had an

7 opportunity to look at it, but I would object because it was

8 filed, it looks like, June 27, 2005, which actually then is

9 long after all the charges in this case except Count 58, and so

10 whatever the Court in Washington decided with regards to Glen

11 Stoll, I mean, this was three years after he had become

12 involved here with CSE.  And also, there's not been any

13 testimony that my client was aware of this injunction either

14 and so -- and my questions initially were not directly

15 regarding this until Agent Schneider brought it up in a long

16 response to my question, and so then I just asked him how he

17 knew about it and if it -- what it actually said, but again --

18 so I would agree at some point that the door was opened.

19 However, there is no evidence that my client knew about it or

20 relied upon it, and the time frame of it comes beyond all the

21 charges except for Count 58.  So if the Court did allow it in,

22 I would ask that there be a limiting instruction, that it could

23 only be used towards Count 58, but that's only if the

24 government could even establish that my client had knowledge of

25 this.

8:26AM 1        THE COURT:  Well, I'm presuming that it relates, the

2    government's intending to introduce this relates more to a

3    rehabilitation or impeachment question.  I'm not sure.  Are you

4    trying to introduce this for any substantive reason?  I mean,

5    what's the purpose of introducing it?

6        MS. HELDMYER:  The purpose, Your Honor, Special Agent

7    Schneider testified that it was in place, Mr. Richey asked him

8    a series of questions, which implied that Mr. Schneider might

9    be wrong about it and didn't know about it, and that's the

10    reason why I intend to offer it, to show that Special Agent

11    Schneider's testimony was correct and that it was in place.

12        I might also add, Your Honor, that Mr. Hovind

13    continued to rely upon Mr. Stoll and use Mr. Stoll as a name

14    and basically an excuse for not having any control over CSE

15    well passed the date that the injunction was entered in 2005.

16    We can certainly establish that.

17        THE COURT:  All right.  What I will need to do is I

18    need to see a copy of the exhibit.  Does it have a number?

19        MS. HELDMYER:  It does, Your Honor.  It's OBS-72-B.

20    Let me give the Court the original exhibit.  I made two copies,

21    and I gave them to the defense, but I can give you the original

22    exhibit.  I don't need it for now.

23        THE COURT:  I'll make a copy of it and return you the

24    original exhibit, and also, I'm going to need to review the

25    testimony and the questions.

8:28AM  1          MS. HELDMYER:  I've also included a copy of the

2     Griffin case that I've cited with regard to the special

3     verdict, Your Honor, and I've got copies of the defense as well

4     of the Griffin case.

5          MR. RICHEY:  Your Honor, along those lines also if

6     this document is introduced, depending on the questioning that

7     is -- or what it's used with, that may open the door for

8     additional questions by me since I didn't have the document.

9          THE COURT:  Well, let me -- I need to review the line

10     of questioning of the testimony.

11          All right.  Ms. Heldmyer, as far as timing and your

12     case, where we are, what say the government?

13          MS. HELDMYER:  Well, Your Honor, I'm hesitant because

14     I was so far off a couple of days ago, but I do anticipate that

15     we'll be resting by the end of the day.

16          THE COURT:  You have Agent Schneider to finish up and

17     Agent Evans?

18          MS. HELDMYER:  Yes, Your Honor.  Well, I have a short

19     witness from Regions Bank, Ms. Johnson, and then Mr. Evans, and

20     that will be it.  Now, I have to qualify that because Special

21     Agent Schneider has been on the stand.  Basically, I have not

22     been able to communicate with him nearly two weeks now, given

23     that we couldn't communicate over the break.  When he's off the

24     stand, because I wasn't allowed to consult with him while he

25     was on the stand, he and I need to sit down and make sure that

8:29AM 1 there are no other summaries that he has that he's prepared, et

2 cetera, regarding any of the other evidence.  I don't believe

3 that there is, but until we have a chance to talk when he's off

4 the stand, there may be something at the very end, but I doubt

5 it.

6    THE COURT:  All right.  Mr. Richey, your case, do you

7 have witnesses ready?

8    MR. RICHEY:  I will have some witnesses ready, yes,

9 Your Honor.

10    THE COURT:  Do you have any further word on

11 Mr. Mooneyhan?

12    MR. RICHEY:  I have not received anything further

13 regarding him.

14    THE COURT:  Mr. Barringer, you're still on track?

15    MR. BARRINGER:  Yes, Your Honor.

16    THE COURT:  Let me briefly before the jury comes in,

17 address Mr. and Mrs. Hovind.  Both of you have heard me say

18 many times during your trial that you do not have to take the

19 witness stand, and you have the right to decline to take the

20 witness stand, and that right is protected.  It is sacred.  And

21 the jury will be instructed that they may never consider --

22    Thank you.  That's all right.  You can sit down.

23    -- that the jury may never consider in arriving at its

24 verdict the fact that you may have elected to exercise your

25 right not to take the witness stand.  With all of that said, I

8:30AM 1  now want you to understand that you do also have a right to

2  take the witness stand, and that is your right and your right

3  individually and alone, and it is a decision that you and only

4  you can make.  It is your decision.  That's the point I'm

5  trying to make.  I don't suggest, however, that you should

6  disregard the advice of your attorneys.  They are trained.

7  They are competent.  They know the law.  They know the issues

8  in this case, and so it behooves you to follow their advice.

9  But if they advise you that they believe that it is in your

10  best interest not to take the witness stand and either one of

11  you disagree and feel that you want to take the witness stand,

12  despite their advice to the contrary, you will have that right,

13  and you will be permitted to take the stand during this trial

14  and testify before the jury.  All you have to do is let me know

15  that you wish to take the witness stand if your attorney is not

16  otherwise letting you know.  Do you understand, Mrs. Hovind.

17        DEFENDANT JO HOVIND:  Yes, ma'am.

18        THE COURT:  Mr. Hovind?

19        DEFENDANT KENT HOVIND:  Yes, ma'am.

20        MR. BARRINGER:  Your Honor, can we take a one-minute

21  recess for restrooms?  It's going to be until 10:30, otherwise.

22  I literally will be out and back in a minute.

23        THE COURT:  All right.  I'll step off the bench for

24  two minutes.

25        (Recess.)

8:38AM 1             (Jury present.)

2            THE COURT:  Good morning.  Did you all have a nice

3  Halloween with your children, and the children in the

4  neighborhood?  Good.  And despite my mistake last night about,

5  the comment about Thanksgiving, I promise you all we will not

6  be here during Thanksgiving.

7            We are ready to proceed this morning, ladies and

8  gentlemen.

9            Mr. Barringer, you are in your cross-examination of

10  Agent Schneider.

11           Agent Schneider, I remind you that you're still under

12  oath.

13           Mr. Barringer, you may proceed, sir.

14           MR. BARRINGER:  Good morning, Agent Schneider.

15           THE WITNESS:  Good morning, again.

16                  **CROSS-EXAMINATION**

17  BY MR. BARRINGER:

18  Q.  Forgive me.  I don't really recall what the last question

19  was or what the topic was that we were dealing with yesterday.

20  I'm going to keep moving forward so that we can wrap this up.

21  A.  Yes, sir.

22  Q.  Again, with respect to the transfer or the change of

23  influence from Mr. Mooneyhan to Mr. Stoll, do you have any

24  knowledge of when that occurred?

25  A.  Well, as we talked about yesterday, I believe that --

8:39AM 1  again, I never believed that there was any control by either

2  party of the organization.  I know that Mr. Mooneyhan was

3  referenced in material during various years between '99 and

4  2002 or 2003, and I know that I've seen documents indicating

5  that Glen Stoll was involved with the creation of a different

6  structure of CSE during the 2003 time frame, 2004, but that's

7  pretty much as accurate as I can get.

8  Q.  Okay.  You would agree that Mr. Mooneyhan apparently was

9  advising or may have been advising Mr. Hovind or do you have

10  any idea?

11  A.  I don't have any independent knowledge of that.  I know

12  I've read documents, but all of them provided -- or indicated

13  that Mr. Mooneyhan had some sort of involvement.  I know his

14  signature was on documents.  Now, whether he was advising --

15  from my direct knowledge, I have no information.

16  Q.  And then with respect to Mr. Stoll, do you know whether or

17  not he was advising Mr. Hovind?

18  A.  Yes, sir.  I know that while he was there, he was being

19  asked questions and giving information over, yes, I guess, in

20  an advisory capacity.

21  Q.  And you had talked previously about that there was a change

22  of structure of CSE.  Do you remember that?

23  A.  Yes, sir.

24  Q.  I think if I recall correctly from your testimony on direct

25  examination way back whenever that was that you had referenced

8:41AM
1    to Unincorporated Business Trust?

2    A.   Yes, sir.

3    Q.   And that was during the time frame of Mr. Mooneyhan?

4    A.   Actually, Unincorporated Business Trust was one of the

5    earlier organizational structures, my understanding, starting

6    around 1996 when the first IRS actions were taking place.  That

7    was the first structure that was created.  And based upon the

8    information I read from Mr. Hovind's own literature, which was

9    used to create a shield against IRS assets.  So that was

10   created around 1996.

11   Q.   And then you commented about a corporation sole and

12   ministerial trust at the time of Glen Stoll?

13   A.   Yes, sir.

14   Q.   Do you have any independent knowledge or background on

15   business trusts?

16   A.   If your question is am I a trust expert, the answer is no.

17   Q.   Fair enough.

18        You had described at the time that the search warrant

19   occurred, April 14, 2004, that when you had arrived, there were

20   only a few individuals there, perhaps Mr. and Mrs. Hovind and

21   maybe one or two other individuals; is that correct?

22   A.   Yes, sir.

23   Q.   Had you ever met Mrs. Hovind prior to that date?

24   A.   I don't recall specifically speaking with her or talking

25   with her.  There may have been an occasion of dropping off

8:43AM  1  paperwork that I knew her, but I don't believe that we actually

2  met prior to that date.

3  Q.  And when you say dropping off paperwork, the only time that

4  I recall that you were there prior to April 14, 2004, was when

5  you brought the summonses in July 2002.  Were you there any

6  other time?

7  A.  I don't recall any other time.  So most likely the search

8  warrant would have been the first time that I actually

9  personally met her.

10  Q.  And with respect to Mrs. Hovind, did you ever have any

11  correspondence with her prior to April 14, 2004?

12  A.  Not that I recall.

13  Q.  And did you ever write to her prior to that time?

14  A.  No, sir.

15  Q.  April 14, 2004 arrives, you said that you allowed the

16  Hovinds -- or Mr. Hovind, I believe, in particular, to lead you

17  around through the house; is that right?

18  A.  Yes, sir.

19  Q.  To take you to different rooms -- I think you said you were

20  working in teams of three to clear the room to make sure there

21  wasn't anything there that was of concern?

22  A.  Well, generally, we allowed him to walk down the main

23  hallway with us as other teams.  The teams of three is how we

24  normally train to make sure our room is empty and has no

25  threat.  With Mr. Hovind, we allowed him to walk down the

8:44AM 1  center, and we first encountered Mrs. Hovind, and then we

2  encountered their guests, so we walked down the main hallway of

3  the house with him.

4  Q.   And that's the main hallway.

5       When we were looking at that picture yesterday, rather than

6  me trying to find out which picture it was, it was to the far

7  left in that picture, it would be that living quarters of that

8  house?

9  A.   Yes.

10  Q.   And the hallway ran that direction to the left?

11  A.   As you're looking at that picture of the house, it would

12  run from right to left down the center of the house.

13  Q.   It was going down there that Mr. Hovind was leading the way

14  and the members would then go off into each of the bedrooms and

15  bathrooms down that hallway?

16  A.   Yes.

17  Q.   Did you search Mr. and Mrs. Hovind when you arrived?

18  A.   When we first arrived, I believe that we did not -- we had

19  control of Mr. Hovind when we first arrived.  I mean, he was

20  right there in our presence.  And we asked him if he had any

21  weapons, and that's when we started talking to him about the

22  weapons in the house and decided he had not told us everything.

23  We had not patted him down at that time.

24  Q.   Okay.

25  A.   We escorted him, but we had him in our immediate control.

8:46AM 1   Q.  You raised a couple of questions, and let me see if we can

2   work our way through it.

3        You asked Mr. Hovind if he had any guns?

4   A.  Yes.

5   Q.  Did you say, do you have any guns in the house?  Do you

6   have any guns in the office?  Do you have any guns on the

7   property?  Exactly what word do you recall was used?

8   A.  I don't recall the specific wording.  We generally ask

9   every which way we can, where are there any weapons to be found

10   because we're here to effect a search.  So we asked him, do you

11   have any weapons on you or any weapons around?  Where are we

12   going to find any weapons so we can secure them?

13   Q.  You said you don't recall what you said.  So what you've

14   just said is what you assume you would have said?

15   A.  Yes, sir.  That's typical.  We tend not to narrow the scope

16   too much.

17   Q.  But it is nevertheless possible that on a particular case,

18   you say, do you have any weapons in the house, or do you have

19   any weapons on you, or do you have any weapons here?  And here

20   can be in a different place than the house, as an example.

21   That is a possibility for somebody to assume that or be

22   mistaken on what you mean?

23   A.  Obviously, I don't recall the exact wording, so I can't

24   answer the question.

25   Q.  Okay.  And with respect to Mrs. Hovind, you had said that

Schneider - Cross/Mr. Barringer

Schneider - Cross/Mr. Barringer

8:47AM  1  someone else was interviewing her, I believe, a female CID

2  agent, if I recall correctly?

3  A.  Yes, sir.

4  Q.  When it was discovered it was Mrs. Hovind, you came in and

5  talked to her at that time?

6  A.  Yes, sir.

7  Q.  At that time did you advise her that she was a potential

8  target?

9  A.  I advised her of her rights, and the reason I advised her

10  of her rights were because I believe that there was a potential

11  for criminal liability.  She was not the target of the

12  investigation at that time.  However, that doesn't preclude us

13  from using our own judgement of someone that may potentially

14  face criminal liability down the road and would read them their

15  rights.

16  Q.  Fair enough.  You read her rights just to protect yourself?

17  A.  Yes, sir.

18  Q.  But you didn't tell her that she was a target or that she

19  was potentially involved in any criminal activity at that time?

20  A.  The rights card itself states that I'm conducting an

21  investigation of -- and I explained that it was primarily of

22  her husband's, you know, tax liability, however, that she --

23  that the things that she said could be used against her, and I

24  read off the card explaining that I was conducting a criminal

25  investigation and that for this reason, she didn't have to talk

8:48AM 1    to me without advice of counsel.  And I did that particularly

2    because of being the spouse of the primary named subject, there

3    is always the potential for their own personal criminal

4    involvement.

5    Q.  With respect to the subject of the money and finding it in

6    different places, do you recall specifically the words you used

7    to ask her where her money was?  Again, we're talking about

8    almost two-and-a-half years.

9    A.  I'm sure at this moment -- the specific wording does not

10   come to mind.

11   Q.  Okay.  And with respect to safes, how many safes were on

12   the property?

13   A.  I believe there were two --

14   Q.  In looking at OBS-120-A through U, only one safe was shown

15   in here, I believe.  I can put each picture up, but -- or I can

16   hand this to you --

17           MR. BARRINGER:  -- if that would help, Your Honor?

18           THE COURT:  Yes, sir, you may.

19           MR. BARRINGER:  May I approach?

20   BY MR. BARRINGER:

21   Q.  What I've given you is the entirety, I believe, of all the

22   pictures in OBS-120-A through U.

23   A.  These are all the pictures entered into evidence.

24   Q.  Is that second safe shown in any of these pictures?

25   A.  I don't believe it is.

8:50AM 1            MR. BARRINGER:  May I approach again, Your Honor?

2            THE COURT:  Yes.

3  BY MR. BARRINGER:

4  Q.  And again, where is that second safe?  Where was that

5  second safe at?

6  A.  I don't recall specifically without -- I'd have to

7  reference other material I have, but I believe -- I believe it

8  may have been in the bookstore, but I can't recall,

9  specifically.

10  Q.  Okay.  The process goes on.  Was Mrs. Hovind told that she

11  could leave or not leave?

12  A.  Oh, she was told that she could leave.

13  Q.  At some point in time, she asked permission to take

14  somebody to a doctor's appointment, I believe?

15  A.  Yes, sir.

16  Q.  Okay.  If she is asking permission, that would tend to

17  imply that she thought she couldn't leave?

18  A.  I disagree, sir.

19  Q.  You think that she was just being polite, despite your

20  having told her that she could leave at any time?

21  A.  No, sir.  She was informed that she could remain on the

22  premises while we conducted our search, but we asked that she

23  remain in one area for our ability to maintain control.  And

24  when she asked if she could leave, my understanding was she was

25  asking could she leave and return, because she wanted to stay

8:51AM

1    on the premises since her husband had since been asked to leave

2    based upon his actions.  So I don't believe there was any

3    indication -- and she was free to go at any time.  All we asked

4    was that if she wished to maintain and remain on the property

5    that she stay in one location for our ability to control the

6    scene.

7    Q.  Where was that one location you wanted her to stay?

8    A.  I believe, sir, that the agents primarily -- she was

9    sitting in the main office area during most of this time.  I

10   believe for a while she sat in the gazebo as well.  Again, it

11   wasn't -- it was more that we had an area that we had one agent

12   that was generally watching over, and she was in the presence

13   of one of our agents most of the time.

14   Q.  Now, with respect to the gazebo or the main office area, as

15   you phrased it, neither one of those are the original house

16   structure, are they?

17   A.  I can't speak to what's the original house structure.  The

18   gazebo, to me, is part of the main structure of the house.

19   It's a back, large room connected to the main house.

20   Q.  You don't know when it was added to the house, do you?

21   A.  No, sir.  But if it was added to the house, I would

22   consider it a part of the main structure.

23   Q.  Okay.  Now, with respect to the process after the warrant,

24   you've taken the $42,000.  Did you at any time tell Mrs. Hovind

25   that the money, that the money would stay there?

8:53AM

1   A.  As we were collecting the money, we informed her that it

2   was our intention of not taking the money.

3   Q.  Okay.

4   A.  But again, that's through the collection process, as I

5   recall.

6   Q.  Now, with respect to the collection process that -- strike

7   that.

8       Ultimately you called your supervisor to get permission to

9   take the money, or to see if you should take the money?

10  A.  After I reviewed -- the other agents were involved with

11  collecting the money from various rooms in the house.  When I

12  came in and reviewed what had been collected and I saw the four

13  large amounts of money, I then decided what I wanted to do, and

14  I called and made sure that we had concurrence with our

15  hierarchy as to taking the money as part of the search warrant.

16  Q.  Okay.  And who was it that you called?

17  A.  We called, I believe it was our special agent in charge of

18  the Tampa field office.

19  Q.  Who was that?

20  A.  I believe at the time it was Francine Evans.

21  Q.  You take the money and you put it in a safe at the IRS

22  offices.  That's here in town, right?

23  A.  Yes, sir.

24  Q.  You counted it, sealed it, all those sorts of things to

25  make sure it didn't disappear, make sure nothing happened to

8:55AM  1  it; is that right?

2  A.  Yes, sir.  Yes, sir, generally.

3  Q.  What crimes or expected crimes or potential crimes was that

4  money taken for?

5  A.  Well, the warrant specifically designated that the crimes

6  that we were investigating were tax-related crimes.

7  Q.  What years?

8  A.  For the years -- I can't recall specifically what was in

9  the warrant.  I mean, I know the general period of

10  investigation covered from '97 through the time of the warrant.

11  Q.  Okay.  Now, with respects to this process of jeopardy

12  assessment that we talked about a little bit yesterday that

13  occurred in June of 2004, do you know what tax years were

14  involved there?

15  A.  I believe it was, as I recall, it was 1996 through 1998,

16  but that's my recollection.

17  Q.  Okay.  And with respect to the process at that time, it was

18  then that you came out in a car with -- and let me see if I've

19  got it.  Is it Revenue Officer Randall Wright, he was there?

20  A.  Yes, sir.

21  Q.  Special Agent Burgess, Burgess?

22  A.  Yes, sir, Burgess.

23  Q.  Special Agent Chuck Evans is here?

24  A.  Yes, sir.

25  Q.  And then I also have a Tracy Preisser?

8:56AM

1    A.   Yes.

2    Q.   Is that also a special agent?

3    A.   Yes, sir.

4    Q.   And so there were five of you coming out and delivering the

5    notice of deficiency; is that what I heard yesterday?

6    A.   No, sir.  What you heard was Randall Wright was delivering

7    the notice of deficiency and the four other agents were there.

8    Q.   As protection?

9    A.   Based upon the activities of the search warrant, they were

10   there as armed escorts, yes, sir.

11   Q.   Just a couple of more areas that I wanted to cover.  You

12   had testified yesterday that you were trained as a military

13   interrogation specialist, or you had that designation in the

14   military; is that correct?

15   A.   I was trained as an Army infantry officer.

16   Q.   Okay.

17   A.   I became part of the military intelligence unit and I was

18   slotted and took over the role as a military interrogator team

19   leader.  However, my branch transferred through that time, I

20   did not complete the advanced course in military intelligence,

21   if you're familiar with the Army terms.  So I was not

22   considered branch qualified, but I had a designator of a

23   military intelligence officer.

24   Q.   Again, we've covered several points.  First of all, your

25   rank in the military was?

8:58AM

1   A.  First lieutenant.

2   Q.  First lieutenant.

3       And you're training in interrogation was from where?

4   A.  The training I had in the area of military intelligence was

5   primarily officers were trained in a broad range of

6   intelligence.  Interrogations are but some small part, and my

7   training was primarily unit-based scenario, just general

8   military training.  I actually went to no interrogation schools

9   or anything like that.

10  Q.  You had commented that you were in advanced training and

11  did not complete that process.  What was that advanced training

12  about?

13  A.  General military intelligence.

14  Q.  Okay.  And then you were slotted to go to Iraq to look for

15  what might have happened to the money that Saddam Hussein had

16  stolen from his people?

17  A.  Slotted, I was asked to volunteer by my agency as an IRS

18  special agent to go over there.  So that was non-military

19  related.  And the reason I was asked was because of my military

20  background and my -- and my limited ability with the foreign

21  language and the culture.  During that time frame, it made it

22  possible to integrate me more quickly into a military

23  environment, so that's the reason why I was asked to go over.

24  Q.  Did you actually conduct interviews or interrogations?

25  A.  I conducted -- yes, sir.

Case 3:06-cr-00083-MCR-EMT   Document 261   Filed 02/08/08   Page 35 of 230

9:00AM 1    Q.   Several, dozens, do you remember?

2    A.   Several, quite a few.

3    Q.   And it was that the IRS in Washington, DC, suggested that

4    you volunteer or picked you?

5    A.   They knew my background, and they thought it would be a

6    good fit.  I had recently been up there on some other cases, so

7    unfortunately, when you do base time in DC, it's not a good

8    thing always.

9            MR. BARRINGER:  If I may have a moment, Your Honor?

10           THE COURT:  Yes, sir.

11           MR. BARRINGER:  That's all I have.  Thank you.

12           THE COURT:  Mr. Richey.

13           MR. RICHEY:  Yes, Your Honor.

14           THE COURT:  Ladies and gentlemen, Mr. Richey has an

15   additional area of limited inquiry.

16           Mr. Richey, you may proceed.

17           MR. RICHEY:  Thank you, Your Honor.

18   BY MR. RICHEY:

19   Q.   Good morning, Agent Schneider.

20   A.   Good morning.

21   Q.   You recall testifying previously before the grand jury in

22   this matter; is that correct?

23   A.   Yes.

24   Q.   And you did so on two different occasions; is that correct?

25   A.   That's as I recalled the other day, yes, sir.

Schneider - Cross/Mr. Richey

9:02AM 1   Q.  And in the testimony that we've seen here today, is it

2   your -- or not -- I'm sorry.  In the testimony we've seen

3   during the course of this trial, it's your belief then that

4   Kent Hovind believes that the Internal Revenue laws are

5   unconstitutional; is that correct?

6   A.  Well, I don't believe I actually testified that he said

7   that they were unconstitutional.  I said -- I've testified thus

8   far that he did not believe that the government, including the

9   IRS, had any authority over him.

10   Q.  Okay.  And so you're saying that you never said that he

11   said it was unconstitutional?

12   A.  That's not what I said, sir.  I said, during this trial, I

13   have not said those words unconstitutional.  I have said that

14   he does not believe that the IRS has any authority over him.

15   That's what I've testified to thus far.

16   Q.  And isn't it -- can you point to any evidence that was

17   submitted during the course of this trial that shows that

18   Mr. Hovind believes that the Internal Revenue Service or the

19   Internal Revenue Code is unconstitutional?

20   A.  Well, sir, as I recall on the audiotape of his radio

21   broadcast, I believe he mentioned that the Sixteenth Amendment

22   wasn't properly ratified, though in his mind, that wasn't the

23   main point.  The Sixteenth Amendment authorized the power of

24   Congress to levy tax on income.  So by his own statement on the

25   radio show, as I recall it, that right there would provide

Schneider - Cross/Mr. Richey

9:04AM
1    information that he doesn't believe the IRS has a

2    constitutional authority to collect income tax.

3    Q.  And that's something that he told you at various times when

4    you met him?

5    A.  Sir, as I just testified, that's what I heard on the radio

6    show here in court.

7    Q.  But my question to you was that's something that he

8    conveyed to you during your conversations, wasn't it?  Did he

9    ever tell you that he thought that the Internal Revenue Code

10    was unconstitutional?

11    A.  I don't know if I recall him specifically stating that it

12    was unconstitutional.

13    Q.  Okay.  But that's what you told the grand jury, didn't you?

14    A.  I don't recall the specific words I used, but if you would

15    like to refresh my memory.

16    Q.  Well, let me show you this.  Didn't you in fact inform the

17    grand jury that Mr. Hovind believes that the Internal Revenue

18    laws are unconstitutional and that's why he agrees -- disagrees

19    with that and the income tax system?

20    A.  I think that that's accurate, but that wasn't the question

21    you asked me here just a minute ago.  You asked me if anything

22    was presented in court as to the constitutionality, and I

23    hadn't said anything in trial so far.

24    Q.  Right.  But you did, in fact, tell the grand jury that you

25    believe that Mr. Hovind -- in fact, you told them that

9:05AM 1   Mr. Hovind disagrees with the constitutionality of the Internal

2   Revenue laws and the income tax system, didn't you?

3   A.   Yes, sir, and I believe that to be true.

4   Q.   And didn't you also tell them that he's -- that he refuses

5   to file his personal income tax returns and anything associated

6   with money?

7   A.   Yes, sir.

8   Q.   And you also testified that you believed that CSE, Creation

9   Science ministries or whatever --

10          MS. HELDMYER:   Improper impeachment, Your Honor.  I

11   object.

12          THE COURT:   Sustained.

13   BY MR. RICHEY:

14   Q.   Isn't it your understanding, or didn't you come to the

15   determination then that CSE was not a ministry but in fact a

16   business?

17   A.   Sir, I would not -- whether you use the words ministry or

18   not, I believed it was operating for sale of materials that

19   would have made it a taxable activity.

20   Q.   That wasn't my question.  My question was:  Didn't you

21   determine then that CSE was a business?

22   A.   I, at that time, did not use the word ministry.  I used the

23   word business.

24   Q.   Okay.  And in fact, you determined that it was in fact a

25   sole proprietor, correct?

9:07AM 1   A.   Sir, I determined the fact that he had not created a

2   corporation.  He had not created a closely held corporation.

3   He had not created a partnership.  He had not created any other

4   type of organizational structure that would have led me to

5   believe that it was anything other than Kent Hovind doing

6   business as these other names.  So for that reason, I believed

7   at the time that it would be considered more of a sole

8   proprietorship type of organization.

9   Q.   So then your direct answer is, yes, you determined that it

10   was a sole proprietorship, correct?

11   A.   Sir, there is no -- I didn't make a determination, an

12   official determination.  My opinion at the time was it didn't

13   fall into any other categories.

14   Q.   You said you didn't make a determination.  Didn't you

15   testify to the grand jury that you determined that they were

16   businesses and that you considered them as a sole

17   proprietorship?

18   A.   Sir, I didn't determine anything, as you're attempting to

19   refresh my memory.  I considered it at the time a sole

20   proprietorship because I did not see any other incorporations

21   or licensing to the contrary.

22   Q.   And you also testified regarding a statement that you had

23   obtained from -- I don't know if you obtained it from

24   Mr. Hovind directly or if it was something that you obtained

25   through the website.  Do you recall that?

9:09AM 1  A.  No, not particularly, sir.

2  Q.  Okay.  Let me show you this and see if this will refresh

3  your memory.

4        MS. HELDMYER:  Objection, improper impeachment, Your

5  Honor.

6        THE COURT:  Sustained.

7  BY MR. RICHEY:

8  Q.  Well, you testified that you believe -- actually, you

9  testified that Mr. Hovind's belief was that the Internal

10  Revenue laws was unconstitutional, correct?

11        MS. HELDMYER:  Objection, asked and answered, and

12  irrelevant.

13        THE COURT:  Sustained, as to asked and answered.

14  BY MR. RICHEY:

15  Q.  Did you get that information from a statement that

16  Mr. Hovind had put on his website?

17  A.  I don't recall.

18  Q.  You don't recall that?  Does this refresh your memory?

19        MS. HELDMYER:  What page?

20        MR. RICHEY:  Page 4.

21        THE WITNESS:  No, sir.  That still doesn't refresh my

22  memory as to why I made the statement that he believed them to

23  be unconstitutional.

24  BY MR. RICHEY:

25  Q.  Okay.  But did that give you any additional evidence that

9:11AM  1  you used then in your criminal investigation?

2  A.  Did what give me additional evidence?

3  Q.  Well, isn't it true then that what you saw or read was a

4  statement by Mr. Hovind regarding his belief on why he didn't

5  have to pay income tax?

6  A.  I did see something like that on his website, yes, sir.

7  Q.  And was that something that you then used to further

8  investigate on to why you believed he just wouldn't listen to

9  anything you told him?

10  A.  That had nothing to do with that, sir.

11  Q.  Okay.  Was it part of -- well, did you disagree with what

12  he said in there?

13  A.  I believed it to be not true, sir.

14  Q.  Did you ever contact him about that and tell him that his

15  belief was incorrect?

16         MS. HELDMYER:  Objection, Your Honor.  This was

17  covered in the first cross-examination.

18         THE COURT:  Sustained.

19  BY MR. RICHEY:

20  Q.  Did you ever contact him specifically about this statement?

21  A.  I don't recall specifically about the statement, no.

22  Q.  Did you ever provide a copy of that to the grand jury?

23  A.  No, sir.

24  Q.  They, in fact, asked for it, didn't they?

25  A.  I don't recall, sir.

Schneider - Cross/Mr. Richey

9:13AM  1   Q.  Does this refresh your recollection?

2              MS. HELDMYER:  Page reference, please.

3              MR. RICHEY:  Page 9.

4              THE WITNESS:  Yes, sir.

5   BY MR. RICHEY:

6   Q.  So in fact, one of the grand jurors did ask for a synopsis

7   of 37 pages, correct?

8   A.  Yes, sir.

9   Q.  But you never provided it?

10  A.  No, sir.

11  Q.  Did you ever at any time inform Mr. Hovind what specific

12  law required him to pay the tax or to file a return?

13  A.  No, sir.

14  Q.  In fact, the grand jury asked you that same question,

15  didn't they?

16  A.  I don't recall.

17             MS. HELDMYER:  Objection, improper impeachment, Your

18  Honor.

19             THE COURT:  Sustained.

20  BY MR. RICHEY:

21  Q.  Well, Agent Schneider, isn't it true that Mr. Hovind is

22  accused of violating the Internal Revenue laws?

23             MS. HELDMYER:  Objection, Your Honor.

24             THE COURT:  Approach the bench, please.

25             (At the bench:

Schneider - Cross/Mr. Richey

9:14AM 1          THE COURT:  You're going to try to impeach him with

2    his grand jury testimony.  You've asked him a question.  If he

3    gives you an answer, if it's different from the answer he gave

4    to the same question before the grand jury, then you may

5    attempt to impeach him through that prior testimony, but I'm

6    not sure where you're heading with this.  I mean, you're now

7    back to where you were yesterday.  You know, you're going

8    through the same type of examination that you went through

9    yesterday.  You're not permitted to do that now.

10          MR. RICHEY:  I'm just trying to ask him specifically

11   about this.

12          THE COURT:  But you don't get to ask a witness about

13   his testimony before the grand jury.  It's only if you want to

14   use that to impeach his present testimony.

15          MR. RICHEY:  Okay.

16          THE COURT:  You don't get to go over with him what

17   happened in the grand jury before this jury.

18          MR. RICHEY:  Okay.

19          THE COURT:  Anything else?

20          MS. HELDMYER:  No, Your Honor.  I was just going to

21   ask if I could take that exhibit back in case I need it to

22   refresh his recollection.

23          THE COURT:  I didn't make a copy.

24          MS. HELDMYER:  I'll give it back.

25          THE COURT:  Anything else?

Schneider - Cross/Mr. Richey

9:16AM 1          MR. RICHEY:  No.

2          THE COURT:  All right.

3          (Bench conference concluded.)

4          THE COURT:  Mr. Richey, you may proceed.

5   BY MR. RICHEY:

6   Q.  I kind of lost my train of thought, and I may have already

7   asked this.  I'm not sure.  But were you in fact asked -- asked

8   by the grand jury to inform them what specific code of the

9   Internal Revenue Code, what section required the payment of the

10  taxes --

11          MS. HELDMYER:  Objection, Your Honor.

12  BY MR. BARRINGER:

13  Q.  -- that Mr. Hovind is charged with?

14          MS. HELDMYER:  Same objection.

15          THE COURT:  Sustained.

16  BY MR. RICHEY:

17  Q.  Do you know -- isn't it true that you could legally avoid

18  paying taxes?

19          MS. HELDMYER:  Objection, Your Honor.

20          THE COURT:  Sustained.

21  BY MR. RICHEY:

22  Q.  Did you inform the grand jury that he could be held guilty

23  in avoiding taxes?

24          THE COURT:  Approach.

25          (At the bench:

9:17AM   1      THE COURT:  I haven't seen his testimony.  I'm not

2   sure what it is you're trying to establish here.  I mean, what

3   are we doing?

4      MR. RICHEY:  Your Honor, the basis of this all goes to

5   the crux of Count 1 through 12 of willfulness.

6      THE COURT:  Right.

7      MR. RICHEY:  And what we have here is a situation

8   where over the process of time, Mr. Hovind continually asked

9   what law he was violating, what law imposed upon him the

10  duty -- what we have in the testimony that the Court can see on

11  the screen is that the grand jurors asked that very question,

12  and again, he could not answer the question.

13     THE COURT:  He did not answer the question about the

14  law or whether he provided a copy or told Mr. Hovind about the

15  law that applied.

16     MR. RICHEY:  The question was if he could tell them

17  what law imposed the duty on Mr. Hovind.

18     THE COURT:  Well, the way to do this is for you to ask

19  him if he ever advised -- well, you've already asked this, but

20  if he ever asked Mr. Hovind about the law that applied and he

21  answers, no, there is nothing to impeach him with.  It would be

22  different if he answered before the grand jury, yes.

23     MR. RICHEY:  He did give an answer, and it was

24  generally the Internal Revenue Code imposes taxes, but he never

25  cited a specific answer.

9:19AM 1          THE COURT:  But again, you can only use this grand

2    jury testimony to impeach the testimony that he gives here in

3    court today.  That's the only way it can be used.  It is not

4    substantive evidence.  It doesn't get admitted as evidence.  He

5    has to give you an inconsistent answer today to the same

6    question.  What you're trying to do is introduce the fact that

7    the grand jury made this inquiry, and that's not proper

8    impeachment.  That's not proper impeachment.  The grand jury's

9    inquiry is not -- you don't impeach that way.  The only way you

10   can impeach him is if he tells you something different to the

11   questions you ask him, if he advised him of the law that

12   applies, and he says, no, and that's consistent with what he

13   said then.  That's the end of it.

14          MR. RICHEY:  Okay.  I'll -- I'll rephrase it.

15          THE COURT:  It's -- I mean, all examination is

16   important, but it's certainly something that we need to be

17   careful about when we're dealing with grand jury testimony, and

18   it doesn't just get admitted into court unless it's done so for

19   a proper purpose.

20          MS. HELDMYER:  Your Honor, it appears to me that what

21   Mr. Richey is trying to do is show that the grand jury had some

22   doubt or had some problem or that the grand jury did not get

23   properly advised of the law or that they had some issue with

24   the law that was not addressed.  It was not this witness'

25   responsibility to address those legal issues to the grand jury.

9:20AM   1   I can represent to the Court that there were no issues

2   unresolved at the time this grand jury indicted this case.

3   Even if there were, it's not proper use.  It would be a motion

4   to dismiss, at best.  It would not be proper cross-examination

5   of this witness.

6              THE COURT:  No, it's not, and I agree, and we're not

7   going to proceed down this path.  Again, this testimony can be

8   used for impeachment purposes only.

9              MR. RICHEY:  Okay.

10             THE COURT:  Not any others.

11             (Bench conference concluded.)

12             THE COURT:  All right.  Mr. Richey.

13   BY MR. RICHEY:

14   Q.  Agent Schneider, you've heard testimony -- you've seen the

15   evidence that Mr. Hovind believed that he had a charitable

16   exemption under the Internal Revenue Code; is that correct?

17   A.  He believed he was a church, is his own statement.

18   Q.  Didn't you testify that he refused to be recognized as a

19   charity?

20   A.  He refused to file the paperwork and apply for charitable

21   recognition, yes, sir.

22   Q.  Well, that's not what you said, though, is it?  I mean,

23   didn't you say -- well, let me rephrase that and see if I can

24   come at it differently.

25       You don't know what particular section in the Internal

1    Revenue Code imposes the tax on Mr. Hovind, do you?

2              MS. HELDMYER:  Objection, Your Honor.

3              THE COURT:  Sustained.

4    BY MR. RICHEY:

5    Q.  But you had determined that these were businesses, correct?

6    A.  At the time I viewed them as businesses, yes, sir.

7    Q.  In fact, you called them a creationist-themed business,

8    right?

9    A.  Yes, sir.

10   Q.  And then you said, Mr. Hovind has adamantly refused to be

11   recognized as a charity.  Didn't you say that?

12   A.  Yes, sir.

13   Q.  And that he used these creationist-themed businesses to

14   avoid being taxed; isn't that correct?

15             MS. HELDMYER:  Objection, Your Honor, improper

16   impeachment.

17             THE COURT:  Sustained.

18   BY MR. RICHEY:

19   Q.  You also testified about how the IRS determines if an

20   organization is a church; isn't that true?

21             MS. HELDMYER:  Objection, unless we know what

22   testimony he's referring to.

23             THE COURT:  All right.  What testimony are you

24   referring to?

25             MR. RICHEY:  Well, there's been quite a bit of -- I'll

9:24AM  1  rephrase it.

2          THE COURT:  All right.

3  BY MR. RICHEY:

4  Q.  You've heard during the course of this trial testimony, in

5  fact, you determined that -- I believe you just said that

6  Mr. Hovind believed that he was a church, that CSE was a

7  church, correct?

8  A.  Yes, sir.

9  Q.  Okay.  But you don't believe that, do you?

10  A.  No, sir.

11  Q.  Okay.  And isn't it true that the IRS has guidelines

12  determining what a church is and what it isn't?

13          MS. HELDMYER:  Objection, beyond the scope, and

14  irrelevant, Your Honor.

15          THE COURT:  All right.  Overruled.  I'll allow him to

16  answer if he can.

17          THE WITNESS:  The IRS has guidelines, general

18  guidelines, of indicators that might in part identify whether

19  an organization for IRS purposes would be considered a church.

20  BY MR. RICHEY:

21  Q.  That's not exactly what your testimony was, was it?  Let me

22  show you this that's on page 10 and see if this refreshes your

23  memory.

24  A.  That looks like the same thing I just said, Mr. Richey.

25  Q.  Okay.  Didn't you say that a church is one that the IRS

9:25AM

1  generally has general guidelines that would let you know it's a

2  church?

3  A.  Sir, it's a poorly worded sentence on my part to the grand

4  jury that still relayed exactly what I just told you, Mr.

5  Richey.

6  Q.  Okay.

7  A.  I'm not always perfectly eloquent.

8  Q.  But you would agree with your testimony before the grand

9  jury then that there are IRS guidelines that let you know if

10  it's a church or not?

11  A.  Like I just said, Mr. Richey, there are general guidelines

12  just like I told the grand jury that allows the IRS to

13  determine for tax purposes if an organization would generally

14  meet the definition of what a church would be.

15  Q.  And so you used those guidelines and you made a

16  determination regarding CSE, that it was not a church; is that

17  correct?

18  A.  Sir, I made no determination.  I formed my own opinion.

19  Q.  And did you send Mr. Hovind a copy of your opinion letting

20  him know that you had made this opinion that CSE was not a

21  church?

22  A.  No, sir.

23  Q.  But you did in fact testify to the grand jury that it was

24  not a church, didn't you?

25  A.  Yes, sir.  I testified that I didn't believe that there was

9:27AM
1    a church located there, just like we've heard other witnesses

2    say the same thing.

3    Q.  Right, because in your belief it was a creationist-themed

4    business?

5    A.  That's how I defined it at the time, yes, sir.

6           MR. RICHEY:  Your Honor, I have no further questions.

7           THE COURT:  Thank you.

8           Ms. Heldmyer.

9           MS. HELDMYER:  Thank you, Your Honor.

10                        REDIRECT EXAMINATION

11   BY MS. HELDMYER:

12   Q.  Hello, Agent Schneider.

13   A.  Good morning.

14   Q.  Let me begin with the last subject matter first.

15   Mr. Richey asked you about the guidelines to determine

16   according to the IRS what is a recognized true church that

17   would be eligible for an exemption.  First of all, what kind of

18   exemption are we talking about?

19   A.  We're talking about exemption as recognized from income

20   tax, that when it comes to churches, churches can receive money

21   from multiple sources and that money is not income to the

22   church.  It's like a business receives income, they have to pay

23   tax on that income, generally.  A church does not.  So when I

24   was speaking in those terms, it was referring to income tax.

25   Q.  Does that have any impact, whatsoever, on employment taxes

9:28AM 1    and withholding?

2    A.  Not at all.

3    Q.  The types of things that the IRS takes into consideration

4    to determine whether there is a church are what, what types of

5    things?

6    A.  My understanding is generally they look for it as an order

7    of worship.  Is there ordained ministers?  Is there an

8    ordination process?  Is there a process for training

9    individuals for ordination.  Are there -- is there a hiearchy?

10   Is there control?  Is there a governing body?  These are just

11   some of the things that come to mind as general indicators that

12   it may be a church.  And as you know, I didn't mention

13   building -- or structure, that's not part of the things that

14   you look at, but the IRS has approximately 12 different

15   indicators of what may lead one to believe that something is

16   operating as an actual church.

17   Q.  Were those the types of factors that you took into

18   consideration when you testified before the grand jury that you

19   did not believe that CSE was a church?

20   A.  Yes, ma'am.

21   Q.  Mr. Richey also asked you about some questions that were

22   posed by the grand jury with regard to some request that they

23   had.  Was that your responsibility to make sure that the grand

24   jury had all the information that it needed on the law and the

25   Internal Revenue Code?

9:30AM 1   A.  No, ma'am.  I'm not a lawyer.

2   Q.  And to your knowledge, this grand jury testimony that you

3   were referencing here with Mr. Richey is dated April 20, 2005,

4   if it wasn't on the record already.  Were there subsequent

5   appearances and testimony that was presented to this same grand

6   jury by yourself or by other witnesses?

7   A.  Yes, ma'am.

8   Q.  And an explanation of the law?

9   A.  Yes.

10         MR. RICHEY:  Objection, Your Honor, calls for

11  speculation of a witness, who is not present.

12         THE COURT:  Sustained.

13  BY MS. HELDMYER:

14  Q.  All right.  Now, you were also asked by Mr. Barringer about

15  the structure of CSE.  He asked you a few questions, I believe

16  Mr. Richey did, too, about the time periods, Mooneyhan, Pastor

17  Mooneyhan and his Faith Baptist Fellowship to Glen Stoll.  And

18  I think you testified that to the best of your knowledge it was

19  somewhere around 2003 that Mr. Stoll stepped in; is that

20  correct?

21  A.  Yes, ma'am.

22  Q.  You were asked by Mr. Barringer some questions about the

23  unincorporated business trusts and the corporation soles and

24  the trusts that were set up by Mr. Stoll.  Do you have any

25  knowledge as to whether or not those structures would have any

9:31AM 1  impact on the subject matter of this trial; that is,

2  withholding of employment taxes?

3  A.  Absolutely none.

4  Q.  Now, let me go way back to Mr. Richey's inquiry of you as

5  to your authority to issue summonses.  I believe there were

6  some questions about some references to some documents and some

7  questions as to whether or not there was a criminal

8  investigation versus a civil investigation going on when you

9  issued the first summons to Mr. Hovind.  Can you explain, to

10  the best of your knowledge, what your authority was to issue

11  the summons to Mr. Hovind's entities before the service of the

12  search warrant?

13  A.  Well, it derives itself from Title 26, Section 7602, as it

14  listed in the summons and Mr. Richey showed up on the screen,

15  it comes down through a delegation order from the Secretary of

16  the Treasury, the commissioner of the IRS, and it's further

17  delegated down to the level that the special agent in our

18  Internal Revenue manual is authorized to issue summonses to

19  retrieve records in criminal investigations.  So specifically,

20  we are authorized, and that is one of the primary tools that we

21  use to obtain records, specifically in an administrative

22  investigation, an investigation done prior to the grand jury

23  becoming involved.

24  Q.  You had referenced the fact that you showed Mr. Hovind your

25  credentials at some point in time.  When was that, the first

9:33AM 1  time?

2  A.  The first time he came in, which was -- I believe it was

3  sometime after the first summons was issued.  So it would have

4  been July 2002, most likely.

5  Q.  Do your credentials have any information on them that could

6  have been read by Mr. Hovind, had he chosen to, with regard to

7  your authority to issue summonses?

8  A.  Yes, ma'am, specifically, it does.

9  Q.  Do you have your credentials with you?

10  A.  Always, ma'am.

11  Q.  Would you pull them out for me, please?

12  A.  Yes, ma'am.

13  Q.  Would you read the portion of your credentials that

14  indicate to Mr. Hovind that you read them what your authority

15  was to issue summonses and warrants?

16  A.  Certainly, ma'am.  It actually has here --

17         THE WITNESS:  Can I turn around to the jury to show

18  the jury just generally what the credentials look like?

19         THE COURT:  Can you do what?

20         THE WITNESS:  Can I turn this toward the jury?

21         THE COURT:  Yes.

22         THE WITNESS:  This is what I'm reading from right

23  here.  The top part has my title.  It says Scott M. Schneider,

24  and it says, this is to certify Scott M. Schneider, whose

25  signature and picture appear, is duly commissioned as a special

9:34AM   1   agent.  And then what I'm going to read you right below here

2   where it has my picture, and then it's signed by myself and the

3   chief of criminal investigation.  And it says, and has

4   authority to perform duties --

5           MR. RICHEY:  Your Honor, I'm going to object to

6   reading a document that's not in evidence.

7           THE COURT:  Sustained.

8   BY MS. HELDMYER:

9   Q.  All right.  The document that you're referring to, is this

10   the document that you referred -- that you allowed Mr. Hovind

11   to look at when you approached him?

12   A.  Yes, ma'am, it is.

13   Q.  All right.  Can you paraphrase for us the information that

14   would have been provided by Mr. Hovind regarding summonses and

15   search warrants?

16   A.  Certainly.  What it says in there is that --

17           MR. RICHEY:  Objection, Your Honor.

18           MS. HELDMYER:  He's not reading from the document,

19   Your Honor.

20           THE COURT:  Approach the bench.

21           (At the bench:

22           THE COURT:  What's the objection?

23           MR. RICHEY:  If she wants him to paraphrase and

24   testify as to what's on the document, then the document should

25   be admitted into evidence, or at least a copy.

9:35AM 1         MS. HELDMYER:  I'd be happy, Your Honor, to make a

2  copy and offer it into evidence.

3         MR. RICHEY:  I think she's also opened further doors

4  for recross.  She's gone much more in detail than what's in

5  cross.

6         THE COURT:  I disagree.  You certainly opened this

7  door on redirect about his credentials and satisfied your

8  client as far as his authority.

9         MR. RICHEY:  Then admitted more evidence and more

10  documents.

11         THE COURT:  You're objecting to how she was trying to

12  do it without trying to admit the evidence.  This is something

13  you're forcing the evidence to do.

14         MR. RICHEY:  That's true, but those are the Rules of

15  Evidence.

16         THE COURT:  They are.  All right.  You can make a copy

17  of it.

18         MS. HELDMYER:  We can do it on a break.

19         THE COURT:  If we could do that on a break.

20         MS. HELDMYER:  We'll assign a number and --

21         MR. RICHEY:  If it's going to be admitted, I have no

22  objection to using it at this time.

23         THE COURT:  Well, how do you want to proceed?  It

24  doesn't matter to me.  You can proceed now or you can wait

25  until you have an exhibit.

9:36AM 1           MS. HELDMYER:  I would rather have him read it.  I can

2    actually get a number.  We can assign the next number down and

3    say we'll submit a copy.

4           THE COURT:  All right.

5           (Bench conference concluded.)

6           THE COURT:  Just one moment, Ms. Heldmyer.

7           Ladies and gentlemen, the agent's credentials, we're

8    going to make a copy of those on the break.  The government has

9    sought to introduce the credentials or a copy of that into

10   evidence, and the number will be. . .

11          MS. HELDMYER:  OBS-124.

12          THE COURT:  OBS?

13          MS. HELDMYER:  124.

14          THE COURT:  124.  It will be admitted into evidence as

15   soon as the exhibit is actually in existence.  However, I do

16   want to caution you at this time that you should not consider

17   the exhibit for the truth of the matters asserted.  They are in

18   the exhibit.  You may, however, consider the exhibit as to the

19   effect that it had on Mr. Hovind when it was shown to him by

20   the agent.

21          All right.  Okay.  You may proceed.

22          MS. HELDMYER:  Thank you, Your Honor.

23   BY MS. HELDMYER:

24   Q.  All right.  Special Agent Schneider, I believe now you can

25   read your credentials for the jury.

9:38AM

1   A.   Would you like to display them?

2   Q.   No.  Just go ahead and read them and we'll get a copy of

3   them made during the break.

4   A.   Okay.  It says, this is to certify that Scott M. Schneider,

5   whose signature and picture appear below, is duly commissioned

6   as a special agent and has authority to perform all duties

7   conferred upon such officers under all laws and regulations

8   administered by the Internal Revenue Service, including the

9   authority to investigate, execute, and serve search warrants

10  and arrest warrants, serve subpoenas and summonses, make

11  arrests without warrant, carry firearms, make seizures of

12  property subject to forfeiture, and to require and receive

13  information as to all matters relating to such laws and

14  regulations by the authority of the commissioner of the

15  Internal Revenue.

16  Q.   And it's signed by?

17  A.   It's signed by myself and the chief of criminal

18  investigation.

19  Q.   All right.  Thank you.  Would those have been the

20  credentials that Mr. Hovind had taken a look at at the time of

21  the search warrant as well?

22          MR. RICHEY:  Objection, Your Honor, leading.

23          THE COURT:  Sustained.

24  BY MS. HELDMYER:

25  Q.   Did you show those credentials to him when you served the

9:39AM 1    search warrant?

2    A.  Yes.  Or actually -- let me correct myself.  I showed those

3    credentials to him, not at the time of the search warrant, at

4    the time that he appeared to the initial time I met with him,

5    which was July 2002 after the summonses.  He came, and I gave

6    him an opportunity to see those credentials at that time.

7    Q.  All right.  Let me ask you a question about OBS-73-B, which

8    is the complaint for preliminary restraining order and

9    temporary injunction filed by Mr. Hovind in 2002 with regard to

10   the summons that we were just referring to.  Connected, as you

11   have been shown, connected with this document is a copy of a

12   notice that was posted that you were asked questions about by

13   Mr. Richey with regard to where this was and whether you had

14   seen it when you went in; is that correct?

15   A.  Yes, ma'am.

16            MR. RICHEY:  Can I have an exhibit number?

17            MS. HELDMYER:  This is OBS-73-B.

18   BY MS. HELDMYER:

19   Q.  This was provided to you in what form, this particular

20   document?

21   A.  This particular document was attached to the lawsuit

22   requesting a permanent injunction.

23   Q.  Does that appear to be a copy of what you saw when you went

24   onto the premises?

25   A.  As best I could tell, I had no reason to believe otherwise.

9:41AM

1    Q.  Would you read that for me, please?

2    A.  Yes, ma'am.  No weapons of any kind may be brought on this

3    property.  Small children live here, and for their protection,

4    this prohibition is strictly enforced.

5    Q.  Now, did you see anything when you were serving the search

6    warrant that was contrary to this representation by Mr. Hovind?

7    A.  Yes, ma'am.

8    Q.  What did you see?

9    A.  Numerous weapons in multiple locations in or around the

10   property.

11   Q.  Like what we saw in Government's Exhibit OBS-120-E, which

12   is the photograph of the weapons?

13   A.  Yes, ma'am.

14   Q.  Did that fact, the fact that he posted this notice about

15   weapons, yet have weapons himself have impact upon any of the

16   conclusions that you drew that you testified about on

17   cross-examination regarding Mr. Hovind's sincerity about his

18   beliefs?

19   A.  Yes, ma'am.  It was just another example that I had to show

20   that everything he did specifically with the attempt to stop

21   law enforcement from doing their job was an attempt to keep him

22   from being investigated.  I mean, he did things for his own

23   personal gain.

24   Q.  You were questioned extensively by Mr. Richey about

25   Mr. Hovind's reasons for working, and I believe specifically

9:42AM 1  Mr. Richey had you read a document that indicated, I think it

2  was PR-4, that indicated that he was working for the Lord.  Do

3  you remember that?

4  A.  Yes, ma'am.

5  Q.  Did the evidence that you found during the course of your

6  investigation find that there were any other reasons that

7  Mr. Hovind may have been working?

8  A.  Well --

9  Q.  Let me be more specific.

10  A.  Yes, ma'am.

11  Q.  Did you find that Mr. Hovind gained materially by his work?

12  A.  Yes, ma'am.  Yes, ma'am.

13  Q.  In what ways?

14  A.  Well, as we've seen some of the other checks, I know that

15  he was able to gain in one way by -- I mean, he provided his

16  children with education.  He paid for his living expenses.  So

17  basically, he had benefit of -- he had better workout equipment

18  than I've ever had.  I mean, generally, he had items that most

19  households are able to afford through the fact that they are

20  working for a living.

21  Q.  You were asked extensively, questions extensively about

22  OBS-44 and the other documents that were provided to the grand

23  jury by Mr. Hovind, and I believe Mr. Richey read extensively

24  from the affidavit that Mr. Hovind had provided to the grand

25  jury; is that correct?

9:44AM  1    A.   Yes, ma'am.

2    Q.   And you had testified, I believe, as you were reading it,

3    that this was in fact information that was provided by

4    Mr. Hovind --

5             MR. RICHEY:   Objection, leading question.

6             THE COURT:   Sustained.

7    BY MS. HELDMYER:

8    Q.   Was this information that was provided by Mr. Hovind in

9    Mr. Hovind's words?

10   A.   Yes, ma'am.

11   Q.   Did you find it to be completely truthful?

12   A.   No, ma'am.

13             MR. RICHEY:   Objection, calls for speculation.

14             THE COURT:   Overruled.

15             THE WITNESS:   No, ma'am.

16   BY MS. HELDMYER:

17   Q.   This one, this OBS-44, is the one that was dated May 16,

18   2005.  Now, in your capacity as the case agent, would you have

19   any information regarding whether or not the grand jury

20   actually saw this document?

21   A.   Yes, ma'am.

22   Q.   What would have been the source of your information?

23   A.   Well, it would have been through my -- what I was told by

24   yourself and other members of your office.

25   Q.   Without telling anyone what was told to you with regard to

9:45AM 1    whether or not this was provided to the grand jury, did you

2    feel it necessary to take any action with regard to these

3    affidavits after you were told whatever it was that you were

4    told, personally take any action with regard to these

5    documents?

6    A.  No, ma'am.

7    Q.  All right.  The affidavit that begins by saying an

8    affidavit of Dr. Kent E. Hovind, did you find him to be

9    properly using the term "Dr."?

10   A.  No, ma'am.

11   Q.  Did you find his versions of the events surrounding the

12   search warrant to be accurate?

13   A.  No, ma'am.

14   Q.  And let me ask you about -- on page 5 of this affidavit, I

15   think Mr. Richey asked you some questions about Mr. Hovind

16   saying that he had been harassed by the IRS.  Do you see that?

17   A.  Yes, ma'am.

18   Q.  Were you harassing Mr. Hovind?

19   A.  Absolutely not.

20   Q.  Was there something that Mr. Hovind could have done to stop

21   the contacts that the IRS was trying to make with him during

22   this period of time?

23   A.  Yes, ma'am.

24   Q.  What was that?

25   A.  Well, Number One, he could have provided records, and

9:47AM 1  Number Two, he could have filed his income tax returns and his

2  payroll tax returns.

3  Q.  And had he done that and paid his taxes, would you have

4  stopped making contact with him?

5  A.  Absolutely.

6  Q.  You were asked a lot of questions, again, about whether you

7  thought this was a church or not.  And again, does that have

8  any bearing on why we're here; that is, the charges involving

9  employment tax and failure to collect and pay over employment

10  taxes?

11  A.  The fact that he claimed to be a church, even if he was, it

12  would have absolutely no bearing on employment taxes.

13  Q.  Mr. Richey asked you if you had any information regarding

14  some of the individuals that Mr. Hovind had claimed to contact,

15  and I believe that you read off a few names, including John

16  Schlobach and Mr. Ortiz, a Guy Curtis.  I don't know if you

17  mentioned any other ones.  Those are the names I wrote down.

18  Are those names that you are familiar with?

19  A.  Yes, ma'am, they are.

20  Q.  Are any of those people local here in the community that

21  Mr. Hovind had made contact with?

22  A.  None of them are.

23  Q.  Mr. Schlobach, I believe you testified as to him.  What is

24  your knowledge Mr. Schlobach?

25  A.  Mr. Schlobach had been banned as an enrolled agent in front

9:48AM  1   of the IRS.  He's no longer allowed to practice in front of the

2   IRS, and he's located up in Washington State.  And I don't know

3   the specifics of the banning, but that's his current situation.

4   I believe that people have been looking for him in connection

5   to other --

6            MR. RICHEY:  Objection, Your Honor, speculating.

7            THE COURT:  Sustained.

8   BY MS. HELDMYER:

9   Q.  What about Mr. Ortiz?  Do you know who he is?

10  A.  Yes, ma'am, if it's the one I believe that is located in

11  Hawaii.  There is Guy Curtis and then there is Mr. Ortiz.

12  Q.  And do you know of any action that has been taken

13  against --

14           MR. RICHEY:  Objection, Your Honor, relevance to this

15  case.

16           THE COURT:  Overruled.

17  BY MS. HELDMYER:

18  Q.  Do you know of any action that's been taken against

19  Mr. Ortiz?

20  A.  Yes, ma'am.  I believe that Mr. Ortiz has been indicted and

21  convicted, and I don't know if he's been sentenced, but as a

22  result of his participation in preparation of letters that

23  have -- that people have been using to create a false reliance

24  on professional advice and protection of them from being

25  prosecuted for tax crimes.

9:50AM

1   Q.  Let me show you something that might refresh your

2   recollection.  It's not yet been admitted into evidence.  Take

3   a look at that and let me flip the page for you.  Do you see

4   that?

5   A.  Yes, ma'am.

6   Q.  Does that refresh your recollection as to the fate of

7   Mr. Ortiz?

8             MR. RICHEY:  Your Honor, this document number?

9             MS. HELDMYER:  It's not admitted, but I have it marked

10   as PR-31-A.

11   BY MS. HELDMYER:

12   Q.  Does that refresh your recollection?

13   A.  Yes, ma'am.

14   Q.  What happened with Mr. Ortiz?

15   A.  He was sentenced to three years in prison as a result of

16   his participation in that conspiracy that I've just described.

17             MR. RICHEY:  Your Honor, can we have a time frame on

18   this?

19             MS. HELDMYER:  That was my next question, Your Honor.

20   BY MS. HELDMYER:

21   Q.  Do you know when that was?

22   A.  I'd have to refresh my memory again, ma'am.  Yes, ma'am.

23   In response to your question of the time frame, he was

24   convicted in 2005 is when sentence was imposed.

25   Q.  And indicted when?

9:51AM 1   A.  He was indicted in 2002, in July of 2002, approximately a

2   week before we -- the first lawsuit was filed in this court.

3   Q.  I believe that you had testified about Mr. Stoll as having

4   been enjoined; is that correct?

5   A.  Yes, ma'am.

6   Q.  Do you recall when -- what court and when Mr. Stoll was

7   enjoined from the types of activities that he was involved with

8   here with Mr. Hovind?

9   A.  As I recall, ma'am, it was in the State of Washington.  I

10  don't recall expressly what district, but it was in the State

11  of Washington, but I believe it was approximately --

12  Q.  Let me show you something that might refresh your

13  recollection and see if this does.  This is OBS-72-B.  Does

14  that refresh your recollection as to what court and when?

15  A.  Yes, ma'am.

16  Q.  What court was it?

17  A.  It was the Western District of Washington, federal court in

18  Seattle, and it was in June of 2000 -- 2005, 2005, I believe.

19  Q.  Let me show you that again to refresh your recollection.

20  A.  Please, yes, June 2005.

21  Q.  That was based upon a complaint that was filed when; do you

22  recall?

23  A.  I recall it was a while before then.

24  Q.  Does that refresh your recollection?  Oh, I'm sorry.  I got

25  you the wrong document.

9:52AM  1    A.  No, ma'am.

2    Q.  I'm sorry.  I'm not seeing the citation.  Let me take a

3    look at that without standing here and wasting everyone's time.

4        But the injunction was entered, you said, in June of 2005.

5    Would that have been preceded by some court action that would

6    have led up to this order?

7    A.  Yes, ma'am.

8    Q.  You were asked a series of questions regarding all of the

9    court filings that Mr. Hovind participated in, the motions to

10   quash and the lawsuits, et cetera?

11   A.  Yes, ma'am.

12   Q.  I believe you were asked the questions as to whether or not

13   those were legal and allowable court actions; is that correct?

14   A.  Yes, ma'am.

15   Q.  And I believe you were asked whether you felt that these

16   were legitimate court actions.  What was your testimony?

17   A.  As I recall, I testified that while the law allowed for

18   these petitions to be filed, these were done in bad faith and

19   that they were filed using arguments that the court had turned

20   down previously and that in my opinion, they were done to delay

21   and impede the investigation.

22   Q.  Did you have any other information when you formed your

23   opinion regarding whether or not Mr. Hovind's, what

24   Mr. Hovind's purpose was in continuously filing lawsuits and

25   motions to quash and FOIA requests, et cetera?

9:55AM 1    A.   At what point in time are you referring to?

2    Q.   What I'm asking for is the basis for your opinion that you

3    provided to Mr. Richey regarding whether these files were in

4    bad faith.  Did you have any information that you obtained

5    during the course of your investigation that would indicate

6    that this was some sort of tactic on Mr. Hovind's part?

7    A.   Yes, ma'am.

8    Q.   What information?

9    A.   Well, besides just the pattern itself, there is other

10   evidence that I had reviewed that indicated that he

11   specifically used the tactic to delay and that specifically his

12   things I read and other -- his own voice and other statements

13   that was in the search warrant evidence indicated that he would

14   do anything to avoid appearing in court.  Anything and

15   everything he did was to avoid confrontation and the tactic

16   used was to keep asking questions because they will never

17   bother you that way, and that was the way that you keep from

18   having the IRS continue and that they will eventually get tired

19   and give up.

20   Q.   Did you hear any testimony in this courtroom from Mr. Brian

21   Popp that would corroborate that belief?

22   A.   Yes, ma'am.

23   Q.   What did he say?

24        MR. RICHEY:  Objection, Your Honor, calls for

25   speculation.

9:56AM 1                    THE COURT:  Overruled.

2    BY MS. HELDMYER:

3    Q.  What did he say?

4    A.  I'm trying to think of his exact words so I'm as accurate

5    as possible, but as I -- I believe he generally referred to the

6    fact that --

7                    MR. RICHEY:  Objection, Your Honor, speculating.

8                    THE WITNESS:  I would have to refer to my own notes of

9    his testimony.

10   BY MS. HELDMYER:

11   Q.  Let me point you in a direction here.  Do you remember

12   Mr. Popp testifying about a conversation that he had with

13   Mr. Hovind about being on the offensive?

14   A.  Yes, ma'am.

15   Q.  Okay.  Tell me about that.

16   A.  Well, the comment that Mr. Popp made --

17                    MR. RICHEY:  I'm going to object, Your Honor.

18                    THE COURT:  Approach the bench, please.

19                    MS. HELDMYER:  Your Honor, I'll withdraw the question.

20                    THE COURT:  All right.  Thank you.

21   BY MS. HELDMYER:

22   Q.  We talked about the Stoll injunction which occurred in

23   mid-2005.  Did you have any evidence pursuant to your

24   investigation whether or not Mr. Hovind continued to invoke the

25   name of Glen Stoll after -- as part of the CSE or having

Schneider - Redirect/Ms. Heldmyer

9:58AM 1  control over CSE after the injunction was put in place in

2  Washington State?

3  A.  Yes, ma'am.

4  Q.  When was that?

5  A.  Well, on several occasions, including the letters to the

6  grand jury after that period of time as well as property

7  transfers that I believe he conducted after the time of the

8  injunction, if I recall correctly.

9  Q.  Now, just a couple more questions.  The date of the search

10  warrant was?

11  A.  April 14, 2004.

12  Q.  You testified that -- about a transaction that you later

13  learned occurred on that day?

14  A.  Yes, ma'am.

15  Q.  Okay.  By Mr. Hovind?

16  A.  Yes, ma'am.

17  Q.  And then in June you indicated that there was a levy?

18  A.  Yes, ma'am.

19  Q.  Or a jeopardy assessment and a levy?

20  A.  Yes, ma'am, approximately June 3rd of that same year, 2004.

21  Q.  Did you also, through a review of bank records, did you

22  determine that there was yet another transaction conducted by

23  Mr. Hovind shortly after the levy on the $42,000 that you

24  seized in the search warrant?

25  A.  Yes, ma'am.

9:59AM

1    Q.   Regarding Pastor Mooneyhan, you were testifying as to Faith

2    Baptist Fellowship and your reasons to believe that he did not

3    have a church.  I think Mr. Richey was asking you those

4    questions.

5    A.   Yes, ma'am.

6    Q.   Do you recall any statements that were made that you had

7    access to directly by Mr. Mooneyhan regarding whether or not

8    Mr. Mooneyhan had a church?

9    A.   Yes, ma'am, I do.

10   Q.   What were the circumstances of the statements made by

11   Mr. Mooneyhan?

12   A.   Well, Mr. Mooneyhan appeared in front of, I believe it was

13   one of the county boards here in Escambia County regarding the

14   fight over the building permit, the fact that Kent Hovind did

15   not want to be required to have a building permit to build

16   buildings on his property because he was a church.

17   Mr. Mooneyhan appeared, and during his statement to the board

18   stated, I don't have a church.  The church is over our head.

19   There is no congregation.  The world is our congregation, but

20   specifically stated that he did not have -- Faith Baptist

21   Fellowship was not a church.  It was the sort of entire world.

22   Q.   Was that in part information that you used regarding your

23   opinion that you formed of whether Faith Baptist Fellowship had

24   anything to do with running CSE?

25   A.   Yes, ma'am, in part.

10:01AM

1  Q.  Now, you were also asked by Mr. Richey a number of

2  questions about some letters that Mr. Hovind had received from

3  the IRS in indicating, asking you -- I think Mr. Richey was

4  asking you to determine whether or not any law had been cited

5  or provided to Mr. Hovind in those letters by the IRS telling

6  him he had to pay his taxes; is that correct?

7  A.  Yes, ma'am.

8  Q.  Have you seen anything else, other than those letters, have

9  you seen anything else that Mr. Hovind had in his possession

10  that in fact did cite to him, for him, provisions of the law

11  that indicated that he had a responsibility to pay taxes other

12  than what you've already testified to about the court opinions

13  calling him a taxpayer and those types of things?

14  A.  I'm not sure.  I believe the Congressional Research Service

15  information was one of those documents that might have provided

16  some additional information regarding the requirement to pay

17  taxes and specifically cited law.

18  Q.  All right.  Let me show you that.  That's OBS-17, and I'm

19  going to go to page CRS-14 of that document.  Would you please

20  read that paragraph that says federal income tax is imposed?

21  A.  Yes, ma'am.  It says the federal income tax is imposed in

22  IRC Section One on the taxable income of every individual.

23  Taxable income is defined in IRC Section 63.  Every individual

24  whose gross income exceeds specified amounts is required to

25  file an income tax return under IRC Section 6012.  Gross income

10:02AM

1   is defined in IRC Section 61.  When a return is required by the

2   IRC, Internal Revenue Code, the person required to make such

3   return is required without assessment or notice and demand of

4   the secretary to pay such tax to the Internal Revenue officer

5   with whom the return is filed under IRC Section 6151.  These

6   sections working together make an individual liable for income

7   taxes.

8   Q.  What are these, Special Agent Schneider, references to IRC

9   sections?

10  A.  These are all of the law sections of the Internal Revenue

11  Code that cite the legal requirement to file income taxes.

12  Q.  The way that this document is put together, it has a series

13  of footnotes all the way through it, does it not?

14  A.  Yes, ma'am, citing law as well as substantive case law.

15  Q.  So here we've got two more IRC sections cited, correct?

16  A.  Yes, ma'am.

17  Q.  And that pertains to -- let's see.  That's Footnote 47 and

18  Footnote 48.  So read that for me, please.

19  A.  Yes, ma'am.  The income tax law requires all taxpayers to

20  maintain such records as are deemed by the treasury department

21  through the IRS to be necessary for the determination of the

22  taxpayer's liability.  Furthermore, the IRS is authorized by

23  statute to inspect such records and to demand their

24  presentation in order to determine whether a return is correct

25  and whether a return has been filed.

10:04AM

1    Q.  Now, let's go to page 15.  Read that first section, that

2    first line right here, please.

3    A.  This summons may be enforced by the IRS by means of an

4    action brought in the United States District Court.

5    Q.  And that's a reference to Footnote 49?

6    A.  Yes, ma'am.

7    Q.  Let's slide down and see what that is.  Is that an Internal

8    Revenue Code citation dealing directly with Mr. Hovind?

9    A.  Yes, ma'am.

10   Q.  Do these footnotes on this page also provide additional

11   references to the Internal Revenue Code?

12   A.  Yes, ma'am, they do.

13   Q.  Now, in addition, we read Section 11, I believe, on direct

14   examination many days ago.  The question is asked --

15           MR. RICHEY:  Your Honor, I'm going to object.  This is

16   beyond the scope of cross.

17           THE COURT:  Overruled.

18   BY MS. HELDMYER:

19   Q.  Has the Withholding Act been repealed, and I think you've

20   already read that so we won't read that again, but we have some

21   citations and footnotes here in this paragraph about the

22   Withholding Tax Act of 1943.

23   A.  Yes, ma'am.

24   Q.  And the act did not expire but was instead repealed, and

25   previous to this repealing Withholding Tax Act, et cetera, the

Schneider - Redirect/Ms. Heldmyer

Schneider - Redirect/Ms. Heldmyer

10:06AM 1  present withholding provisions, read that for me.

2  A.  The present withholding provisions were enacted as part of

3  the Internal Revenue Act of 1954 and continued as part of the

4  Internal Revenue Code of 1986.  While they have been amended,

5  they have not been repealed.

6  Q.  All right.  We go down here to the footnotes referenced.

7  And what's referenced here in the footnotes for Mr. Hovind's

8  reference?

9  A.  What it appears to be is chapter and statute citations for

10  the congressional sessions in 1943 and 1944.

11  Q.  As well as -- it's not highlighted, but as well as?

12  A.  As well as 1954, yes, ma'am.

13  Q.  All right.  Now, just briefly skimming the rest of the

14  document, let's take a look at some more footnotes.  Do those

15  footnotes on page 18 provide Mr. Hovind with the law and with

16  treasury department orders?

17  A.  Yes, ma'am.

18  Q.  Including references to the United States Code?

19  A.  Yes, ma'am.

20  Q.  Next page.  What are these references to?

21  A.  Again, different sections of the United States Code and the

22  Internal Revenue Code.

23  Q.  Next page references to what?

24  A.  Again, congressional sessions and publications by Congress.

25  Q.  Along with?

10:07AM

1    A.  Along with case law and different sections of the United

2    States Code.

3    Q.  Is that the Supreme Court right there?

4    A.  Yes, ma'am.

5    Q.  And then on page 25, talking about, talking about filing

6    income tax returns, correct?

7    A.  Yes, ma'am.

8    Q.  And read that first paragraph for me, please.

9    A.  The penalty is $500.  It may be imposed on any individual

10   who files a document which purports to be a tax return but

11   fails to contain information from which the substantial

12   correctness of the amount of tax shown on the return can be

13   judged or contains information which on its face indicates that

14   the amount of the tax shown on the return is substantially

15   incorrect and such conduct arises from a frivolous position

16   taken by the taxpayer or a desire of the taxpayer which is

17   apparent from the face of the return to delay or impede the

18   administration of the tax laws.

19   Q.  And that's Footnote 105, and we go down to Footnote 105,

20   and what is Mr. Hovind given there?

21   A.  A section of the Internal Revenue Code.

22   Q.  And then would you read the highlighted, excuse me, read

23   the highlighted section for me, please.

24   A.  Yes, ma'am.  It should also be mentioned that the federal

25   courts may impose penalties for frivolous claims brought before

10:09AM  1    them.

2              MS. HELDMYER:  One moment, Your Honor, if I could.

3              I think that's all I have.  Thank you very much,

4    Special Agent Schneider.

5              THE WITNESS:  Can I get down now?

6              THE COURT:  You may step down.

7              Ladies and gentlemen we're going to go ahead and break

8    for our morning recess.  Before we do, I have a question to ask

9    you.  There is a witness to be called this morning, and I

10   believe her name was omitted inadvertently from the witness

11   list that I read to you during the jury selection process, and

12   I need to inquire now as to whether any of you know this

13   person, have any knowledge of her whatsoever, ever heard of

14   her, and her name is -- let me find where I wrote this down --

15             MS. HELDMYER:  Jennifer Johnson.

16             THE COURT:  -- Jennifer Johnson.

17             And she works with Regions Bank in Pensacola?

18             MS. HELDMYER:  Yes, Your Honor.

19             THE COURT:  Ms. Jennifer Johnson.

20             No.  All right.  Thank you.  We'll go ahead and recess

21   until 10:35.  You'll be excused at this time.

22             (Jury out.)

23             MS. HELDMYER:  May I approach with the exhibits, Your

24   Honor?

25             THE COURT:  Yes, please.

10:11AM 1                    Mr. Richey.

2              MR. RICHEY:  Yes, Your Honor, I would ask a couple of

3       things that came up that were not previous exhibits, OBS-124,

4       and also during redirect PR-31-A regarding Mr. Ortiz, if the

5       Court is not going to allow recross on that, that the Court at

6       least grant a limiting instruction that whatever action the IRS

7       has taken or the courts have taken regarding Mr. Stoll, Mr.

8       Ortiz, and Mr. Schlobach, that that could not be inferred or

9       used against my client.

10             THE COURT:  All right.  Well, they were not admitted.

11      The documents were not admitted.  If you wish to recross Agent

12      Schneider about his knowledge of those legal actions, you do so

13      at your peril, but I'll allow it.

14             MR. RICHEY:  Well, as long as -- if the Court will

15      issue a limiting instruction, I won't have the need.

16             THE COURT:  Any objection to a limiting instruction?

17             MS. HELDMYER:  No, Your Honor.  That information was

18      offered to show a lack of good faith, and if the Court wants to

19      apprise the jury that they can consider it only to dispute for

20      the determination of whether he was acting in good faith, I

21      have no objection to that.

22             MR. RICHEY:  And limited to the time frames of the

23      conviction, there was reference to the indictment being brought

24      in 2002.  However, as we're all well aware, it's not until a

25      conviction that the person charged with the crime is presumed

10:13AM

1    innocent until proven guilty.  So that conviction didn't come

2    down until 2005.  The testimony that he was indicted in 2002

3    would also leave in the jury's mind the impression that as of

4    2002, there was an issue there.  So a limiting instruction

5    should also refer to specifically, it can only be considered

6    after the time frame of 2005 that were shown.

7           THE COURT:  I'm not sure I understand the objection or

8    the point that you raise here.

9           MR. RICHEY:  That the limiting instruction, it

10   should -- it can only go to his good faith belief or

11   understanding as of the time that the Court impose the

12   injunction on Mr. Stoll, he was made aware of it, if he ever

13   was, and the same with Mr. Ortiz.  He was not convicted until

14   2005.  Although the testimony brought out that he was indicted

15   in 2002, that could raise in the jury's mind that as to 2002

16   then, Mr. Hovind should have known there was a problem with

17   Mr. Ortiz.  And so the instruction should be that the jury can

18   only use that as of the dates that the Court imposes.

19          THE COURT:  All right.  Well, Mr. Richey, I'm going to

20   allow you to propose the limiting instruction that you would

21   like the Court to give.  Please provide that to Ms. Heldmyer

22   for her review, and then I'll meet back with both of you about

23   that.  But you propose what you think is appropriate, and I'll

24   consider it.

25          All right.  Anything else?

10:14AM
1          MR. BARRINGER:  No, Your Honor.

2          THE COURT:  We'll be in recess until 10:30.

3               JENNIFER JOHNSON, GOVERNMENT WITNESS.

4          THE WITNESS:  Yes, I do please state your full name

5    and spell your last name for the record.

6          THE WITNESS:  Jennifer Johnson, J-o-h-n-s-o-n.

7          THE COURT:  Ms. Heldmyer.

8                     DIRECT EXAMINATION

9    BY MS. HELDMYER:

10   Q.  Good morning, Ms. Johnson.

11   A.  Good morning.

12   Q.  Where do you work?

13   A.  Regions Bank.

14   Q.  Here in Pensacola?

15   A.  Yes, ma'am.

16   Q.  What branch?

17   A.  Beverly Parkway.

18   Q.  What do you do for a living there?

19   A.  I'm the branch manager.

20   Q.  What kind of duties do you have?

21   A.  The kind of duties that I have, I maintain the daily

22   operations of the bank.  I supervise the tellers, the customer

23   service representative, and conduct transactions with customers

24   as necessary.

25   Q.  Are you considered one of the custodians of records of

Johnson - Direct

1    Regions Bank?

2    A.   Yes, I am.

3    Q.   Have you had the opportunity to look at some documents that

4    we provided to you to determine whether or not they are true

5    copies of Regions Bank documents?

6    A.   Yes, I have.

7    Q.   Let me just show you -- you've seen them before, but let me

8    just show you here on your screen, STR-155-C right there.  Do

9    you see those?

10   A.   Yes, I do.

11   Q.   A series of documents, are those Regions Bank records?

12   A.   Yes, they are.

13            MS. HELDMYER:  The united States would offer STR-155-C

14   into evidence.

15            THE COURT:  Any objections?

16            MR. RICHEY:  No, Your Honor.

17            MR. BARRINGER:  No, Your Honor.

18            THE COURT:  STR-155-C will be admitted.

19   BY MS. HELDMYER:

20   Q.   Let's go through these documents then.  Are you familiar

21   with these types of documents that you can explain them to us?

22   A.   Yes, I am.

23   Q.   What are we looking at here on the first page of 155-C?

24   A.   Okay.  This document is what we call our checking debit,

25   and the date is April 14, 2004.  Sometimes tellers will use

Johnson - Direct

10:38AM

1    these when customers come in to conduct business.  They will

2    write them out, whether it be for cash or for this purpose, an

3    official check.  This looks like a debit used to purchase an

4    official check for $35,000.

5    Q.  And the account number would be listed right there?

6    A.  That is correct.

7    Q.  And then the name up here, what will that reflect?

8    A.  That is the name on the account.

9    Q.  What will that reflect?

10   A.  The signature of the person that was conducting that

11   transaction.

12   Q.  Okay.  I'm going to go to the second page of this document,

13   which is -- is that a copy of the same transaction on the top

14   there?

15   A.  Yes, it is.

16   Q.  Okay.  And then we have on this page, we also have the

17   backside of this document; is that correct?

18   A.  Yes, it is.

19   Q.  Now, I know this is going to be hard for you to read, but

20   what can you tell us about this particular check by looking at

21   the back?

22   A.  Okay.  I can tell you that this item was negotiated at our

23   branch on Garden Street on April 14, 2004 at 11:03, and this

24   was used to purchase an official check.

25   Q.  The 11:03?

Johnson - Direct

1    A.   I'm sorry.   That was 11:03 a.m.

2    Q.   Let me turn that around because you can probably see it

3    better if it's not up side down?

4    A.   That's correct.

5    Q.   Okay.   For $35,000.

6         The next page of this is a copy that says Regions Bank, it

7    says send to proof.   Let me back that out so you can see it.

8    What is this?

9    A.   Okay.   That is our proof copy of the official check that

10   was used to run with that checking debit.

11   Q.   Was that the official check that was purchased with the

12   checking debit that we just looked at?

13   A.   That is correct.

14   Q.   And it says pay to the order of.   Can you read that for me?

15   A.   Yes, I can.   Pay to the order of Creation Science

16   Evangelism.

17   Q.   The account number here would be whose account?

18   A.   That account number is our official check account number.

19   Q.   Posing date, it looks like it's divided up by first of the

20   year and then the month and then the day?

21   A.   That is correct.

22   Q.   So this would have been on what day?

23   A.   April 14, 2004.

24   Q.   Bottom of this, what can you tell us by looking at the

25   backside of this send to proof, which is the bottom part of

Johnson - Direct

1   this page?

2   A.   I can tell you that that was run through our proof

3   department at Regions Bank in Birmingham, Alabama on April 13,

4   2004.

5   Q.   What is your proof department?

6   A.   Okay.  Our proof department is similar to like a back

7   office function.  Anytime our branches conduct transactions,

8   any of the work that's received from the customers or by the

9   tellers is sent to this department to process.

10  Q.   Is that standard operating procedure?

11  A.   Yes, it is.

12  Q.   Okay.  The next page of this exhibit is this document.

13  What are we looking at here?

14  A.   Okay.  We're looking at a Regions Bank official check

15  issued on April 14, 2004 in the amount of $35,000.

16  Q.   What is this a copy of with regard to the other documents

17  that we just looked at?

18  A.   That is a copy of the official check that was given to the

19  customer.

20  Q.   And it's got your name up here as requester.  You're the

21  one that pulled this on behalf of the bank?

22  A.   That is correct.

23  Q.   And there is a name of Becky Meredith down here.  Who is

24  she?

25  A.   She is another branch manager.

Johnson - Direct

10:42AM

1   Q.  Tell me about official checks.  What are they alikened to?

2   Is it more like a regular check you write off your account or

3   is it more like cash, or what is it?

4   A.  Well, a lot of companies and so forth, they will request

5   official checks.  This is people that accept these official

6   checks value them as a little bit more important than someone

7   writing a personal check.  This is guaranteed funds by Regions

8   Bank.

9   Q.  The bottom here is the backside of the official check after

10  it came back to the bank; is that correct?

11  A.  That is correct.

12  Q.  Now, I'm going to flip it around.  It appears to have a

13  signature on it.  Can you tell whose signature that is?

14  A.  By looking at that, it looks like the signature of Mr. Kent

15  Hovind.

16  Q.  Okay.  I'll flip it back here.  And what can you tell us by

17  looking at the backside of this check as it was returned to

18  Regions Bank?

19  A.  Okay.  In looking at the back of this check, it looks like

20  it was negotiated through a company called LPSI out of

21  Louisville, Kentucky on April 19, 2004.

22  Q.  And then right here, what does that stand for?

23  A.  That would be when it went back through our proof

24  department.

25  Q.  The next page of this exhibit is another checking debit

10:43AM

1   dated the same day.  What's happening here?

2   A.  Okay.  This checking debit is completed in a branch, and

3   this was for cash for $35,000 on April 14, 2004.

4   Q.  So is that the same cash that was used to purchase the

5   cashier's check or is that different cash?

6   A.  That is different cash.

7   Q.  So what can you tell us about what happened when the

8   customer came into the bank that day?  What did he do?

9   A.  In looking at this document?

10  Q.  Yes.

11  A.  Cash was given from the teller to the customer.

12  Q.  In addition to the cashier's check?

13  A.  That is correct.

14  Q.  The next page of that is the document with the back of it

15  as well; is that correct?

16  A.  That is correct.

17  Q.  Let me flip that around so you can see part of that.  What

18  can you tell us from looking at the backside of that check?

19  A.  I can tell you that on April 14, 2004 at 11:05, a separate

20  transaction was run for $35,000 cash, check.

21  Q.  Let me zoom in here and take a look at that time.

22  A.  I'm sorry.  That was 11:09.  Thank you for adjusting that.

23  Q.  Sometimes they are hard to read, these checks.

24      Okay.  How much did the customer walk out of the bank with

25  that day?

Johnson - Direct

10:45AM  1    A.   $35,000 in cash, and the $35,000 official check.

2    Q.   Where did that money come from?

3    A.   His account.

4    Q.   Okay.  Now, I'm going to show you what's been marked for

5    identification purposes as STR-216-C.  Have you had the

6    opportunity to review this document?

7    A.   Yes, I have.

8    Q.   Are these Regions Bank, copies of Regions Bank records?

9    A.   That is correct.

10   Q.   Regarding an account held by Creation Science Evangelism?

11   A.   That is correct.

12   Q.   The United States would offer STR-216-C into evidence?

13            THE COURT:  Any objection?

14            MR. RICHEY:  No, Your Honor.

15            MR. BARRINGER:  No, Your Honor.

16            THE COURT:  That will be admitted.

17   BY MS. HELDMYER:

18   Q.   Tell us what's happening here.  I've got the first page of

19   216-C up on the screen.

20   A.   Okay.  That is a copy of a check from Creation Science

21   Evangelism paid to the order of cash on June 8, 2004 for

22   $15,000.

23   Q.   What happened with this $15,000 cash?

24   A.   This check was cashed and cash was given to the customer.

25   Q.   The second page of this document appears to be, again, a

10:46AM

1  copy of that front page, front of the document, plus the

2  backside of the document, correct?

3  A.  That is correct.

4  Q.  I'm going to flip that backside around so you can see, and

5  this time I'll zoom in.  This one is a little harder to read,

6  but what can you glean from looking at the backside of this

7  check?

8  A.  I can tell you that on June 8, 2004 at 10:52 this check was

9  cashed at our Garden Street office for $15,000.

10  Q.  Do you know what that means there?

11  A.  That means Regions, cash check.

12  Q.  Finally, ma'am, I'm going to show you what's marked for

13  identification purposes as STR-215-C.  Have you had the

14  opportunity to review these documents?

15  A.  Yes, I have.

16  Q.  Are these also Regions Bank records?

17  A.  Yes, they are.

18       MS. HELDMYER:  The United States would offer STR-215-C

19  into evidence.

20       THE COURT:  Any objection?

21       MR. RICHEY:  No, Your Honor.

22       MR. BARRINGER:  No, Your Honor.

23       THE COURT:  That will be admitted.

24  BY MS. HELDMYER:

25  Q.  We're now looking at the front page of this document.

10:48AM 1   Would you please explain it to us?

2   A.  Yes, I will.  This check written on June 10, 2004, paid to

3   the order of cash in the amount of $15,000.

4   Q.  The second page of this appears to be the same pattern as

5   we've seen before that's the same front and it includes the

6   backside of the checks?

7   A.  That's correct.

8   Q.  Flip it around and ask you the same question, what can you

9   tell, us as you're looking at the backside of this check?

10  A.  Okay.  This one is a little bit more difficult to read.

11  However, I can make out that this was cashed on June 10th, and

12  it was cashed at Regions Bank, Beverly Parkway office, in the

13  amount of $15,000.

14  Q.  Obviously, we just looked at two different dates, June 8th

15  and June 10th.  Are those two separate transactions that

16  occurred, each for $15,000?

17  A.  That is correct.

18  Q.  Did the customer on each of those occasions leave the bank

19  with $15,000 in cash?

20  A.  That is correct.

21          MS. HELDMYER:  I have no further questions.  Thank you

22  very much, Ms. Johnson?

23          THE COURT:  Mr. Richey.

24          MR. RICHEY:  Yes, Your Honor.

25                          CROSS-EXAMINATION

1   BY MR. RICHEY:

2   Q.   Good morning, Ms. Johnson.

3   A.   Good morning.

4   Q.   My name is Allen Richey, and I represent Kent Hovind.

5   A.   Okay.

6   Q.   You're the branch manager at the bank; is that correct?

7   A.   That is correct.

8   Q.   How long have you had that position?

9   A.   I've had that position for two years.

10  Q.   Okay.  And you said that you deal with currency

11  transactions as part of what you do?

12  A.   That is correct.

13  Q.   Now, this first exhibit, STR-155-C, that was for $35,000;

14  is that correct?

15  A.   That is correct.

16  Q.   Was there any problem with this?

17  A.   No.

18  Q.   You weren't the one that actually handled this, were you?

19  A.   No, I was not.

20  Q.   In all of the documents that we saw today, did you actually

21  handle those transactions or did someone else?

22  A.   Someone else did.

23  Q.   You're the one that, I guess, when these documents were

24  requested, then, you're the one that was able obtain them?

25  A.   I obtained a copy of the official check.  The other copies

10:50AM

1   came out of our office out of Birmingham.

2   Q.  So you don't keep all these documents right there?

3   A.  No, we do not.

4   Q.  Okay.  It's your central location in Birmingham that

5   maintains all these documents?

6   A.  That is correct.

7   Q.  Do you know about the procedure about how they keep the

8   documents there?

9   A.  No, I do not.

10  Q.  Continuing in this document here, we see this official

11  check that was made.  There was no problem with this check, was

12  there?

13  A.  No, there was not.

14  Q.  Okay.  And Regions Bank, they didn't have any problem

15  issuing the check?

16  A.  No, they did not.

17  Q.  And they did not have any problem honoring the check

18  afterwards, did they?

19  A.  This check was not cashed at a Regions Bank location.

20  Q.  But after it was cashed, Regions Bank did not have any

21  problem honoring it, did they?

22  A.  That's correct.

23  Q.  And in fact, when this official check was issued, the bank

24  made sure that there was sufficient funds in the account that

25  it was pulled from in order to cover the check, correct?

10:52AM

1    A.   Yes, that is correct.

2    Q.   And let me just clarify one thing, because I believe at the

3    end of when you were looking at these particular documents, you

4    said that the money came from the customer's account.  You said

5    it came from his account.

6    A.   It came from Creation Science Evangelism's account.

7    Q.   Okay.  Thank you.

8    A.   Thank you.

9    Q.   Now, did -- I'm assuming -- you testified that not only was

10   there this official check that was made, but also $35,000 in

11   cash was issued as well, correct?

12   A.   That is correct.

13   Q.   And did Regions Bank then issue what's called a currency

14   transaction report?

15   A.   Yes, they did.

16   Q.   Did you provide copies of those as well?

17   A.   Those copies were provided.

18   Q.   And you're familiar with the currency transaction report?

19   A.   I am.

20   Q.   And which form is that?

21   A.   Okay.  The currency transaction form is when a customer

22   comes in and notes negotiate a transaction where more than

23   $10,000 is given I'm sorry it's either given or received.

24   Q.   And so one would have been issued on this one; is that

25   correct?

10:53AM 1    A.   Yes, that is correct.

2    Q.   Do you know the particular form number, the number on the

3    currency transaction form?

4    A.   No, I do not.

5    Q.   So you're not familiar enough with it to just cite it by

6    number or anything, correct?

7    A.   That is correct.

8    Q.   But you have filled them out before?

9    A.   Yes, I have.

10   Q.   And you checked and made sure that there was one that was

11   issued that was filed on this transaction?

12   A.   Yes, I did.

13   Q.   Was there only one that was issued or two?

14   A.   There was one issued.

15   Q.   And that's because of the 35,000 in cash that was given,

16   correct?

17   A.   That is correct.

18   Q.   Was one issued or -- let me rephrase that.

19        There was not one issued on the official check that was

20   made; is that correct?

21   A.   That is correct.

22   Q.   Are you familiar with suspicious transaction reports as

23   well?

24   A.   Yes, I am.

25   Q.   And was one prepared and filed on this transaction?

10:54AM
1   A.   Not to my knowledge.

2   Q.   And let me show you what you also saw as STR-216-C.   And

3   did this also come from, then, Creation Science Evangelism's

4   account?

5   A.   That is correct.

6   Q.   And was there any problem with the funds being in that

7   account?

8   A.   No, there was not.

9   Q.   There was sufficient funds to cover this check?

10  A.   Yes, sir.

11  Q.   So the bank honored it and did in fact -- I'm sorry -- did

12  in fact issue the 15,000 in cash?

13  A.   That is correct.

14  Q.   And did the bank prepare a CTR on this transaction?

15  A.   Yes, they did.

16  Q.   And do you know if the bank prepared a suspicious

17  transaction report on it?

18  A.   To my knowledge, it was not.

19  Q.   Okay.  And then Exhibit STR-215-C, again, came from

20  Creation Science Evangelism's account?

21  A.   That is correct.

22  Q.   And there was no problem with the funds being in the

23  account?

24  A.   The funds were available.

25  Q.   And the bank did issue the cash?

Johnson - Cross/Mr. Richey

10:56AM

1    A.   Yes.

2    Q.   And again, a CTR would have been prepared on this account?

3    A.   That is correct.

4    Q.   And was -- there was nothing else prepared on this, was

5    there, suspicious transaction report?

6    A.   No, there was not.

7         MR. RICHEY:  I'll pass the witness, Your Honor.

8         THE COURT:  Thank you, Mr. Barringer.

9         MR. BARRINGER:  Thank you, Your Honor.

10                    CROSS-EXAMINATION

11   BY MR. BARRINGER:

12   Q.   Good morning, Ms. Johnson.  My name is Jerry Barringer, and

13   I represent Mrs. Hovind.

14   A.   Good morning.

15   Q.   I only have one or two quick questions.  How much cash

16   would a Regions Bank branch facility have available on any one

17   day to hand out?

18   A.   Okay --

19        MS. HELDMYER:  Objection, relevance, Your Honor.

20        THE COURT:  I'll allow it.

21        THE WITNESS:  Okay.  Sir, it depends on the day.  We

22   actually, each branch ships money out during the week, one to

23   two times per week, so depending on what cash was brought into

24   the bank, a branch could have several hundred thousand dollars

25   at a time.

Johnson - Cross/Mr. Barringer

10:57AM 1  Q.  Just generally what might be a lowest number that a branch

2  might have?

3  A.  For example, Friday, for example, depending on the

4  transactions that come in, maybe 50,000.

5  Q.  Okay.  With respect to this phrase of an official check, is

6  that a service that Regions Bank provides to its customers,

7  issuing that type of check?

8  A.  Regions Bank does issue official checks, yes.

9  Q.  And you said that, if I recall correctly that the customers

10  that use these think they are better than regular checks?

11  A.  Some customers think that.  I can tell you that official

12  checks are guaranteed by the financial institution, whereas,

13  sometimes personal checks, the funds are not available.

14  Q.  Is it -- strike that.

15      We know of things like cashier's check, certified checks.

16  Is an official check like a certified check?

17  A.  Each institution calls them different things, but, yes, in

18  Regions Bank, an official check is considered certified funds.

19          MR. BARRINGER:  Okay.  That's all I have, Your Honor.

20  Thank you.

21          THE COURT:  Ms. Heldmyer.

22                    REDIRECT EXAMINATION

23  BY MS. HELDMYER:

24  Q.  Ms. Johnson, does the bank have any kind of policy as to

25  how much cash a customer can take out at any one time?

Johnson - Redirect

10:59AM 1    A.  We do not have that policy.

2              MS. HELDMYER:  Thank you.

3              I have nothing further, Your Honor.

4              THE COURT:  All right.  Ma'am, you may step down.

5              And your next witness.

6              MS. HELDMYER:  Chuck Evans.  If I may, Your Honor,

7    before Mr. Evans takes the witness stand, I have some certified

8    records that I would ask be admitted.  Actually, he can go

9    ahead and take the stand.  These are certified records and they

10   are numbered PR-50, PR-53, PR-54, and PR-55, all certifications

11   of lack of record, as we discussed previously.

12             THE COURT:  Any objection?

13             MR. RICHEY:  As to relevance, Your Honor.

14             MR. BARRINGER:  May I look at the exhibits right

15   quickly?

16             THE COURT:  Yes.

17             MS. HELDMYER:  That's what we discussed.

18             MR. RICHEY:  I withdraw my objection, Your Honor.

19             THE COURT:  All right.

20             MS. HELDMYER:  May I consult with counsel one moment?

21   That's fine, Your Honor.  We'll discuss it outside of the

22   presence of the jury, the other issue.  Thank you.

23             THE COURT:  You're not seeking to admit.

24             MS. HELDMYER:  I'm sorry.  There is no objection to

25   PR-50, 53, 54, and 55.  I have others, but we'll talk about

1   those at another time.

2           THE COURT:  So 50, 53, 54, and 55 will be admitted.

3           THE CLERK:  Do you solemnly swear that the testimony

4   that you shall give will be the truth, the whole truth and

5   nothing but the truth so help you God?

6           THE WITNESS:  I do.

7           FREDERICK CHARLES EVANS ,GOVERNMENT WITNESS.

8           THE CLERK:  Be seated.

9           Please state your full name and spell your last name

10  for the record.

11          THE WITNESS:  Frederick Charles Evans, E-V-A-N-S.

12          THE COURT:  Ms. Heldmyer.

13          MS. HELDMYER:  Thank you, Your Honor.

14                    DIRECT EXAMINATION

15  BY MS. HELDMYER:

16  Q.  All right.  Special Agent Evans, where do you work?

17  A.  I work for the Internal Revenue Service in the criminal

18  investigation division.

19  Q.  How long have you been with the Internal Revenue Service?

20  A.  Combined as a revenue agent and a criminal investigator,

21  since 1983.

22  Q.  How long have you been a criminal investigator?

23  A.  Approximately eleven-and-a-half years.

24  Q.  What is your current post of duty?

25  A.  Pensacola, Florida.

Evans - Direct

11:02AM

1   Q.  Do you work in the same office as Special Agent Schneider?

2   A.  Yes, ma'am.

3   Q.  Before that, you said you were a revenue agent?

4   A.  That's correct.

5   Q.  How long were you a revenue agent?

6   A.  Approximately 12 years.

7   Q.  And what was your pose of duty when you were a revenue

8   agent?

9   A.  Orlando, Florida.

10  Q.  What were your specific duties when you were a revenue

11  agent in Orlando?

12  A.  Conduct examinations, what we called examinations or what

13  you may consider audits, of corporations, partnerships, 1040

14  personal returns.

15  Q.  What's your educational background?

16  A.  I have an accounting degree and a systems science degree.

17  Q.  What is the last degree, systems science, what is that?

18  A.  Computers.

19  Q.  All right.  Now, during your tenure as a revenue agent and

20  a special agent, have you had an opportunity to do what's

21  called a tax computation?

22  A.  Yes, ma'am.

23  Q.  What is a tax computation?

24  A.  A tax computation, depending on whether you're talking

25  about personal income tax and employment tax, it could vary.

11:03AM

1   Q.   What do you do when you do a tax computation?

2   A.   There is a rate that has been imposed and it is computed

3   based on whether it's personal income, it would be based on an

4   individual's taxable income, or in this particular case if it's

5   in regards to payroll tax, it would be based on wages paid.

6   Q.   Where generally do you get the information that you use to

7   compute payroll taxes?

8   A.   From the employer.

9   Q.   Now, let me back you up and ask you if you got involved in

10  the investigation which eventually led to the arrest of Kent

11  and Jo Hovind?

12  A.   Yes, ma'am.

13  Q.   How did you get involved in this investigation?

14  A.   Well, aside from just being an assistant agent in our

15  office, the investigation was transferred to me, I believe, the

16  last summer, May or June of 2005.

17  Q.   For what purpose?

18  A.   As, I believe Agent Schneider testified to earlier, it was

19  because of some demands and other duties that he had been

20  assigned.

21  Q.   Eventually did you and Agent Schneider work the case

22  together?

23  A.   Yes, we did.

24  Q.   Did you participate in the execution of the search warrant

25  that Agent Schneider testified?

Evans - Direct

11:04AM

1    A.   Yes, I did.

2    Q.   What was your role in the search warrant?

3    A.   Just as an assisting agent, and as I recall, I may have

4    been the team leader for the residence.

5    Q.   At that point in time when you were there on the premises,

6    did you have any contact with Kent Hovind?

7    A.   At some point that day, yes, ma'am.

8    Q.   Did Mr. Hovind ask you to do anything?

9    A.   He asked me for my credentials.

10   Q.   Did you show him your credentials?

11   A.   Yes, ma'am.

12   Q.   We've heard about Special Agent Schneider's credentials and

13   the wording on the credentials.  Are yours similar to his?

14   A.   Yes, ma'am.  He actually took down, wrote down all the

15   serial numbers for credentials and my badge.

16   Q.   Did he write down your name as well?

17   A.   I believe so.

18   Q.   All right.  Now, subsequent to the search warrant, your

19   participation in the search warrant, did you have opportunity

20   to speak to Mr. Hovind again?

21   A.   I'm sure from time to time that day.

22   Q.   I'm sorry.  After the search warrant --

23   A.   Oh, yes, ma'am.

24   Q.   -- at some later time, did you talk to him?

25   A.   Yes, ma'am.

Evans - Direct

11:05AM

1    Q.   When approximately was that?

2    A.   I believe it was June 16, 2004.

3    Q.   Where were you?

4    A.   At our IRS office.

5    Q.   Here in Pensacola?

6    A.   Yes, ma'am.

7    Q.   Who was there in the office with you?

8    A.   It was myself and my supervisor, Andy Howard.

9    Q.   Were you expecting Mr. Hovind to show up that day?

10   A.   No, ma'am.

11   Q.   Did he have an appointment with Special Agent Schneider or

12   anyone else in that office?

13   A.   No, ma'am.

14   Q.   This was approximately two months after the service of the

15   warrant; is that correct?

16   A.   That's correct.

17   Q.   To your knowledge, did you know whether or not and

18   Mr. Hovind and Agent Schneider had any contact during that

19   two-month period?

20   A.   I don't recall specifically.

21   Q.   Okay.  Tell us what happened.

22   A.   Mr. Hovind came to our office with his son, Eric Hovind,

23   and explained to us that he wanted badge and credential numbers

24   for specific agents in our office.

25   Q.   But before you get that far, tell us -- he came to the

Evans - Direct

11:06AM

1   office -- describe the office area where he came to and where

2   you were having your conversation with him?

3   A.  We have a reception area before you actually come into our

4   office -- and that's where the conversation took place.

5   Q.  He was not in the office space where the desks and the work

6   is done?

7   A.  No, ma'am.

8   Q.  And was the door between where he was and where you were

9   locked?

10  A.  Yes.

11  Q.  Okay.  Can you see the people who come to your door from

12  inside the office?

13  A.  Yes, ma'am.  We have a camera in the reception area.

14  Q.  Did you know before you opened the door that it was

15  Mr. Hovind?

16  A.  Yes, ma'am.

17  Q.  Did you recognize him?

18  A.  Yes, ma'am.

19  Q.  And you said that your supervisor, Andy Howard, was also

20  there?

21  A.  That's correct.

22  Q.  Did he also recognize Mr. Hovind?

23  A.  Yes, ma'am.

24  Q.  So the two of you talk to Mr. Hovind together?

25  A.  Yes.

Evans - Direct

11:07AM

1   Q.  What was the purpose of both of you talking to Mr. Hovind

2   statement?

3   A.  So that there would be a witness.

4   Q.  What does that mean?

5   A.  To ensure that things weren't misconstrued at a later

6   point.

7   Q.  Okay.  After the meeting -- we're going to jump ahead for

8   just a second.  Did you jot down notes as to your meeting?

9   A.  Yes, ma'am.

10  Q.  Eventually, did you turn those into a report?

11  A.  Yes, ma'am.

12  Q.  Okay.  You said you had a conversation with them him.  Did

13  you go out in the lobby area, you and supervisory Special Agent

14  Howard?

15  A.  Yes.

16  Q.  Who spoke first; do you recall?

17  A.  I may have.  I don't recall who actually spoke first.

18  Q.  Now -- I'm sorry.  I interrupted you.

19      You said he was asking for your badge and creditial

20  numbers?

21  A.  He asked for our badge and creditial numbers specifically

22  for four agents in our office, myself, supervisor, Andy Howard

23  and Connie Burgess, and he was corrected.  There is no Connie

24  Burgess in our office -- it's Tanya Burgess -- and Scott

25  Schneider.

11:08AM

1   Q.  Did he explain why he was asking for credital numbers and

2   badges?

3   A.  Not that I recall.  In addition to that, he asked for our

4   oath of office and our job description.

5   Q.  Who responded to Mr. Hovind directly?

6   A.  In response to that, I don't recall whether it was myself

7   or my supervisor, but it was indicated to Mr. Hovind that the

8   badge and credital numbers had already been provided and

9   Mr. -- my supervisor did provide his badge and credential

10  numbers to Mr. Hovind.

11  Q.  Did you provide yours again?

12  A.  I did not.  I recalled informing Mr. Hovind that I had

13  already provided my badge and credital numbers to him during

14  the execution of the search warrant.

15  Q.  Was there any comment to Mr. Hovind about why he would need

16  to verify your employment?

17  A.  Yes.  My supervisor informed him, Mr. Hovind, something to

18  the effect that you know where these special agents work; you

19  know where our office is; you have no issue with where our

20  location is or who we work for.

21  Q.  What was Mr. Hovind's response?

22  A.  Mr. Hovind said, anyone can rent a uniform.

23  Q.  Were you wearing a uniform?

24  A.  No, ma'am.

25  Q.  Did he ask for anything else like telephone numbers?

Evans - Direct

11:10AM

1   A.   He did.  He asked for our office telephone number.

2   Q.   Was he provided your office telephone number?

3   A.   Yes, he was.

4   Q.   All right.  Were there any other statements that were made

5   by Mr. Hovind on that day before he left?

6   A.   Yes, ma'am.

7   Q.   What did he say?

8   A.   He indicated to us that he hoped that we could settle this

9   peacefully and that people across the United States were

10  praying for us, us being CI special agents, were praying for us

11  across the country.

12  Q.   Praying for you specifically?

13  A.   Yes, ma'am.

14  Q.   What did he say about that?

15  A.   That -- you know, I took it that he had given our personal

16  names out to people across the country.

17  Q.   Now, when he said, made this comment, what was the tenor,

18  what was the tone of the meeting?

19  A.   You know, to me, it was another tactic that, you know,

20  corroborates what's been said, you know, during the trial, that

21  Mr. Hovind intends to be on the offensive with regards to the

22  IRS.

23  Q.   Was he friendly and smiling while he was having these

24  conversations with you?

25  A.   It was not a friendly visit.

Evans - Direct

11:11AM

1   Q.  All right.  After he said that everyone across the country

2   was praying for you by name what did he say?

3   A.  That he hoped God did not have to step in.  And I asked

4   Mr. Hovind what did he mean by that.  And he said that he's

5   been reading the Bible, and he knows what God does to people

6   who interfere with his ministries.

7   Q.  Was there any response by you or Special Agent Howard about

8   that comment?

9   A.  Not that I recall.

10  Q.  Did you take that comment as a threat?

11  A.  Yes, ma'am.

12  Q.  Did he leave at that point?

13  A.  Yes, ma'am.

14  Q.  All right.  Did you get any, directly, any correspondence

15  from Mr. Hovind after that meeting?

16  A.  Yes, ma'am.

17  Q.  Let me show you what's been marked for identification

18  purposes as OBS-71.  Do you recognize that one-page document?

19  A.  Yes, I do.

20  Q.  Is that a letter that you received from Mr. Hovind?

21  A.  Yes, ma'am.

22  Q.  On or about August 18, 2004?

23  A.  That's correct.

24          MS. HELDMYER:  We would offer OBS-71 into evidence,

25  Your Honor.

Evans - Direct

1                    THE COURT:  Any objections?

2                    MR. RICHEY:  No, Your Honor.

3                    MR. BARRINGER:  No, Your Honor.

4                    THE COURT:  All right.  That will be admitted.

5    BY MS. HELDMYER:

6    Q.  All right.  Special Agent Evans, we're looking at something

7    called administrative notice of Kent Hovind, XX XXXXXXXX Road,

8    Pensacola, Florida, dated August 18, 2004, addressed to you.

9    Is that you Special Agent Chuck Evans?

10   A.  Yes, ma'am.

11   Q.  Oh, and when you were having your conversation with

12   Mr. Hovind, did he ask you about your name because your name is

13   Frederick?

14   A.  My name is Frederick Charles Evans.

15   Q.  Did he ask you about your name when you were talking to him

16   two months prior to this letter?

17   A.  He did.

18   Q.  What did he ask you?

19   A.  He asked myself and special agent -- supervisory Special

20   Agent Andy Howard if those were our real names or business

21   names.

22   Q.  When you provided your names?

23   A.  Yes.

24   Q.  What did you tell him?

25   A.  My supervisor told him those were our real names and we did

Evans - Direct

11:13AM

1    not have business names.

2    Q.   Did you know what he meant by that, business names?

3    A.   No, ma'am.

4    Q.   Are you aware of any provisions within IRS that allow

5    someone working for IRS to use a pseudonym or a false name for

6    protection?

7    A.   I believe revenue officers do.

8    Q.   Now, it says, Dear Agent Check Evans.  Would you just read

9    that portion for me, please?

10   A.   Notice, I Kent Hovind is not now nor have I ever been a

11   resident of the Northern District of Florida.  I am not now and

12   never have been a citizen or resident of the geographical

13   United States, including the District of Columbia, purity RICO,

14   the Virgin Islands, Guam, American Samoa and the Northern

15   Marianna islands.

16   Q.   This is signed by Mr. Hovind, correct?

17   A.   Yes, ma'am.

18   Q.   Is this similar to another document that we have seen here

19   in court?

20   A.   Yes.  There was a letter similar to this addressed to

21   Special Agent Schneider.

22   Q.   Basically saying the same thing about the notice?

23   A.   Yes, ma'am.

24   Q.   And read that portion for me, please.

25   A.   You, Chuck Evans, are hereby put on notice that this letter

Evans - Direct

11:14AM  1    must be filed as a permanent part of my IRS, IMF record.

2    Please send me the transaction code and document locator number

3    that this letter will be filed under as soon as possible and

4    please remember to refer to it as letter number A n 02.

5    Q.  Special Agent Evans, as part of your assignment with regard

6    to this particular case, did you have any specific duties that

7    pertain to the structuring counts of the indictment?

8    A.  Yes, ma'am.

9    Q.  Did you have the opportunity to look at exhibits that have

10   now been entered into evidence that are the original checks to

11   cash that Mrs. Hovind and others there at CSE wrote?

12   A.  Yes, ma'am.

13          MS. HELDMYER:  May I approach, Your Honor, to retrieve

14   a document?

15          THE COURT:  Yes, ma'am.

16          MS. HELDMYER:  Special Agent Evans, we have previously

17   admitted this particular package of checks, this includes STR-1

18   through STR-151-A and STR-156 through STR-214; is that correct?

19   A.  Yes, ma'am.

20   Q.  And did you have a hand in preparing this package?

21   A.  Yes, ma'am.

22   Q.  And let me show this just very briefly here.  This is a

23   sequence of checks that are mounted with the exhibit number

24   next to them, and they are just all checks to cash, correct?

25   A.  Yes, ma'am.

Evans - Direct

11:16AM

1   Q.   Now, obviously, there are a lot of them.  Did you have the

2   opportunity to count how many checks there were here?

3   A.   There's approximately 200.

4   Q.   From what period of time to what period of time?

5   A.   From 1999 through 2003.

6   Q.   Obviously, there are a lot of checks.  Did you have the

7   opportunity to review those checks and put them in some sort of

8   a summary form so that it could be more easily looked at and

9   analyzed?

10  A.   Yes, ma'am.

11  Q.   How were these charts created?

12  A.   They were created by our trial illustrators.

13  Q.   And trial illustrators, you're talking about people that

14  are IRS employees?

15  A.   Yes, ma'am.

16  Q.   Did that do that -- did they create charts under your

17  supervision?  That is, did you tell them the information that

18  would go into the chart and they just then created the charts?

19  A.   That's correct.  I provided them with spreadsheets.

20  Q.   Okay.  Let me show you what's been marked for

21  identification purposes as STR-217-A, B, C and D.  Do you see

22  those?

23  A.   Yes, ma'am.

24  Q.   Are those the charts that were prepared to summarize the

25  checks for cash for the period of time of 2000 through 2003 of

Evans - Birgot

11:18AM  1  the checks that we've just seen in that composite exhibit?

2  A.  Yes, ma'am.

3  Q.  And have you had the opportunity to verify the accuracy of

4  these charts?

5  A.  Yes, I have.

6  Q.  The United States would offer STR-217-A, B, C and D into

7  evidence?

8       THE COURT:  Any objection?

9       MR. RICHEY:  No, Your Honor.

10       MR. BARRINGER:  No, Your Honor.

11       THE COURT:  All right.  Those will be admitted.

12  BY MS. HELDMYER:

13  Q.  Looking at the first one, Special Agent Evans, Kent E. and

14  Jo Hovind, checks to cash, 2000, what I want you to do on this

15  first chart is just kind of explain to us how this is arranged

16  and what we are looking at.

17  A.  Down the left side are the months for that particular year.

18  In this case, it's 2000.  To the right of the months are the

19  checks to cash, each one has the check number on it, the amount

20  and the date that was written on the check.

21  Q.  I'm going to zoom in here so that we can see a little bit

22  better some of the specifics that we're talking about.  Please

23  continue.

24  A.  Yes, ma'am.  And then furthest to the right indicates who

25  signed the checks.

Evans - Direct

11:19AM

1   Q.  So, and you can pick up your pen if you've got it there and

2   mark, if you'd like, we've got signed by Jo Hovind.  What does

3   that pertain to right there?

4   A.  This particular signed by Jo Hovind pertains to this

5   particular check right here.

6   Q.  Okay.  Now, this one here say signed by Martha Harris, what

7   would that reflect?

8   A.  That would indicate that both of these checks were signed

9   by Martha Harris.

10  Q.  And here we have a little bit more specific information,

11  one pertaining to that check and one pertaining to that check?

12  A.  Yes, ma'am.

13  Q.  Okay.  I'm going to back out now so that we can see the

14  activities of this for the year 2000.  If I back out too much,

15  you won't be able to read it.  I think that generally can be

16  seen.

17      Walk us through what is happening here.  We start with 8-

18  and $9,000 checks.  Can you explain that to us, please?

19  A.  Yes, ma'am.  You start out in February and March, or

20  February, the checks for $8,000.  They increase in March and

21  April up to $9,000.  May and June continues to be $9,000, all

22  the way up through August.  The September checks increase to

23  $9,000.

24  Q.  Have you had an opportunity to look at these dates and

25  compare those to calendars and count the number of days in

Evans - Direct

11:21AM 1  between these checks?

2  A.   Yes, ma'am.

3  Q.   Is there any pattern here?  In other words, is there a

4  check that's cashed every Friday, every Wednesday and Friday,

5  any kind of pattern?

6  A.   There is no pattern with regard to the dates.

7  Q.   The the amount of checks per month seem to vary, obviously,

8  correct?

9  A.   Yes, they do.

10  Q.   You indicated that here in 2000, the amounts, the amounts

11  of the checks, generally, did they increase?

12  A.   Yes, they do.  They increase to $9,500 up through the end

13  of 2000.

14  Q.   Once they increased to 9,500, did they stay consistent in

15  that number, $9,500?

16  A.   Yes, ma'am, up through December, 9,500.

17  Q.   Have you had an opportunity to review this document as

18  compared to some of the other documents that have come into

19  evidence that indicate the payroll needs of Creation Science

20  Evangelism during this period of time?

21  A.   Yes, ma'am.

22  Q.   And these checks, the need for this money, do they

23  correspond at all for the actual need for payroll?  In other

24  words, on these days do the records reflect that was the exact

25  amount of money that was needed to fulfill payroll?

Evans - Direct

11:22AM

1    A.   No, ma'am, it doesn't at all.   The payroll fluctuated quite

2    a bit, whereas, these checks to cash do not fluctuate other

3    than the fact they go from 9,000 to $9,500, later on to $9,600.

4    Q.   You have an indication here.   Tell us what that means here.

5    A.   That's the total checks that were cashed in 2000 that were

6    on this chart.

7    Q.   Let me go to 2001.   Would you walk us through this, please?

8    A.   Yes, ma'am.   This is, again, more of the same beginning in

9    January, the first check for $9,000, then, 9,500, 9,500.   The

10   signatures on the check again are to the right of the checks

11   for that particular month.

12   Q.   Again, the same question, is there any pattern here in 2001

13   as to the number of days between or the days of the week that

14   these monies were needed?

15   A.   No pattern that I could come up with.

16   Q.   What, in fact, is consistent about these checks?

17   A.   The only thing that appears consistent are the signers, the

18   majority of them are Jo Hovind and the amounts.

19   Q.   We have, for example, right here we have one for $7,000.

20   Is that the exception to the rule that you just stated?

21   A.   Absolutely.

22   Q.   Okay.   So we have 9,500, and 9,500, right here, I believe

23   that's the first $9,600 check.   Am I looking at that correctly?

24   A.   Yes, ma'am.

25   Q.   Does it appear then from that point in time that there is a

11:24AM 1    new pattern?

2    A.   Yes, ma'am.   The checks increase $100.

3    Q.   We've got one here that's back to 95?   The rest are how

4    much?

5    A.   9,600.

6    Q.   On this particular chart on 2001, we have two different

7    colors of these green boxes.   What do the two colors reflect?

8    A.   As indicated here, the darker shaded checks were charged in

9    the return of the indictment.

10   Q.   So these particular checks right here, the ones in the

11   dark, are those counts in the indictment as structured?

12   A.   Yes, ma'am.

13   Q.   What is that, the total for this year?

14   A.   The total checks that were cashed, and I can't quite see

15   the year -- I'm sorry -- 2001, $482,400.

16   Q.   When we're looking at these checks for cash, what do these

17   indicate what was actually happening at the bank?   We have the

18   bank and the checks and we have the chart.   What was happening?

19   A.   Mrs. Hovind was coming in with a check payable to cash.

20   The checks were endorsed by Mrs. Hovind and currency was given

21   to Mrs. Hovind in the amount of the check.

22   Q.   We have -- let's take a look here, just as an example, at

23   the June, that seems to be the month with the most checks here,

24   which is with right there.   The date's up here, we've got

25   June 1st, et cetera, those reflect which dates now?

11:26AM 1    A.   Those reflect the dates that were written on the check.

2    Q.   Did you find that sometimes the date that was written on

3    the check did not correspond with the day the check was

4    actually cashed?

5    A.   Very often.

6    Q.   Do you know why?

7    A.   No, ma'am.

8    Q.   So let's take a look at June.   Just kind of walk us through

9    June and tell us how often these $9,500 checks were cashed in

10   the month of June.

11   A.   The dates that were written on the check it goes from

12   June 1st and then six days later approximately to June 7,

13   four days later, June 11, two days later June 13, six days

14   later, June 19 and then ten days later, June 29.

15   Q.   I asked about the payroll needs, and I know that we don't

16   have a lot of records, but did you see anything, any needs of

17   CSE that would have been met by this consistent cashing of

18   9,500 and subsequent $9,600 checks?

19   A.   No, I did not.

20   Q.   So at this point in time, you were explaining about Mrs.

21   Hovind going into the bank other than signed by somebody else,

22   signed by somebody, who actually went to the bank, do you know?

23   A.   It would indicate on the back of that check.   The

24   individual that had signature authority on this account were Jo

25   Hovind, Martha Harris, and Tanya Hovind.

11:27AM 1   Q.  So this person who was primarily Jo Hovind would actually

2   go in the bank and physically carry out $9,500 in cash?

3   A.  That's correct.

4         MR. RICHEY:  Objection, Your Honor.

5         THE COURT:  Overruled.

6   BY MS. HELDMYER:

7   Q.  Now, let's go to 2002.  Now, we're up to a total of how

8   much cash was taken out of the bank by Mrs. Hovind and these

9   other individuals listed?

10   A.  Approximately half-a-million dollars.

11   Q.  Let's take a look at the amounts.  Walk us through now,

12   please.  We still have the dark and the light are we still

13   talking about those listed in the indictment and those that

14   would not be?

15   A.  That's correct.

16   Q.  Okay.  Let me ask you about that.  The ones, there are some

17   here, for example, here's April.  There are two that are light

18   green.  Those apparently, according to this chart, were signed

19   by Tanya Hovind.  Does that have anything to do with those not

20   charged in the indictment?

21   A.  Yes, they were in fact signed by Tanya Hovind.

22   Q.  If we walk through, how much were these checks for up to,

23   let's go right into there, above.  How much are these checks

24   for?

25   A.  It looks like every single one of them are for $9,600.

11:29AM 1   Q.   So there is obviously some months, for example, January,

2   three checks, and then in March, there were six checks and each

3   one of those was for $9,600?

4   A.   Yes, ma'am.

5   Q.   Regardless of how many times she had to go to the bank that

6   month?

7   A.   Yes.

8        MR. RICHEY:   Objection to the leading questions.

9        THE COURT:   Sustained.

10   BY MS. HELDMYER:

11   Q.   So we're going to talk about this particular point in time

12   right here.  We go $9,600, $9,600, and then we go down, the

13   amounts then go down from that point.  It looks like

14   September 10th.  Do you see that?

15   A.   Yes, ma'am.

16   Q.   That's where I'm talking about.  That amount of that check

17   that I have the arrow for is how much?

18   A.   $5,400.

19   Q.   What do you know, based upon your investigation was

20   happening around that period of time?

21   A.   I think it's been testified to by Special Agent Schneider

22   that the criminal investigation began in June or July, I

23   believe, of 2002 -- or I'm sorry -- that Mr. Hovind was

24   notified of the criminal investigation.

25   Q.   Do you recall Mr. Popp's testimony with regard to cash?

Evans - Direct

11:30AM 1    A.   Yes, ma'am.

2    Q.   And there is an exhibit that is PR-1 that's been entered

3    into evidence regarding -- which is a memo from Mr. Hovind.  Do

4    you recall that document?

5    A.   Yes, I do.

6    Q.   Without me having to pull it out, can you remind us what

7    that says?

8    A.   I think you said it was addressed to the staff and it

9    indicates that there is going to be a transition from cash to

10   check with regards to the payroll.

11   Q.   What do you know from analyzing the records what actually

12   happened regarding the pay to employees?  In other words, at

13   that point in time, did they completely stop paying cash to

14   employees?

15           MR. RICHEY:  Objection, leading questions.

16           THE COURT:  Overruled.

17   BY MS. HELDMYER:

18   Q.   You may answer.

19   A.   That particular exhibit indicates that if employees --

20           MR. RICHEY:  Objection, Your Honor.  The document

21   speaks for itself.  He's paraphrasing.

22           MS. HELDMYER:  I'll get it.

23           THE COURT:  Would you get the document, please?  Thank

24   you.  That's PR-1.

25           MS. HELDMYER:  PR-1, Your Honor.

Evans - Direct

BY MS. HELDMYER:

Q.  It's on the screen.  Would you please read paragraph one

for us?

A.  Every week we withdraw, transport and store a large

quantity of cash to meet the support of our growing staff.  It

would simplify several things for our financial staff as well

as be safer for the ministry to give checks every week instead

of cash.  Please notify Tanya or Martha right away if you still

need to be paid in cash.

Q.  And the date on that memo is?

A.  July 22, 2002.

Q.  Did you also find indications based upon the information

that was seized in the search warrant that whether or not the

family members, the Hovind family members, were being paid by

check or by cash?

A.  Yes.

Q.  What did you learn?

A.  That they continued to be paid in cash.

Q.  I'll back out one more time here and show you the pattern

starting at that time frame in early September.  What's

happening after that?

A.  The amount of the checks, the amounts that are being cashed

fall somewhat.

Q.  The total amount of checks per month, does that -- let me

just back out so we can make sure we see the whole thing.  The

Evans - Bireet

11:33AM 1    total amount of checks for that time frame, how does that

2    compare with the rest of the year?

3    A.  I would have to add them up, but quite possibly, it still

4    may be somewhat lower.

5    Q.  And I'm just talking about the number of checks.

6    A.  Oh, I'm sorry.

7    Q.  The count of checks?

8    A.  Yes, the number increases.

9    Q.  So does it appear that whether or not from this chart

10    whether or not there were more trips to the bank after the

11    amount of money dropped?

12    A.  Obviously, there were more trips to the bank.

13    Q.  Okay.  We saw the total of $501,050 for 2002, and let's

14    take a look at 2003.  Tell us about that.

15    A.  The checks to cash significantly decreased.

16    Q.  So for a total in 2003 of how much?

17    A.  145,000 -- $145,450.

18    Q.  What can we glean based upon the color of these boxes

19    regarding whether or not any of these checks were charged in

20    the indictment?

21    A.  They were not charged.

22    Q.  We have introduced a number of currency transaction

23    reports, and I think the last witness testified about some

24    currency transaction reports.  Are you familiar with those that

25    have come into evidence?

Evans - Direct

11:34AM

1  A.  Yes, ma'am.

2  Q.  Have you had the opportunity to take a look to see what

3  events created or caused the filing of those CTRs, based upon

4  the financial records obtained from the Hovinds?

5  A.  Yes, I have.

6  Q.  What document specifically did you look at that would be

7  admitted into evidence that you used to make this analysis?

8  A.  The specific checks.

9  Q.  And do you have the exhibit numbers?

10  A.  For which?

11  Q.  I'm sorry.  For the currency transaction report checks?

12  I'm sorry do you have those up there with you?

13  A.  No, I do not.

14  Q.  Let me show you STR-218 marked for identification purposes.

15  Is this a check that you created, I mean, a check -- is this a

16  chart that you created?

17  A.  Yes, ma'am.

18  Q.  Is this a chart that you created based upon evidence that's

19  been admitted during the trial here these past couple of weeks?

20  A.  Yes, that's correct.

21  Q.  The exhibit numbers that are listed on this chart, do they

22  show the exhibit numbers of the information that was used to

23  create this chart?

24  A.  That's correct.

25  Q.  So we have two exhibit numbers listed here, one for the CTR

Evans - Direct

11:36AM 1    and one for the checks?

2    A.   That's correct.

3              MS. HELDMYER:  The United States would offer Exhibit

4    STR-218 into evidence.

5              THE COURT:  Any objection?

6              MR. BARRINGER:  No, Your Honor.

7              MR. RICHEY:  No, Your Honor.

8              THE COURT:  218 is admitted.

9    BY MS. HELDMYER:

10   Q.   Would you walk us through this chart, please?

11   A.   As indicated on the columns or the titles of the columns

12   across the top, the first column is the date of the currency

13   transaction report, the first one being December 20, 1999.  The

14   transaction amount is for $15,000.  The exhibit number is

15   STR-154-B.  The checks that made up that particular currency

16   transaction report, there are two of them, each of which are

17   for $7,500, the time negotiated is the time that the check was

18   cashed and the exhibit number, and then the comment column

19   describes who the check was payable to and who signed the

20   check.

21   Q.   The CTRs then that are referenced here, and I'm not going

22   to pull them out, but those are the exhibit numbers; is that

23   correct?

24   A.   Yes, ma'am.

25   Q.   The CTRs were filed for this amount of dollars for

Evans - Direct

11:37AM

1    transactions, and those were filed -- were they filed by the

2    bank?

3    A.   Yes, they were.

4    Q.   Now, let's walk through the first one.  This is

5    December 20, 1999.  The CTR was filed because what happened?

6    A.   There was one or more transactions that exceeded $10,000.

7    Q.   And what did you do to determine what those transactions

8    were that triggered the CTR filing?

9    A.   Reviewed the checks to cash.

10   Q.   What did you find out happened in this particular

11   transaction?

12   A.   On this particular transaction, Mrs. Hovind wrote two

13   checks payable to cash, came in on the same day, which was

14   December 20th.  The first time she came in at 1:19 p.m., cashed

15   a check for $7,500; came in at 2:50 p.m. the same day and

16   cashed another check for $7,500.

17   Q.   Is there something significant about the time negotiated

18   here?

19   A.   Yes.

20   Q.   What is it?

21   A.   The 2:00 p.m. cutoff for AmSouth Bank.

22   Q.   What is the 2:00 p.m. cutoff?

23   A.   That is when their business day begins and ends.

24   Q.   So the 2:00 p.m. cutoff, what are you saying about that in

25   relation to when Mrs. Hovind was in the bank twice that day?

11:39AM  1   A.   I believe Mrs. Hovind felt that she was going to evade --

2            MR. BARRINGER:  Objection, Your Honor.

3            THE COURT:  Sustained.

4   BY MS. HELDMYER:

5   Q.   If you would just explain -- the checks were negotiated at

6   what time with regard to or in relation to the 2:00 p.m.

7   cutoff?

8   A.   I'm sorry.  Yes.  The first check was negotiated at

9   1:19 p.m., and the second check was negotiated at 2:50 p.m.

10  Q.   What I'm asking, what is that in relation to that 2:00 p.m.

11  cutoff?

12  A.   Before and after.

13  Q.   The CTR was filed by -- in all these cases it's AmSouth

14  Bank?

15  A.   Yes, ma'am.

16  Q.   Do you know why they went ahead and filed the CTR even

17  though the transactions were before and after the cutoff?

18  A.   I can't say for sure.

19           MR. BARRINGER:  Objection, if he can't say for sure.

20           THE COURT:  Sustained.

21  BY MS. HELDMYER:

22  Q.   12/12/2000, the next one was the CTR amount that we saw in

23  court was $19,000?

24  A.   Yes, ma'am.

25  Q.   Tell us what happened here.

11:40AM 1    A.   Mrs. Hovind came in at 12:48 p.m. cashed a check for

2    $9,500.   On the same day she came in at 3:59 p.m. and cashed

3    another check for $9,500.

4    Q.   Now, we have the checks to cash chart here as STR-217-A for

5    the year 2000, and we have two checks in December.   Now, the

6    dates on these checks here in the chart in 217-A were for

7    12/8/2000 and 12/12/2000.   So what makes you believe in your

8    previous chart that they were cashed on the same day?

9    A.   Because that's what's indicated on the back of the check.

10    Q.   So you flipped the check over and looked at the

11    information?

12    A.   That's correct.

13    Q.   So the date that was on the check was 12/8?

14    A.   That's the date written on the front of the check.

15    Q.   But it was cashed on?

16    A.   12/12/2000.

17    Q.   All right.   The next one, 12/12/2001 is the next

18    structuring -- I'm sorry -- the next CTR?

19    A.   Yes, ma'am.

20    Q.   What happened here?

21    A.   Mrs. Hovind came in on that day and cashed a check for

22    $9,600.

23    Q.   What triggered the CTR being filed on that day?

24    A.   At some point that during that day Maury Adkins came in

25    with a check on the CSE account and cashed a check for, I think

Evans - Direct

11:41AM

1   that's $987.93.

2   Q.  Does that help?

3   A.  That's correct.

4   Q.  All right.  On 3/01/02?

5   A.  Something similar happened.  Mrs. Hovind came in on

6   March 1, 2002 and cashed a check for $9,600.  At some point

7   during that day, Maury Adkins came in and cashed a check for

8   $500 on the same account.

9   Q.  3/12/02?

10  A.  Same thing, Mrs. Hovind came in and cashed a check for

11  $9,600 on March 12th, and sometime during that same day, Maury

12  Adkins came in and cashed a check for $4,000.

13  Q.  If I slide it over, you have a notation here that says

14  payable to Maury Adkins signed by Jo Hovind.  What does that

15  mean?

16  A.  That would mean the check was payable to Maury Adkins and

17  Jo Hovind signed the check.

18  Q.  She made out the check and signed it?

19  A.  Yes, ma'am.

20  Q.  Okay.  6/13/02?

21  A.  On June 13, 2002, Mrs. Hovind came in at 1:05 p.m. and

22  cashed a check for $9,600, and again at 4:02 p.m. -- and if you

23  could slide it over just so I could ensure Mrs. Hovind -- I'll

24  pull it down.

25  A.  4:20 p.m. Tanya Hovind came in and cashed a check for

Evans - Direct

11:43AM  1    $9,600.

2    Q.   8/02/02?

3    A.   On August 2, 2002, Mrs. Hovind came in and cashed a check

4    for $9,600.  At some time during that same day, August 2nd,

5    Maury Adkins came in and cashed a check for $500.

6    Q.   On 11/12/02?

7    A.   On November 12, 2002, Mrs. Hovind came in.  At 11:45 a.m.,

8    cashed a check for $7,200, again came in at 3:04 p.m. and

9    cashed another check for $7,800.

10    Q.   We look at our chart that was introduced as STR-217-C,

11    which was checks cashed in 2002, and we go down to November and

12    we see what appears to be those two checks.  Are those the two

13    checks?

14    A.   That's correct.

15    Q.   And the dates on there again are -- reflect?

16    A.   November 8th and November 12th.

17    Q.   Which are what on the check?

18    A.   Those are the dates that are written on the front of the

19    check.

20    Q.   Okay.  But they were cashed?

21    A.   They were both cashed on November 12, 2002.

22    Q.   Again on these last two, what was significant about the

23    times?

24    A.   Again, before and after 2:00 p.m.

25    Q.   Now, let's talk about tax computations.  Do you have

Evans - Direct

11:45AM 1   experience in tax computations, as you've testified earlier?

2   A.   Yes, ma'am.

3   Q.   Can you explain, ordinarily, how you would calculate

4   employment tax computations?  In other words, what kinds of

5   things are you computing?

6   A.   Normally an employer would compute the employment tax.

7   Q.   What is an employment tax?

8   A.   It's a tax imposed on the wages of employees and on the

9   employer.

10   Q.   What is supposed to happen with the employment taxes?

11   A.   Normally an employer will withhold FICA taxes, which are

12   the Social Security and Medicare taxes, from employees and

13   federal withholding as well from the employees, and they will

14   also pay over a matching amount of the FICA taxes.

15   Q.   What are those percentages?

16   A.   The Social Security tax portion is 6.2 percent for the

17   employee and six point, the matching portion is 6.2 percent for

18   the employer.  The Medicare portion for the FICA tax are, I

19   believe, 1.45 percent for the employee and the matching, again,

20   1.45 percent for the employer.

21   Q.   When we talk about withholding, physically what is an

22   employer supposed to do?

23   A.   When they pay the wages to the employee, they are required

24   to withhold the FICA taxes and the income tax.

25   Q.   And put it where?

Evans - Direct

11:47AM

1   A.   In trust and pay it over to the IRS with their quarterly

2   941 return.

3   Q.   They hold it in trust, they pay it over, are they supposed

4   to add their portion before they pay it over?

5   A.   When they file the 941 quarterly return they are supposed

6   to include their portion of the FICA taxes.

7   Q.   You said there is something called a quarterly 941.  What

8   is that?

9   A.   It's an employment tax return that's due at the end of the

10  month following each quarter.

11  Q.   Which means what, in terms of dates?

12  A.   In other words, for the first quarter, which would be

13  January through March, that first quarter return would be due

14  to the IRS by the end of the following month, which would be

15  April 30th.

16  Q.   What does the IRS do if the IRS is called upon to do its

17  own tax computations where no withholding was done?  How would

18  the IRS calculate those withholdings, what should have been

19  withheld?

20  A.   The income tax is calculated at 20 percent.

21  Q.   So if there was -- well, if the employer has withheld, what

22  normally would he base that figure on, that percentage?

23  A.   Normally an employer will provide an employee with a form

24  W-4, which the employee will complete and that W-4 indicates

25  his marital status and number of allowances and withholding is

Evans - Direct

11:48AM

1    computed based on that information.

2    Q.  So does the 20 percent figure that is used by IRS, under

3    what circumstances is that used to compute the withholding of

4    the income taxes?

5    A.  When the employer hasn't fulfilled that duty.

6    Q.  How about the Social Security and Medicare, does that stay

7    consistent?

8    A.  Yes, ma'am.

9    Q.  That is the 6.2 percent and 1.45 percent?

10   A.  It's 7.65 for the employee and 7.65 for the employer.

11   Q.  You said something about the quarterly returns.  Are they

12   supposed to be filed -- quarterly, obviously, how many times a

13   year?

14   A.  Four times.

15   Q.  Let me show you what's been admitted into evidence as

16   PR-50.  This is a certification of lack of record.  What does

17   that mean?

18   A.  It indicates that there is no record of a form 941

19   quarterly federal income tax return for CSE Enterprise business

20   trust.

21   Q.  And this is a certification from what, from whom?

22   A.  Our IRS office in Atlanta, Georgia.

23   Q.  And this one relates to who?

24   A.  CSE Enterprises Business Trust, Kent Hovind, trustee.

25   Q.  And it indicates that, let's see, it says kind of form, a

Evans - Direct

11:50AM
1  941, is that what they were searching for with this particular

2  form?

3  A.  Yes, ma'am.

4  Q.  And it indicates that no records were found for this entire

5  period of time?

6  A.  That's correct.

7  Q.  Now, PR-53 is the same type of one-page document for

8  certification of lack of record.  This one reflects Kent

9  Hovind, CSE Enterprises, Form 940.  What is that?

10  A.  Form 940 is the employer's annual federal unemployment tax

11  return.

12  Q.  And what happened?  What are they certifying here?

13  A.  That there were no form 940s for 2001, 2002, 2003, or 2004.

14  Q.  PR-55 is a certification for lack of record for Kent Hovind

15  CSE Enterprise's, again for form 941?

16  A.  Yes.

17  Q.  Is that correct?

18  A.  Yes, ma'am.

19  Q.  Indicating what?

20  A.  That there were no quarterly payroll returns for these

21  specific quarters right here.

22  Q.  Why do we have two of these, one for Kent E. Hovind CSE

23  Enterprises and one for CSE Enterprises Business Trust, Kent

24  Hovind, trustee?

25  A.  In an effort to ensure there were no employment tax returns

Evans - Direct

11:51AM

1    filed under any of these entities.

2    Q.  And finally, PR-55, certification of lack of record for the

3    business trust, Kent Hovind, trustee, the 940s?

4    A.  Yes, ma'am.

5    Q.  What does this sheet tell us, this form tell us?

6    A.  Indicates there were no 940 returns prepared for that

7    period.

8    Q.  Well, because of that, what formula did you use in

9    attempting to compute the amount of employment tax that

10   Mr. Hovind should have withheld during this period of time?

11   A.  The rates were computed.  As I stated earlier, the total

12   employee's portion, which was 7.65 percent for the FICA, the

13   employer's portion, which was 7.65 percent for the FICA, and

14   the withholding was computed at 20 percent.

15   Q.  All right.  Did you create charts based upon your

16   calculations of how much employment taxes should have been

17   withhold and paid over?

18   A.  Yes, I did.

19   Q.  Let me show you PR-58-A through F.  Are those the charts

20   you created?

21   A.  These charts were, again, created by our trial

22   illustrators, but they were created based on spreadsheets that

23   I provided to them.

24   Q.  At your direction?

25   A.  Yes, ma'am.

Evans - Direct

11:53AM

1   Q.  Have you verified that the information that you provided to

2   them to put into these charts is accurately reflected in these

3   charts?

4   A.  Yes, I did.

5           MS. HELDMYER:  The United States would offer PR-58-A

6   through F into evidence.

7           THE COURT:  Any objection?

8           MR. RICHEY:  No, Your Honor.

9           MR. BARRINGER:  No, Your Honor.

10           THE COURT:  Those will be admitted.

11   BY MS. HELDMYER:

12   Q.  The first chart we're looking at is 58-A it says 1999

13   employment tax computation.  Just explain to us what this chart

14   tells us, please.

15   A.  These charts compute the employment tax for each month and

16   each quarter for 1999 that we were able to obtain records

17   pursuant to the search warrant with regards to this particular

18   time period.

19   Q.  And I believe I forgot to ask you, what information did you

20   use to determine what the total payroll was for CSE?

21   A.  The records were obtained pursuant to the search warrant

22   and they include exhibits PR-32 through PR-36.

23   Q.  Did you do any independent investigation with regard to how

24   much total payroll they had or did you take their documents at

25   their word?

Evans - Direct

11:54AM

1    A.   They were taken at their word.

2    Q.   Did you have enough information from the search warrant in

3    order to accurately -- well, let me take back accurately.  In

4    order to give us the figures that are presented here on the

5    chart?

6    A.   Yes, ma'am.

7    Q.   This chart starts in July.  Why does it start in July?

8    A.   That's the beginning of -- we found no records prior to

9    that.

10   Q.   Okay.  So this has the month, obviously, and the total

11   payroll in the second column.  Again, these figures came from

12   where?

13   A.   Exhibits PR-32 through 36.

14   Q.   The second one is quarter total.  You only have entries in

15   September and December.  Why is that?

16   A.   This figure would represent the total of those three

17   months, and this figure would represent the total for those

18   three months.

19   Q.   Those would be for what they say, they are quarterly

20   totals, right?

21   A.   Yes, ma'am.

22   Q.   And the FICA tax, and FICA stands for?

23   A.   Federal Insurance Contributions Act.

24   Q.   How did you calculate these numbers?

25   A.   7.65 percent was this whole column.

Evans - Direct

11:55AM

1    Q.  There are a lot of arrows.  Let's try again.

2    A.  7.65 percent.

3    Q.  That's good.  7.65 percent, of this figure here?

4    A.  Yes, ma'am.

5    Q.  And this dollar figure here in this column represents what

6    in terms of Mr. Hovind's responsibility?

7    A.  This is the FICA tax that should have been withheld from

8    the employees and paid over.  These amounts totaled together

9    would be the amount that was required to be withheld and paid

10   with regards to FICA tax.

11   Q.  Next column is federal withholding.  What does that mean?

12   A.  These amounts were computed at 20 percent of these wages

13   here.

14   Q.  Okay.  Total tax required to be withheld per quarter, and

15   here, again, we have the two figures at the end of the two

16   quarters; is that correct?

17   A.  Yes, ma'am.

18   Q.  And the total tax required to be paid per quarter, what

19   does that mean?

20   A.  These amounts here include the employer's portion of the

21   FICA.

22   Q.  And you have the totals column here at the bottom.  Is that

23   all of the figures added up?

24   A.  Yes, ma'am.

25   Q.  For 1999, based on the information you had?

Evans - Direct

11:57AM

1    A.   That's correct.

2    Q.   Let's go to 2000.  Same column, same information?

3    A.   Yes, ma'am.

4    Q.   So very briefly, if you could walk us through.  This time

5    we have a full year, so we have four quarter totals for the

6    payroll, correct?

7    A.   Yes, ma'am.

8    Q.   And then your calculations and the withholding.  What

9    figures represent how much had been withheld total for that

10   year?

11   A.   This total right here represents the amount that should

12   have been withheld from the employees, representing the FICA

13   tax.  This amount right here should be 20 percent that should

14   have been withheld or if WD-4s had been completed and the

15   amount of income tax that was withheld from employees.

16   Q.   This figure represents what?

17   A.   The total of these two.

18   Q.   And this figure represents?

19   A.   That figure includes the employer's portion of this figure,

20   in other words, the matching amount for 2000.

21   Q.   The total for the year?

22   A.   Yes, ma'am.

23   Q.   And for the record, that was PR-58-B and now we're looking

24   at PR-58-C, the same information?

25   A.   Yes, ma'am.

11:58AM

1   Q.   Okay.   Just run through the totals for us, please.

2   A.   Total payroll for that year $479,661.93.   The FICA tax that

3   should have been withheld from the employees should have been

4   36,694.14.   The income tax withholding totaled $95,932.39.   The

5   total required to be withheld and paid over, $132,626.52.   The

6   total here, again, the grand total including the employer's

7   portion of the FICA.

8   Q.   PR-58-D is for 2002.   We have an extra column on here, so

9   let me pan out here.   Explain why we have an extra column that

10  says current indictment, total tax required to be withheld.

11  A.   These are the figures that match the indictment along with

12  the total figure, $163,556 is the total amount due.

13  Q.   And that figure is very similar to that figure.   Why are

14  those two figures the same?

15  A.   Because that's the consistent total of the payroll for that

16  year.

17  Q.   What happened here in 2002 that makes a difference between

18  the numbers quarterly that are in the indictment versus the

19  numbers that you've come up with here to add up to basically

20  the same figure?

21  A.   At the time of the indictment, records were not found that

22  specified -- there were not specific records found that showed

23  the monthly payroll amount, and therefore, the total amount

24  $163,000, 163,556 was divided by four, and those wages were

25  applied equally each quarter.

Evans - Direct

12:00PM

1    Q.  So why is that different than -- why do we have these

2    figures now?

3    A.  If you could slide it over.

4    Q.  Sure.

5    A.  Again, the total figure here does not change.  The only

6    thing that changed are these numbers here, and that is because

7    records were found that did indicate specifically each month's

8    payroll up through July.  After July what was left of the total

9    payroll was divided by five, again, because there were not

10   records located that indicated what the specific amounts were

11   for August, September, October, November or December.

12   Q.  You were able obtain such records after the indictment was

13   returned?

14   A.  Well, the records were in evidence.  They were located --

15   as I indicated before, there were 30 or 40 boxes.  In

16   preparation for trial, those charts were found that did

17   indicate the specific amounts for January through July.

18   Q.  Okay.  So when we go in here, in terms of what's charged in

19   the indictment, are the specific quarter totals charged in the

20   indictment, these particular figures here for this and other

21   years that we have been looking at?

22   A.  Yes, ma'am.

23   Q.  Okay.  So these figures are the more accurate figures right

24   in here based upon what you found?

25   A.  These figures, yes, ma'am.

Evans - Direct

12:02PM

1    Q.   Okay.  Are they fairly consistent with the number that you

2    used to calculate the total?

3    A.   I'm sorry?

4    Q.   I'm sorry.  Are these numbers fairly close to what you

5    ended up dividing out the total per quarter?

6    A.   Somewhat, yes.

7    Q.   And I'm looking at 2003, same information?

8    A.   Yes, ma'am.  Again --

9    Q.   Totals, please?

10   A.   Total payroll for 2003 is $642,449.11.  The FICA tax that

11   should have been withheld from the employees, $49,147.36,

12   income tax withholding, $128,489.82.  The total that should

13   have been withheld and paid over $177,637.18.  And this amount

14   here, again, includes the employer's portion of the FICA.

15   Q.   2004 only has the first quarter on it.  Why is that?

16   A.   We executed the search warrant in March -- I'm sorry -- in

17   April of 2004.

18   Q.   So you have records for the rest of the year?  Do you have

19   anything past the search warrant date?

20   A.   No, ma'am.

21   Q.   Same information, same type totals?

22   A.   Yes, ma'am.

23   Q.   Did you do any analysis of the bank records that have been

24   admitted into evidence regarding the available cash at CSE?

25            THE COURT:  I apologize.  Ms. Heldmyer, I think this

Evans - Direct

12:04PM 1    is probably a good time to break for lunch before you start

2    into another line.

3             Ladies and gentlemen, we'll be in recess for lunch

4    until 1:15.  Please don't discuss the case amongst yourselves

5    or with anyone else during the lunch recess, and also please

6    don't attempt to form any opinion about the merits of the case

7    at this time.

8             THE COURT:  We'll see I back at 1:15.

9             (Jury out.)

10            THE COURT:  Agent Evans, you may step down.  Please

11   don't discuss your testimony during the recess.

12            THE WITNESS:  Yes, ma'am.

13            THE COURT:  All right.  Ms. Heldmyer.

14            MS. HELDMYER:  Yes, Your Honor.  We have a copy of

15   Special Agent Schneider credentials.  Apparently, I'm not up on

16   the Internal Revenue Service's protocol when it comes to things

17   like this.  I was told after -- during the break that it is

18   their policy not to copy these.  I suggested that perhaps we

19   could get some sort of a protective order with regard to this

20   particular exhibit so that it's not copied or maybe even put

21   under seal after its use by the jury so that there is no chance

22   that Special Agent Schneider credentials would get copied and

23   removed from the clerk's office.  Would that be appropriate?

24            THE COURT:  Yes, we can certainly file it under seal

25   after the trial.

Evans - Direct

12:06PM 1                  MS. HELDMYER:  I'll offer it's been admitted OBS-124.

2                  THE COURT:  All right.  On the issue of OBS-72-B,

3      which has been identified, marked, but not admitted.  This is

4      the injunction in the case of Glen Stoll and Remedies At Law.

5      In reviewing this document, Ms. Heldmyer, I'm going to

6      sustained the objection to the admission of the document.  I do

7      not think enough was made of this by Mr. Richey with Special

8      Agent Schneider to justify putting in the entire document, and

9      I would find that the probative value would be substantially

10     outweighed by the risk of prejudice here even with a limiting

11     instruction and even if it is admitted only to rehabilitate

12     Special Agent Schneider I don't think he was impeached enough

13     to justify the admission of this document.

14                 MS. HELDMYER:  Understood, Your Honor.  Thank you.

15                 THE COURT:  Let me return this to you.

16                 Mr. Richey or Mr. Barringer, anything before we go?

17                 MR. RICHEY:  No, Your Honor.

18                 MR. BARRINGER:  No, Your Honor.

19                 MS. HELDMYER:  I'm afraid I have something.

20                 THE COURT:  All right.

21                 MS. HELDMYER:  Mr. Richey had admitted into evidence

22     during Special Agent Schneider's cross-examination.  Obviously,

23     he was allowed to do that.  He put in a document that's

24     PR-44-E, which was one single year of a certificate of

25     assessments and payments for Mr. Hovind.  I believe in the

Evans - Direct

1 doctrine of completeness and fairness, we should be allowed to

2 go ahead and introduce the remaining years for the pertinent

3 period of time under indictment regarding certificate of

4 assessments and payments.  He wanted that particular one

5 because of the $42,000 assessment I would like to offer the

6 remainder of them, PR-44-A, B, C, D and F -- I'm sorry -- and

7 G, which are for the years 1999 through 2005, with one of them

8 already being admitted.

9          MR. RICHEY:  Yes, Your Honor.  My objection is that

10 these are form 4340s regarding the personal individual income

11 tax of Mr. Hovind.  And my argument is that they are not

12 relevant to this case and could be prejudicial to the jury or

13 to -- excuse me -- prejudicial to my client because this case

14 is not about his individual income taxes.  The reason that 44-E

15 was offered and admitted was because it did deal specifically

16 with the cash that was seized and what action the IRS took

17 regarding that, and that's the only reason why that particular

18 document was admitted.

19          THE COURT:  All right.  I'm not going to allow the

20 admission of the documents, Ms. Heldmyer.  I don't think that

21 there is enough relevance there to admit those, and there is

22 certainly the risk of prejudice as Mr. Hovind is not charged

23 with personal income tax evasion.  So I'll sustain the

24 objection to the admission of those documents.

25          If there is nothing else, we'll be in recess until

Evans - Direct

1:15.

(Recess.)

THE COURT:  Ms. Heldmyer, Agent Evans, you may be
seated.  You're still under oath.  Ms. Heldmyer, you may
proceed.

MS. HELDMYER:  Thank you, Your Honor.

BY MS. HELDMYER:

Q.  Special Agent Evans, I think we were talking about some
analysis that you may have done of bank records to determine
whether or not Mr. Hovind was capable of paying the tax
computation amounts that you found due and owing --

MR. RICHEY:  Objection, Your Honor.  Is there a
question?

THE COURT:  Sustained, as to leading.

BY MS. HELDMYER:

Q.  PR-58-A through F, which I'll put one of them here,
PR-58-A?

THE COURT:  These have not been admitted?

MS. HELDMYER:  Yes, these are admitted, Your Honor.

THE COURT:  Okay.  I thought they were.  All right.  I
apologize.

BY MS. HELDMYER:

Q.  This is the the 1999 tax computation.  And remind us again
what we're looking at in terms of the amount required for
Mr. Hovind to have withheld in 1999?

Evans - Direct

1:18PM

1    A.   The amount that he was required to withhold is this amount

2    here.

3    Q.   And the next figure would be, 59 would be what?

4    A.   That includes the employer's portion of the FICA tax.

5    Q.   And we looked before lunch, we looked at charts all in the

6    PR-58 series for 2000, 2001 for those figures, 2003 -- I'm

7    sorry.  I got those out of order.  That's 2003, 2004, do you

8    see those?

9    A.   Yes, ma'am.

10   Q.   Did you do an analysis of any bank records that were of

11   bank accounts owned or operated by the Hovinds?

12   A.   Yes, ma'am, the CSE accounts, the two accounts at AmSouth

13   and then the Regions Bank account.

14   Q.   For what purpose did you do that analysis?

15   A.   It's just another way to show that there were funds

16   available to pay the employment tax obligation, and this would

17   be in addition to various disposition of funds during the same

18   time periods with regard to capital acquisitions, personal

19   expenditures, so on and so forth, payments to their children to

20   show that there were funds available to meet the employment tax

21   obligations.

22   Q.   Did you analyze, in performing this function, analyze

23   exhibits that were already in evidence here in this trial?

24   A.   Yes, ma'am.

25   Q.   Do you have those exhibit numbers in front of you?

Evans - Direct

1:20PM 1   A.   Yes, ma'am, I sure do, separated by year.

2            MS. HELDMYER:   This has not yet been admitted, Your

3   Honor, INC-248.

4   BY MS. HELDMYER:

5   Q.   Is this a summary chart that you created?

6   A.   Yes, it is.

7   Q.   Based upon the information admitted into evidence?

8   A.   Yes, ma'am.

9   Q.   Is this a summary of something?

10  A.   It's a summary of the bank balances on these three

11  accounts.

12  Q.   And tell us the exhibit numbers that you used to come up

13  with this particular chart for 2001.

14  A.   For 2001, they are exhibits INC-2 through 13 and 55 through

15  66.

16  Q.   For the 2002 chart, what exhibits did you use to calculate

17  this chart?

18  A.   INC-14 through 25, 30.

19  Q.   I'm sorry.  Go ahead.

20  A.   Thirty-nine and 40, 67 through 78.

21  Q.   For 2003 part of the same exhibit, what exhibits did you

22  use to create this chart?

23  A.   INC-26 through 38, 41 through 53, and 79 through 83.

24           MS. HELDMYER:   Your Honor, the United States would

25  offer INC-248 into evidence.

1            THE COURT:  Any objections?

2            MR. BARRINGER:  No, Your Honor.

3            MR. RICHEY:  No, Your Honor.

4            THE COURT:  It will be admitted.

5   BY MS. HELDMYER:

6   Q.  The first page up here, Special Agent Evans, is INC-248.

7   Could you walk us through what this represents, please?

8   A.  2001 monthly bank balances.  The beginning balance all the

9   way down through here, this is the first account, CSE

10  Enterprises at Amsouth Bank with the listed account number.

11  This is the Regions Bank account, which was not open in 2001,

12  and this is the other AmSouth Bank account which was the money

13  market account.

14  Q.  We see here where, in the money market account

15  specifically, where there is a balance of over $100,000 and

16  then drops to $2,811.49.  Do you know, based upon the

17  information and evidence provided during the trial, what

18  occurred during that period of time in May of 2001 to cause

19  that number to drop?

20  A.  The property was purchased from Darlene Porter.

21  Q.  All right.  So for 2001, January through December, what did

22  you do to create this total funds available column?

23  A.  Each one of these figures was taken directly from the bank

24  statement, and this would have been the beginning balance in

25  this particular account added with this balance in this

Evans - Direct

1:23PM 1   particular account to create the total in the two accounts in

2   that column there.

3   Q.  Is there anything reflected in this chart other than just

4   cash in the bank in the names of any of these accounts?

5   A.  I'm not sure I understand the question.

6   Q.  Okay.  Is there anything else -- this total funds available

7   here, this figure, is there anything else represented in those

8   dollar figures other than what's available in cash out of these

9   three accounts?

10  A.  No, ma'am.

11  Q.  In other words, did you factor in any of the value of the

12  property or any of the value of the assets that they own or

13  anything of that nature?

14  A.  No.  And also it doesn't include any checks that may be

15  outstanding.  There wasn't a bank reconciliation done.

16  Q.  This column right here, it says not open.  What do we know

17  this account to be?

18  A.  That was the payroll account that was opened in 2002.

19  Q.  So we'll see that as we get into the 2002 chart.  Now, 2002

20  we show February through December and the running balances

21  here.  Can you walk us through that, please?

22  A.  Again, it's much the same thing, the beginning balance of

23  the accounts listed up here in these columns, the Regions Bank

24  account did not open until December '02, and the money market

25  account which maintained a minimum balance.

Evans - Direct

1:24PM 1  Q.  Do you keep -- is this a running total of funds available

2  here?

3  A.  Yes, ma'am.  Again, it's going to be these two columns

4  combined.

5  Q.  And in the case of December forward, it's going to be those

6  three?

7  A.  Yes, ma'am.

8  Q.  2003, same columns, although we have a closed account here

9  for the money market; is that correct?

10  A.  That's correct.  The money market was closed there.

11  Q.  All right.  Give us just a couple of samplings of the total

12  funds available here in 2003.

13  A.  These were the balances that were maintained throughout the

14  year, ranging right around -- above 200,000, the lowest going

15  down to here, which is 169,000.

16        MS. HELDMYER:  That's all the questions I have.  Thank

17  you very much.

18        THE COURT:  Mr. Richey.

19                  CROSS-EXAMINATION

20  BY MR. RICHEY:

21  Q.  Good afternoon, Agent Evans.

22  A.  Good afternoon.

23  Q.  Now, you said you've been with the IRS since 1983; is that

24  correct?

25  A.  Yes, sir.

Evans - Cross/Mr. Richey

1:26PM

1   Q.   And did you go to work with the IRS straight out of

2   college?

3   A.   I co-op'd with the IRS while I was in college.

4   Q.   Okay.  But then after you graduated from college, you went

5   straight to work with the IRS?

6   A.   That's correct.

7   Q.   And you said you had degrees in accounting and systems

8   science; is that correct?

9   A.   It was a double major.

10  Q.   So those are both bachelor degrees; is that correct?

11  A.   Yes, sir.

12  Q.   Are you also a CPA?

13  A.   No, I am not.

14  Q.   So you have your accounting degree and then a systems

15  science degree?

16  A.   Yes, sir.

17  Q.   Let me just understand, from your testimony, you were

18  present on April 14, 2004?

19  A.   At the execution of --

20  Q.   Yeah, at the execution of the warrant?

21  A.   Yes, sir.

22  Q.   And you heard Agent Schneider say that he didn't have any

23  evidence that Mr. Hovind had a doctorate degree; is that

24  correct?

25  A.   Yes, I believe Agent Schneider testified to that.

1:27PM

1    Q.   Is that your belief as well?

2    A.   Yes.

3             MS. HELDMYER:  Objection.  That's beyond the scope,

4    Your Honor.

5             THE COURT:  Sustained.

6    BY MR. RICHEY:

7    Q.   Well, when you were present that day, didn't you see

8    hanging on the wall the doctorate degree of Mr. Hovind?

9             MS. HELDMYER:  Objection, beyond the scope, Your

10   Honor.

11            THE COURT:  Sustained.

12   BY MR. RICHEY:

13   Q.   But that's still your belief?

14            MS. HELDMYER:  Objection, Your Honor.

15            THE COURT:  Sustained, Mr. Richey.  My ruling is not

16   going to change.

17   BY MR. RICHEY:

18   Q.   So as a revenue agent, you said that you performed

19   examinations and audits?

20   A.   Examination and audits are interchangeable, and they mean

21   the same thing to me.

22   Q.   And that's basically when you take the documents, financial

23   documents that are provided for you and you go through and

24   calculate what the potential income was and then calculate

25   deductions and things of that nature and come up with the tax

1:28PM 1   due; is that right?

2   A.  That would vary.  You would have to be more specific.

3   Q.  You did do that at times, right?  You've done examinations

4   before?

5   A.  Yes.

6   Q.  And so you know of the procedures with examinations?

7   A.  Yes.

8   Q.  Okay.  And you're aware of the procedures then after an

9   examination is done of notifying the individual of what the tax

10  calculation is?

11  A.  Somewhat.  It's been eleven-and-a-half years.

12  Q.  So you don't do that anymore?

13  A.  Not since I became a special agent.

14  Q.  And you don't work with revenue agents anymore?

15  A.  Occasionally.

16  Q.  Did you work with a revenue agent in this case?

17  A.  I did not.

18  Q.  So it's your testimony today that no actual examination was

19  performed then by a revenue agent?

20  A.  With regards to?

21  Q.  With regards to the documents that you're showing here

22  today?

23  A.  With regards to employment taxes through 2000, 2003.

24  Q.  Correct?

25  A.  Not to my knowledge.

1:29PM

1   Q.   Okay.  But you never worked with a revenue agent, right?

2   A.   No, I did not.

3   Q.   So to your knowledge, there was no civil examination

4   performed regarding the employment taxes, right?

5   A.   For what period?

6   Q.   From 2001 through 2003?

7   A.   Not that I'm aware of, no.

8   Q.   Or even into 2004?

9   A.   Not that I'm aware of.

10   Q.   So the times consisting of the indictment here, there

11   hasn't been any examination or notice, notice of deficiency,

12   anything like that, correct?

13   A.   Again, with regards to -- I'm assuming that you're talking

14   about the employment tax liability for 2002, 2003?

15   Q.   Correct.

16   A.   Correct.

17   Q.   Now, you said that when the warrant was, on the execution

18   of the warrant, maybe I misheard you, that you were the team

19   leader for the residence?

20   A.   If I recall, I was the team leader and I believe Special

21   Agent Schneider testified also for the residence.

22   Q.   And so by the residence, what do you mean at XX XXXXXXXX at

23   XX XXXXXXXX?

24   A.   Yes, where Mr. and Mrs. Hovind reside.

25   Q.   Was that at XX XXXXXXXX or XX XXXXXXXX?

1:31PM 1    A.   XX XXXXXXXX.

2    Q.   By team leader, what do you mean by that?

3    A.   Because Special Agent Schneider was not always available at

4    each particular location, each particular location had its own

5    team leader and that was me for the XX XXXXXXXX.

6    Q.   Okay.  And that is where when all of the individuals came

7    in to work that day, that is where they were all kept, at XX

8    XXXXXXXX; is that correct?

9    A.   In the gazebo, as testified previously.

10   Q.   Right, and that's at XX XXXXXXXX?

11   A.   Yes, sir.

12   Q.   So you oversaw all of that, correct?

13   A.   No, sir, not necessarily.

14   Q.   What were your duties that day then?

15   A.   My duties with regard to the execution of the warrant at XX

16   XXXXXXXX was to answer any questions that came up with regards

17   to that residence if Scott was not available, Special Agent

18   Schneider.

19   Q.   So you just kind of meandered around, and if someone had a

20   question, they asked you?

21   A.   That's correct.  And I also assisted in the search.

22   Q.   Okay.  In what ways did you assist in the search?

23   A.   I searched portions of the residence.

24   Q.   Which portions?

25   A.   I don't recall exactly which portions.

1:33PM 1   Q.   And you talked about when you met with Mr. Hovind on

2   June 16, 2004 that he came down to your office.  Where is your

3   office located?

4   A.   XXX XXXXX XXXXX here in Pensacola.

5   Q.   Oh, okay.  And so when you come into your offices, you said

6   there was a receptionist area?

7   A.   A reception area.

8   Q.   Okay.  A reception area.  And how large is that area?

9   A.   It's relatively small.  I can't say exactly, but maybe

10   10 feet by 12 feet or something like that.

11   Q.   And just a couple of chairs in that area?

12   A.   That's correct.  There's two or three chairs in there.

13   Q.   And you said there is a camera there.  Is that -- I mean,

14   from the camera, you could see the whole area?

15   A.   Pretty much.

16   Q.   And you said that the doors are locked.  That means that no

17   one can come in past the reception area into the office area;

18   is that correct?

19   A.   It's a combination lock, a punch combination.

20   Q.   But someone just coming in, they couldn't get past the

21   reception area without you or someone else who is present to

22   allow them entrance; is that correct?

23   A.   That's correct.

24   Q.   Okay.  And so that day you remained in the reception area;

25   is that correct?

1:34PM  1   A.  To the best of my recollection, we remained in the

2   reception area.

3   Q.  Okay.  So in this small area, then there were four people

4   there?

5   A.  Yes, sir.

6   Q.  And you said there's a camera there.  Is the camera -- is

7   it recorded to where you keep the recording or is it just kind

8   of a running --

9   A.  It's recorded.

10   Q.  Okay.  Does it also pick up sound?

11   A.  No, sir, it does not.

12   Q.  And past the reception area, then that's not a public area,

13   is it?

14   A.  It is not.

15   Q.  And during your conversation then with Mr. Hovind, I

16   believe you said that he said that he hoped that you could

17   settle this peacefully; is that correct?

18   A.  Peacefully sticks in my mind as the quote.

19   Q.  Okay.  And so did you ever, after you performed your

20   calculations and determined what you thought was owed as a tax,

21   did you ever send that to Mr. Hovind and say, hey, we think

22   that you owe this; come in and pay it?

23   A.  No, sir.

24   Q.  Did you ever even send him a notice and tell him, look,

25   we're calculating tax; we believe that you owe an employment

1    tax?

2    A.   No.

3    Q.   This was the first time that -- or strike that.

4         Now you said that he said that people across the country

5    were praying for you and you said that was for you

6    individually?

7    A.   That's correct.

8    Q.   And --

9    A.   Personally.  In other words, I got the impression from him

10   that he had given my name out to individuals across the

11   country.

12   Q.   You got that impression because he said that he had given

13   your name out?

14   A.   That's correct.

15   Q.   He specifically said, I told people to pray for Frederick

16   Charles Evans or Chuck Evans?

17   A.   I don't know specifically what he said.  He gave me -- that

18   was the impression that he gave me.

19   Q.   You said that your perception is that Mr. Hovind is on the

20   offensive with the IRS, right?  Do you recall saying that?

21   A.   Yes, I do.

22   Q.   So that means that you felt like you were on defensive?

23   A.   That's not true.

24   Q.   So when he said you said it was not a friendly conversation

25   or a friendly meeting that day?

1:38PM 1   A.  Not what I would consider friendly.

2   Q.  So you didn't shake hands when you came in; you didn't

3   shake hands when you left?

4   A.  I don't recall specifically, but that would not surprise me

5   if I shook his hand, both when he arrived and when he departed.

6   Q.  Was there any pushing or shoving or yelling that went on

7   during that time?

8   A.  No, sir.

9   Q.  But because he told you that he hoped God didn't have to

10  step in and made reference to something that he had read in the

11  Bible of what God does and then you took that as a threat?

12  A.  In the context, yes.

13  Q.  Okay.  And is that the only time you felt threatened by

14  Mr. Hovind?

15     Let me ask you this:  Did you feel threatened on April 14,

16  2004?

17  A.  I don't know if threatened is the right word.  I was aware

18  in my mind that there were security issues with regards to the

19  fact that he had a concealed weapons permit and that we had

20  indications that there were weapons on the property.

21  Q.  But while you were there on the property, you never saw him

22  holding a gun or waving it around or anything like that,

23  correct?

24  A.  No, I did not.

25  Q.  And let me just show you OBS-71 and let me ask you this:

1:40PM 1   Did you ever ask Mr. Hovind what he meant by this?

2   A.  By what, sir?

3   Q.  By this statement here?

4   A.  No, I did not.

5   Q.  So you don't know what he meant by this, then; is that

6   correct?

7   A.  Other than what's indicated and, you know, how it reads.

8   Q.  Okay.  Then you prepared these documents, STR-217; is that

9   correct?

10   A.  Would you mind --

11   Q.  Do you recall those by name -- or by number?  I'm sorry.

12   A.  I do not.

13   Q.  Okay.  These documents here?

14   A.  Yes, sir.  I'm sorry.  What was your question?

15   Q.  You prepared these documents?

16   A.  No.  As I stated previously, these were actually prepared

17   by our trial illustrators.

18   Q.  Okay.  And for example, if we look at 217-B, then 7/20/01,

19   you're saying this is the first count of the indictment

20   regarding structuring, correct?

21   A.  Yes, sir.

22   Q.  Okay.  And then this one here is not part of the

23   indictment; is that your testimony?

24   A.  That's correct.

25   Q.  And the reason for that is that it was signed by Martha

Evans - Cross/Mr. Richey

1:43PM 1    Harris, correct?

2    A.  Yes, sir.

3    Q.  And then on 217-C -- I'm not sure if that helped.  We see

4    then a number of checks also for the same amount of $9,600, is

5    that correct, that are not in the darker, indicating that they

6    are not part of the indictment; is that correct?

7    A.  Yes, sir.

8    Q.  And all of these are because they were signed by Tanya

9    Hovind?

10   A.  That's correct.

11   Q.  So regarding structuring, it's only the checks between July

12   of 2001 and August of 2002 that are in the indictment?

13   A.  The ones that are shaded in the darker green.

14   Q.  And only those signed by Mrs. Hovind, not signed by Tanya

15   Hovind or by Martha Harris, correct?

16   A.  That's correct.  Only those in the darker green.

17   Q.  Even though these check amounts are in the amount of

18   $9,600?

19   A.  Yes, sir.

20   Q.  Did you -- I mean, you prepared this before 2000, but did

21   you also see the checks and review the accounts even older than

22   2000?

23   A.  Yes.  And again, let me point out, you said that I prepared

24   this.  I did not prepare this.

25   Q.  Oh, I'm sorry.  But when this was prepared, based on the

1:45PM 1    information that you had, didn't you also review prior years,

2    years prior to 2000?

3    A.  That's correct.

4    Q.  Okay.  And in those prior years were the funds 9,000 or

5    were they -- excuse me.  The checks that were written, were

6    they also 9,000, or were they less like 8,000, or 7,500 or do

7    you know, or do you know if there was a pattern established

8    prior?

9    A.  Yes.

10   Q.  And what was that?

11   A.  The same pattern.

12   Q.  Of less or more?

13   A.  Less or more than what?

14   Q.  Well, was it less or more than 9,500 or 9,600?

15   A.  They were less than 10,000.

16   Q.  Just like on 217-D, for 2003, they are all less than

17   10,000?

18   A.  No, sir.  Those numbers are significantly less than 10,000.

19   Q.  They are less than 10,000.  Are you saying that they are

20   not less than 10,000?

21   A.  These are significantly less.  And if you refer back to the

22   CTR that was filed in 1999, that would be an example of two

23   checks that were cashed in 1999.

24   Q.  Okay.  And you didn't prepare anything for 2004 either, did

25   you?

1:47PM  1   A.   No, sir, I did not.

2   Q.   Did you ever issue -- because you were trying to determine

3   the amount of funds, did you ever issue summonses after 2004 to

4   get more current bank records before the charges were brought?

5   A.   No, sir.  Mr. Richey, could you ask that question again,

6   please?

7   Q.   Yes.  Did you, after 2004, did you ever issue another

8   summons to the bank to obtain more financial documents?

9   A.   Just to be clear, there was not a summons, there were grand

10   jury subpoenas for information, some of which you got within

11   the last few days.

12   A.   Okay.

13   Q.   Okay.

14   A.   I just wanted to be clear.

15   Q.   Thank you.  I appreciate that.

16        Now, when you were looking at 217-B, you were asked and

17   your answer was that you did not see, having reviewed the

18   documentation, you had not seen any need of CSE for these

19   amounts of funds; is that correct?

20   A.   I'm not sure I understand your question.

21   Q.   Well, you were asked that in your evaluation of the

22   documentation, I believe, and the evidence that you had

23   received, that you could not determine, you couldn't find that

24   CSE, Creation Science Evangelism, had any need for these

25   amounts?

Evans - Cross/Mr. Richey

1:49PM

1    A.  For these amounts in this frequency, no.

2    Q.  And then in reference to 217-C, you had indicated that that

3    last large check for $9,600 was in September and you alluded to

4    the fact that you believed that that stopped because then at

5    that time the Hovinds became aware that they were under

6    criminal investigation; is that correct?

7    A.  I indicated that that could be one reason.

8    Q.  Okay.  But isn't it true that the summonses were issued

9    back in June?

10   A.  Of?

11   Q.  June of 2002, isn't that when the summons was served?

12   A.  I don't recall the specific date that the summonses were

13   served.

14   Q.  Okay.

15   A.  But that time frame sounds about right, yes.

16   Q.  Okay.  And then you also looked at the memo, and I'm not

17   seeing it here, so I'm not going to try to find it and pull it

18   out, but the memo from Dr. Hovind telling -- maybe.  Here we

19   go.  PR-1.  Do you recall this memo?

20   A.  Yes, sir.

21   Q.  And where it's indicated -- well, and you read this; is

22   that correct?

23   A.  Yes, I did.

24   Q.  And so it specifically pointed out to notify Tanya or

25   Martha if they still wanted paid in cash, otherwise they would

1:51PM 1   be paid in checks; is that what that indicates?

2   A.   That's what it says.

3   Q.   And then when you were preparing your employment

4   computations, you did prepare these documents, right, the PR-58

5   series?  Let me just show you that.

6   A.   Again, those documents were prepared by our trial

7   illustrators.

8   Q.   But at your request and you reviewed the information for

9   accuracy; is that correct?

10   A.   That's correct.  I provided them with spreadsheets.

11   Q.   So for example, for the Year 2001, PR-58-C for the month of

12   January, there is, according to this figure, a total payroll of

13   30,374; is that correct?

14   A.   For January, yes, that's correct.

15   Q.   And your testimony is that that is an accurate figure?

16   A.   That's an accurate figure, based on the evidence obtained

17   pursuant to the search warrant.

18   Q.   Okay.  And then if we look at STR-217-B, this is for 2001,

19   correct?

20   A.   Yes, sir.

21   Q.   And for the month of January, how many checks are indicated

22   there?

23   A.   The dates indicate that there were three checks.

24   Q.   Three checks and the first one is 9,000, correct?

25   A.   Yes, sir.

Evans - Cross/Mr. Bierber

1:53PM

1   Q.   And the second one is 9,500?

2   A.   Yes, sir.

3   Q.   And the third one is 9,500?

4   A.   Yes, sir.

5   Q.   What's the total of those three checks?

6   A.   27,000.

7   Q.   27,000.  And what was the payroll amount for January?

8   A.   $30,374.

9   Q.   All right.  But according to your testimony just a few

10  minutes ago, you said you didn't see any indication of why CSE

11  would have needed those funds.  That's what you said; isn't

12  that true?

13  A.   I don't recall exactly what I said, but it would be

14  impossible to pick out one particular month.  There is no

15  pattern with regards to the frequency of the currency

16  withdrawals as compared to the payroll.  The payroll

17  consistently fluctuated where the currency withdrawals did not.

18  Q.   Well, let's look at 2001, for example, you said that they

19  didn't fluctuate.  In January there were three checks; is that

20  true?

21  A.   Yes, sir.

22  Q.   In May there were five checks; is that true?

23  A.   Yes, sir.  What I meant was the amounts didn't fluctuate

24  very much.

25  Q.   Well, if there's six checks here as opposed to three checks

Evans - Cross/Mr. Bieber

1:55PM 1  there, are you still saying the amounts didn't fluctuate as to

2  what was withdrawn?

3  A.  The amounts on the checks did not fluctuate.

4  Q.  Okay.  But certainly the amount withdrawn each month

5  fluctuated, correct?

6  A.  Yes.

7  Q.  And you said that the payroll fluctuated; is that true?

8  A.  Yes, it did.

9  Q.  Okay.  STR-218.  What was this document?

10  A.  It's a summary of the currency transaction reports that

11  were filed.

12  Q.  So these were actual times when the bank filed a currency

13  transaction report; is that correct?

14  A.  That's correct.

15  Q.  And each time it was over $10,000, correct, that's what

16  triggered it?

17  A.  When the amounts of the transactions exceeded $10,000, a

18  currency transaction report was created or generated.

19  Q.  Okay.  So these are times when a currency, each one of

20  these times there was a currency transaction report that was

21  generated; is that what you're saying?

22  A.  Yes, sir.

23  Q.  And then, for example, this one here, 12/12/2000, then

24  looking back at STR-217-A, we see this check on 12/12/2000, so

25  you're saying that that was the check that was triggered here;

Evans - Cross/Mr. Bieber

1:58PM  1   is that correct?

2   A.   That's one of the checks.

3   Q.   Okay.  And then there is another one here, 12/12/2001,

4   correct?

5   A.   Another one being a currency transaction report?

6   Q.   Right, a currency transaction report that was issued on

7   December 12, 2001?

8   A.   Yes, sir.

9   Q.   For the amount of $9,600?

10   A.   No, sir.  The currency transaction report was for $10,588.

11   Q.   Okay.  Excuse me.  I'm sorry.  But there was a check that's

12   Exhibit STR-48 for $9,600, correct?

13   A.   Yes, sir.

14   Q.   Okay.  And then again, that's 12 -- December 12, 2001,

15   correct, on the date?

16   A.   Yes, sir.

17   Q.   And then here is your STR-217-B for 2001, correct?

18   A.   Yes, sir.

19   Q.   And we look at December, and where is the check on 12/12?

20   A.   I don't recall the check number.

21   Q.   Well, do you have one listed here at 12/12?

22   A.   No, sir.  As I indicated before, that's not the -- the

23   dates there do not indicate when the check was actually

24   negotiated.

25   Q.   Okay.  So the fact that the last one we looked at actually

Evans — Cross/Mr. Bieber

2:00PM 1    matched up with the date was just a fluke?

2    A.   The last one, meaning which one?  Because the last one

3    obviously did not.

4    Q.   The last one we looked at 12/12/2000 but also had one

5    12/12/2000?

6    A.   Yes.  That check was written the same day it was

7    negotiated.

8    Q.   Now, you said, I believe, that when you prepared these

9    documents, PRA through F, which was the employment tax

10    computation, that you did that, when did you -- I'm sorry.  I

11    apologize.  You didn't prepare this.  But when were these

12    prepared?

13    A.   Within the last several months.

14    Q.   Okay.  And the information that you used to prepare those,

15    that was all information that you had obtained in the execution

16    of the warrant on April 14, 2004, correct?

17    A.   Pursuant to the warrant, yes, sir.

18    Q.   You didn't receive other information from elsewhere and

19    used on these computations?

20    A.   That's correct.

21    Q.   So you say you prepared them in the last few months.  Can

22    you give a more exact date on that?

23    A.   No, sir.  I said that those charts were prepared within the

24    last few months, being the trial illustrators.

25    Q.   Meaning since August or in July or do you know?

Evans - Cross/Mr. Richey

2:02PM 1    A.   I don't recall specifically when our illustrators prepared

2    the charts.

3              MR. RICHEY:   Your Honor, I have no further questions.

4              THE COURT:   All right.   Thank you.   Mr. Barringer.

5              MR. BARRINGER:   Thank you Your Honor.

6                          CROSS-EXAMINATION

7    BY MR. BARRINGER:

8    Q.   Good afternoon, Agent Evans.

9    A.   Good afternoon, sir.

10   Q.   To be clear, some of the exhibits that you have brought in

11   deal with Counts 1 through 12; some of them deal with Counts 13

12   through 57; is that a fair statement?

13   A.   Yes.   I may not be perfectly familiar with the indictment,

14   but. . .

15   Q.   Okay.   Let me take you to --

16             MR. BARRINGER:   -- what's been already marked, Your

17   Honor, as INC-248.

18   BY MR. BARRINGER:

19   Q.   I'm going to show you the first page.   You recall this

20   document; is that correct?

21   A.   Yes, sir.

22   Q.   Now -- and I will -- I will note here, first of all, that

23   that center category says during this year of 2001, it's not

24   opened?

25   A.   Yes, sir.

Evans - Cross/Mr. Richey

2:04PM

Q.   And your testimony was, and in fact I believe Agent
Schneider's testimony was, that this ultimately became the
account where the missionaries employees, whatever phrase you
want to use, were being paid?

A.   That's correct.

Q.   Okay.

A.   With the exception to the children and anyone else who may
have requested to be paid in cash.

Q.   Okay.  So some people got paid with checks and some people
got paid with cash.  And the ones that got paid with checks, it
came from this account?

A.   Apparently, yes, sir.

Q.   Do you know otherwise?

A.   Other than payment by cash, no.

Q.   Okay.  Now, let me just very briefly talk about, how many
checks were written by the -- by whomever had access to the
accounts from 1999 through 2003, total, how many checks?

A.   Ask the question again, please.

Q.   Absolutely.  From 1999 to 2003, how many checks were
written by the CSE ministries, the CSE payroll account, how
many checks in total were written?

A.   Were written by whom?

Q.   Anybody who had authority to write checks?

A.   I have no idea.

Q.   How many checks were written by Jo Hovind during that same

Evans - Cross/Mr. Bieber

2:05PM  1   period of time?

2   A.  I have no idea.

3   Q.  How many of checks were written by Tanya Hovind during that

4   period of time?

5   A.  I do not know.

6   Q.  How many checks out of the AmSouth account that was used

7   for the main operation of the business?

8   A.  I don't know.

9   Q.  How many checks came out of the employee accounts during

10   that same -- during the period of time when it was opened?

11   A.  I don't know.

12   Q.  This one here --

13          MR. BARRINGER:  I'm sorry, Your Honor.  This is the

14   second page of INC-248 already admitted.

15   BY MR. BARRINGER:

16   Q.  This is the 2002 year; is that correct?

17   A.  Yes, sir.

18   Q.  And as we look on that, we see that right there -- this

19   account is finally opened up; is that correct?

20   A.  Yes, sir.

21   Q.  And it's opened in November of '02; is that correct?

22   A.  I'd have to refer to the statement itself.

23   Q.  Well, okay.  We have this issue --

24   A.  It indicates here that there is a beginning balance in

25   December, so, yes, I would. . .

2:06PM

1    Q.   Okay.  So then that raises a question.  With respect to

2    each month, are you looking at the beginning balance of the

3    month or ending balance of the month on each number?

4    A.   The beginning balance.

5    Q.   Okay.  So at the beginning of November, it says zero

6    dollars.  At the the beginning of December, it says 16,055.99;

7    is that right?

8    A.   Yes, sir.

9    Q.   And so that is now becoming the employee account in

10   December of 2002?

11   A.   Yes, sir, for people that are paid by check.

12   Q.   Paid by check, that's right.  And Special Agent Schneider

13   and you have both said that this account may have come about as

14   a result of the summonses in June or July of '02?

15   A.   That could be one reason.

16   Q.   Four or five months apart, and this might be one reason; is

17   that the testimony?

18   A.   Yes, sir.

19   Q.   Okay.  We've also heard testimony that sometime, perhaps

20   during this period and perhaps otherwise, Glen Stoll became

21   involved.  You have heard that testimony?

22   A.   Yes, sir.

23   Q.   That could be a reason as well, could it not?

24   A.   Yes, sir.

25   Q.   Now, going back to --

2:08PM 1              MR. BARRINGER:  Again, Your Honor, this is still

2       INC-248.  This is the first page again.

3       BY MR. BARRINGER:

4       Q.  And over here on this side, we have the $100,000 and this

5       is the money market account; is that right?

6       A.  Yes, sir.

7       Q.  You testified the $100,000 went to purchase property that's

8       attached now part of Dinasaur Adventure Land somewhere?

9       A.  I believe the address was XXXX XXXXX XXXXXXX.

10      Q.  Behind the main residence where the Hovind's lived?

11      A.  Yes, sir.

12      Q.  Do you know where the $100,000 came from?

13      A.  There were two $50,000 checks that were deposited into this

14      account.

15      Q.  Where did the $50,000 checks come from?

16      A.  I believe they came from AmSouth.

17      Q.  Where did they come from -- Where did the two $50,000

18      checks originally come from?  Who put the money into CSE?

19      A.  We did not have the deposit items available for the CSE

20      AmSouth account.

21      Q.  Did you do summonses to AmSouth?

22      A.  For deposit items?

23      Q.  Sure.

24      A.  No, sir.

25      Q.  You didn't care where the money came from; you just cared

Evans - Cross/Mr. Barringer

2:09PM 1    where it went?

2    A.   With regards to?

3    Q.   This case?

4    A.   With regards to the employement taxes?

5    Q.   We are talking right now -- we're talking about the

6    $100,000.   Do you know where the money came from?

7    A.   The $100,000 that is deposited to this account came from

8    the AmSouth account.

9    Q.   You have said that.

10       Before it got into the original AmSouth account, where did

11   it come from?

12   A.   I don't know.

13   Q.   Okay.

14        MR. BARRINGER:   And this is the third page, Your

15   Honor, that same exhibit, INC-248.

16   BY MR. BARRINGER:

17   Q.   First of all, did this number -- was it reduced

18   substantially from previous months or years?   Did that account

19   change dramatically?

20   A.   I'd have to see the previous years.

21   Q.   Certainly.   You're seeing the numbers there now?

22   A.   Yes, sir.

23   Q.   Okay.   And how about there?   This is the second page of

24   that document, 2002?

25   A.   Yes, sir.

2:10PM 1    Q.  Okay.  Did the number in that account change dramatically

2           over a period of time?

3    A.  It continued to increase.

4    Q.  It continued to increase over time; is that what you're

5    saying?

6    A.  As compared to the next year?

7    Q.  Yes.

8    A.  If you could put the next year up there, I believe it's

9    2003.

10   Q.  Certainly.  There it is.

11   A.  Yes, it appeared to increase.

12   Q.  And the employee account, it continued to increase as well,

13   or do you know?  You said it actually fluctuated, I believe.

14       This is again that third page of that INC-248.

15   A.  Yes, sir.

16   Q.  Okay.  How much -- strike that.

17       Now, you've also talked --

18           MR. BARRINGER:  This is STR-217-C, Your Honor, already

19   admitted.

20   BY MR. BARRINGER:

21   Q.  Now, Ms. Heldmyer had brought you and talked to you about

22   that break in the action between $9,600 checks and checks in

23   lesser amounts; is that correct?

24   A.  Yes, sir.

25   Q.  Now, first of all, did you see any checks for 9,700

Evans - Cross/Mr. Bieber

2:12PM 1    throughout this period of time?

2    A.  No, sir, not that I recall.

3    Q.  9,800?

4    A.  No, sir, not that I recall.

5    Q.  9,900?

6    A.  No, sir, not that I recall.

7    Q.  9,999?

8    A.  No, sir.

9    Q.  And for purposes of the indictment, the only ones that are

10   counts are ones that are dark green; is that correct?

11   A.  Yes, sir.

12   Q.  Okay.  That one wasn't -- that check right there that's

13   dated from 9/10/02, that's not a check in the indictment?

14   A.  That's correct.

15   Q.  And your testimony was is because it's a smaller amount; is

16   that right?

17          MS. HELDMYER:  Objection.  Calls for a legal

18   conclusion as to why something is in the indictment.

19          THE COURT:  Overruled.

20          THE WITNESS:  Ask the question again, please.

21   BY MR. BARRINGER:

22   Q.  Certainly.

23       The $9,600 checks are in.  The $5,400 checks are not.

24   Where is the line that says it should be in or shouldn't be in?

25   A.  It's not as egregious as the $9,600, I guess, would be my

Evans - Cross/Mr. Richey

2:13PM 1   best answer.

2   Q.   And again, you didn't include checks that were written that

3   somebody else signed; is that correct?

4   A.   Yes, sir.

5   Q.   And as to each count, those counts stand alone for what you

6   have alleged; is that correct?

7   A.   I'm not sure I understand the question.

8   Q.   Try again.

9        This last one I've circled, that would be Count 57, would

10   it not, or do you know?

11   A.   I don't know.  I would have to refer to the indictment to

12   be sure.

13   Q.   Each check is a separate count in the indictment?

14   A.   Yes, sir.

15   Q.   And each check stands by itself for purposes of being in

16   the indictment; it doesn't require a check beside it?

17   A.   That's correct.

18   Q.   When you -- first of all -- strike that.

19        With respect to Mrs. Hovind, did you ever talk with her?

20   A.   I'm sure I spoke with her, yes, sir.

21   Q.   When would that have been?

22   A.   During the execution of the search warrant.

23   Q.   Do you recall what you talked about?  I don't remember

24   seeing any statements?

25   A.   Yes, and they would not have been anything worthy of an

Evans - Cross/Mr. Barringer

2:15PM
1    interview memorandum.

2    Q.  You didn't go with Agent Schneider when the summonses were

3    delivered?

4    A.  In 2002?

5    Q.  Yes.

6    A.  No, sir.  I was still in Orlando at that time.

7    Q.  Okay.  Have you ever had any correspondence with Mrs.

8    Hovind?

9    A.  Not that I recall.

10   Q.  We've also got --

11           MR. BARRINGER:  And this is STR-218, Your Honor.

12   BY MR. BARRINGER:

13   Q.  We've got this -- the listing of the currency transacting

14   reports; is that right?

15   A.  Yes, sir.

16   Q.  And some of these came in through Ms. Dyson from AmSouth;

17   is that correct, the CTRs?

18   A.  Yes, sir.

19   Q.  And did she bring in -- were there any CTRs from Regions

20   Bank?

21   A.  Yes, there were.

22   Q.  And they were admitted through Agent Schneider?

23   A.  I believe, there was one CTR, which was certified that was

24   admitted with regards to the April 14, 2004 transaction.

25   Q.  And I took a look from my copies of the CTRs, and I also

2:16PM

1    saw the CTRs dealing with the actions, the checks that were

2    cashed in June of '04.  Do you recall seeing those as well?

3    A.  Just recently introduced, correct.

4    Q.  Were those from Regions Bank or were those from AmSouth

5    Bank?

6    A.  The $215,000 transactions?

7    Q.  Yes.

8    A.  Those were from Regions Bank.

9    Q.  Okay.  Now, you said that CTRs were filed; is that correct,

10   for each of these -- for each of these dates involved?

11   A.  For each of these dates.

12   Q.  Right.  Okay.  Over there on that side.  Thank you.

13       And you had commented that there was a difference -- that

14   the bank's business day ends at 2 o'clock; is that correct?

15   A.  Yes.  That's what Ms. Dyson testified to.

16   Q.  Okay.  So based upon what she had testified to, CTRs

17   probably shouldn't have been filed in this instance?

18   A.  Not necessarily.

19   Q.  Are you familiar with what the requirements are with filing

20   a CTR?

21   A.  Yes, sir.

22   Q.  And are you familiar with the instructions that go along

23   with the CTR?

24   A.  Somewhat, yes, sir.

25   Q.  If I were to show you outside the presence of the jury

2:18PM   1   those instructions, could you tell whether or not those were

2   accurate?

3   A.   Whether or not what was accurate?

4   Q.   The instructions themselves, as an example?

5          MR. BARRINGER:   If I may, Your Honor.

6   BY MR. BARRINGER:

7   Q.   Do you know whether this is the instructions for a CTR?

8   A.   Yes, sir.

9   Q.   And does it say -- and I will use for purposes of your and

10   I's discussion?

11   A.   Thank you.

12   Q.   Does it describe when a bank's business day is?

13   A.   Yes, sir.

14   Q.   Okay.  And it talks about when it normally -- the CTR is

15   filed, if there is more than $10,000 transaction on one bank's

16   business day?

17   A.   Yes, sir.

18   Q.   Now, going back in a moment to 218.  We see that we have

19   four different ones that are on opposite sides of the bank's

20   business day?

21   A.   Yes, sir.

22   Q.   Those transactions would be separate business days,

23   according to the instructions, would they not?

24   A.   For the bank, yes, sir.

25   Q.   Okay.  Now again, I'm going to go to the other document.

Evans - Cross/Mr. Richey

2:19PM  1          MR. BARRINGER:  Your Honor, thank you.

2  BY MR. BARRINGER:

3  Q.  And does it define in here what currency is or who a person

4  is or what a transaction in currency are?

5  A.  Yes, sir.

6  Q.  In currency, does it say that it is coin and paper money?

7  A.  Yes, it does.

8  Q.  Okay.  A transaction in currency is a physical transfer of

9  currency from one person to another; is that right?

10  A.  That's what it says.

11  Q.  Now, I'm going to go back to 218 again.

12          MR. BARRINGER:  Your Honor.  Thank you.

13  BY MR. BARRINGER:

14  Q.  And back again on STR-218, Mr. Evans, we see that in one,

15  two, three, four instances, checks were written to Maury

16  Adkins; is that correct?

17  A.  Yes, sir.

18  Q.  Now, the checks were made out to Maury Adkins and signed on

19  the front of the check by Mrs. Hovind, is that your testimony?

20  Do you know what I'm talking about, signing on the front of the

21  check?

22  A.  Yes, sir.

23  Q.  On the back of the check, it was not signed by Mrs. Hovind;

24  it was signed by Maury Adkins?

25  A.  It was endorsed by Maury Adkins.

Evans - Cross/Mr. Barringer

2:21PM  1  Q.  In fact, I think for purposes of everyone here, if

2  everybody takes a look at the original checks that are in

3  evidence, there is a thumb print, what looks like a thumb print

4  on each of the Maury Adkins checks?

5  A.  Yes, sir, that's correct.

6  Q.  How do you know that Mrs. Hovind knew that Maury Adkins was

7  going to go cash a check that day?

8  A.  I don't know that.

9          MR. BARRINGER:  Bear with me a moment, Your Honor.

10  I'm going to get these messed up if I'm not careful.

11  BY MR. BARRINGER:

12  Q.  Do you know what type of growth or increase in terms of

13  structure at CSE or Dinasaur Adventure Land was going on from

14  1999 to 2003?

15  A.  You'll have to be more specific, sir, please.

16  Q.  Certainly.  What additional buildings were being built?

17  A.  I believe all of that has been testified to.  I believe the

18  Dinasaur Adventure Land park, several pieces of property along

19  XXXXXXXX, pieces of property along XXXXX XXXXXXX, numerous

20  capital acquisitions.

21  Q.  Okay.

22          MR. BARRINGER:  I think that's all I have, Your Honor.

23          THE COURT:  Thank you.

24          Ms. Heldmyer.

25          MS. HELDMYER:  Thank you, Your Honor.

Evans - Redirect

2:24PM    1                        REDIRECT EXAMINATION

2        BY MS. HELDMYER:

3        Q.  Special Agent Evans, Mr. Barringer asked you a couple of

4        questions about the $100,000 that was used for the acquisition

5        of the Darlene Porter property, correct?

6        A.  Yes, ma'am.

7        Q.  Based upon your knowledge of the investigation, can you

8        tell us basically the sources of income for CSE?

9        A.  Basically, yes, ma'am.

10       Q.  What are they?

11       A.  Book sales, video sales, speaking engagements, Dinasaur

12       Adventure Land, admission fees.  I may have left something out.

13       Q.  Was there any rental property?

14       A.  Yes, ma'am, there was also rental property.

15       Q.  Did your investigation reveal whether or not the $100,000

16       that was used to buy the Darlene Porter property was obtained

17       in that like fashion by CSE?

18               MR. RICHEY:  Objection, Your Honor.

19               MR. BARRINGER:  He couldn't answer my question on the

20       same issue.  I don't know how he can answer it now.

21               THE COURT:  Approach the bench.

22               (At the bench:

23               THE COURT:  I don't want any more speaking objections

24       like that.  If you need to approach the bench, you ask to do

25       that.

Evans - Redirect

2:25PM
1          MR. BARRINGER:  I'm sorry.

2          THE COURT:  Where are you heading with this?

3          MS. HELDMYER:  All I'm trying to do is rebut the

4   impression that Mr. Barringer left that they have no idea where

5   the money comes from.  And as a matter of fact, he said he

6   doesn't even care where the money came from.

7          MR. BARRINGER:  He doesn't have any idea where the

8   money came from.

9          THE COURT:  That's not the question she's asking him.

10  She's asking him if he knows where the different sources of

11  income for the business, which is a response to the question

12  you asked a very general question.

13         MR. BARRINGER:  Yes, I did.

14         THE COURT:  She's asking a more specific question.

15  And if he can answer that, I think that's fair game.  So the

16  objection is overruled.

17         (Bench conference concluded.)

18         THE COURT:  You may proceed.

19  BY MS. HELDMYER:

20  Q.  You may answer the question.

21  A.  If you could please re-ask it.

22  Q.  I started with we were talking about the $100,000.

23  A.  Yes, ma'am.

24  Q.  I asked you if you knew about the general sources of

25  income?

2:26PM 1     MR. RICHEY:  Objection, Your Honor.  Is there a

2 question?

3     THE COURT:  Overruled.

4     MS. HELDMYER:  Thank you, Your Honor.

5     THE COURT:  Proceed.

6 BY MS. HELDMYER:

7 Q.  I asked you about the general sources of income.

8 A.  Yes, ma'am.

9 Q.  And then I asked you about regarding the $100,000 during

10 that time period, whether you were aware of whether or not

11 income of like kind that you just testified to was coming in

12 during that period?

13 A.  Absolutely.

14 Q.  Mr. Barringer was also talking to you about the 2 o'clock

15 banking day, and the CTRs that were filed, even though one of

16 the transactions came in before and one of the transactions

17 came in after the 2 o'clock banking day and -- I'm sorry.  It's

18 mixed in with the others.  I've got it.  Thank you.

19   In STR-218?

20 A.  Yes, ma'am.

21 Q.  Do you remember Mr. Barringer was asking you questions

22 about the filing of the CTR even though the banking day ended

23 here.

24   Do you recall Ms. Dyson's testimony regarding that

25 particular point, what happens at the end of the banking day?

2:27PM

1    A.   No, ma'am, not precisely.

2    Q.   Do you know whether or not the bank prepares a report at

3    the end of the day?

4    A.   Oh, yes, ma'am.

5    Q.   And what happens then?

6    A.   Currency, I'm still not sure I understand the question.

7    Q.   Okay.  Do you recall Ms. Dyson's testimony regarding the

8    report at the end of the day?

9    A.   Somewhat, yes.

10   Q.   Do you recall her testimony with regard to what happens if

11   during the course of that day transactions were made before and

12   after the 2:00 p.m. period?

13   A.   Yes, ma'am.  They would err on the side of caution and fill

14   out a currency transaction report?

15   Q.   Now, regarding the questions about why some of these checks

16   were charged in the indictment and some were not, I'm going to

17   put up CTR-217-C, I believe you said that the best way you

18   could put it is some were not as egregious as others.  Could

19   you explain that answer for us, please?

20   A.   They didn't approach the $10,000 threshold.

21   Q.   After that point in time; is that correct?

22   A.   For the most part, yes, with the exception to -- what year

23   is this?

24   Q.   Oh, I'm sorry.

25   A.   Yes, with exception to -- I think these two checks here

Evans - Redirect

2:29PM 1    were -- the transactions were conducted on the same day.

2    Q.  Is that one of them that's in your chart, in your

3    structuring chart regarding the before and after?

4    A.  Yes, ma'am.

5    Q.  Before and after the 2:00 p.m. cutoff?

6    A.  Yes, ma'am.

7    Q.  That would be the one right there on STR-218?

8    A.  That's correct.

9    Q.  And Mr. Barringer asked you how you would know that

10   Mrs. Hovind could predict or knew that Maury Adkins was going

11   to cash a check that day.  If she had known he was going to

12   cash a check that day, what else could she have known, based

13   upon the fact that Mr. Adkins was going to cash his check?

14   A.  She could have known --

15             MR. BARRINGER:  Objection, calls for speculation.

16             THE COURT:  Sustained.

17   BY MS. HELDMYER:

18   Q.  If -- let me ask -- let me ask this on STR-218 on one of

19   the Maury Adkins -- let's go down here to this one.  Do you see

20   that 8/02/02?

21   A.  Yes, ma'am.

22   Q.  Do you see -- you have the check -- it's a $500 check to

23   Maury Adkins, correct?

24   A.  Yes, ma'am.

25   Q.  And it has a $9,600 check that was cashed by Mrs. Hovind,

Evans — Redirect

2:31PM 1    correct?

2    A.  Yes, ma'am.

3    Q.  Had Maury Adkins not gone to the bank that day and cashed

4    his $500 check that day, would the CTR have been filed?

5    A.  No, ma'am.

6    Q.  The amount of check that she has, this $9,600, is that

7    amount familiar to you for this period of time?

8    A.  Absolutely.  It's consistent with the other checks for

9    $9,600.

10   Q.  And the same with the 12/12/01 right here?

11   A.  Yes, ma'am.

12   Q.  Had Maury Adkins not gone to the bank and signed the -- and

13   cashed his check, would a CTR have been filed based upon the

14   actions of --

15   A.  No, ma'am.

16          MS. HELDMYER:  Thank you.  I have nothing further.

17          THE COURT:  All right.  You may step down.

18          Your next witness.

19          MS. HELDMYER:  Your Honor, the United States rests.

20          THE COURT:  I'd ask counsel to approach, please.

21          (At the bench:

22          THE COURT:  What is your plan?

23          MR. RICHEY:  First of all, I'd like to make a motion

24   of judgement of acquittal.  The government has failed to make

25   its case.

2:32PM  1                    THE COURT:  All right.  Do you want to make this here

2        now?

3                    MR. RICHEY:  I'd prefer outside the presence of the

4        jury.

5                    THE COURT:  What we'll do -- I don't want to take the

6        jury's time right now.  What we can do is proceed with your

7        case with the understanding that you have the right to reserve

8        and make your ruling at a break or at the end of the day --

9                    MR. RICHEY:  Okay.

10                   THE COURT:  -- and you don't waive your right.

11                   MR. RICHEY:  I need to consult real quickly with my

12       client because we had a witness outside waiting, and he may

13       have left.  So I need to see if my client is going to take the

14       stand if that witness isn't here or -- I just need to confer

15       just briefly with him.  It will be 30 seconds or a minute.

16                   THE COURT:  Go do that.

17                   MS. HELDMYER:  Can I point something out, though?  The

18       names that we got from Mr. Richey, some of those names were not

19       on the witness lists that were given at the beginning of trial.

20                   THE COURT:  I'm going to let the jury go out for a

21       minute.

22                   (Bench conference concluded.)

23                   (Jury out.)

24                   THE COURT:  All right.  Ladies and gentlemen, we need

25       to tie up a few loose ends before we proceed with the defense

2:33PM 1   part of the case, so I'm going to excuse you for, hopefully not

2   very long, to the comforts of the jury room.

3          Please don't discuss the case during this brief

4   recess, and please don't form any opinions about the merits of

5   the case, because although the government has rested, there is

6   still perhaps more evidence for you to hear.

7          You will be excused at this time.

8      (Jury out.)

9          MR. RICHEY:  Your Honor, if I could address those

10   names.  I believe there were four, and one of them is Michelle

11   Kane, who is a representative for AmSouth Bank, and then Karen

12   Land, who also works with AmSouth.  And in issuing the

13   subpoenas, we found out that they were the appropriate persons

14   or individuals to contact.  However, I don't believe they will

15   be testifying today because in discussing with them, they still

16   did not have the documents ready.

17          The other two individuals that were given on the list

18   was Jonathan Sampson and Dan Woods, both of whose names have

19   been used quite a bit in this trial, as they were -- had

20   actually submitted affidavits and were involved there at CSE.

21          MS. HELDMYER:  Your Honor, I believe Dan Woods was on

22   our witness list and Karen Land was on their witness list, so I

23   think we're safe on those two.

24          MR. RICHEY:  So it would have been just been those

25   two, Jonathan Sampson and Michelle Kane.

2:35PM

1          THE COURT:  All right.  What's the objection to

2    Mr. Sampson and Ms. Kane, Ms. Heldmyer.

3          MS. HELDMYER:  Your Honor, I don't have an objection.

4    I just thought that the jury ought to -- I mean, I certainly

5    don't have an objection at this point, but I just thought the

6    jury ought to know.

7          THE COURT:  I apologize.  I assumed you had a specific

8    objection to them testifying.

9          MS. HELDMYER:  Not at this point.

10         THE COURT:  Is it Karen Land, L-a-n-d?

11         MR. RICHEY:  Yes.

12         MS. HELDMYER:  That name has already been given to the

13   jury, hasn't it?

14         THE COURT:  Michelle Kane.  How do you spell that?

15         MR. RICHEY:  I believe it's K-a-n-e.

16         THE COURT:  And she's with what bank?

17         MR. RICHEY:  AmSouth.

18         THE COURT:  And Jonathan Sampson, S-a-m-p-s-o-n.

19         MR. RICHEY:  That's right.

20         THE COURT:  And is he from Pensacola?

21         MR. RICHEY:  Yes, he is.

22         THE COURT:  All right.  Then how do you wish to

23   proceed?

24         MR. RICHEY:  Well, Jonathan Sampson was out there.  If

25   I could just make a motion for judgement of acquittal now?

2:36PM

1           THE COURT:  You can, yes.

2           MR. RICHEY:  Your Honor, the evidence -- the charges

3    require the government to prove, first of all, Counts 1 through

4    12, willfulness on the part of my client.  And to prove

5    willfulness, they have to have proven that there was a known

6    legal duty or a legal duty that my client was aware of that

7    duty and that he failed to obey that duty.  The evidence that

8    has been presented.  There is no evidence as to what -- that he

9    knew that there was a legal duty.  In fact, there's been no

10   testimony that he was ever been given notice that he had to pay

11   employment taxes or told that.

12           So in essence, the administrative process of the

13   Internal Revenue Service has been avoided, due process has been

14   avoided, and they've left it to these charges.  And this being

15   the first time ever that my client has been notified that he,

16   in fact, had this duty to perform.

17           Further, the government bore the burden to prove that

18   he was, in fact, an employer, although there's been some

19   allegations regarding that, but never any proof rising to what

20   is required for a conviction under 7202.

21           In regards to Counts 13 through 57, Your Honor, the

22   testimony has been that the threshold amount is $10,000 or

23   more.  And as the evidence has just been demonstrated, that on

24   every one of those transactions that are charged in the

25   indictment, the amount is only $9,600 or $9,500, thus, never

1    reaching the amount that was required to, in fact, have a crime

2    be committed.  It is like charging -- like an officer pulling

3    someone over in a 55-mile-an-hour speed zone doing 51 and

4    charging them with speeding.  In order to have a conviction

5    under Counts 13 through 57, the threshold amount had to have

6    been met and triggered or at least that there were transactions

7    in that time frame, but so close in proximity as to causing the

8    bank to avoid having to -- or to evade -- actually, to cause

9    the bank to evade having to file that CTR.  And what we see in

10   the indictments is -- in the indictment is that the dates that

11   separated were so far apart that they could not legally be

12   linked together to serve as one transaction, thus, breaching

13   the required amount.

14        In regards to Count 58 under 7212, the charge is that

15   Mr. Hovind did corrupt the endeavor to impede and obstruct the

16   due administration of the Internal Revenue Service.  And the

17   evidence that's presented is that, although the revenue

18   officers believed that he had made veiled threats due to

19   prayers or had filed lawsuits, which as this Court saw, many of

20   those lawsuits were dismissed not because they were frivolous

21   but because they -- Mr. Hovind failed to follow proper

22   procedures.  They were dismissed on procedural errors.  And in

23   fact, many occasions, the law specifically gave Mr. Hovind the

24   opportunity to come to court under the First Amendment and seek

25   a regress of its grievances.  But more importantly than that,

2:41PM

1   he had the right to challenge those.  He had the right to come

2   to court and ask that.  And the fact that it was thrown out on

3   technical procedural errors cannot amount to a crime.

4          Further, the actual requirement is corruptly endeavor

5   to impede or obstruct.  And all we heard was -- well, it

6   impeded me.  It obstructed me a little bit.  And yet, he

7   testified -- the Agent Schneider testified that there were, in

8   fact, other things that he could have done at that time.  And

9   so the actual investigation was never impeded or obstructed.

10  The fact that a summons was issued and he filed a petition to

11  quash that and refused under the Fifth and Fourth Amendment to

12  provide the evidence that could be used to convict him can also

13  not be held as committing a crime.  And so although the

14  officers may have felt that they were somewhat obstructed or

15  impeded, it never reaches the threshold of being corrupt.

16         So based on that, Your Honor, we'd ask the Court to

17  dismiss the charges in this case.

18         THE COURT:  All right.  Thank you.

19         Do you wish to proceed, Mr. Barringer?

20         MR. BARRINGER:  Thank you, Your Honor.  I also would

21  make a motion for judgement of acquittal as to Counts 13

22  through 57 on behalf of Jo Hovind.  I reiterate or adopt in

23  part what Mr. Richey had stated concerning these checks.  We

24  heard from Agent Evans just a few minutes ago that each check

25  stands by itself.  They are not a group.  Each check is a

2:42PM 1    separate transaction.  Each check in and of itself does not

2    have multiple transactions within that one day that triggered

3    the $10,000.  Each check by itself is not -- it is not a crime

4    under the statutes that are listed in this indictment and the

5    regulations that go along with it.

6            We saw from -- or Agent Evans testified as to how the

7    CTRs are supposed to specifically apply and how it would work

8    itself through the process of filling one out, and it made it

9    abundantly clear that with respects to all of these Counts 13

10    through 57, none of them rise to the level of meeting the

11    criteria that we've already been talking about that

12    demonstrates that a crime has occurred and that structuring has

13    occurred that is a crime.  Structuring has to be multiple

14    transactions above 10,000.  We have one check, each count, that

15    isn't the structured count, isn't a structuring process.  It is

16    one check per count.  That's how the indictment is pled and

17    that's how it has to stand.  The indictment fails, as a matter

18    of law, because it cannot and does not state a cause of action

19    on each separate count standing by itself.  And, therefore, I

20    request the Court dismiss those charges.

21            THE COURT:  Thank you.

22            Ms. Heldmyer.

23            MS. HELDMYER:  Your Honor, we have a fundamental

24    disagreement on what the law is, particularly in structuring.

25    The point of the structuring is to punish the offense of

2:44PM

1   creating a financial transaction to evade the reporting

2   requirement.  Therefore, if we prove, which I believe we have,

3   that the reason why these transactions were conducted under

4   $10,000, that is classic structuring.  Where the defense is

5   getting the idea that we have to go over the $10,000 limit is a

6   mystery to me.  There is absolutely no requirement.  As a

7   matter of fact, it wouldn't be structuring if that were the

8   case.

9          Certainly, in this particular case, this is an

10  overwhelming pattern of checks that were written to cash, that

11  were written under the $10,000 limit with absolutely no pattern

12  and no structure that would indicate that it was reflective of

13  any of their needs.  The fact that the transactions were

14  conducted before and after 2 o'clock on the same day is nearly

15  prima facie evidence of structuring on its face.  So certainly

16  in this particular case, and with the evidence viewed in the

17  light most favorable to the government, the structuring counts

18  stand and should go to the jury.

19         Likewise, with the payroll, the United States has

20  provided evidence from many witnesses that they had an

21  employer-employee relationship, that he was aware; that he

22  informed his employees that he would not be withholding; that

23  he didn't believe in all that.  So he was well aware.  He just

24  chose not to do it.  So I believe that we have shown and we

25  have presented enough evidence to go to the jury with regard to

2:45PM

1   willfulness and with regard to the employer-employee

2   relationship.

3          As to Count 58, Your Honor, the defense has taken as a

4   whole show a very persuasive pattern of abuse, and we even have

5   witnesses who testified that Mr. Hovind had stated

6   affirmatively, Mr. Gibbs, Mr. McConnell, that he was doing

7   this; that he was going to stay on the offensive; that he was

8   going to file these lawsuits.  He doesn't care whether they

9   were frivolous; he doesn't care whether he's got right.  And

10  it's the intent behind the lawsuit, not whether the lawsuit

11  itself is permissible, generally speaking, under the law.  It

12  is his intent behind those lawsuits and behind the FOIA

13  requests and the threats against the agents.  And the jury is

14  certainly free to find that this is obstructive behavior; that

15  he was corruptly impeding and impairing the IRS.

16          THE COURT:  All right.  Construing the evidence in the

17  light most favorable to the government as to Counts 1 through

18  12, there has been sufficient evidence presented during the

19  government's case in chief to establish willfulness as well as

20  to support a jury's verdict on the question of whether

21  Mr. Hovind was an employer as well as willfulness.

22          On 13 through 57, and the counts there, the

23  structuring counts, I agree with the government.  The law does

24  not require the government to prove that the bank actually did

25  have the duty to file the CTRs and it's irrelevant whether they

2:47PM 1    did or they didn't file the CTRs.  The only issue that's

2    relevant on the structuring count, the 5324(a) charge is

3    whether or not the defendants had the intent or the purpose to

4    evade those reporting requirements through their structuring or

5    financial activities -- excuse me -- financial transactions,

6    and there has been sufficient evidence to present that to the

7    jury in this case.

8         On Count 58 there has been more than ample evidence

9    submitted to support sending that count to the jury as well on

10    whether Mr. Hovind corruptly endeavored to impede or obstruct

11    the due administration of the IRS laws, and there is no

12    requirement for the government to prove that the IRS was

13    actually impeded or obstructed in their activities.  So both of

14    the motions on behalf of Mr. Hovind as well as on behalf of

15    Mrs. Hovind will be denied.

16         And you will now present your case.  Are you ready to

17    do so?

18         MR. RICHEY:  If I can step out with my client just one

19    minute?

20         THE COURT:  I tell you what we'll do, we're going to

21    take, all of us, take a ten-minute recess and then when we come

22    back in.  We'll just proceed and see where we get at the end of

23    the day.  I was trying to decide whether we would take another

24    break, but I'll decide that later.  We'll take ten minutes, and

25    we'll be in recess until 3 o'clock.

2:48PM 1           (Recess.)

2           THE COURT:  Mr. Richey?

3           MR. RICHEY:  Yes, Your Honor.

4           After discussing with my client and reviewing

5 everything, we believe, again, that the government has not met

6 its burden, so at this time we're going to rest.

7           I would ask the Court to inquire of my client whether

8 he is going to give up -- I've discussed it and advised him not

9 to take the stand, but I would, again, ask the Court to inquire

10 of him regarding that.

11          THE COURT:  All right.

12          Mr. Hovind, you've heard what Mr. Richey, your

13 attorney, has just communicated to the Court.  Is it your

14 decision, sir, to proceed as he's indicated?

15          THE DEFENDANT:  If I understand your question, I do

16 not believe the government has met their burden of proof.

17          THE COURT:  That was not my question.  My question was

18 whether you plan not to proceed.  It's your decision not to

19 take the witness stand or present any defense.

20          THE DEFENDANT:  That is correct.

21          THE COURT:  Mr. Barringer, then, you're up.

22          MR. BARRINGER:  After having consulted with my client,

23 we also choose to rest.

24          THE COURT:  Is that your decision individually, Mrs.

25 Hovind?

3:04PM  1          THE DEFENDANT:  Yes, Your Honor.  Under the advice of

2  my counsel, I'm not going to take the witness stand.

3          THE COURT:  Understanding that you have the right to

4  act against the advice of your counsel and to take the witness

5  stand?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  Thank you.

8          MR. RICHEY:  Your Honor, again, at this time I would

9  like to renew my motion for judgement of acquittal.

10          THE COURT:  That would be denied.

11          MR. BARRINGER:  As would I, Your Honor.

12          THE COURT:  That would be denied as well.

13          All right.  Then what I propose we do is bring the

14  jury back in and excuse them for the day, ask them to return

15  tomorrow and we will begin with closing arguments and the

16  instructions, and then they will begin to deliberate.

17          We do have some final things we need to discuss as far

18  as instructions that we can take this afternoon to do just

19  that.

20          Any objection to proceeding in that fashion, Ms.

21  Heldmyer?

22          MS. HELDMYER:  No, Your Honor.

23          THE COURT:  Mr. Richey?

24          MR. RICHEY:  No, Your Honor.

25          MR. BARRINGER:  No, Your Honor.

3:05PM 1              THE COURT:  All right.  If you would bring the jury

2      in.

3              (Jury present.)

4              THE COURT:  All right.  Ladies and gentlemen, you have

5      now heard all of the evidence that is to be presented during

6      the trial.  Both of the defendants, individually, have elected

7      not to present any evidence to you, and as I've told you

8      several times during these proceedings, that is their right.

9      And they have elected to proceed in that fashion, so the

10     evidence has now all been presented to you.  And this portion

11     of the trial, the evidence portion of the trial, is now

12     complete.

13             However, the trial is not over.  As I have indicated

14     to you, there is still the matter of the closing arguments of

15     counsel, and then also, of course, your instructions on the

16     law.  Once those two proceedings have been completed, then you

17     will retire to the jury room to consider your deliberations.

18             Because of the hour of the day, I'm going to excuse

19     you now.  We have some final things that we need to discuss

20     here, I need to discuss with the attorneys.  And so as not to

21     just leave you sitting in the jury room, I'm going to let you

22     go home now and ask that you return tomorrow at 8:30, and we'll

23     begin promply at 8:30 with the closing arguments of the

24     attorneys, and we'll proceed immediatly into the final

25     instructions, and then you'll retire to the jury room for

3:07PM 1   deliberations.

2                  Do you understand?

3                  THE JURY:  Yes.

4                  THE COURT:  All right.  As always, but probably more

5   important now than ever because you have heard all of the

6   evidence, but the trial, again, is not over, and you may not

7   begin to consider your decision in this case or the merits of

8   the case until you've heard the arguments of the attorneys, and

9   of course, until you've received your instructions on the law.

10  So please, don't begin to form any opinion at this time.

11                 Please don't discuss the case amongst yourselves, nor

12  with anyone else during this evening recess.  Avoid all news

13  reports of this trial and make no inquiry or any research on

14  your own of the matters which you've heard testified or

15  discussed during the trial.

16                 And we'll see you tomorrow morning at 8:30 to proceed

17  with the closing arguments of the attorneys.  Goodnight.

18                 All right.  I'm going to step off the bench just

19  momentarily to make copies of these jury instructions.  I

20  wasn't exactly prepared to proceed right into that at this

21  time, so let me do that and get copies of these instructions

22  for you to review and that's how we will proceed.

23                 We'll take a brief recess.

24                 (Brief recess.)

25                 THE COURT:  All right.  Well, I wasn't, as I said,

3:25PM 1    prepared to proceed right into jury instructions, so it's going

2    to take just a few moments for us to get those printed for all

3    of you.

4         I do want to talk about the issue of Count 58 and the

5    special verdict form and that issue.

6         Ms. Heldmyer, do you agree that if the jury --

7    hypothetically, the jury was to find beyond a reasonable doubt

8    as to only the one activity beyond the statute of limitations

9    that there would be an issue here?

10        MS. HELDMYER:  Your Honor, I don't know how we would

11   know that though.  That in a nutshell, I would agree with that,

12   but how would we know if not all of the acts are listed or they

13   don't have an opportunity to vote on all of the activities that

14   they may consider to be impairing and impeding?  Or what if

15   they find that it's an overall pattern, you know, that is an

16   ongoing issue.  I don't think -- so if that were the only

17   charge or if that were -- if they could somehow communicate

18   that, then I would be a little bit more agreeable to that, but

19   frankly, I don't know how we can do that.

20        THE COURT:  I don't either and the suggestion to list

21   what is charged in the indictment with a catchall at the

22   bottom, that says "other" is not a solution.  I mean, the

23   government -- I've already announced my ruling the government

24   doesn't have to list each and every act, and the indictment, I

25   believe, says the following acts among others or including

3:27PM 1    others or something.

2           MS. HELDMYER:  It says "including."  "Impairing,

3    impeding, including the following," is what it says.

4           THE COURT:  Well, I don't see a way to address it

5    without totally confusing the jury.

6           MR. RICHEY:  Your Honor, if I may just briefly, if you

7    say that enlisting them and then putting a catchall at the

8    bottom would be confusing to the jury, then my argument is that

9    the indictment is confusing to the jury.  As the case that was

10   provided by counsel, the *Griffin* case, points out that if under

11   circumstances where there are alternatives and if those

12   alternatives were -- any of them were to be found

13   unconstitutional or illegal, and there was no way to determine

14   if one of those were what the jury had decided upon, then the

15   entire verdict must be overturned, and so in an effort to avoid

16   that, that's one of the reasons why I proposed this.

17          THE COURT:  I'm wondering if we couldn't word the

18   verdict form -- instead of listing all these acts and

19   attempting to covering others that there is evidence of --

20   somehow to ask the jury on the verdict form if they -- if they

21   conclude that Mr. Hovind, beyond a reasonable doubt, that he

22   did corruptly endeavor to obstruct and impede the due

23   administration of the Internal Revenue laws.  Well, none of

24   these, there are no dates here as far as when these activities

25   occur.

3:32PM 1          Which act is it that falls outside the statute?

2          MR. RICHEY:  It would be the bankruptcy petition, Your

3     Honor.

4          THE COURT:  Ms. Heldmyer, you suggest that if the jury

5     were to find that it was an ongoing pattern, that that would

6     escape the statute?

7          MS. HELDMYER:  I do believe so, Your Honor, because --

8     because it's -- as we argued in our motion to dismiss response,

9     I believe this to be a continuing act crime, and I think that

10    the jury could find that we have an ongoing pattern of

11    behavior.

12         THE COURT:  What's the time period?  Refresh my memory

13    between --

14         MS. HELDMYER:  March 1996 up to and including the date

15    of the indictment.

16         THE COURT:  Right, but as far as the bankruptcy

17    petition and the next most recent act that's alleged.

18         MS. HELDMYER:  The bankruptcy petition was in 1996.

19    These are more or less in chronological order as best we could

20    put them, so the next one would be after the search warrant, so

21    we're going all the way up to 2004.  Except for that, there is

22    D which says "making threats of harm to those investigating him

23    and to those who may consider cooperating with their

24    investigation," which could span a period of time, depending on

25    how they define threat.

3:35PM  1        And in terms of spanning time periods, I think G and H

2   would probably span the time period as well, "destroying

3   records and paying employees in cash and labeling them

4   missionaries."

5        THE COURT:  My question related only to the bankruptcy

6   in relation to the next most recent, or to the next act and

7   what time span in terms of accepting your argument as far as an

8   ongoing pattern.

9        MS. HELDMYER:  Right.  That was my point on those

10   particular allegations, that those allegations themselves span

11   time, several threats, incidents of destruction of records, and

12   calling employees missionaries, that's all over a period of

13   time.  Those aren't single acts, is what I'm saying.

14        MR. RICHEY:  Except, Your Honor, I believe the

15   evidence that's been presented in regard to all of that only

16   spans, I believe from 1999.  I don't think there is any

17   evidence of destroying records or paying employees and labeling

18   them as missionaries back as far as 1996.

19        THE COURT:  I'm sorry.  What was the date of the

20   allegation in B in the indictment?

21        MS. HELDMYER:  That would be the allegation right

22   after the search warrant, so that the search warrant was April

23   of 2004 and the criminal trespass was the service of the search

24   warrant, so it was a couple months after that.

25        Regarding the missionaries, I think Brian Popp

3:37PM 1  testified that he was considered a missionary all the way back

2  to the beginning of his employment which was the early '90s.

3          THE COURT:  I'm trying to determine if there is some

4  way to objectively address this now so as to resolve any issue

5  later or to avoid any issue later.

6          MS. HELDMYER:  Is there any way to fashion an

7  instruction or a part of the verdict form that indicates that

8  they must find that some part of the behavior that they are

9  finding was committed -- occurred within the past five years.

10          THE COURT:  Well, let me ask what you think about

11  this, this language is similar to what you propose.

12          If you find that the defendant has obstructed or

13  impeded the due administration of the Internal Revenue laws,

14  and that's a predicate, that must first be determined, but that

15  the most recent act that the defendant took to obstruct or

16  impede occurred prior to July 11, 2000 -- you'll have to

17  correct me if I'm wrong about that date -- then you must find

18  the defendant not guilty of the charge in Count 58.  Or we can

19  reword it.

20          The idea is to try and ensure that they don't

21  convicted Mr. Hovind of Count 58 based solely on an act that

22  took place prior to the statute of limitations.

23          MS. HELDMYER:  I agree with the goal, Your Honor, I

24  don't have any problem with that.  I've asked Mr. Davies to

25  join me.  He'll be here very soon.  I'd like to consult with

3:39PM  1    him.  He's done the research on this particular issue so --

2           THE COURT:  We'll get back to this, Mr. Richey.

3           MR. RICHEY:  Your Honor, just one thing.  It sounded

4    fine to me except if you could, again, include the word

5    corruptly in there, corruptly endeavor to obstruct or impede.

6           THE COURT:  All right.

7           MR. RICHEY:  And then I don't know if the Court wants

8    to address it, I want to address one thing as far as what was

9    handed out this morning.

10          THE COURT:  I'm going to get to that in a moment.

11          I'm going to ask Ms. Simms, if you would hand this to

12   Ms. Heldmyer so she can discuss this with Mr. Davies.

13          MS. HELDMYER:  Thank you, Your Honor. I appreciate the

14   time.

15          Your Honor, does the statute have a six-year statute

16   of limitations?

17          THE COURT:  You'll have to tell me.

18          MS. HELDMYER:  I'll look it up.

19          MR. RICHEY:  Your Honor, I believe it is a six year.

20          THE COURT:  I'm trusting that it is because my law

21   clerk, Stephen, came up with the date, and he's been

22   researching these issues for me.

23          MS. HELDMYER:  I believe Title 26, generally is, I

24   noticed you used the date of July 11th of 2000, so.

25          THE COURT:  You know what, I will send a message to

3:41PM 1    Stephen and ask him to check on it.

2            MR. RICHEY:  Title 26 is generally a three year, but

3    there is a exception for this specific provision.

4            THE COURT:  All right.  We'll confirm it one way or

5    the other.  Okay.

6            MS. HELDMYER:  Your Honor, we do not have an objection

7    to the proposal the Court has given us here in the addition of

8    the Court's instruction.

9            THE COURT:  Okay.  And I think that solves the

10   problem, thank you, and we will make that change.  And I'm

11   having Mr. Ng, my law clerk, check on the statute.

12           MR. RICHEY:  Your Honor, I believe it's 26 U.S.C.

13   6531.

14           THE COURT:  Yes.  That's the message I just received.

15   It's six years.  Thank you.

16           All right.  You all now have a new packet, new and

17   revised, updated.

18           And, Mr. Richey, I'll hear comments from everyone who

19   wants to make them as we get to those specific instructions

20   that you wish to comment on, including the ones that you were

21   given today.  All right.

22           Let's start with -- page 1 is, obviously, not an

23   issue.  Page 2 is 2.2, the headings have been removed, but it's

24   2.2.  It is the instruction that is to be given when a

25   defendant elects not to testify so as to protect his or her

3:44PM 1    right to do so.  Page 3 is burden of proof, reasonable doubt.

2    Page 4 concerns direct and circumstantial evidence.  Page 5

3    concerns credibility of witnesses.  Page 6 -- and I'm sorry.  I

4    don't remember what number in the six series this is.  I

5    believe it may be 6.1.  We have no defendant testifying.  We

6    have no prior felony convictions.  So this is the simplest of

7    the six series.  We didn't have any felony convictions, right?

8            MS. HELDMYER:  Right.

9            THE COURT:  Page 7 is the instruction on charts or

10   summaries.  Page 8 is the 404(b) instruction that we've already

11   discussed.  Page 10, note-taking.  And then the next

12   instruction on page 11 is the introduction to offense

13   instructions, and there is something here that I am going to

14   change that I just didn't pick up on it previously.  I'm not

15   going to capitalize the defendants' names.  I don't typically

16   do that.

17           Yes, Mr. Richey?

18           MR. RICHEY:  Yes, down on Counts 13 through 57, that

19   would be the fourth paragraph.

20           THE COURT:  Right.

21           MR. RICHEY:  It charges the defendant Kent E. Hovind

22   and the defendant Jo D. Hovind knowingly, and then it says, "In

23   addition, each of the counts charge the defendant Kent E.

24   Hovind and the defendant Jo D. Hovind in aiding and abetting."

25           I believe that government stated yesterday stated --

214

3:46PM

1    and I'm not trying to put words in their mouth, if I'm

2    incorrect, I stand corrected -- but the government stated that

3    actually -- and the evidence shows, that all the checks

4    regarding Counts 13 through 57 were signed by Jo Hovind.  None

5    of them were signed by Kent Hovind.  So this needs to either be

6    changed to -- that Jo Hovind was charged and that it is Kent

7    Hovind is charged with aiding and abetting or -- I'm going to

8    renew my motion to dismiss based on there was no evidence on

9    Counts 13 through 57 that my client was the principal in this

10   charge.

11           THE COURT:  Do you have your mike off or covering --

12           MR. RICHEY:  Do I need to start over?  I will.

13           I'll start over now.  I apologize.

14           On page 11, down to paragraph 4, charges Counts 13

15   through 57 and charged as principles, both Kent E. Hovind and

16   defendant Jo D. Hovind, and then the last sentence says, "In

17   addition, each of these counts charge that defendant Kent E.

18   Hovind and Defendant Jo D. Hovind of aiding and abetting the

19   commission of this offense."

20           And it's my understanding that the government said

21   that it was Jo Hovind that was charged as a principal and my

22   client, Kent Hovind, with the aiding and abetting.  So I would

23   ask that that be changed.  If the Court doesn't change that,

24   I'm going to renew my motion for judgement of acquittal that

25   the charges against my client be dismissed as to Counts 13

3:48PM  1    through 57 inasmuch as none of the checks, none of the evidence

2    that was submitted on this were signed by my client, so he

3    could not be charged as a principal in these counts.

4             THE COURT:  All right.

5             Ms. Heldmyer?

6             MS. HELDMYER:  Your Honor, the proper statement of the

7    law is found in the aiding and abetting pattern jury

8    instruction and it says in the first paragraph, "The law

9    recognizes that anything a person can do for oneself may also

10   be accomplished through the direction of another person or by

11   acting together with or under the direction of another person

12   or persons in joint effort."

13            So aiding and abetting covers both ends of the

14   principal and agent spectrum and so it's properly worded the

15   way that it is.

16            THE COURT:  All right.  I agree.

17            Mr. Richey, I'm going to deny the motion and leave it

18   as it is.

19            MR. RICHEY:  Your Honor, just one more thing, and this

20   is just for clarification.  All of the objections we raised

21   before are secured, correct?  We don't have to renew them now

22   as we're going through?

23            THE COURT:  Objections to the instructions?

24            MR. RICHEY:  To the instructions.

25            THE COURT:  No, you don't need to renew them.  They

3:49PM 1    are preserved and the ruling is on the record.

2           Unless there is something that you don't think you

3    have a ruling on yet.  If I have neglected to give you a ruling

4    on an objection that you've made, then you may need to remind

5    me of that.  I think I've covered them all, but to the extent

6    that you think I missed something, then you would need to let

7    me know that.

8           All right.  So back to page 11 and that instruction, I

9    am going to not capitalize, as I just mentioned, the

10   defendant's names.  And that will be the same throughout the

11   instructions.

12          All right.  Page 12 is the instruction on Count 1

13   through 12.  On page 14 at the bottom, there is the language

14   about churches not being exempt from the requirements.  Page

15   15 --

16          MR. RICHEY:  Your Honor, I just need, for

17   preservation's sake, I think this is a new edition and I didn't

18   make objection on page 14 that churches are not exempt.  My

19   objection is that under -- I don't think that it was clearly

20   testified in the trial that there are exemptions granted, but

21   what those exemptions are, I think, are still -- I don't know.

22   I don't even know what they are.  I know it was stated that

23   churches have some exemptions under 501(c)(3), anyway I. . .

24          THE COURT:  Actually, I think that it may be that as

25   far as employment taxes that some religious orders are exempt,

3:52PM 1  but not what you and I understand to be a church.

2        MR. RICHEY:  Well, I'm not sure what you and I

3  understand to be a church -- I don't know that there's been any

4  definition here in the Court of what a church actually is.

5        THE COURT:  Well, I'm going to leave this and there

6  is -- there is and has been evidence presented during the trial

7  or suggested argument through the evidence that CSE perhaps was

8  not required to withhold these taxes, and I'm not going to

9  allow the jury to be misled in that regard.

10       I mean, if you want to propose different language that

11  meets that same goal that I have, I'll consider it.

12       MR. RICHEY:  I'm stating my objection, so. . .

13       THE COURT:  So your objection is what?

14       MR. RICHEY:  Objection as to that being included,

15  because I think it's unclear what -- as you just stated, that

16  some religious orders are exempt from that, and I don't think

17  it's clear which or what and that there hasn't been a specific

18  determination as to CSE, where it lies.  We heard from Agent

19  Schneider where he believes it lies, but that wasn't even a

20  legal determination, as he said.  He doesn't make legal

21  determinations, so.

22       THE COURT:  Well, I'm going to leave it in.  Mr.

23  Richey, your objection is noted.  If you want to bring me a

24  specific provision of the code that indicates that CSE, as it

25  existed, was exempt, I'll hear your argument, but in this case,

3:54PM

1    based on the evidence that has been presented, this language is

2    going to be given.  Do you have such argument you wish to make?

3                MR. RICHEY:  And this has been brought forth in the

4    trial as well, but 26 U.S.C. 508(c)(1) is a mandatory exception

5    to churches -- (1)(a) "to churches, their integrated

6    auxiliaries and conventions or association from the churches."

7                THE COURT:  From paying employment taxes?

8                MR. RICHEY:  You know, to be honest, I don't know

9    which taxes this applies to.

10               THE COURT:  Well, can you stand here as an officer of

11   the Court and represent to the Court in good faith that you're

12   aware of some provision that indicates that churches do not

13   have to pay employment taxes?  I'm not concerned about any

14   other taxes but employment taxes.

15               MR. RICHEY:  To be honest, Your Honor, I don't know

16   which taxes this applies to.  Congress, as far as I know,

17   hasn't set it out and I don't know what the regulations are

18   underneath it.

19               THE COURT:  Ms. Heldmyer, are you aware of any

20   provision that says churches are not exempt from these

21   requirements?

22               MS. HELDMYER:  Absolutely not, Your Honor.  508 is an

23   income tax provision.

24               THE COURT:  Right.  But are you aware of something in

25   the law that would indicate that churches are not exempt and

3:55PM 1   must pay employment taxes, because that's been my understanding

2   throughout the trial.

3         MS. HELDMYER:  Certainly, Your Honor, I can provide

4   citations to the Court that indicate that churches do have to

5   withhold.

6         THE COURT:  I would appreciate that if you could do

7   that.

8         MS. HELDMYER:  Yes, Your Honor.

9         THE COURT:  I may rephrase the language to be

10  consistent with the law that you provide because this is just

11  the Court's own choice of words.

12        MR. RICHEY:  Your Honor, the only other thing that I

13  have is 26 U.S.C. 3401 that defines wages -- 3401(a) defines

14  wages and then it exempts or actually it does not exclude, so

15  it's an exception paren nine, (a)(9) which says "for services

16  performed by a duly ordained, commissioned, or a licensed

17  minister of a church in the exercise of its ministry or by a

18  member of a religious order in the exercise of duties required

19  by such order."

20        THE COURT:  I think those are the two exceptions.  And

21  I believe what that's indicating is that the church does not

22  have to withhold from the ordained minister's wages and then

23  the religious order exception.  Neither of those are applicable

24  here.  That's not what this case is about.

25        MR. RICHEY:  I think that --

3:57PM 1        THE COURT:  You didn't have any ordained ministers.

2        MR. RICHEY:  The defendant's good faith belief is

3   that, in fact, he and everyone that testified that was there

4   testified that they were working as missionaries in a ministry

5   and that that may, in fact, fall under provision nine.

6        THE COURT:  Well, I disagree.  You can certainly make

7   your argument to the jury, but I'm not going to have the jury

8   misled in this case that CSE was somehow not required to

9   withhold these taxes because they were a church.  As a matter

10  of law, I'm not going to have that argument made.  As far as

11  Mr. Hovind's belief, you can argue away about that.  I mean,

12  you can argue as strenuously as you can about that, but in

13  terms of what the law is, I'm not going to allow the jury to be

14  misled on that.

15       MR. RICHEY:  All right.  Just so my objection is

16  noted.

17       THE COURT:  It's noted.

18       And Ms. Heldmyer, you'll endeavor to provide that cite

19  or cites to me.

20       MS. HELDMYER:  Yes, Your Honor.

21       THE COURT:  All right.  Page 15, any comments?  Ms.

22  Heldmyer, anything from the government?

23       MS. HELDMYER:  No, Your Honor.

24       THE COURT:  Mr. Richey or Mr. Barringer?

25       MR. BARRINGER:  There's none by me, Your Honor.

3:59PM 1          THE COURT:  All right.  Page 16 is the willfulness

2     instruction.  Ms. Heldmyer, do you wish to be heard on this

3     instruction?  All right.

4          Mr. Richey?

5          MR. RICHEY:  Just to renew the citation *Brian*, as the

6     Court noted, that is one sentence out of *Brian*.  I would also,

7     as an officer of the Court, submit to this Court that one

8     sentence out of every instruction here is in fact the law, so

9     the Court should, again, reconsider that one sentence that was,

10    in fact, decided upon by the Court and held, and, in fact, the

11    Ninth Circuit has held that it is an actual element.  And so if

12    the Court proceeds that way, it could create a conflict --

13    depending on what the outcome, of course, could create a

14    conflict, but what the Ninth Circuit held was that in looking

15    at that specific sentence of *Brian* and then referring to

16    *Cheek* --

17         THE COURT:  Refresh my memory on the sentence that

18    you're referring to.

19         MR. RICHEY:  That it must have actual knowledge of the

20    law that they are charged with violating.

21         THE COURT:  The specific statute?

22         MR. RICHEY:  Right.

23         And what the Ninth Circuit said was that "the cases to

24    which *Brian* refers are cases in which the Supreme Court read

25    the element of actual knowledge of the law into complex

4:00PM 1  statutes that punished willful failures to perform statutory

2  duties."  That's a direct quote from U.S. versus Hancock.

3        THE COURT:  I'm going to instruct that the government

4  must prove that Mr. Hovind had knowledge of the duty.  All

5  right.

6        Anything else?  Let me back up.  Knowledge of the duty

7  that is imposed under the law.

8        Anything else on this instruction, Mr. Richey?

9        MR. RICHEY:  Not aside from the objections I already

10  made.

11        THE COURT:  All right.  Page 19.

12        MR. BARRINGER:  Your Honor, you had indicated earlier

13  that you weren't going to capitalize the defendants' names.  Is

14  that throughout?

15        THE COURT:  Yes.  Thank you.

16        All right.  Other than the objections that have been

17  made and noted, any comments or objections to the 5324(a)(3)

18  three instruction, and I did -- we did add, I believe, at the

19  top of this instruction, 5324(a)(3), specifically charged in

20  the indictment under that subsection.

21        Ms. Heldmyer?

22        MS. HELDMYER:  No objections, Your Honor.

23        THE COURT:  All right.  Mr. Richey?

24        MR. RICHEY:  No, Your Honor, not aside from what was

25  already made, so. . .

4:02PM 1     THE COURT:  All right.  Mr. Barringer?

2     MR. BARRINGER:  No, Your Honor.

3     THE COURT:  All right.  Page 21.

4     MS. HELDMYER:  I'm assuming that's the pattern, Your

5 Honor.

6     THE COURT:  Yes, other than Mr. Richey's objection is

7 made and noted, but as to anyone else, no comments?  Page 22

8 this is as to Count 58.  Ms. Heldmyer, any comments,

9 objections?

10     MS. HELDMYER:  It's fine, Your Honor.  Thank you.

11     THE COURT:  Mr. Richey, other than what has been

12 raised, argued, and ruled on?

13     MR. RICHEY:  No, Your Honor.

14     THE COURT:  Mr. Barringer, I know you don't have a

15 horse in this race.

16     MR. BARRINGER:  No, Your Honor.

17     THE COURT:  Page 24, you will see that I have added

18 the willfully language at the bottom, also added -- I'm sorry,

19 on the first paragraph, added language pertaining to the exact

20 date of each alleged offense because we have numerous offenses

21 alleged.

22     MR. RICHEY:  Your Honor, in those regards, I would

23 object to, again, here there is a new definition of willfully

24 which would then be more confusing to the jury since it was

25 defined under Counts 1 through 12 as one thing and now here it

4:05PM   1   says the word willfully as that term is used in the indictment

2   or in these instructions.

3        THE COURT:  Well, Mr. Richey, I mean, the point -- you

4   raise a good point, but if you go back to page 16, that does

5   include that definition of willfully.  I don't have any

6   objection because we do have this unique animal of willfulness

7   under the tax charges.  I don't have an objection as to page 24

8   and the willfulness -- or the willfully language here,

9   confining it to the aiding and abetting charge or just placing

10  that language at the end of the aiding and abetting instruction

11  because I think that's the only other place that willful

12  appears in the instructions.

13       MR. RICHEY:  Yes, correct.

14       THE COURT:  So if that is the preference of you all, I

15  don't have any problem doing that and I certainly -- anything

16  we can do to avoid confusing the jury is a good idea.

17       So Mr. Richey, do you have a proposal?  Would you

18  prefer that the language be placed underneath the aiding and

19  abetting or left where it is and indicate it as it is used in

20  that part of the instruction?  I'm not going to omit it.

21       MR. RICHEY:  I understand it needs to be there.

22  Probably in the aiding and abetting portion, Your Honor.

23       THE COURT:  Ms. Heldmyer, any?

24       MS. HELDMYER:  I have no preference, Your Honor.

25       THE COURT:  All right.  So it will -- on that page 21,

4:07PM 1   which is the aiding and abetting instruction, will read

2   something along these lines, the term willfully as used in this

3   instruction means that the act, et cetera.

4          Page 25, multiple counts, multiple defendants.  Page

5   26, verdict form -- excuse me, juror duty and then verdict form

6   on the last page.

7          The verdict form, when we meet at eight, I'll provide

8   the verdict form to you then, but it is, essentially, a

9   standard verdict form with each count listed, guilty, not

10  guilty with the exception of the Count 58, and there will be

11  the language that we discussed just a moment ago regarding the

12  statute of limitations.

13         MR. RICHEY:  Your Honor, also in regards to that, in

14  what I provided, I also ask the Court to -- and this was back

15  in my original form as well -- that if they find Mr. Hovind

16  guilty on Counts 1 through 12, only, then, they should try to

17  determine the amount of the tax loss.  Is that something that

18  the Court is going to include?  And in that on the first page,

19  I included in there the citation to Apprendi versus New Jersey,

20  530 U.S. 4th 66, page 490, 2000, where the Supreme Court has

21  said that "anything that increases the penalty or may enhance

22  sentencing should be given to the jury to decide."  And I've

23  had this occur in a couple of cases, well, at least in one case

24  before where the judge did this and his -- and the purpose of

25  that was because the jury should make that finding and since

4:10PM 1    there is an alleged tax loss under Counts 1 through 12, that

2    that should be something for the jury to decide at this point,

3    if he is found guilty on those counts, then they should look to

4    determine the tax laws.

5             THE COURT:  All right.  Ms. Heldmyer?

6             MS. HELDMYER:  We object to such a finding, Your

7    Honor, and I cite the Court to the *Pope* case which I know the

8    Court is familiar with.  That is -- it's a 461 Fed 3d, 1331,

9    such finding does not have to be made by the jury any more

10   post-Booker.

11            THE COURT:  That is my understanding of the law, Mr.

12   Richey.  And the amount of loss does not have to be submitted

13   to the jury.  Now, as to forfeiture, now, it's a different

14   question, but *Apprendi* would not apply here.  There is nothing

15   that -- no findings that need to be made by the jury to satisfy

16   *Apprendi,* but it does raise the issue of forfeiture, and I

17   believe we're hard at work on those instructions, should we

18   need to proceed into the supplemental proceedings following a

19   guilty verdict and hope to have those for you to review.

20            Anything you wish to point out or make note of, Ms.

21   Heldmyer, as to the forfeiture proceeding, should we proceed?

22            MS. HELDMYER:  No, Your Honor.  We submitted proposed

23   forfeiture instructions.  I do not believe that, if in fact we

24   get to a forfeiture proceeding, I don't believe there would be

25   any additional testimony to be presented.  I think it would be

4:11PM 1    fairly brief closing argument.

2           THE COURT:  Mr. Richey?

3           MR. RICHEY:  I'm not certain that I'm aware of what

4    proposal the government made as far as the forfeiture hearing.

5           THE COURT:  I believe she's referring to forfeiture

6    instructions that were submitted as part of their proposed jury

7    instructions.  As far as the proceeding itself, if you would

8    just advise the Court, no need to expect further evidence to be

9    submitted, just argument and then instruction.

10          All right.  Well, in the morning, I will have for you,

11   unless you wish to hangout, hang around until five and you're

12   certainly free to do that, I can have them for you by 5

13   o'clock, the changes that we've discussed as well as the

14   verdict form; otherwise, I'll provide them to you at 8:00 in

15   the morning.  As far as the language regarding churches being

16   exempt, or not being exempt from the withholding requirements,

17   if you can have that for me at 8:00.

18          MS. HELDMYER:  I'll do my level best, Your Honor,

19   which means I won't be hanging out here until 5:00.  I've got

20   some research to do.

21          THE COURT:  And we'll conduct our own as well, but

22   that is my understanding of the law, and I feel certain there

23   is case law to support that.  We'll do our own research as

24   well, Ms. Heldmyer.

25          MS. HELDMYER:  Thank you, Your Honor.

4:13PM  1          THE COURT:  Is there anything else, then, before we

2    recess for the evening?

3          MR. RICHEY:  Your Honor, the one thing is, as I had

4    raised earlier, a limiting instruction and I was working on

5    that, but I haven't been able to finish it.  Is it appropriate

6    for me to continue with that and I'll try to go back, I'll

7    e-mail it to counsel.

8          THE COURT:  Well, you can --

9          MR. RICHEY:  In some ways -- I'm sorry, Your Honor.  I

10   didn't mean to cut you off.

11         In some ways I believe it rises to the same effect as

12   if a witness had testified and was convicted of a felony for

13   them bringing in, especially the felony conviction of Mr. Ortiz

14   and the -- that it was alluded to that he was indicted in 2002,

15   but not sentenced until 2005, that's quite a bit of the primary

16   time that we are talking about in this indictment, and for the

17   impression to be left on them that clear back in 2002, there

18   was something wrong which as the Court is aware, a charge being

19   filed, you're still presumed innocent until found guilty, I

20   believe that there should be a limiting instruction on that.

21         THE COURT:  All right.  And that's why I gave you the

22   opportunity to fashion some language for me to consider and I

23   don't have any problem giving a limiting instruction --

24         MR. RICHEY:  Okay.

25         THE COURT:  -- to give you an opportunity to draft it

4:15PM  1    in the way you feel bests protects your client and I'll

2    consider that.

3            MR. RICHEY:  I'll try to get that finished quickly.

4            Your Honor, one other thing, would it be possible -- I

5    guess the only thing left is the forfeiture instructions.  I

6    don't know if the Court wants to e-mail those or just take them

7    up tomorrow morning.

8            THE COURT:  We can, I'm not sure we'll have those

9    done --

10           MR. RICHEY:  That's fine.

11           THE COURT:  -- this evening.  It may be that those are

12   worked on during the morning, during closing arguments, and

13   then as the jury is deliberating.  I'll have to check with my

14   law clerk and see where he is.  I know he's trying to get the

15   instructions finalized and so I can have those to you.  I mean,

16   if we get something finished, I don't mind e-mailing you all

17   what's proposed, but I can't promise it.

18           MR. RICHEY:  That's fine, Your Honor.

19           THE COURT:  Ms. Heldmyer has indicated she's not going

20   to hangout until 5:00 are either of you?

21           MR. RICHEY:  No, Your Honor.

22           MR. BARRINGER:  No, Your Honor.

23           THE COURT:  All right.  I'll have these ready for you

24   at 8:00 tomorrow morning.  I'll see you all then.

25           We'll be in recess.

```
4:16PM  1            (Proceedings adjourned at 4:16 p.m.)

        2

        3              ---------------------

        4   I certify that the foregoing is a correct transcript from the
            record of proceedings in the above-entitled matter.  Any
        5   redaction of personal data identifiers pursuant to the Judicial
            Conference Policy on Privacy are noted within the transcript.

        6

        7      s/Gwen Kesinger                      12-31-07

        8   _____      _____

        9   Gwen B. Kesinger, RPR, FCRR          Date
            Official Court Reporter

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25
```