## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

*UNITED STATES OF AMERICA,*    )
                           )
        *Plaintiff,*      )
                           )   *CASE NO.  3:06cr83/MCR*
*vs.*                       )
                           )
*KENT E. HOVIND*          )   *Pensacola,Florida*
*and JO D. HOVIND,*      )   *January 19, 2007*
                          )   *9:00 A.M.*
                           )
        *Defendants.*     )
_____)

## TRANSCRIPT OF SENTENCING PROCEEDINGS
## BEFORE THE HONORABLE M. CASEY RODGERS,
## UNITED STATES DISTRICT JUDGE
(Pages 1 thru 125.)

<u>APPEARANCES</u>:

FOR THE PLAINTIFF:        MICHELLE M. HELDMYER, ESQUIRE
                          ROBERT G. DAVIES, ESQUIRE
                          Assistant United States Attorney
                          21 East Garden Street, Suite 400
                          Pensacola, Florida 32502

FOR THE DEFENDANT        ALAN S. RICHEY, ESQUIRE
KENT E. HOVIND:           Alan Richey, P.A.
                          331 Sentinel Firs Road, #A
                          Port Hadlock, Washington 98330

FOR THE DEFENDANT        JEROLD W. BARRINGER, ESQUIRE
JO D. HOVIND:             Jerold W. Barringer,P.A.
                          102 South Pine Street
                          Nokomis, Illinois 62075

```
 1   (Court in session.)

 2   (Defendants present.)

 3           THE COURT:  Good morning.  Okay.  We have a sentencing

 4   scheduled this morning in the case of United States of America

 5   versus Kent Hovind and Jo Hovind.  I would like to first to

 6   address Mrs. Hovind's sentencing with counsel.  In my review of

 7   the presentence investigation report -- Mr. Barringer, good

 8   morning.

 9           MR. BARRINGER:  Good morning, Your Honor.

10           THE COURT:  In my review of the presentence

11   investigation report on Mrs. Hovind, it appears to me that

12   there may be an issue as to base offense level in her case.

13   This is not something that was raised by either party, either

14   side, but something that in consultation with the probation

15   office that I think it's important to raise now and may result

16   in the continuation of Mrs. Hovind's sentencing for today.

17           Let me direct you to, in your guideline manual, 2001

18   edition, to 2S1.3.  It's on page 259.

19           MR. BARRINGER:  Your Honor, I accidentally left that

20   at home.  So I don't have that with me.  And I apologize.  I do

21   have some notes that deal with that particular provision, Your

22   Honor.

23           THE PROBATION OFFICER:  Your Honor, I have an extra

24   copy of that, if he would like to review them.

25           THE COURT:  Thank you, Ms. Lassiter, yes.
```

9:10AM
1          MR. BARRINGER:  Yes, Your Honor.

2          THE COURT:  All right.  Also referencing page 15 in

3     the PSR.

4          MR. BARRINGER:  I'm there.

5          THE COURT:  Okay.  The base offense level reflected in

6     the PSR is a 22.  That is based on an initial base offense

7     level of six called for under the guidelines, with a 16 level

8     increase based on the value of the funds involved.  And that's

9     where we arrive at 22 in the PSR.  But if you look at the

10    guideline section, 2S1.3, the Court is concerned about two

11    subsections there, 2S1.3(b)(2) and 2S1.3(c)(1).  My thought was

12    initially that 2S1.3(b)(2) might apply, which would decrease

13    the offense level to a six.  However, I then considered the

14    cross-reference which is mentioned in 2S1.3(c)(1).  And then to

15    complicate matters even more, if you consider the

16    cross-reference and that the offense was committed for the

17    purpose of violating the Internal Revenue laws, then it appears

18    that 2S1.3(b)(1) may apply, because the intent may have been to

19    promote unlawful activity.

20         So it appears there are arguments to be made on both

21    sides that have not been made, or perhaps maybe should be made.

22    What I would -- well, let me hear from you all first.

23    Mr. Barringer.

24         MR. BARRINGER:  Thank you, Your Honor.  And I

25    certainly did argue that the base offense level should be, in

4

9:13AM 1  fact, six, was in my objections to the presentence report.

2          THE COURT:  However, not specifically based on --

3          MR. BARRINGER:  As to these issues.  And I agree that

4  the Court is raising different concepts in terms of whether or

5  not this was dealing with -- directed towards taxes, directed

6  towards something else, some other unlawful activity that, as

7  the Court is pointing out, may alter and, in fact, increase the

8  sentence report from the government's position, or whether or

9  not under (b)(2), whether it drops back down to six.  And as

10  the Court said, we've not discussed that.

11          THE COURT:  Well, the oddity here is that on the front

12  end of the transaction, an argument can be made that the

13  purpose was to violate the IRS laws.  I think the argument can

14  at least be made.  On the tail end of the transaction, I think

15  the argument can also be made that the funds were to be used

16  for a lawful purpose, that is, to pay the employees of CSE and

17  the expenses of CSE.

18          MR. BARRINGER:  Nor do I believe that there was a lot

19  of evidence that was deduced at trial that would point

20  ultimately in either direction.

21          THE COURT:  Well, that would be an argument you might

22  want to make.  I'm asking if you would like the opportunity to

23  address this to the Court.  And if so, then I would continue

24  the sentencing to a separate date.  And I'm going to ask

25  Ms. Heldmyer the same question.

9:15AM 1                     MR. BARRINGER:  I'd like to have a moment, Your Honor.

2     Thank you, Your Honor.

3                     And it seems pretty clear in talking to Mrs. Hovind

4     that we would prefer to brief it out or to address it in

5     writing as opposed to off-the-cuff oral comments about the

6     issue.

7                     THE COURT:  And that would be my preference as well.

8     Ms. Heldmyer.

9                     MS. HELDMYER:  We agree, Your Honor.

10                     THE COURT:  All right.  Very well.  Then the parties

11     will brief the issue the Court has raised in Mrs. Hovind's

12     case, and your memorandum should be filed by February the 19th,

13     and that's for both the government and Mrs. Hovind, both due

14     February the 19th, and sentencing will be rescheduled to March

15     the 1st at 9:00 a.m.  If you have conflicts with that date, you

16     can notify my chambers, and we will endeavor to accommodate

17     your schedule, considering the Court's schedule.

18                     MR. BARRINGER:  Anything further for Mrs. Hovind

19     today, Your Honor?

20                     THE COURT:  No.  No, sir.  Then you would be excused,

21     Mr. Barringer, as well.

22                     MR. BARRINGER:  Thank you.  I know that Mrs. Hovind

23     would like to stay.  I'm not sure that there is really room.

24                     THE COURT:  She can stay.

25                     MR. BARRINGER:  Would that be okay if I just sit as

9:16AM 1    well.

2           THE COURT:  Yes.

3           All right.  Then as to Kent Hovind, Mr. Hovind, the

4    way we will proceed this morning with your sentencing is that I

5    will address both attorneys as to the objections that have been

6    filed pertaining to the presentence report.  I will -- I don't

7    know if we have evidence to be presented.  I believe there may

8    be evidence to be presented.  I'll resolve all objections.  I

9    will give you an opportunity to address the Court before

10   sentence is imposed.  You're not required to speak, but you do

11   have that right.  And I'll notify you of the appropriate time

12   before that.  And then I will impose sentence.

13          Mr. Richey, let me ask if you have had an opportunity

14   to review the presentence report with Mr. Hovind?

15          MR. RICHEY:  Yes, Your Honor.

16          THE COURT:  And you have filed objections to certain

17   portions of the presentence report?

18          MR. RICHEY:  Yes, Your Honor.

19          THE COURT:  I think the best way for us to proceed is

20   to look at each of the offense groups and go through them

21   separately.  There are adjustments that have been raised as to

22   each group and objections made based on those adjustments.  Any

23   objection to proceeding in that fashion?

24          MS. HELDMYER:  No, Your Honor.

25          MR. RICHEY:  No, Your Honor.

9:18AM  1        THE COURT:  All right, then.  Well, we'll start then,

2  I believe, on page 15 of the PSR with the offense or counts of

3  conviction 1 through 12.  All right.  Mr. Richey, is there any

4  objection as to the offense level arrived at here of 20?

5        MR. RICHEY:  Yes, Your Honor, my objection there is

6  that, first of all, the government was required to prove the

7  tax loss.  They still did not prove any tax loss.  And, in

8  fact, I would raise at this time the Supreme Court cases of

9  Apprendi v. New Jersey and Blakely v. Washington.  Any

10  enhancement that would be imposed at sentencing should be

11  raised and addressed by the jury.  It should be found by the

12  jury.  And so there was no tax loss that was found by the jury.

13  Based on that then, the base offense level would be a six.

14        THE COURT:  All right, then.  Ms. Heldmyer.

15        MS. HELDMYER:  Your Honor, for this argument and for

16  the arguments to follow and, of course, the United States is

17  going to be relying upon the evidence that was produced at

18  trial.  We've also filed the sentencing memorandum, neither of

19  which I'm going to repeat too extensively during the arguments.

20  We do believe that the guidelines allow for the tax loss or

21  intended loss.  There was certain problems resultant from

22  Mr. Hovind's inability or lack of records that we were able

23  obtain.  That was something that was a problem with regard to

24  the tax loss in terms of the employment taxes that we

25  encountered in calculating tax loss that is solely the

9:20AM 1    responsibility of Mr. Hovind.  The intended tax loss, however,

2    is clear even though a number -- a specific number other than

3    what was proven at trial, could not be calculated.  We believe

4    that the way the probation office calculated that tax loss is

5    correct.

6        MR. RICHEY:  Your Honor, I failed to address one more

7    thing, if I could, regarding that.  There was also evidence at

8    trial, many of the witnesses testified that they prepared their

9    own tax returns and paid their taxes.  That being the case,

10   then that would be an amount that the government would not be

11   entitled to, because the tax was already paid on that.  And,

12   again, the burden would rest on the government to prove what

13   the actual tax loss was.  And that was not considered or taken

14   into account in their figures.

15        THE COURT:  Ms. Heldmyer.

16        MS. HELDMYER:  Your Honor, the intended loss is a

17   calculation that is used if it is above and beyond the tax law.

18   There is no way that we could possibly calculate how much taxes

19   were paid by these employees separately.  But the intended loss

20   is what is important here, Mr. Hovind intended the loss as

21   noted in the presentence investigation report by his actions

22   and activities.  If these employees then went out on their own

23   and paid the Internal Revenue Service, that is -- he may be

24   right in terms of a restitution figure, but that's certainly

25   not correct in terms of calculating the loss in this particular

9:21AM  1    guidelines.

2              THE COURT:  As to his _Blakely_ objection.

3              MR. DAVIES:  Your Honor, may I address that issue?

4              THE COURT:  Yes, Mr. Davies.

5              MR. DAVIES:  In our sentencing memorandum at page 6,

6    those cases, _Pope_, _Valnor_ and _Talley_, all say that the way it's

7    handled post-_Booker_ is the Court calculates the guideline

8    range.  Once the Court does that correctly, then it imposes a

9    reasonable sentence pursuant to that 3553(a) factor.  So his

10   _Blakely_ argument is -- _Booker_ argument has repeatedly been

11   rejected by the Eleventh Circuit including in those cases.

12             THE COURT:  All right.  Under the laws in this

13   circuit, it is clear and has been repeatedly addressed by the

14   Eleventh Circuit that this type of enhancement need not be

15   presented to the jury and a jury finding beyond a reasonable

16   doubt in order to support the enhancement at sentencing.  As

17   long as I make the finding based on the evidence -- by a

18   preponderance of the evidence standard, that is sufficient.

19   And I do make that finding now as to the amount at issue.

20             For the years 2001 through 2003, I believe the

21   number -- and I believe this is reflected in the presentence

22   report.  It was $604,874.87.  That, again, was for the years

23   2001 through 2003.  This is referencing the employment taxes.

24   I can consider all relevant conduct in this case.  And at this

25   time, I do consider also the conduct in the years '99 and 2004

9:24AM 1   in finding the intended loss at $890,577.01

2          As far as the base offense level, if the tax loss is

3   greater than 400,000, we would be at a base offense level of

4   20.  And I believe -- Ms. Lassiter, am I correct, but less than

5   a million?  Is it 400 to a million in the table?

6          THE PROBATION OFFICER:  More than a million, Your

7   Honor.  It should be less than a million --

8          THE COURT:  So whether I used the 600,000 or the

9   $890,000 figure, we're at the same base offense level of 20.

10  All right.

11         And that objection, Mr. Richey, will be overruled.

12  Paragraph 38 then applies an adjustment for role in the

13  offense.  Do you wish to address that?

14         MR. RICHEY:  Your Honor, I believe that was already in

15  the objections, but just briefly then, the role there would

16  indicate that he was leading or had some supervisory role, and

17  if -- the evidence that was presented at trial indicated that

18  the witnesses were told that they could prepare their tax

19  returns if they wanted, he was not going to tell them what to

20  do regarding that.  And as the evidence also indicated, many of

21  them did pay their taxes.  So I would object that there be any

22  enhancement in that, because there was no role as a leader in

23  regards to that.

24         THE COURT:  Ms. Heldmyer.

25         MS. HELDMYER:  Your Honor, the evidence that was

9:26AM 1    adduced at trial is supported by paragraph 38 that was written

2    by the probation office.  The evidence was very clear that

3    Mr. Hovind was a leader -- a very strong leader among his

4    family and his followers and all of the employees, which at the

5    high point I believe there were approximately 45, that he

6    engaged regularly in anti-tax rhetoric, that he very

7    regularly -- there was nobody who didn't understand what

8    Mr. Hovind's position was, that he was advocating the

9    non-payment of taxes and the illegality of the Internal Revenue

10   Service.  The entire scheme was certainly extensive.  It lasted

11   a number of years and involved the whole of the business.  And

12   Mr. Hovind even sold and promoted anti-tax issues and arguments

13   by way of the videotapes and the other literature that he sold,

14   and that he gave -- and that he allowed to be videotaped on his

15   property.  So we believe that the evidence is very supportive

16   according to the testimony with regard to Mr. Hovind.

17            THE COURT:  All right.  I've considered this issue,

18   and I agree that the role adjustment should apply, and that

19   being the four-level adjustment.  The offense did involve a

20   number of years, '99 to 2004, and it also involved significant

21   tax loss.  I've stated that amount at just shy of a million

22   dollars.  There were -- the entire operation was involved, not

23   just CSE, but also the Dinosaur Aventure Land as well and the

24   employees of that operation.  It is clear also from the

25   evidence that Mr. Hovind was in complete control of those

9:28AM 1    operations.

2              As far as the other participants, the Court does not

3    have to find that in applying this adjustment, that the other

4    participants, excuse me, were somehow responsible for the

5    offense.  It's not a matter of me resolving or determining

6    relative criminal responsibility.  Many of these employees were

7    what I would consider unknowing participants in Mr. Hovind's

8    scheme.  While it is true that there was testimony during the

9    trial from employees that Mr. Hovind told them they could file

10   taxes if they wanted to, it is also true that the evidence was

11   very clear that Mr. Hovind never shied away from advising

12   individuals, including his own employees, that there was no law

13   that required anyone to pay taxes in this country.  There was a

14   video that was disseminated and shared with employees and

15   others about that.  There was testimony, I know, from at least

16   one employee, Mr. Nelson, Dan Nelson in which he testified that

17   he was told specifically that he did not have to pay -- pay

18   taxes.

19             So I believe and would find that the adjustment --

20   four-level upward adjustment is appropriate in this case as

21   Mr. Hovind was an organizer or leader of an extensive criminal

22   operation.

23             All right.  There is another adjustment that has been

24   applied here, Mr. Richey, in paragraph 39 for abuse of position

25   of public or private trust.  Do you wish to address that?  I

9:30AM 1   understand you filed a sentencing memorandum, but there is a

2   lot in your sentencing memorandum.  So if you wish the Court to

3   consider an objection, I would like you to make it orally as

4   well here on the record.

5          MR. RICHEY:  In regards to the public trust, Your

6   Honor, I don't think that that applies in this situation

7   because he's not considered a public figure.  Certainly he's a

8   minister and went around preaching, but that's a different

9   matter than what these charges address.  The charges dealt with

10  taxes.  And the evidence that came into trial also was that the

11  organization, CSE, was actually operated by other individuals,

12  Dr. Mooneyhan and Glen Stoll, and that they actually supervised

13  and ran everything.

14         THE COURT:  All right.  Thank you.  Ms. Heldmyer.

15         MS. HELDMYER:  Your Honor, again, the evidence adduced

16  at trial is completely contrary to that.  The evidence adduced

17  is very clear that Mr. Hovind ran that business, ran every

18  aspect of that business and ran it with a tight fist.  And

19  whether or not he claimed to have given ownership or control to

20  someone else, which he did on a number of occasions, the

21  evidence was very clear that he never, in fact, did that.  He

22  exerted control over all of those employees.  He did not give

23  any of his employees whom he had control over the option of

24  having wages or taxes withheld from their pay, which was

25  something that was forced upon them if they wanted to work at

9:32AM 1    Dinosaur Adventure Land or CSE.  So he certainly had a position

2    of private trust with regard to his relationship with his

3    employees.  And with regard to his relationship to the public,

4    he was -- he had some level of esteem in the community, and he

5    had some level of power.  He did a number of lectures and even

6    held himself out as an expert.  And simultaneous with holding

7    himself out as an expert, he also advocated the non-payment of

8    taxes.  So he clearly abused a position of trust that he had

9    gotten from the general public and from his own staff and his

10   own employees.

11          THE COURT:  The evidence adduced during the trial was

12   very clear, at least from the employees' perspective, that

13   Mr. Hovind again was in complete control of the operation.  He

14   had great influence over the employees at the operation of CSE

15   and Dinosaur Aventure Land.  To say they looked up to him would

16   not be a strong enough characterization of their testimony and

17   the way they perceived Mr. Hovind.  He had great influence over

18   the employees.  No question they trusted him.  They believed

19   him and what he had to say.  And by his actions in this case

20   with respect to those employees, Mr. Hovind breached that trust

21   that they placed in him.

22          I also need to mention for the record, which it's

23   clear, but let me do so for the record, that he was a minister,

24   and this operation was run as a ministry in the views of many

25   who worked there, and it was a family of individuals, and they

9:34AM

1    looked to Mr. Hovind as almost like a father figure in many

2    respects.  Mr. Hovind's reputation in the community, I agree

3    with what Ms. Heldmyer just said, did also play a role in his

4    influence over the employees in this situation.  There was also

5    no one to supervise Mr. Hovind's activities in this regard.

6    Again, he was the leader, the organizer, the controller of the

7    operation.  It was not Glen Stoll or anyone else.  It was

8    Mr. Hovind.  Because the employees placed such trust in

9    Mr. Hovind, I find that it made the detection of the offense

10   that he committed significantly less likely in this case.

11   Those employees were not -- were not going to cross Mr. Hovind.

12   They were not going to report Mr. Hovind to the IRS, because,

13   in fact, they believed Mr. Hovind and what he told them.

14          I do find, Mr. Hovind, that you abused a position of

15   trust in this case and, therefore, the two points -- or

16   two-level adjustment will also be applied.

17          All right.  Mr. Richey, we then get to paragraph 40,

18   which is the adjustment for obstruction of justice.

19          MR. RICHEY:  Yes, Your Honor.  The charge that -- and

20   I guess this would in some way parallel Count 58, the last

21   count, is that the charge was the obstruction of the -- and

22   what the jury found was obstruction of the administration of

23   the Internal Revenue laws.  And I would just note that that is

24   different -- that's a different charge than obstruction of

25   justice.  Obstruction of justice would come under Title 18.

9:36AM 1  And since that was not what was found by the jury, I object to

2  any enhancement found under obstruction of justice.

3        THE COURT:  Ms. Heldmyer.

4        MS. HELDMYER:  Your Honor, I believe that this issue

5  is sufficiently briefed in the sentencing memorandum,

6  specifically on page 2, the government's sentencing memorandum,

7  the counts are to be grouped, and the underlying conviction for

8  the obstruction charge would then be -- mandate a two-level

9  enhancement -- a two-level adjustment.

10        THE COURT:  Just one moment, please.  The obstruction

11  adjustment under 2J1.2 should be applied here, Mr. Richey, and

12  I'm not sure I understand your argument as to why it shouldn't

13  be applied.  Is this a -- is your argument a grouping argument?

14  Is that what you're objecting to?  Certainly you're not

15  suggesting Mr. Hovind should not be punished for the offense of

16  conviction in Count 58?

17        MR. RICHEY:  No, Your Honor, that's not what I'm

18  saying.  I'm just saying that that's a different thing, and

19  obstruction of justice was never previously alleged.  He was

20  charged with a different count.  And the obstruction of justice

21  here doesn't meet or require what -- the evidence that was

22  provided at trial did not meet the level for obstruction of

23  justice under this point system.  So --

24        THE COURT:  Do you have an objection then as to the

25  grouping of the counts for purposes of sentencing?

9:40AM  1              MR. RICHEY:  You mean grouping Count 58 with 1 through

2      12 and all the other counts?

3              THE COURT:  I didn't see an objection to that in your

4      memorandum.  So I'm asking you now.

5              MR. RICHEY:  As far as -- if I understand your

6      question right, as far as grouping them all together for

7      purposes of determining the base loss -- or the base in

8      calculating and the overall sentencing, correct.

9              THE COURT:  Right.

10             MR. RICHEY:  No, I don't have that objection.

11             THE COURT:  Well, absent -- absent grouping, the way

12     that the PSR has done, there would be no punishment to

13     Mr. Hovind for that offense of conviction absent this

14     adjustment.  And that's, in fact, what the grouping rules

15     require me to do, so that the sentence accurately and

16     appropriately would reflect the conduct, and that's why 2J1.2

17     is to be applied in the grouping.

18             For the record, let me note how I come to that

19     conclusion, and that would be starting in Section 3C1.1 of the

20     guidelines manual and the commentary to that section, which

21     notes that this adjustment would apply to obstructive conduct

22     with respect to the official investigation, prosecution or

23     sentencing of the instant offense where there is a separate

24     count of conviction for such conduct.  And then in paragraph 8

25     refers specifically to the grouping, which states that the

9:43AM  1    offense level for that group of closely related counts will be

2    the offense level for the underlying offense increased by the

3    two-level adjustment specified by this section, or the offense

4    level for the obstruction offense, whichever is greater.  In

5    this case, it would be what we have here in the presentence

6    report.  But there is no question in the Court's mind that the

7    obstructive conduct in this case related to both the counts in

8    1 through 12, as well as 13 through 57.

9             MR. RICHEY:  Your Honor, just for clarification

10    purposes, I'm not sure I heard, and maybe I just didn't hear,

11    was that a two-point increase?

12             THE COURT:  Two points -- a two-level adjustment.  And

13    the obstructive conduct is outlined in the presentence report

14    in paragraphs 24 -- well, it's contained -- it's one paragraph

15    with several subparagraphs following that, pages 11 through 13

16    of the presentence report.  And those of us present for the

17    trial are well aware of what the conduct was.

18             All right, then.  Let's look back at the computations

19    for the grouping in Counts 1 -- or for the group of counts of

20    conviction 1 through 12, then the adjusted offense level would

21    be 28.  We also need to consider the computation under 13

22    through 57 in order to determine according to the guidelines

23    which results in the higher offense level, which is what the

24    guidelines instruct the Court to apply.

25             Are you with me, Mr. Richey?

9:46AM  1              MR. RICHEY:  Yes, your Honor.

2              THE COURT:  I'm on page 16, paragraph 42.  Do you wish

3    to address this base offense level?  We're now dealing with the

4    structuring counts.

5              MR. RICHEY:  Yes, Your Honor.  This -- my objection is

6    under 2S1.3, then that the base offense level is a six, because

7    there was no demonstrated loss to the government on this.

8    Also, then, the PSR requests a 16-point enhancement based on

9    what they say is a loss of more than $1 million.  Again, there

10   was -- that was certainly not any loss.  If you look at only

11   what the jury found, the loss that the jury alleged was

12   400,000.  So it would not exceed the $1 million mark for the 16

13   points that they've requested.

14             THE COURT:  But I want to note, as I've already ruled,

15   the law in this circuit is that I'm not bound by the jury's

16   verdict with respect to loss.

17             MR. RICHEY:  Further in regard to that, Your Honor,

18   there was no demonstration by the government of what other

19   illegal activity this was in conjunction with.  And as the

20   Court already noted for Mrs. Hovind, there is some question

21   there as to what the underlying conduct would be.  So based on

22   that, Your Honor, I would just state that the defense's

23   position is that it should be a six-point.

24             THE COURT:  All right.  Ms. Heldmyer.

25             MS. HELDMYER:  Your Honor, the guidelines provisions

9:48AM 1    for structuring do not require that the government prove or

2    this Court find for sentencing purposes that there was a loss

3    for the government.  The structuring guidelines specifically

4    say that it's a six-base offense level, plus a number of

5    offense levels corresponding to the value of the funds.  So

6    they use the table that refers to a loss, but the actual

7    finding by the Court needs to be just the value of the funds.

8          And the Court is accurate that the Court is not bound

9    by the proof at trial.  The counts, as the Court may recall,

10   were restricted to those counts within the statute of

11   limitations, but there was, I believe, entered under 404(b), if

12   I'm not mistaken, a number of other structuring transactions

13   that occurred, and all of those can be considered for

14   sentencing purposes, and those are the figures that were used,

15   along with the charge and counts of conviction, to come up with

16   that figure.  We agree with the probation office's calculations

17   in that regard.

18         MR. RICHEY:  Your Honor, if I may, one more thing, and

19   I want to be brief on this, but just to raise to the Court's

20   attention, I know on Tuesday the Court issued its order denying

21   the judgment of acquittal and cited a couple of cases there.

22   And I also wanted to apprise the Court of one other case, and

23   that case would be U.S. v. Davenport at 929 F.2d 1169.  That's

24   a Seventh Circuit case, 1991.  In that case, that Court -- the

25   Davenports had been charged with a conspiracy to violate

9:49AM 1    5324(3), and a single count alleging 81,500.  And then there

2    were ten separate charges dividing up the 81,500 in each

3    individual transaction that occurred.

4           The Court looked at that and said that -- and kicked

5    out the ten that were the separate transactions under 10,000

6    and said that it should have only been the one count of 81,500,

7    and that was what they were convicted on, and the other counts

8    were dismissed.  Then, specifically with regard to the cases

9    that the Court cited, Morales v. Rodriguez, in that one --

10          THE COURT:  Mr. Richey, I'm sorry to cut you off, and

11   I don't mean to be rude, but if you wish me to reconsider my

12   order on the motions of judgment of acquittal, I need you to

13   file a proper motion for reconsideration.  Now is not the time.

14          MR. RICHEY:  Okay.  That's not really what I'm doing.

15   I'm just trying to point out the actual loss in this that would

16   go to the loss.

17          THE COURT:  Based on the ruling that I have already

18   made, the analysis will include all counts of conviction.

19   Again, if you wish -- I don't remember the case that you have

20   just cited to me, the Davenport case.  I don't remember that

21   being specifically referenced.

22          MR. RICHEY:  Correct.  The Court did not reference

23   that case.

24          THE COURT:  I don't remember you referencing it and

25   arguing it.

9:51AM 1              MR. RICHEY:  No, I don't believe so.

2              THE COURT:  So if you wish -- again, if it's something

3    that you wish me to reconsider or a point you wish to make on

4    reconsideration, you should do that in a motion to the Court,

5    and I'll review it.  As to our purpose for being here today,

6    which is the sentencing of Mr. Hovind, we need to proceed on

7    the rulings that have been made.

8              MR. RICHEY:  Right.  So -- but based on what the

9    government just said of the structuring, that in order to prove

10   the structuring transactions in all those cases looked at,

11   there had to have been, and in each of those cases there was a

12   single charge alleging the total amount of loss.  And that

13   wasn't in this case.

14             THE COURT:  Again, that goes for your motion for

15   judgment of acquittal, which has already been ruled upon, and

16   the government -- as we stand here now today, the government

17   has proved what it charged in the indictment, and Mr. Hovind

18   has been found guilty of those charges.  So my sentencing today

19   will proceed on that basis.

20             MR. RICHEY:  Also -- well, okay.  Then, also, Your

21   Honor, in regards to that, then, he was not charged with

22   5324(d)(2), which would be the penalty.  And so that -- he was

23   not apprised of that, so that any enhancement based on that

24   should not be considered at this time.

25             THE COURT:  All right.  I do want to address the

9:52AM  1    5324(d)(2) issue, and probably I should have done that at the

2    outset, because I agree with Mr. Richey that Mr. Hovind was not

3    charged specifically under that section, and because it would

4    or does increase the penalty beyond the statutory maximum

5    otherwise, I do believe it's an Apprendi issue, and that would

6    have been something that the jury would have had to found

7    beyond a reasonable doubt, which is not the case here.

8    However, that only affects the statutory maximum in this case,

9    not the guidelines.

10          So the presentence report, Mr. Richey, will be

11    reflected -- excuse me, modified and amended to reflect -- to

12    reflect that fact.  And I agree with you in that regard.

13    However, that argument does not pertain to the guidelines.  It

14    pertains only to the statutory maximum, which is five years as

15    opposed to ten.

16          Also, I think it important to point out, specifically

17    in connection with these counts, the guideline -- the edition

18    of the guideline manual that's being used in Mr. Hovind's case,

19    and that is the 2006 edition of the manual, and that is

20    consistent with the application note 2 to 1B1.11, which states

21    that the edition -- or that the last date of the offense of

22    conviction is what is to be considered in determining which

23    edition to use.

24          Here, actually, Count 58 charged conduct up until the

25    date of the return of the indictment, which was July the 11th,

9:55AM 1    2006.  There are no ex post facto issues in Mr. Hovind's case.

2    There were, in fact, such issues in Mrs. Hovind's case, and

3    that's why the 2001 manual -- the edition of the manual was

4    used for Mrs. Hovind's purposes, but not for Mr. Hovind's

5    purposes.  And that is an issue in Mr. Hovind's case because of

6    one of the adjustments, and that is reflected in the PSR, which

7    we'll get to in just a moment, and that would be in paragraph

8    43.

9            Back to paragraph 42 and the base offense level, the

10   guidelines do not refer -- as Ms. Heldmyer pointed out, do not

11   refer to loss.  They refer to the value of the funds, which is

12   a clear indicator to the Court what the Commission's intent

13   was, and that is for the Court not to consider loss, but

14   instead value of the funds, which is what you have in a

15   structuring situation as opposed to a loss.  It would make no

16   sense to have the Court consider loss in a structuring case.

17   The value of the funds, based on the evidence at trial, is as

18   reflected in the PSR on page 10.  I am not limited by any jury

19   determination in this regard, and also consider all relevant

20   conduct, and that additional relevant conduct is identified in

21   paragraph 21 of the PSR, which does bring the amount -- total

22   amount value of the funds involved in Counts 13 through 57 to

23   $1,570,538.

24           And that does -- if you refer to the corresponding

25   table, 2B1.1, which is what the guidelines tell us to do, there

9:58AM  1  is a 16-level upward adjustment for the value of the funds.

2  It's 16 levels for a value between -- greater than 1 million,

3  but less than 2.5 million, which is less than where we are.  So

4  that then brings the base offense level to a 22.

5          There is, in the PSR in paragraph 43, a two-level

6  upward adjustment under 2S1.3(b)(2).  Mr. Richey, do you wish

7  to address this fact -- this issue?

8          MR. RICHEY:  Your Honor, just based on that,

9  1.3(b)(2), that's not authorized under the facts of this case,

10  and I would just rely on the objections that we've already

11  made, that each individual check was written for 95- or 9600.

12          THE COURT:  Ms. Heldmyer.

13          MS. HELDMYER:  Your Honor, we agree with the

14  calculations and the statements from the probation office that

15  it was -- that it did involve more than $100,000 over a

16  12-month period as the evidence showed.  I think that was very

17  clear.

18          THE COURT:  All right.  I agree.  The evidence was

19  that the structuring conduct occurred from 1999 to 2003 and did

20  involve well in excess of 100,000 in at least three of the

21  years.  And so the two-level increase is appropriate.  And the

22  objection will be overruled.

23          All right.  Paragraph 45.  Mr. Richey, we have

24  reflected here an adjustment for role in the offense again.

25  Different offense, so you may have a different objection.

10:00AM 1          MR. RICHEY:  Right, Your Honor.  Under this one for

2    the role, there was no evidence of any role that my client had

3    on this.  He was merely alleged in the indictment as a

4    co-conspirator on this.  Certainly there is no indication that

5    his name was ever on any of the checks, that he ever told

6    anyone to go down and withdraw cash, or that he gave specific

7    instructions to anyone.  I mean, he was just named as a

8    co-conspirator, and that was it.

9          THE COURT:  I think he was aiding and abetting as

10   opposed to a co-conspirator.

11         MR. RICHEY:  I stand corrected.  Aiding and abetting.

12         THE COURT:  Thank you.  Ms. Heldmyer.

13         MS. HELDMYER:  Your Honor, the evidence was also very

14   clear that Mrs. Hovind didn't do anything that she wasn't

15   directed to do by her husband.  Clearly, though, she had her

16   own freewill and could have said no, which is I'm sure why she

17   was convicted.  Clearly the evidence is and has been very clear

18   that Mr. Hovind directed all of the activities, particularly

19   the monetary activities.  We introduced a number of documents

20   in the Court which indicated that Mr. Hovind -- the memos and

21   things that were seized from CSE which showed that Mr. Hovind

22   was, in fact, directing all the financial transactions and the

23   financial responsibilities, and that he was, in fact, directing

24   how the employees were being paid, why the cash was being

25   obtained, the cashier's checks for property, all of those kinds

10:02AM  1   of things were directed by Mr. Hovind.  And though the

2   structuring -- the actual -- the person who went down to the

3   bank and actually did the structuring was Mrs. Hovind, that

4   does not preclude the Court from finding that these activities

5   were directed by Mr. Hovind, and that he is -- was the

6   organizer and leader of this otherwise extensive activity.

7           I think that the Court can find that it was otherwise

8   extensive.  I think the Court can find that there were five or

9   more people involved with regard to the -- how the cash was

10   being paid, because we're talking about structuring occurrences

11   that started with the direction from Mr. Hovind, and

12   Mrs. Hovind who actually performed the act of the structuring,

13   brought the cash back, and the cash was then distributed to the

14   employees.  There were some other employees who also cashed

15   some checks as well.  So it certainly was --

16           THE COURT:  Where do you come up with the five?  I

17   certainly recognize Mrs. Hovind.  Martha Harris, I believe, was

18   also involved in the transactions, and I believe Tonya Hovind.

19   I may have that wrong.

20           MS. HELDMYER:  Your Honor, there was other evidence

21   that other members of the Hovind family also conducted the

22   structuring transactions.  I would urge the Court, however, to

23   rely upon the otherwise extensive subsection of that, rather

24   than the five.  I think we could come up with five.  I think

25   it's much more sound to argue that it was otherwise extensive.

10:03AM 1   It was over a long period of time.  It permeated the business.

2   It was the reason why the structuring allowed and enabled the

3   illegal Internal Revenue Service activities by getting all the

4   cash that came back.  And the cash was primarily for the

5   payment of the employees so the employment taxes would not have

6   to be paid, et cetera.  So I think the Court can very easily

7   find that it was otherwise extensive, and I would ask the Court

8   to rely on that particular subsection.

9           With regard to the aiding and abetting, I do not

10  believe, as I said, that that precludes the Court from finding

11  Mr. Hovind was an organizer and leader.  Simply because he

12  didn't go down and do these transactions does not mean that he

13  was not the organizer and leader.  Again, the relationship

14  between Mr. and Mrs. Hovind is very, very clear that

15  Mrs. Hovind was subservient to her husband, she did what her

16  husband told her to do, and that these activities were all

17  directed by Mr. Hovind, and that's why we believe that you can

18  find he was the organizer and the leader of this particular

19  activity.

20          THE COURT:  Thank you.  I don't know and haven't been

21  provided with any authority to preclude me from finding that

22  someone who aids and abets cannot be given this adjustment

23  under the guidelines.  And absent some legal authority

24  indicating that that cannot be done, it makes sense to me that

25  it can be done.  And in this case, I do think it's appropriate.

10:05AM  1    Mr. Hovind, as I've already indicated, was the decision-making

2    authority for the operation, and based on the degree of control

3    and influence that he exercised over others, including those

4    involved in the financial transactions at issue here, I believe

5    I can find and do find that the adjustment for being an

6    organizer and a leader of an otherwise extensive operation is

7    appropriate, that he did direct the activities of those

8    involved in the financial transactions, namely, those

9    activities of his wife, Mrs. Hovind.

10           I also would note the length of time, the span of time

11   involved in this offense, and that it is significant, and also

12   the significant -- the value of funds involved at 1.5 million

13   lends me or causes me to believe and find that it was an

14   extensive operation.

15           All right, then.  Mr. Richey, we are at paragraph 46,

16   which is back to the obstruction.  Unless you have some

17   additional argument to make here, the same analysis would be

18   applied by the Court with respect to this group of counts.

19           MR. RICHEY:  Your Honor, I think with respect to this

20   group of counts, that there is no evidence of hiding of bank

21   records or hiding the amounts in order to -- unless you look

22   specifically just at the structuring charge itself.

23   Otherwise -- in fact, I would point to the Court to the fact

24   that the IRS had issued summons and did obtain all bank records

25   from the banks, and so there was no affirmative act of the

10:07AM  1   defendant to hide the monetary transactions and the monetary

2   amount.  And so based on that, we would object to any

3   enhancement.

4           THE COURT:  Okay.  I understand the argument.

5           Ms. Heldmyer, do you wish to address it?

6           MS. HELDMYER:  No, Your Honor.  I believe the same --

7   the same logic would apply.  It doesn't have to be related to

8   the counts, the obstructive behavior does not have to be

9   related to the counts.  So we would urge that same analysis

10  applies.

11          THE COURT:  Well, I would find that the conduct does

12  relate to this group of counts as well.  The -- if I recall the

13  evidence, there was -- there was communication from, and I

14  believe it was Glen Stoll to Mr. Hovind regarding the need to

15  notify Mr. Stoll in the event of any transactions being

16  conducted in excess of $10,000.  And I believe that Mr. Stoll

17  and Mr. Hovind had the same intent, and that was the intent to

18  not only avoid the payment of taxes, but also to obstruct and

19  impede any efforts of the Internal Revenue Service to

20  administer its laws.

21          All right.  The adjusted offense level, then, on these

22  counts is 30, which is a greater offense level than those for 1

23  through 12 in which the guidelines would indicate that is the

24  offense level to be applied.

25          Mr. Richey, I believe in your objections you -- I

10:09AM 1   believe you raised an objection to no adjustment for acceptance

2   of responsibility.  Do you wish to address that?

3          MR. RICHEY:  Not anything further, Your Honor, but I

4   do believe that my -- well, actually I retract that.

5          THE COURT:  Okay.

6          MR. RICHEY:  Just a couple of things.  The Court just

7   noted the evidence that was presented regarding Glen Stoll, and

8   actually after that came in, there were no more cash

9   transactions over 10,000.  So I believe as far as that goes,

10   that portion has been corrected, and that is no longer

11   continuing.  I would also point out to the Court that after the

12   conviction in this case -- and it's -- I mean, there was quite

13   a bit of dialogue during the course of this trial regarding

14   Mr. Hovind's awareness of what he was actually charged with,

15   and I think the testimony was that initially the investigation

16   did deal with his personal income taxes, and then converted

17   over to an investigation of employment taxes.

18          And regarding that, after the conviction in this case,

19   then steps have been taken to put in place a program where an

20   employment agency is now being used for everyone there at CSE

21   and Dinosaur Aventure Land.  And so with regards to that, I

22   believe that he has taken appropriate steps, now having

23   understood what the charges were and what the issues were, to

24   correct those.  And I believe that he will later make a

25   statement regarding that.  So I would ask the Court to keep

1   that in mind and to -- to find acceptance of responsibility.

2           THE COURT:  Thank you.  Ms. Heldmyer.

3           MS. HELDMYER:  Your Honor, we have reason to believe

4   that that is not the case, that those activities as outlined by

5   Mr. Richey are not exactly as represented by Mr. Richey.  We do

6   have evidence to present at some point in time that's relevant

7   to that and other issues, and I will leave it, of course, to

8   the Court to decide when the Court may want to hear that

9   evidence, but it's actually -- this evidence is evidence of

10  conversations after conviction and recent conversations that

11  Mr. Hovind has had at the jail that would relate directly to

12  acceptance of responsibility to -- and to sentencing issues

13  whether -- where within the guidelines range the Court may wish

14  to sentence the defendant or whether the Court may choose to

15  sentence the defendant to a sentence above the guideline

16  ranges.  We believe these conversations would be relevant to

17  all of those -- all of those issues.

18          If the Court wants to hear those relative to the

19  acceptance of responsibility, we're willing to do that now.

20  But regardless of those representations, we do not believe,

21  even if those were true, that those representations by

22  Mr. Richey are sufficient to allow this Court to give

23  Mr. Hovind the two levels for acceptance of responsibility.

24  Mr. Hovind has done everything but accept responsibility.  He

25  continues to believe that he didn't owe any taxes, that there

10:12AM 1    are no laws that require him to pay taxes.  He certainly did

2    not plead guilty.  And he is continuing to conduct criminal

3    activities that we can illustrate by this evidence.  So if the

4    Court wishes to hear that now, we can proceed now or wait until

5    perhaps the guidelines range is calculated and the sentence is

6    to be determined.

7            THE COURT:  All right.  Well, it would relate to the

8    argument as far as this adjustment.  So I will hold my decision

9    or ruling in abeyance as far as the level here and whether any

10   adjustment should be made.

11           Mr. Richey, you're standing up, so I presume you have

12   something you would like to say.

13           MR. RICHEY:  Yes, Your Honor.  In regards to this disk

14   that was made of the telephone calls, my objection would be,

15   first of all, that they are only blippets taken out of sequence

16   and out of the conversation.  Further, so that it doesn't shed

17   the true light of the nature of the conversation, in fact, in

18   many of them, you don't know what -- it was obvious that there

19   was a question that preceded that.  We don't know what the

20   question was, because that was cut out.  It's unclear who the

21   conversation is taking place with in many of the conversations.

22   And so this disk, we would object to it as coming in in that it

23   doesn't meet -- it's been distorted and deformed and not even

24   in its true and correct and accurate original intent.  So --

25           THE COURT:  I would find that the arguments that you

10:14AM 1   raise would go to the weight of the evidence as opposed to the

2   admissibility.

3           But, Ms. Heldmyer, if you wish to address the accuracy

4   of what he says, you're free to do that for the record.

5           MS. HELDMYER:  Your Honor, the speakers can be

6   identified by Special Agent Schneider as the tape is rolling.

7   I think he's probably listened to more tapes than he cares to

8   say, and he can identify the speakers as the tapes are playing.

9   They are not entire conversations, but they are entire

10  questions and answers of the conversations.  The copy may not

11  be simply easy to hear what's being said by the other person,

12  but the tape recording is very easy to hear what Mr. Hovind

13  says.  It's not very difficult.

14          THE COURT:  That's why I want to make sure that my

15  ruling was premised on the belief that these were conversations

16  with Mr. Hovind.

17          MS. HELDMYER:  They're all with Mr. Hovind and another

18  individual.  I think that we have set up the equipment such

19  that we will be able to hear the questions and what's being

20  said on the other side.  Mr. Richey's copy, probably it was

21  difficult to hear, but I think we've set it up so that you will

22  be able to hear what the actual question is or what the

23  exchange is, but all of them have Mr. Hovind on them.  And the

24  tape is portions of conversations that we felt obviously were

25  relevant to the Court's decision on these matters, and they are

1   all identified by date, and Special Agent Schneider can

2   identify the speakers as well.

3            THE COURT:  How long is the tape?

4            SPECIAL AGENT SCHNEIDER:  30 minutes.

5            MS. HELDMYER:  30 minutes.

6            THE COURT:  Is there anything either of you would like

7   to address before we proceed with the tape?  I think we've

8   resolved the computations.

9            MR. RICHEY:  Yes, Your Honor.  One other thing in

10  regard to is that then my other objection would be that these

11  are specifically hand-picked conversations that were taken, and

12  the Court should also take into account when the conversations

13  were made, because obviously he's been incarcerated for about

14  three months.  And whether these were at the beginning of that

15  as opposed to now, that certainly I would make a representation

16  in discussing this with my client, that there have been more

17  recent conversations where his attitude has, in fact, changed

18  and altered.  And so this is not a true, fair and accurate

19  depiction of all the conversations that he's had in his true

20  mental state.

21           THE COURT:  All right.  You will be permitted to

22  cross-examine Agent Schneider as far as the timing of the

23  conversations and when they took place.

24           You did indicate Agent Schneider, did you not?

25           MS. HELDMYER:  Yes, Your Honor.  And the actual dates

10:17AM 1   of the conversations are going to appear on your screen as the

2   disk is being played.

3          THE COURT:  All right.  And you can make points

4   through cross-examination that you just raised if you feel it

5   necessary.  And then, of course, Mr. Hovind can address the

6   Court about his present state of mind.

7          MR. RICHEY:  Thank you.

8          THE COURT:  We're going to take a ten-minute recess

9   before we begin with the tape.  We'll be in recess until 10:30.

10         (Recess.)

11         THE COURT:  Ms. Heldmyer.

12         MS. HELDMYER:  Yes, Your Honor.  Special Agent Scott

13   Schneider.

14         THE CLERK:  Do you solemnly swear that the testimony

15   that you shall give will be the truth, the whole truth and

16   nothing but the truth so help you God?

17         THE WITNESS:  I do.

18          SCOTT SCHNEIDER, GOVERNMENT'S WITNESS.

19         THE CLERK:  Be seated.  Please state your full name

20   and spell your last name for the record.

21         THE WITNESS:  I'm Scott Schneider, S-c-h-n-e-i-d-e-r.

22         THE COURT:  Ms. Heldmyer.

23         MS. HELDMYER:  Thank you, Your Honor.

24              DIRECT EXAMINATION

25   BY MS. HELDMYER:

Schneider - Direct

10:30AM 1   Q.   Special Agent Schneider, how are you employed?

2   A.   I'm a special agent with IRS Criminal Investigation,

3   Pensacola, Florida.

4   Q.   Are you the same Scott Schneider that testified at the

5   trial of Kent and Jo Hovind?

6   A.   Yes, ma'am.

7   Q.   And one of the case agents that investigated the case?

8   A.   Yes, ma'am.

9   Q.   At some point in time after the conviction, Special Agent

10  Schneider, did you have the occasion to attempt to get copies

11  of tape recordings made by the jail where Mr. Hovind was

12  staying and listen to those tape recordings?

13  A.   Yes, ma'am.

14  Q.   Would you explain the procedure, please.

15  A.   Well, as part of their regular procedure, the jail makes

16  recordings of --

17          MR. RICHEY:  Objection, Your Honor.  Hearsay,

18  speculation.

19          THE COURT:  Overruled.

20          THE WITNESS:  The jail makes recordings of phone

21  calls.  The phone calls start off warning the caller or the

22  recipient of the phone call that the call is subject to

23  monitoring and recording.  I specifically requested from the

24  Escambia County Sheriff's Office that phone calls relating to

25  certain PIN numbers be looked for, meaning the home and

Schneider - Direct

10:31AM

1    business of Kent Hovind.  We were able to ascertain that he was

2    using someone else's PIN number for making those phone calls

3    from the jail.  The PIN number is assigned to inmates so that

4    they can make phone calls out and they can identify who the

5    caller is.  So he was using a James Bergeron's PIN number for

6    the majority of the time.

7              And we obtained these phone calls on disk pretty much

8    once a week, sometimes once every other week, but for most of

9    the time once a week.  We would get a CD by called number.  So

10   if the phone number for the house we would get a CD for all the

11   phone calls going to that house the prior week and they would

12   be in a form that it had its own media player but it was also

13   in a form that you could listen to it on any Window's-based

14   computer through their Window's-based media player.

15   BY MS. HELDMYER:

16   Q.  For what period of time were you doing this?

17   A.  We started doing it probably about a couple weeks after

18   initial incarceration at Escambia County jail, and we went back

19   and started the day he was actually convicted.  So it was

20   November 2nd, I believe, 2006, is when the tape recording

21   started.

22   Q.  What calls did you listen to total, the calls that had --

23   the calls to the home telephone number and what else?

24   A.  Calls to the home telephone number, calls to the business

25   number.

Schneider - Direct

10:32AM 1    Q.  The business being?

2    A.  The business being Creation Science Evangelism.  And, also,

3    later on he did obtain the ability to call some cell numbers,

4    and we started listening to those as well, retrieving those in

5    addition.

6    Q.  Do you know why he was using someone else's identification

7    number?

8    A.  Well, it appeared at the early onset it was because he was

9    having problems.  The recordings indicated that he was having

10   problems with his own PIN, so he started using someone else's.

11   He used his own for the majority of the time, and I believe as

12   late as December 30th or around the first of the year, that

13   individual left, their PIN number was cut off, and he finally

14   got his working again.  And so he started using his own.

15   Q.  Can you give us an estimate of about how many hours of tape

16   recordings you listened to?

17   A.  There was probably an average of eight hours a week, six to

18   ten, ten on the high side, six on the low side.  And it covered

19   about 11 weeks or so.  So I'd say somewhere in the neighborhood

20   of about 80 to 90 hours.

21   Q.  What types of things or topics of conversations were you

22   looking for?

23   A.  Well, we -- we initially started looking for issues

24   regarding the possibility of him secreting and hiding or

25   removal of assets.  Since we had the judgment -- or we had the

Schneider - Direct

10:33AM

1    forfeiture order pending, we were concerned that despite our

2    warnings, immediately after conviction that he might start to

3    dissipate or move assets out of the reach of the government.

4    So that's what initiated the reason for monitoring the phone

5    calls.

6    Q.  Did you find phone calls that you would categorize as

7    telephone calls regarding that topic, that subject matter, the

8    hiding of assets?

9           MR. RICHEY:  Objection, Your Honor, calls for

10   speculation.

11          THE COURT:  Overruled.

12          THE WITNESS:  Yes, ma'am.

13   BY MS. HELDMYER:

14   Q.  What else did you eventually listen for and record?

15   A.  Well, it became apparent while we were listening for that

16   information, that he was continuing to make threats of -- there

17   were a couple of veiled threats, but the majority of them were

18   threats about additional legal action that he was going to

19   take.

20          MR. RICHEY:  Objection, Your Honor, testifying as to

21   evidence not or -- not in evidence.

22          THE COURT:  Overruled.  It's a statement he's

23   overheard of the defendant.  I'll allow it.

24          THE WITNESS:  So, again, that was a category that we

25   started hearing, and so we made note of significant -- again,

Schneider - Direct

10:35AM

1    similar to the type of charge he was convicted of in court,

2    threats of additional legal action, additional TIGTA

3    complaints.  So that was a category.  And in addition to that,

4    we started hearing a lot of the same rhetoric that we heard

5    during our investigation, as well as in his correspondence,

6    which is his continuing refusal to recognize the IRS or to

7    believe that they have any authority whatsoever.  So we started

8    noting those phone calls as well.

9    BY MS. HELDMYER:

10   Q.  At some point in time did you create a separate disk with

11   portions of telephone calls that you believe were relevant to

12   those topics?

13   A.  Well, yes and no.  Yes, I created a separate disk.  I

14   created a separate file.  This one file that -- that I'm seeing

15   right now that I compiled, I put on a disk with the full phone

16   calls that comprised this tape recording.  This right here is

17   basically my compilation for the Court's ease of use.  Instead

18   of having to listen to eight hours of phone calls that comprise

19   this, the full phone calls, I broke down the comments that were

20   made primarily by Kent Hovind.

21   Q.  Did you bring a copy of these calls to court in the form of

22   a disk?

23   A.  Yes, ma'am.  As a matter of fact, every call separated in a

24   different directory list.  There is one directory on this disk

25   that has every single phone call we got from the prison, and in

Schneider - Direct

10:36AM

1   addition to it is every single phone call that made up this

2   actual compilation.

3   Q.   All right.  So all of the phone calls are on the disk that

4   you brought to court?

5   A.   Yes, ma'am.

6   Q.   Is that disk marked Government's Exhibit 1?

7   A.   Yes, ma'am.

8   Q.   And is it keyed up and ready to play?

9   A.   The file is keyed up and ready to play, yes, ma'am.

10           MS. HELDMYER:  The United States would move

11   Government's Exhibit 1 into evidence at this time.

12           THE COURT:  It will be admitted.

13           MS. HELDMYER:  Your Honor, if I make the inquiry, the

14   screen will not tell the Court who the speakers are.  Do you

15   want the agent to interject at the beginning of every phone

16   call and identify the speakers?

17           THE COURT:  Yes.

18           MS. HELDMYER:  All right.  If you would do that when

19   the tape is played.

20           And I believe you'll see, Your Honor, the date and

21   time of each of the phone calls that are played.  May I be

22   seated during the playing of the tape?

23           THE COURT:  Yes.

24           (Tape played.)

25           THE WITNESS:  There is about a 20-second blank intro.

Schneider - Direct

10:37AM
```
1        That's Mr. Hovind.

2                (Tape played.)

3                THE WITNESS:  And the other speaker is Glen Stoll.

4                (Tape played.)

5                THE WITNESS:  That's one of the employees at Creation

6     Science Evangelism, Diane -- I don't remember the last name off

7     the top of my head.

8                (Tape played.)

9                THE WITNESS:  That was Jo Hovind.

10               (Tape played.)

11               THE WITNESS:  That's Eric Hovind.

12               (Tape played.)

13               THE WITNESS:  This is an employee, I believe the first

14    name of Jeff that works over there.  Just another employee at

15    CSE.

16               (Tape played.)

17               THE WITNESS:  That's Eric Hovind again.

18               (Tape played.)

19               THE WITNESS:  That's Marlissa Hovind, and Eric Hovind

20    is also on this phone call.

21               (Tape played.)

22               THE WITNESS:  That's Eric Hovind again.

23               (Tape played.)

24               THE WITNESS:  That is Glen Stoll.

25               (Tape played.)
```

10:55AM

1          THE WITNESS:  I believe he's talking to Paul Hanson

2    about the article he's writing portraying what happened.

3          (Tape played.)

4          MS. HELDMYER:  That completes the tape, Your Honor.

5          THE COURT:  Do you have any further questions?

6          MS. HELDMYER:  I do have one or two follow-up

7    questions.

8    BY MS. HELDMYER:

9    Q.  Agent Schneider, you heard Mr. Richey make representation

10   regarding employment -- outside employment consultants.  Did

11   you hear anything on the tape with regard to that subject?

12   A.  Yes, ma'am, I did.

13   Q.  What did you hear?

14   A.  Well, we heard some discussions and specifically --

15         MR. RICHEY:  Your Honor, I'm going to object to this.

16   The evidence has not been admitted with regards to his

17   conversation.  It's hearsay.

18         MS. HELDMYER:  It is admitted, Your Honor.  It's part

19   of the tape -- the CD, Government's Exhibit 1, I believe all

20   the conversations are on there.

21         THE WITNESS:  Every single conversation from the

22   prison.  And my recap will prevent us from having to go over

23   pulling specific conversations.

24         MR. RICHEY:  My objection is mischaracterization, and

25   the evidence speaks for itself.

Schneider - Direct

11:10AM
1              THE COURT:  When it's your turn, if you want to play

2    the tape, you can play it.  Go ahead.

3              THE WITNESS:  In general, there is discussions about

4    using an employee leasing company, and there are discussions

5    about how to do it.  But, specifically, there was a comment

6    made about it's okay to use an employee leasing company for

7    their -- what they call their -- I believe he refers to them

8    sort of as grunt workers, people who do the lawn, dig the

9    ditches, do the maintenance work.  But everybody else that's

10   actively working for the ministry of CSE was not going to be

11   going through that employee leasing company.

12             MS. HELDMYER:  All right.  That's all I have, Your

13   Honor.  May I approach the clerk with the disk?

14             THE COURT:  Yes.

15             MS. HELDMYER:  If the tape needs to be played, we can

16   do that.  I just need to retrieve the disk.

17             THE COURT:  Mr. Richey.

18             MR. RICHEY:  Yes, Your Honor.

19                       CROSS-EXAMINATION

20   BY MR. RICHEY:

21   Q.  Good morning, Agent Schneider.

22   A.  Good morning.

23   Q.  So I just have a few questions about this recording.  So

24   this is a recording -- you received all of the conversations

25   that Mr. Hovind made or just numbers that you picked out?

Schneider - Gross

46

11:11AM

1    A.  Well, we attempted to locate all of the conversations that

2    were made.  So we searched by numbers we knew him to call.  We

3    cross-referenced those with the PIN numbers used.  So unless he

4    was hiding them with the use of other PIN numbers, we've gotten

5    every phone call that he made out of there.

6    Q.  Okay.  And then all of the phone calls are on this disk; is

7    that correct?

8    A.  Yes, sir.

9    Q.  Okay.  And you said that there were about 80 or 90 hours'

10   worth; is that correct?

11   A.  I'd say average, yes, sir, generally.

12   Q.  All right.  And then what we listened to was about 31

13   minutes?

14   A.  Thirty-one minutes of selected clips of approximately 30

15   phone calls, which would have been approximately five hours of

16   phone calls.

17   Q.  Okay.  And you're the one that picked out those 30 minutes,

18   right?

19   A.  Myself and Agent Evans, yes, sir.

20   Q.  So you said that those 30 minutes came out of about five

21   hours?

22   A.  Yes, sir, in order to compress it for use here.  I don't

23   think the Court wanted to hear 80 hours' worth or even five

24   hours' worth.

25            THE COURT:  No, we don't want to do that.

Schneider - Cross

1                THE WITNESS:  I apologize, ma'am.

2                THE COURT:  All right.  Go ahead.

3    BY MR. RICHEY:

4    Q.  So then it's your testimony that all 80 or 90 hours,

5    whatever the total amount was, it's all the same as what we

6    listened to, this 30 minutes?

7    A.  I didn't say that.

8    Q.  I'm asking if that's your testimony?

9    A.  My testimony is that what you see is generally

10   representative of Kent Hovind's comments and stances throughout

11   that last three months, as well as I would say that

12   Mrs. Hovind's statements here are generally representative of

13   her stance and viewpoint over that same three months.

14   Q.  Okay.  And during the phone conversations, we heard people

15   like Glen Stoll where Mr. Hovind was asking him questions, and

16   he gave answers; is that right?

17   A.  You heard some conversations like that, yes, sir.

18   Q.  Right.  And do you know if what Glen Stoll told him to do,

19   that that's what was carried out?

20   A.  In reference to what exactly, sir?  I guess I'm not

21   understanding the question.

22   Q.  There were a number of things, for example -- well, I

23   believe that there is at least one question about whether

24   complaints or lawsuits should be filed, he asked that of Glen

25   Stoll?

Schneider - Gross

11:14AM

1    A.   Okay.  Regarding any of those that have been carried out,

2    including the transfer of the bank account, I don't know for

3    sure.  I don't have records back from the bank yet.  So I

4    couldn't tell you.

5    Q.   Okay.  Were there any phone calls where Mr. Hovind actually

6    said that they were trying to comply?

7    A.   Well, he might have used those words, but in the context --

8    in the proper context, he -- just like you heard in these

9    recordings, he's trying to comply, but we're not following the

10   law.  And that's the general context that he would be saying

11   them in.  So he might use the words "we are attempting to

12   comply," but he doesn't agree with what the law is, so we're

13   the ones in the wrong.  So I would put it in that context, yes.

14        MR. RICHEY:  Just one minute, Your Honor.

15   BY MR. RICHEY:

16   Q.   In one of the conversations that we heard, and I may

17   misstate it, so feel free to correct me if I do, Mr. Hovind

18   made reference to that he had to talk to Glen Stoll in regard

19   to those things.  Do you know if -- and we heard the

20   conversation about employee leasing companies, and I believe

21   your comment was -- or actually we didn't hear that.  I'm

22   sorry.  You said that there were some conversations about the

23   employee leasing company and only the grunt labor should be

24   part of that.  Was that a conversation that was held with or

25   had with Glen Stoll?

11:15AM  1   A.  As I recall, Glen Stoll was involved in some of the

2   conversations regarding employee leasing, but primarily I

3   believe that phone call was between Mr. Kent Hovind and Eric

4   Hovind where he was giving his opinion on who should be part of

5   it, and that this is the way it should be done and he'd like it

6   done that way.  But, yes, he did refer to Glen in that

7   conversation, but that actual comment, I believe, was made to

8   Eric Hovind.

9   Q.  And was that prefaced or do you know if there is another

10  conversation preceding that where Glen Stoll told him that

11  that's what needed to be done?

12  A.  I do not hear Glen giving any instructions.  I know that

13  Glen was involved in conversations discussing using an employee

14  leasing company, and most of the conversations between

15  Mr. Hovind and Glen surrounded the fact of the contractual

16  obligations and whether the contracts were proper and whether

17  they agreed in their theory that a ministry can enter into a

18  contract for employee leasing.  And there was also further

19  discussion of whether or not they should lease them, but pay

20  the employee directly.  Thus, basically they are leased on

21  paper, but they continue to pay them themselves.  So there were

22  a variety of conversations.  But specifically regarding your

23  question, no, not that I recall.

24  Q.  Do you know how the jail records the phone conversations?

25  A.  They are put onto a main database.  There is a PIN number

Schneider - Gross

1    that inmates are given, and I believe they are electronically

2    recorded by computer.

3    Q.   Okay.  And then -- just so I can understand, then you

4    requested and they provided you a CD every week?

5    A.   I have individual CDs, yes, sir, and then I transferred

6    them to one hard drive and put them all on one disk for ease of

7    use.

8    Q.   So each of those -- I'm just trying to make sure.  So then

9    each of those phone calls is on this disk; is that correct?

10   A.   Yes, sir.

11   Q.   And you compiled this disk when?

12   A.   That copy was actually burned yesterday, and I compiled

13   everything -- Monday or Tuesday morning, I had pretty much

14   everything compiled.  We got some additional calls Wednesday

15   midday, and they were added.  So that final disk was done

16   Thursday, I guess.

17   Q.   Thursday meaning yesterday?

18   A.   Meaning yesterday, yes, sir.

19          MR. RICHEY:  Thank you.  Your Honor, I have no further

20   questions?

21          THE COURT:  Thank you.  Ms. Heldmyer.

22          MS. HELDMYER:  Nothing, Your Honor.

23          THE COURT:  You may step down.

24          THE WITNESS:  Thank you.

25          THE COURT:  Ms. Heldmyer, anything else from the

11:18AM 1  government?

2          MS. HELDMYER:  Your Honor, I think before the tape

3  began to play, we were talking about acceptance of

4  responsibility, and I believe the tape speaks for itself with

5  regard to that issue.

6          THE COURT:  Anything you wish to present on this

7  issue?

8          MR. RICHEY:  On this particular issue?

9          THE COURT:  On the acceptance of responsibility.

10         MR. RICHEY:  No, Your Honor.

11         THE COURT:  All right.  I indicated that I would -- to

12  the extent that Mr. Hovind wishes to address the Court in

13  allocution, I will listen to that prior to ruling on the

14  acceptance of responsibility.

15         I don't believe there is anything else left to be

16  discussed with respect to the presentence report.

17  Ms. Heldmyer.

18         MS. HELDMYER:  I don't think so, Your Honor.

19         THE COURT:  Mr. Richey.

20         MR. RICHEY:  No, Your Honor, with respect to the

21  presentence report, no.

22         THE COURT:  Mr. Richey, do you have anything to

23  present on Mr. Hovind's behalf in relation to sentence?

24         MR. RICHEY:  Your Honor, I believe that there are --

25  may be a couple of people who would like to say a couple of

1   words.  Would now be the time for that?

2          THE COURT:  Now would be the time.

3          MR. RICHEY:  Let me just confer and see if they still

4   want to do that.

5          THE COURT:  Ms. Heldmyer, are you going to want to

6   cross-examine?

7          MS. HELDMYER:  Probably not, Your Honor.  We're

8   talking about character witnesses, obviously.

9          THE COURT:  I'm assuming that's what you're referring

10  to, is character reference testimony?

11         MR. RICHEY:  Yes.  They were just going to speak.  I

12  wasn't going to question them.  Is that okay with the Court?

13         THE COURT:  It is if that's the type of statement that

14  they are going to make.  If they are going to get into any

15  factual matters that might pertain to the sentencing, then they

16  would perhaps be subject to cross-examination, and that's why I

17  ask.

18         MR. RICHEY:  I don't -- I don't believe so.  I haven't

19  talked to them about their testimony.  I just asked if anyone

20  wanted to speak on behalf.

21         THE COURT:  And they will be permitted to do that,

22  absolutely, if they want to make those type of statements, no

23  problem.  If they want to testify, that is not a problem, they

24  would just be subject to cross-examination.  Otherwise, do let

25  me note, though, that I have received numerous letters on

11:20AM 1   behalf of both Mr. and Mrs. Hovind, and I have reviewed each

2   and every letter.

3             MR. RICHEY:  Thank you, Your Honor.

4             THE COURT:  To the extent someone wishes to speak,

5   you're welcome to do so.

6             MR. RICHEY:  I believe Eric Hovind.  And then there

7   may be one other.

8             THE COURT:  All right.  Mr. Hovind, if you would

9   approach the podium here.  You can speak from there.

10            MR. ERIC HOVIND:  Good morning, Your Honor.  I

11   appreciate it.  My name is Eric Hovind.  I'm Dr. Hovind's son.

12   And I was instructed that I would be able to give testimony as

13   to my dad's character.  And I would be absolutely honored,

14   honored to do that.

15            Dr. Hovind is somebody that I've known from a very

16   early age, obviously.  Dr. Hovind all my life has -- my dad has

17   searched for truth.  And when he finds truth, he sticks with

18   it.  His entire ministry is devoted to seeking out what is

19   truth and staying with what is truth, regardless of the

20   consequences.  I know that growing up whenever -- I remember a

21   particular instance where my dad told me something, he said,

22   "Listen, son, we're in store, so don't play with that.  If you

23   break it, you're going to have to buy it."  And -- well, I

24   grabbed it, and it fell.  It was a little snow globe, and it

25   broke, and all the water leaked out.  And he said, "Well, son,

1    I told you what was going to happen." So we went to the front

2    counter, and I had a couple of dollars of my allowance, and

3    that went to buy a broken snow globe, as an example.

4         He's very consistent in what he does, which I believe

5    is incredible, absolutely incredible in today's society, in a

6    world of politics where people will say whatever is needed to

7    be said in order to gain whatever they want to get. They'll

8    say whatever needs to be said to manipulate the situation. My

9    dad doesn't do that, Your Honor. My dad speaks the truth.

10   He's very consistent in what he does. And I find that

11   admirable in today's world.

12         Some examples to show that he's consistent, I think

13   have been brought up in court. He did not believe that he was

14   not supposed to withhold on contractors. We signed a

15   contracting agreement, and he believed, he really believed and

16   was consistent in, look, we have a contractual arrangement with

17   you, we're not going to withhold taxes. That's been evident.

18   He was consistent in the fact that he believes that the law has

19   not been shown to him, which was again demonstrated just a

20   minute ago. He sincerely believed and is very consistent in

21   the fact that, look, I haven't been shown the law. I believe

22   he's very consistent, despite the fact that others may desire

23   to change their opinion just in order to make it easier on

24   themself.

25         He also believed that his rights had been violated,

11:23AM  1    and he believed that there were certain things that he could do

2    to reinstate the rights of his that had been violated by the

3    IRS.  He believed that he had written in good faith to the IRS

4    and was consistent in that belief, and it still is, that he

5    wrote to the IRS and said would you please just show me where

6    I'm wrong or show me where you have the jurisdiction, and then

7    we can get along.  I don't know if it was his communication

8    skills that were lacking or the IRS's communication skills that

9    were lacking in doing that, but obviously that didn't happen.

10         He's consistent in his message.  It's always been the

11    same.  His message has always been if you owe a tax, you better

12    pay it.  I know the government has taken information and bits

13    of information and twisted it into making it -- and even

14    stating that Kent Hovind is a tax protester.  I'm here to tell

15    you as a character witness that Kent Hovind is not a tax

16    protester.

17         MS. HELDMYER:  Your Honor, if I may object.  We've

18    gotten into several factual issues at this point.  If we

19    continue to go along those lines, we may want to swear him, and

20    I may want to cross-examine him.

21         THE COURT:  Mr. Hovind, if you want to continue and

22    make references to factual matters in connection with your

23    father's activities in this case and his state of mind in this

24    case, the government may wish to cross-examine you, and you may

25    be subject to that.  Do you wish to proceed in that fashion?

1          MR. ERIC HOVIND:  My understanding is if that I'm

2     talking about his character, which is what I'm trying to

3     basically show to you is what his character is like, I will

4     certainly try not to -- well, all of his character has to do

5     with facts.  So how do I --

6          THE COURT:  Well, if you relate it to this case and

7     actions that he's taken in this case which may pertain to the

8     sentencing, then the government would be entitled to cross or

9     you need to be placed under oath and testify, and the

10    government would be entitled to question you about that.

11         MR. ERIC HOVIND:  I understand, Your Honor.

12         THE COURT:  I assume that you are making these

13    comments in hopes that I would take them into consideration

14    when I impose sentencing?

15         MR. ERIC HOVIND:  I'm making these comments because

16    these are relevant things that even you would know to help

17    ensure what his character is like.

18         THE COURT:  Ms. Heldmyer, are you willing to forego

19    the cross-examination at this point?

20         MS. HELDMYER:  I would, Your Honor.

21         THE COURT:  You may proceed as you are.

22         MR. ERIC HOVIND:  Thank you, Your Honor.  Not only is

23    he a man that is consistent, he is also a man of conviction.

24    He is a man that is convicted that he's going to do what is

25    right because God has told him to do what is right no matter

11:26AM 1    what.  And he is a man that has not swayed or swerved from that

2    at all, as if I can say, I think would be evident to you.  Win

3    or lose, he's going to stay on what's truth -- he's going to

4    stay with what the truth is.  He's a man of conviction when it

5    comes to right and wrong, good and bad.  He is a man of

6    conviction when it comes to evil in this world.  He is a man of

7    conviction of -- to say that God hates evil and God desires

8    good.  He is a man of conviction.  He has stood on his

9    conviction of what God believes and what he believes God has

10   shown him through God's word.

11          He is a also a man of love, unbelievable love.  And he

12   is not a man who is in love with money.  He's a man who is in

13   love with God.  Plain and simple.  Not only is he a man in love

14   with God, which is extremely evidence, which I believe -- you

15   read the letters, the character letters, which I would dare say

16   easily show he's a man that loves God.  Not only does he love

17   God, he's a man that loves his country.  I don't know if I can

18   say that it's been brought up -- or it's been tried to be shown

19   that he doesn't.  I'm here to say he does.  He loves this

20   country.  He would not want to live in another country.  He

21   would want to live here in America.  He's had options going to

22   other countries.  He could have taken us as a family to raise

23   us in a different country.  He loves his country.  There is no

24   question about that.  I can testify to that.

25          He's also a man that loves others.  The reason he

11:27AM
1    loves others isn't because they deserve to be loved.  The

2    reason he loves others is because he has experienced God's

3    incredible love, which makes it possible now for him to love

4    the unloveable, for him to love the unlikable.  He loves God.

5    He loves his country.  He loves others.  Man, does he love his

6    children.

7            Boy, I tell you, I look up to my dad.  He is a great,

8    great example of what a dad should be in a world that -- I

9    don't know the exact statistics, besides 85 percent are made up

10   on the spot anyway.  He's a man that has done an incredible job

11   of raising his kids.  My sister and my brother are here.  And

12   I'm sure if they had the nerve to stand up here, they would

13   testify my dad has been an awesome dad.  He has loved me

14   unbelievably and unconditionally.  Despite the many trials and

15   tribulations that we as children have put on his life, he said

16   you know what, I'm going to keep loving you.  That's an

17   unconditional thing.

18           He's a man that loves his grandchildren.  Wow.  He's

19   got five now, one just born a week and a half ago that he's

20   never seen.  And, boy, I know he would like to see them.  He

21   sure does love them.  And I don't know if I'm allowed to say,

22   because of that -- because of his love for that and the

23   closeness of our family, despite the fact that there are

24   disagreements, the closeness of our family is just incredible.

25   And if I might be able to say, I don't know if I can say this,

11:29AM 1   but I am able to say this, I would love to request that after

2   sentencing is imposed, that if there is time to be served, that

3   it be locally at the Saufley Field location, so that we could

4   visit with him, which would be invaluable.  Just invaluable.

5          Kent Hovind is also an incredibly generous man, a man

6   that is willing to give everything for God and country, a man

7   that has tried desperately over the years to -- from 1989, when

8   he took a vow of poverty and said, look, I don't want to own

9   anything.  I'm not trying to build up a kingdom.  I'm not

10  trying get a lot of wealth and prosperity.  I want to serve

11  God.  And since 1989, he's tried to give it all away.  He

12  doesn't want anything.  From the fact that his seminar tapes

13  that he produces are not even copyrighted.  He said copy them.

14  Get this word out.  This is an important message for God.  He's

15  not a man that's tried to hide money from the IRS in order to

16  gain wealth or benefit himself.  He's not trying to do that.

17  You heard about a motor home that a gentleman still has, a guy

18  that gave it to us.  That was gifted to us.  The gentleman has

19  it because he's fixing electrical problems on the motor home.

20  And my dad said, you know what, I appreciate that.  People have

21  been incredibly generous because he is a man of incredible

22  generosity.  He's not trying to hide stuff.

23          He's a man that, like I said, will stand on truth.

24  He's a man that doesn't desire to skirt the issues.  He wants

25  to hit it head on.  He's also -- well, he's just -- he's an

11:31AM
1    incredible hero of mine.  I know that the circumstances he's in

2    right now are incredibly tough.  And through it all, he said,

3    Eric, my number one goal is to love God.  That's what I want to

4    do.  I want to love God.  He's been an incredible example to

5    me.  He's been an incredible example to others.  And as a

6    character witness for my dad, it's an honor to say, Dad, I love

7    you.  And you are a man of conviction.  You're man of integrity

8    and honesty.  You're a man that loves truth.  You're a man that

9    just simply loves.  And you're a man that's incredibly

10   generous.  That's amazing.  And that's my testimony of my dad,

11   Your Honor, and I hope you'll take that into consideration.

12          THE COURT:  Thank you, Mr. Hovind.  Is there someone

13   else?

14          MR. GUSTI:  Your Honor, I'll keep it brief for you.

15   My name is John Gusti.  And out of all the people that have

16   served at CSE, I'm probably the one who that has lasted the

17   longest, call it whatever you want, loyalty, discipline.  I

18   think it's loyalty to whom I serve ultimately, whom you may or

19   may not know Him.  That's for your decision.

20          But as a character reference or witness to Dr. Hovind,

21   I'll put it this way:  I believe Agent Schneider is a military

22   man, I believe, or former.  I myself am a military man, six

23   years in the Marine Corps, honorably.  I understand what honor

24   is.  I know how to stand in it.  I know how to walk in it.  I

25   know how to walk in truth.  I know how to stand on your beliefs

1   and to fight for what you believe in.  And I believe that's his

2   conviction.  I have stood and walked beside of him for ten

3   years now, going on the 11th year.  And if the Lord permits, I

4   will continue.  But regardless, I hold him in the highest

5   regard and highest esteem.  I honor him for what he stands for.

6          He is a man of conviction.  And I think sometimes

7   because of the personality of this man, he has such a strong

8   personality, that people can misunderstand when words come out,

9   but if you spend time with him, I think that everyone or anyone

10  would understand that although there may be a little bit of an

11  edge on the verbs or the words that come out or maybe a little

12  bit of edge on the heart sometimes, deep down I agree with Eric

13  Hovind.  He is a man of conviction, a man of honor, and a man

14  who will stand on the principles of what he believes.  And I

15  would ask for mercy from a man who has walked with him for ten

16  years.  And he is an honorable man.  That's it.

17          THE COURT:  Thank you.

18          PASTOR DIXON:  I'm Pastor Greg Dixon, pastor emeritus,

19  Baptist Temple.  My remarks will be very short.  I've come here

20  today to say that a good name is to be honored more than choice

21  silver, according to the Scriptures.  And I can say from the

22  very depths of my sole that Mr. Hovind, Pastor Hovind,

23  Evangelist Hovind has not done one thing, he has not said one

24  thing, he has not conducted himself in any manner that great

25  multitudes, even thousands of pastors across America that he

11:35AM 1   has ministered to would not say thank you for standing up in

2   the times in which we live for doing what you believe is right.

3   He refused to take a license for his ministry.  John Bunyan

4   went to jail for 13-and-a-half years because he refused to take

5   a license for his ministry.  In the eyes of many of us, that's

6   the real crux of this issue today.

7            In closing, I would like to say I sat here for 30

8   minutes, 31 minutes, and listened to things that were said in

9   that jail.  I've lived for 74 years on this earth.  I did not

10  hear one word out of that man's mouth, not one expletive, not

11  one word of filth or vileness.  And I can imagine if other

12  people had been in his same situation, the invectives that

13  would have come out of their mouth toward you and toward this

14  court and everyone involved, but there was not one word like

15  that.  And I think that alone shows the character of this man.

16           I've driven a long way to be here today, and I stand

17  proudly to say I love Dr. Kent Hovind and his wife Jo, their

18  children, their family.  And I'm honored to be able to stand

19  here in the presence of this awesome Court and be able to give

20  this testimony.  Thank you, Your Honor.

21           THE COURT:  Thank you, sir.

22           Anyone else?  Is there anyone else?  You have your

23  hand raised.

24           MR. ABRAMSON:  If I may speak.  Your Honor, members of

25  the court, my name is Paul Abramson, A-b-r-a-m-s-o-n.  I'm

11:38AM 1    currently contracting at Creation Science Evangelism to answer

2    the technical creation questions that come in, and I also help

3    with a subtitling project that we're doing and various other

4    responsibilities.  I fell into the creation-evolution debate

5    about nine years ago.  I was working for Intel Corporation in

6    Oregon at the time and thought of the Web page name of

7    creationism.org, which kind of put me into the battle because I

8    had a good name for the Website.

9           And it was about a year later when I met Dr. Hovind

10   for the first time.  He had come to Oregon and spoke, and I met

11   him and watched his seminar series.  I was very impressed at

12   how good he was at presenting the evidence.  And then over the

13   years after that, I got to know him as a person.  I had moved

14   down to Berkeley following the .com push down in the Bay area

15   and was working down there and living in the city of Berkeley,

16   California, which has a reputation for being not particularly

17   conservative, but I was there teaching creation, sometimes on

18   campus and sometimes in churches, and then trying to help to

19   invite others in.  I had invited persons from other major

20   creation ministries to come and speak, but I couldn't promise

21   to even pay for their airfare.  I couldn't promise to even have

22   a good crowd -- I could get a crowd, but not a crowd that would

23   buy books, and they would be partially hostile.  But Dr. Hovind

24   came anyway.  He came on his own cost, and he came to Berkeley

25   twice.  We had huge crowds.

11:40AM 1              And in testifying to Dr. Hovind's character, I see him

2      as a very generous man.  700 times a year in recent years he's

3      spoken on creation.  And I ask for the mercy of this Court,

4      because I believe his voice is one that is essential in the

5      creation-evolution debate.  And that debate aside, that is my

6      purpose or part of my purpose in asking for mercy, is that his

7      voice needs to be heard.  When he goes, he affects a crowd.

8      He's debated about 100 times, and he often or usually wins

9      those debates.  And the creation message needs to be heard.  He

10     is such an important person in that debate that if he is

11     incarcerated, if he's locked away, it will -- it would -- well,

12     I believe it would be detrimental to our society as a whole.

13             So -- so I just -- as one of those 700 persons per

14     year who helped him and now is working with this ministry in an

15     active basis, I -- I believe this is such an important ministry

16     in the United States and in the world.  As this Court knows, in

17     August there was a huge meeting scheduled -- meetings scheduled

18     in South Africa.  I believe there was like 15,000 or 18,000

19     people who were scheduled to attend those meetings.  And, of

20     course, those had to be cancelled, but this is a -- to us a

21     very important issue, and I request the mercy of the Court.

22     Thank you for your time.

23             THE COURT:  Thank you, sir.  Mr. Richey.

24             MR. RICHEY:  Yes, Your Honor, I believe at this time

25     Mr. Hovind would like to address the Court.

11:42AM  1          THE DEFENDANT:  Yes, ma'am.  I very much would like --

2    if I could publish on the screen the affidavit that's been

3    referred to so many times, I don't know if that's allowable or

4    not, so everybody can see.  To summarize, to save the Court

5    time, is by picking out sentences, I have copies for you of

6    things I would like to enter into the record.  I don't know

7    anything about the legal system.  I don't know how to do that.

8    So -- the affidavit and the letters referred to in the

9    affidavit is what I would like to enter.

10          THE COURT:  Mr. Richey, assist him in doing that,

11   please, because you really need to be the one -- I don't know.

12   Ms. Heldmyer now has seen this.

13          MS. HELDMYER:  I have no idea what he's talking about,

14   Your Honor.

15          THE COURT:  All right.  We do have rules, Mr. Hovind.

16   And the government is entitled to see whatever it is you

17   present to the Court, just as you're entitled to see whatever

18   it is presented to the Court.  So, Mr. Richey, if you would.

19          THE DEFENDANT:  She has seen this before.  This has

20   been sent to her three times.  If I could use that microphone,

21   I could point out things.

22          THE COURT:   in just a moment.

23          MS. HELDMYER:  Your Honor, may counsel approach?

24          (At the bench:

25          MS. HELDMYER:  Perhaps the Court would want to see

11:44AM 1  this.  It appears to me Mr. Hovind is going to retry this case,

2  and we object.  This is evidence he wants to make in the record

3  and more than likely become an appellate issue, et cetera.  He

4  just wants to retry the case.

5          THE COURT:  What is his purpose here?

6          MR. RICHEY:  I'm not really certain, Your Honor.  I

7  believe it's mostly speculation on my part.  So I hate to do

8  that too much, but I think he just wants to point out -- again,

9  these are just things that he's said, and he's consistent with

10  that.  He hasn't changed, and probably even in the things that

11  he heard, I think he's just going to reference it.  I don't

12  think he's going to read from any of it.

13          THE COURT:  Has he given you any indication of how

14  long he expects for his allocution?

15          MR. RICHEY:  Forty-five minutes.

16          THE COURT:  He may not get 45 minutes.

17          MR. RICHEY:  I told him.

18          THE COURT:  I'm going to allow it.  The appellate

19  court will recognize it for what it is.

20          MS. HELDMYER:  I was just concerned that we were going

21  down that path, because, you know, he obviously hasn't talked

22  to Mr. Richey about what he wants to do, and it appears to me

23  that we might be back in trial here in a minute.

24          THE COURT:  Mr. Richey, I'm going to take a very brief

25  recess.  I want you to communicate with your client and find

11:46AM 1  out what it is he hopes to accomplish as part of his time

2  before the Court, and I want you to represent to me -- when we

3  come back into court, I'll call you back up here and ask you

4  what you understand his intent to be.  I want you to relay that

5  to me honestly and seriously and tell me what he wants to do.

6  And I'll decide if he's permitted to do it.  This is not a time

7  for him to get on the pulpit and preach to the Court.  It is a

8  time for allocution.  That is it.  And there is a time limit

9  for that.

10         MR. RICHEY:  Do you have a time limit that I can tell

11  him?

12         THE COURT:  No, I really don't.  I've never had -- I

13  think I may have cut one person off, and I don't remember at

14  what point I did that.  I think it was at the point at which

15  the person began personally attacking the assistant U.S.

16  attorney and the Court, and that's about the point I cut that

17  person off.  But I don't suggest that's what he's going to do.

18  I don't know.  But I do need to know ahead of time.  I'm going

19  to take a brief recess.  Well, you'll be invited up to the

20  bench when we recess.

21         MS. HELDMYER:  May I ask you another question

22  unrelated to this?  Roy Atchison, A.U.S.A. Atchison, he was

23  here to make sure there were no problems with the forfeiture.

24  He's been preparing the forfeiture documents.  We have a final

25  order of forfeiture prepared and ready to submit to the Court.

11:47AM 1    If there aren't going to be any issues in that regard, he can

2    go on.  May I inquire if there are going to be any issues with

3    the final order of forfeiture?

4           THE COURT:  I don't have any notice of issues of the

5    final order.

6           MR. RICHEY:  The only issues that I raised before

7    regarding in my objections that I filed in response and only a

8    couple of those were addressed in the new order, but, also, I

9    believe, I mean --

10          THE COURT:  There is an issue of substitution.

11          MR. RICHEY:  That's not before the Court at this time.

12          MS. HELDMYER:  All I need for today is to give the

13   Court a final order for signature and the incorporation of the

14   J and C, if we get that far today, and I want to make sure

15   there aren't any issues.

16          THE COURT:  Why don't you talk about that when I take

17   the recess and decide whether there are issues for me to

18   consider.

19          MS. HELDMYER:  Okay.

20          THE COURT:  The preliminary order has been entered.

21          MR. RICHEY:  And I guess -- how long do you anticipate

22   in doing that?  I mean, just the presentation of the order.

23          MS. HELDMYER:  That's all it would be, is providing

24   the Court with a final order for signature.  And by law it has

25   to be incorporated in the J and C, and we have to do that

11:49AM 1    today.

2              MR. RICHEY:  Just to be honest, I wasn't anticipating

3    this to go very long, and my return flight is for 3 o'clock

4    this afternoon.  I don't think we'll go that long.

5              THE COURT:  You'll have to talk to him.  All right.

6              MS. HELDMYER:  Thank you.

7              (Bench conference concluded.)

8              THE COURT:  Mr. Hovind, I'm going to take a brief

9    recess and allow you and Mr. Richey to have a short discussion

10   about the purpose for allocution.  And I'll return right about

11   12:00.

12             (Recess.)

13             THE COURT:  Would you like to approach?

14             MR. RICHEY:  Yes, Your Honor.

15             (At the bench:

16             MR. RICHEY:  Your Honor, I've discussed the matter

17   with him.  He said it's only to show his state of mind.  I told

18   him he can't rehash the case.  He can't go over things.  He

19   can't say anyone was wrong or anything was wrong.  And it's

20   merely to show that his state of mind has been consistent and

21   that -- and so he's only going to reference them.  He's not

22   going to read from them, and he said he could cut it down to 30

23   or 35 minutes.

24             THE COURT:  That will be fine, particularly since he

25   did not testify, I think this is entirely appropriate.

12:02PM 1                MR. RICHEY:  Do you want me to offer the exhibits?

2                THE COURT:  Sure.  But the thing I want to explain to

3     you, the minute he begins to try to suggest to me that the law

4     is wrong, that someone needs to show him where the law is, the

5     law that he violated, I will cut him off.

6                MR. RICHEY:  Okay.

7                THE COURT:  Okay.  Let me give -- you have his -- was

8     this a copy for me?

9                MR. RICHEY:  I think that's the original.

10                THE COURT:  It needs to be marked.

11                (Bench conference concluded.)

12                MR. RICHEY:  Your Honor, may I?

13                THE COURT:  Yes.

14                MR. RICHEY:  Your Honor, this group of affidavits and

15     letters and other information that the government did have in

16     its possession and was turned over in discovery, and there are

17     things that Mr. Hovind will at this time make reference to.  We

18     will just offer them into evidence at this time.

19                THE COURT:  Those will be admitted.

20                Mr. Hovind, you do have the right under our rules, as

21     I mentioned to you at the outset, to address the Court and to

22     make any statement or to present information that you wish to

23     present to the Court in mitigation of your sentence.  And

24     because you did not testify during the trial in this case, it

25     would be entirely appropriate for you to address the Court as

12:03PM

1    to your state of mind and intent.  What I will not permit,

2    however, is a rehashing of the case and the evidence, and also

3    will not permit a suggestion to the Court that the law is wrong

4    or should not be, or a demand that the Court show you the law

5    that you have violated.  The jury -- the 12-member jury in this

6    case has found you guilty, and we have to proceed on that

7    basis.  All right.  Sir, take the podium.

8            MR. RICHEY:  Your Honor, I'm sorry, just one matter.

9    It appears that he has his own copy.  So do you want me to hand

10   these?

11           THE COURT:  Certainly, if you would, Mr. Richey.

12           MR. RICHEY:  Thank you.

13           THE COURT:  And, Mr. Hovind, do you want to use the

14   overhead; is that right?

15           THE DEFENDANT:  Yes, ma'am, if I could.

16           THE COURT:  All right.  Proceed.

17           THE DEFENDANT:  I won't need that for about six

18   minutes.

19           THE COURT:  You let me know when.

20           THE DEFENDANT:  Thank you, Your Honor, for letting me

21   share my side of the story that none of you have seen.  I would

22   just like to cover three things, if you'd give me the time.  I

23   would like to give you a brief history of our church ministry,

24   a brief history of my state of mind on the three charges that I

25   was charged with, and just a few simple questions I just cannot

12:05PM 1   resolve.  I can say everything in 20 minutes, but your court

2   reporter would have a stroke.  So I need to slow down.  Please

3   allow me the time to finish.

4        In Aesop's Fables, there was once a lion who trapped a

5   mouse, and the mouse said would you please let me go?  And the

6   lion said what can you ever do for me?  And the mouse said I

7   don't know, maybe someday I can do something for you.  And one

8   day the lion was caught in a net, and the mouse chewed him out

9   of there.

10        I feel like the mouse.  I stand here in great fear of

11   the power of this Court.  I know full well you have the power

12   to free me, send me home today, and you have the power to send

13   me to prison for many years.  Your decision can destroy my

14   life, destroy my ministry, destroy my grandchildren.  I've

15   prayed for God to guide your decision.  I know that huge

16   amounts of money and time have been spent, on both sides have

17   been spent on this issue.  I have even a greater fear of

18   standing before God some day.

19        We have never had the opportunity to speak, Your

20   Honor, other than hearing what's said in court.  I've never had

21   the opportunity one time to speak to Michelle Heldmyer in a

22   friendly manner.  I have never one time had the opportunity to

23   speak to Scott Schneider other than adversarial.  I wish so

24   badly we could have just talked to them.  I have been over

25   everything that I can find on this case 30 times in my freezing

12:07PM
1  jail cell the last three months.  I'm convinced more than ever,

2  every single thing could have been settled with a discussion.

3  I know I tend to be haughty and proud, and I apologize.  I

4  don't think that's against the law.  I think that's just my

5  personality.

6       I think Agent Schneider and Ms. Heldmyer, possibly

7  you, Your Honor, face a false opinion about who I am.  I know I

8  cannot change the jury instructions, and that is not my desire

9  today, but I want you to see my heart.  Proverbs 18 says it's

10 folly and shame to answer a matter before you hear it.  You

11 need to hear both sides.  You've heard what the IRS says about

12 me and my wife.  You've heard that we are evil tax protesters

13 and law breakers, and we have to pay for our crimes by spending

14 years in prison and paying the government back millions of

15 dollars they say we stole from them.  Matthew 5 says I'm

16 supposed to agree with my adversaries, while I'm in the way,

17 before I go to court, before I go to prison.  I never had the

18 chance.

19      The first notice I had that they were concerned at all

20 about how we were conducting our ministry was the day I was

21 arrested and handed a sealed indictment.  I never had a clue.

22 For ten years they've been investigating personal taxes on me,

23 could not get a grand jury to indict, and all of a sudden I get

24 arrested for something I knew nothing was coming or I would

25 have talked to them.  I would have obeyed the Matthew 5 passage

12:08PM 1    and gone and tried to resolve it with them.  And I know some

2    far-out radicals have written this Court, you know, claiming

3    all kinds of crazy things, and because of that you probably

4    think I'm a flight risk.  Your Honor, I'm not a flight risk.  I

5    do know people all over the country that love me and love my

6    ministry, but they are the same people that love the law and

7    love the word of God, and they would be the first ones to turn

8    me in.  I have no intention to flee.  If sentencing is

9    postponed, if I could just go home, I promise you, I fear God

10   more than anybody else on this planet, before God, I will do

11   whatever this Court says.  I will show up when you tell me to

12   show up where you tell me to show up.  I wish everybody would

13   just, please, put away their swords for just a minute.

14        The three months I have been in jail have been very

15   good for me in many ways.  I have been able to lead 15 men to

16   Christ and seen some incredible lives changed.  I've grown much

17   closer to the Lord.  I've been away from my hectic travel

18   schedule.  My daughter has done my scheduling for years, and

19   she knows it's pretty bad.  It's been a good rest time for me.

20   I've experienced the whole range of emotions that being locked

21   in a cage gives a person.  I see now why God's law, which is

22   perfect, the Bible authorizes restitution, beatings and capital

23   punishment, but never jails.  I can tell you from being on the

24   inside, it doesn't work.  Every man in there, when I talk to

25   them, would you rather just have a beating than be away from

12:10PM

1    your family?  Oh, yes, please give me the worst beating I can

2    take.  The jail and prison, in my opinion, is cruel and unusual

3    punishment.  It doesn't work.

4         I'm not a lawyer, and the whole legal system baffles

5    me, but everything I know and hear about this tells me that

6    this whole thing could have been resolved just if we could

7    talk.  I have never been offered that opportunity.  I'm

8    supposed to be a peacemaker, according to the Bible, and I've

9    failed miserably to make peace with Scott Schneider.  I'm

10   sorry.  I would love to.  I see at least one major mistake I

11   made in going over all the papers I've filed over the years, my

12   attitude and frustration with what I felt sincerely was the

13   lack of due process showed through in my letters.  And I

14   apologize for that.  My letters show my frustration and my

15   pride.  And I sincerely apologize for that.

16        I am not a tax protester and never have been.  I have

17   said hundreds of times, the tax laws are perfectly fine.  I

18   don't object to any of the laws.  Yet some people are enforcing

19   things that aren't even in the laws I object to.  I know there

20   are tax rebels out there, and the government has ordered people

21   to send a message to stop the tax rebellion.  I'm not part of a

22   tax rebellion.  Never have been.  I'm an evangelist.  I want

23   everybody to obey the law.  So it is not my intent to break any

24   laws at all, never has been.

25        I need to apologize to Scott Schneider, if I can.  My

12:11PM

1  last words ever said to him around the street in front of my

2  house, he was taking pictures for this trial, and I rolled down

3  the window of my van and I said, Scott, we'd like you not to

4  come on the property, please.  We've had 80,000 visitors over

5  the years come to our ministry, and Scott Schneider is the only

6  one that I have ever turned away.  And I'm sorry.  You're

7  welcome anytime, Scott.  I would love for this to be over.  And

8  bring your family.

9        And to you, Judge Rodgers, I want to thank you for

10  your patience and your professional manner in the courtroom.  I

11  know you have a very heavy burden and a heavy caseload, and I

12  pray for you daily that God will bless you.  My only complaint

13  is you won't allow water in here.  As a public speaker, that

14  probably bothers me, but that's your decision.

15        I regret that this case was ever brought here.  These

16  issues could have been resolved.  Instead of jail time, if you

17  could please order mediation, I know we could work everything

18  out.  I struggled as our ministry developed in 1989 until the

19  present for the proper way to structure a church ministry that

20  would be true to Scripture and obey the law.  We have gone

21  through three different stages of an unincorporated business

22  trust, and then Faith Baptist Fellowship, and it dissolved

23  without Remedies at Law.  I'm relying on people to tell me how

24  is the proper way to do this.  My goal is to do it right to

25  make everybody happy, but I've never, to my knowledge,

12:13PM 1   willfully disobeyed any known obligation, law or statute that

2   applies to me or the Lord's church.

3        And I want to thank you, also, Your Honor, for withholding

4   formal adjudication until allocution is finished.  If I could

5   publish now very quickly a brief history of our ministry.

6   Three times in 2005, I sent letters to the foreman of the grand

7   jury and copied them to Michelle Heldmyer.  I realize now this

8   was a major mistake.  I should have actually sent the letter to

9   Michelle Heldmyer.  So because of this, she doesn't have to

10  answer.  It wasn't actually sent to her.  That was a technical

11  mistake, of which I've made many over the years.  But I asked

12  her, this is to the grand jury regarding the investigation of

13  Creation Science, Faith Baptist Fellowship, which was at that

14  time dissolved, Dinosaur Adventure Land and Kent Hovind.  My

15  third letter, I got no response.  At the bottom, my attorney

16  tells me that the U.S. attorney told him the grand jury

17  investigation of me has been indefinitely postponed, but Scott

18  Schneider is still investigating the possibility of tax evasion

19  or other tax crimes to the above names, which would be above.

20       Every lawyer I have consulted informs me, ministers and

21  churches are not liable for income taxes, as shown later in

22  this affidavit.  We did not ever consult David Gibbs.  He and

23  his family came over to our ministries and to our Dinosaur

24  Adventure Land after he preached at our church.  We discussed

25  many topics, and I never one time advocated to him or anybody

12:15PM

1   else in my life that anybody should break the law regarding

2   taxes.  Never have I done that.

3       Paragraph 2, during my numerous written inquiries, IRS

4   refuses to identify at the time the law or taxes.  This caused

5   me great frustration.  I did not know what I was doing wrong.

6   7202 is not an identifiable law.  It frustrates me dearly that

7   I want badly to be right with God, and I don't know how to do

8   it.  I don't know how to get right.  I don't know what I've

9   done.  So has my state of mind changed?  I still want to serve

10  God.  I still want to obey the law, but I haven't seen it.

11      Paragraph 3, Agent Schneider has refused to answer my

12  simple questions for four years now, because he knows he's

13  acting outside the law.  The law says his clear delegated

14  authorities is under Title 27, Alcohol, Tobacco and Firearms,

15  which includes Count 58.  I'm not involved in any of those.

16  Enclosed letter to Scott Schneider from December 27, it's only

17  ten pages long, but it's a lot of supporting documentation.  As

18  usual, he never responded.  "It is my prayer that both you and

19  the U.S. attorney will read it and help me understand if I'm

20  wrong."  Over and over and over the years, I've asked for help

21  from Agent Schneider, please tell me what I'm doing wrong.

22  Three times I sent a copy of this letter to the U.S. Attorney.

23          THE COURT:  Mr. Hovind, she's going to have a stroke.

24  You've got to slow down, please.  Thank you.

25          THE DEFENDANT:  Bottom paragraph, after sending

12:16PM 1    hundreds of pages of documents to the IRS, numerous letters

2    asking honest questions which received no response except a

3    surprise gestapo-type raid, the only conclusion I can come to

4    is someone is trying to stop the creation ministry.  And,

5    again, I'm summarizing.

6           On May 3rd, my attorney sent a letter to the assistant

7    U.S. attorney, Michelle Heldmyer, requesting that I come

8    testify before the grand jury.  She refused.  Being a preacher

9    of the gospel and not wishing to break any laws or embarrass my

10   Lord, I thought it best that you see and hear the truth from

11   all sides before deciding if our church ministry should be

12   drawn into an expensive lawsuit, and here we are today having

13   spent a fortune.  And then the whole bottom of this page, there

14   is a little bit of a history of our ministry, where I was born

15   and raised.  I was ordained at Emmanuel Baptist Church in 1974

16   to the gospel ministry.  Page 4, at the bottom, mostly just

17   summary again.

18          1989, I took a vow of poverty to commit my resources

19   to spreading the word of God.  I don't want to own anything.  I

20   am not the owner of CSE.  I don't own anything nor do I want

21   to.  And this is not a way to get out of taxes.  This is a

22   sincere desire in my heart to dedicate everything that I have

23   to God, who began our ministry in 1989, Creation Science

24   Evangelism.  Bottom line, we've always encouraged others to

25   copy our materials and give them away.  We have never charged

12:18PM
1    anything for our ministry, never.  We don't charge for my

2    seminars.  In the affidavit it said I do debates for a fee.

3    That is not true.  We only take love offerings.

4         Page 5, between '89 and '96, the ministry grew very

5    rapidly.  I was invited to preach all over.  So we were able to

6    purchase the parsonage that my wife and I still live in.  There

7    used to be ten offices in the house.  There are now only seven.

8    What woman in this room would want to have seven offices in the

9    house where she lives?  My wife is amazing.  She has put up

10   with this all these years.  The property used by CSE consists

11   of a parsonage, office buildings and office equipment, et

12   cetera.  Nothing belonging to CSE can now or ever become my

13   property.  It is an irrevocable and sacred trust of an ongoing

14   ministry, which is why when Agent Schneider sees the $42,000 in

15   church funds, I'm responsible for that.  God entrusted this to

16   me.  The legal recourse I had to was to file suit.  So I filed

17   suit.  That's what I'm supposed to do.  And now they are mad

18   for doing what the law says I can do.  I do not understand what

19   I did wrong.

20        Next page, beginning '99, we merged with Faith Baptist

21   Fellowship.  These are the years in the indictment.  Why am I

22   here?  It should be Pastor Mooneyhan.  2002, Pastor Mooneyhan

23   resigned and dissolved the fellowship.  So Remedies at Law took

24   over the management of the ministry.  It's still that way

25   today.  If the IRS or the government wants to seize the

12:19PM 1    property, they need to deal with Remedies at Law, not me.  I

2    don't know how they can seize ministry property for a debt Kent

3    Hovind owes.  I don't understand that.  Remedies at Law, as a

4    great courtesy response, Michelle Heldmyer referred to them as

5    being under injunction or something like that.  There is simply

6    a great misunderstanding on that.  But I have it with me, but I

7    won't take time today to read all that.

8           1996, our cars were seized, as we heard in the trial.

9    A friend of mine paid the money to get the cars back.  To be

10   sure I was not doing anything wrong, that year I wrote to three

11   tax professionals, just like it says in the booklet, 517, I

12   believe.  It says if you're concerned about your tax, you

13   should write to an attorney, enrolled agent, and a tax

14   consultant.  So I wrote to John Schlobach, an enrolled agent.

15   I stayed at his house.  I sat down.  I'm a minister.  Is this

16   taxable?  He wrote back a letter saying no, you're not breaking

17   any laws.  You're fine.  I wrote to Guy Curtis, an attorney.

18   Glen -- John told me many attorneys believe this, but are

19   afraid to write a letter because then they'll be hassled by the

20   IRS.  They will be bullied.  But Guy Curtis, who I have said

21   now is in trouble, of course they are going to target anybody

22   who ever stands up against them, but in '96 he wrote me a long

23   letter saying, no, Kent, I agree with what you're doing and

24   you're not breaking any laws.  I wrote to Fred Ortiz, a tax

25   consultant in Hawaii, because he was the only one brave enough

12:21PM 1   to do it.  He wrote a long letter back saying, no, Kent, you're

2   doing fine.  I'm relying on the advice of these professionals.

3          I contacted the IRS to get a copy of my IMF file, had

4   it decoded.  On my code they had me coded as an underground

5   coal miner in Virgin Islands.  That is a taxable activity.  And

6   I've never been to the Virgin Islands.  And I sure don't mine

7   coal there.  And we finally got that fixed in the IMF.  And

8   when we paid to get the IMF file sent to us, it was 700 pages,

9   the government was complaining about all the time it took for

10  them to do that.  That's their job.  And we did pay to have

11  that done.  Every letter said please send me the cost.  We paid

12  hundreds of dollars to have those pages copied.  When those

13  pages were handed to Agent Schneider on the stand, my attorney

14  pointed out there were ten pages missing.  Without even looking

15  at the stack, he said, yes, I know, those pages are not in

16  here.  Those ten pages, Your Honor, say very clearly I am not a

17  tax protester and I owe no tax.  That's what was in those ten

18  pages.  That's why they were excluded.

19          I kept receiving letters from the IRS.  I always

20  answered their letters every time.  I have never avoided their

21  questions.  I kept asking them questions.  Which letter should

22  I fill out or which form should I fill out?  Which tax am I

23  allowable for?  I sent them the professional letters from the

24  professional saying, what am I doing wrong?  I'm not involved

25  in a taxable activity.  The ministry, as I'm going to show you

12:22PM 1   in a minute, is not.  And it seems to me that Agent Schneider

2   is acting outside of his authority.  So I asked him direct

3   questions about his authority.  I sent letters to Agent

4   Schneider, certified mail.  In the movie "Catch Me if You Can,"

5   Tom Hanks tries to catch Leonardo DiCaprio.  He's so good at

6   posing as anything, a pilot, a doctor.  I believe Scott

7   Schneider has very legitimate authority.  I believe the IRS CID

8   has a wonderful place in America.  We need them.  But he's

9   acting outside of this authority when he comes after a church

10   ministry.  That's what my letters are about.

11        I've examined -- he wanted to examine the financial

12   records.  I said I think this exceeds the venue and dangerous

13   subject matter of your jurisdiction.  You may be operating

14   under color of law.  And I sent him this long letter.  And we

15   could spend days on that, but this is 11 pages long saying,

16   would you please tell me which code section gives you the

17   authority to investigate me.  I'm a minister.  He never

18   answered.  This greatly increased my frustration with the whole

19   system.  How do I deal with these people?  I sent him another

20   letter, December 27 of '02 and said you're not following due

21   process.  It's my belief based on the code that I've seen that

22   law enforcement -- the term "law enforcement officer" does not

23   include Internal Revenue special agents.  Under the law, I'm

24   charged with knowledge of the authority of government agents,

25   United States v. Jones.  Please show me where your authority

1   comes from.  Your authority appears to be limited by law to

2   Alcohol, Tobacco and Firearms.  I sent him all the statute

3   regulations.  This is only the first part.  The letter was

4   one-and-a-half inches thick and 200 pages of documentation at

5   the end.

6          In June 1980, during hearings before the Subcommittee

7   of Oversight of the Internal Revenue Service Finance Committee,

8   Senator Lowell Weicker said, "I want to make a statement here

9   just so we all understand, the ground on which we stand, the

10  IRS is not," underlined, "not a law enforcement agency."  Next

11  paragraph, I sincerely tried to avoid doing anything that might

12  remotely be considered an act to try to impede any IRS agents.

13  I do not wish to impede even you.  I cannot locate the

14  authorizing documents authorizing the IRS unit as a CID to

15  enforce Chapter 575.  Could you please review the attached

16  materials and point out to me which delegation order gives you

17  authority.  He never answered.  What am I supposed to do?  All

18  I get is silence and the raidings and terrorizing my wife and

19  my ministry.

20         January 14, I sent him a letter, Dear Mr. Schneider, I

21  just today received your letter dated January 6 asking if I

22  intend to comply with your summons.  I hereby assure you that I

23  am very willing to comply, and I intend to do whatever the law

24  requires me to do.  I did not wish to make your job difficult.

25  This is my state of mind.  It is still my state of mind to this

12:25PM 1   moment.  We agree that if you have authority, I should not

2   hinder you from doing so.  The major area of disagreement is

3   whether you're acting within the law and have the lawful

4   authority to conduct an investigation.  It is my duty as a

5   child of God to obey his letters as well as the letters of the

6   land that I live in.  Because of past abuses of power by

7   people, I have a duty to ensure that you are not one of those

8   people seeking to defraud me under color of law.

9         Skip all the way to page 11 here.  I ended the letter

10  by saying, "If you find I'm in error about the law regarding my

11  production of documents, please notify me within 20 days or

12  else I can only presume you cannot demonstrate an error."  No

13  response.  20 days goes by.  I assume I'm fine.  I go back out

14  preaching.  I'm spending a fortune and spending hundreds of

15  hours researching and trying to find out what's wrong, at the

16  same time trying to maintain our ministry.

17        Back to the affidavit.  So these are all the letters

18  that I sent to Agent Schneider asking for help, please tell me

19  what I'm doing wrong.  I sent him tax forms.  Getting no

20  response from Agent Schneider or anyone else, I considered the

21  matter closed and went off preaching, until April 14, 2004, I

22  was preparing for these.  When he drove in the driveway with 16

23  other IRS agents and 20 or so Escambia County officers, it was

24  just a raid on our ministry.  A gestapo-type raid is the best

25  way I can describe it.  He could have just called, hey, Kent, I

1    need you to come in.  He never does that.  It's always got to

2    be a high profile raid in the media, so that we look bad.  Our

3    staff filled out many affidavits about how terrorized they

4    were.  They are in the stack, Your Honor.  I'm not going to

5    read any of those, but, please, get the heart of our staff as

6    you read some of these affidavits of what they did to us that

7    day.  This is America.  Nobody should have to go through that.

8    They took all kinds of boxes of materials and all the cash.

9    They wouldn't even let me see what they had taken.  As Agent

10   Schneider was about to leave, he said would you sign this paper

11   for all the stuff I've taken.  No, I said, I want to see it all

12   first.  I don't know what you're taking.  I still to this day

13   do not know what all they took.

14          The IRS should know from the tax code that every

15   attorney and professional I consulted informs me that Internal

16   Revenue Code 1401 imposes a tax on self-employment, but the

17   services of a minister are specifically excepted.  1402 says

18   employment income, trade or business.  The term "trade or

19   business" shall not include performance of service of a duly

20   ordained, commissioned or licensed minister of a church.

21   That's what I am.  That's what most of our staff are.  3101

22   imposes a tax on income, but it specifically excepts in 3121 --

23   I'll turn the page here -- for the purposes of this chapter,

24   the term "employment" means whatever service, but such term

25   shall not include service performed by a duly ordained,

12:29PM 1  commissioned or licensed minister of a church.  3402, one of

2  the charges I'm charged with here, talks about employers taking

3  taxes out of their employees' wages, but 3401 defines wages.

4  And 3402(a)(9) specifically excepts -- the term "wages" shall

5  not include services performed by a duly ordained, commissioned

6  or licensed minister.  7202, one of the charges in my

7  indictment, any person required under this title shall deduct

8  and withhold taxes.  I don't see where I'm required under this

9  title.  I've searched -- I've asked him.  I sent the letter

10  three times.  My state of mind is great frustration, Your

11  Honor.

12       I would love to obey the law.  I'm trying.  CSE has

13  never existed to the benefit of a membership.  CSE functions as

14  a bona fide Christian ministry spreading the gospel.  I'm a

15  minister.  I have taken a vow of poverty.  I'm independent.  I

16  don't own a car.  I don't own a house.  I don't own anything.

17  Even if I did receive income, it would be an exception

18  according to the law.  Why is there an investigation of me at

19  all unless they are trying to disrupt the creation message?  If

20  there is any doubt, come visit.  If the IRS is accusing me or

21  my fellow ministers of the church ministry at CSE of some other

22  crime I do not know, I'll be glad to answer questions before

23  the grand jury.  Every lawyer I consulted says we are obeying

24  the applicable letters.  I just want to be dedicated to

25  preaching the gospel.  I realize now I made a fatal mistake by

12:30PM

1    not sending it to Michelle Heldmyer, only copying it her.  As a

2    loophole in the law, she doesn't have to answer.  I understand.

3    That was my heart.  I wanted answers.  Still today would like

4    some answers.  One of the major problems that I see here, in

5    closing, the IRS does not want to recognize our ministry as a

6    legitimate church ministry.  I'm done, Your Honor, with that.

7            I'd like to briefly discuss the three basic charges

8    and my understanding and my state of mind of what's happening.

9    Counts 1 through 12 are for willful failure to withhold taxes

10   from employees.  By the definition of employees that I could

11   see and the definition of wages, I wasn't allowed to.  IRS Code

12   3402(p) says very clearly any withholding has to be a voluntary

13   agreement.  If they agree to such withholding, when people came

14   to work at our ministry, I said we cannot withhold taxes for

15   several reasons.  We're not authorized to be an agent for the

16   federal government.  It's not my job to take money out of your

17   paycheck.  I said you should take care of your own taxes.  If

18   you have an obligation, pay it.  But what the government wants

19   to do is make the church one of their agents.  The pastor,

20   Mooneyhan, says we cannot do that.  You cannot deduct wages.  I

21   said what do I do?  He said tell them they are on their own,

22   they're independent contractors, call them missionaries.  It

23   was his decision to call them missionaries.

24           I was never given any notice that I was required to do

25   the things they've charged me with not doing.  I was never made

12:32PM  1   aware that these statutes applied to our ministry.  I was

2   relying on the professional opinions and the research that I

3   had done and I had sent to them and gotten no response.  I was

4   relying on -- because they hadn't responded and I told them

5   clearly, if you don't respond, I will assume it's true, and I

6   relied on that.  Many ministries, even the large ones, Lakewood

7   Bible translators and South African Community Church have

8   hundreds of people working in their ministry.  They all do

9   their staff through independent contracting.  They do not take

10  out any tax taxes.

11          No evidence was presented that -- we never made a

12  contract to become withholding agents for the government.  No

13  evidence that I can see was presented on what specific statute

14  or law we broke or what obligation we have.  3402 prohibits me

15  from withholding without a mutual agreement.  But to be a

16  peacemaker, we have since the indictment started using employee

17  leasing service.  This is Glen's decision.  I don't know why

18  they tried to make me look bad.  Glen Stoll is the director.

19  They need to talk with him.  But then they put me in prison.  I

20  thought what I was doing was perfectly lawful.  I assure you,

21  Your Honor, I will do everything I can within my power to

22  comply with their legitimate concerns.  All or nearly all of

23  the staff members file taxes as independent contractors anyway,

24  as far as I know.  It's not my business what they do, but many

25  testified that they did.

12:33PM 1          It was never my intent to violate any letters.  It was

2    my understanding that ministers and ministries had a special

3    exemption or exception.  I asked Michelle Heldmyer three times

4    to show me, and she never answered.  What else should I have

5    done?  Evidence was presented that the staff were asked, do you

6    prefer cash or checks?  Since many are Bible college students

7    from out of town or out of state, they don't have local banking

8    arrangements, they requested cash.  So we did that to be a

9    minister to them.  There was no evidence that they were ever

10   violating any law or willfully trying to injure anybody.

11   Nobody was injured by this.  And we certainly weren't trying to

12   hide anything.

13          Counts 13 through 57, in '96, we started drawing cash

14   out to pay the people.  It was about $3,000 a week.  The

15   records would show that slowly grew from 3,000 a week, 4,000 a

16   week.  As the ministry grew and the needs grew, we only

17   withdrew enough up to meet the needs.  It finally got up over

18   10,000.  Pastor Mooneyham said and later Glen Stole said don't

19   go over 10,000 without specific permission from me.  I said why

20   not?  He said, oh, it just causes trouble.  I said what kind of

21   trouble?  He said don't worry about it, just if you need to go

22   over 10,000, call me, we'll do it.  Okay.  I did not know what

23   a CTR, whatever the thing is.  I didn't see one until the day

24   of trial when this showed up on the screen.  The ministry shows

25   a great lack of structure in withdrawal.  Sometimes it's three

12:35PM  1    or four days apart, sometimes it's 34 days apart, it would

2    become 49 or 50.  This is not structuring.  There is no

3    evidence that the cash was ever less than the ministry needed

4    or that it ever went to some unlawful use.  It never went to

5    drugs or controlled substances.

6         I was shocked and upset when the government alleged

7    that our ministry property should be forfeited based on drug

8    letters.  And more shocked when you, Your Honor, signed the

9    okay for that.  And I'm sure they've got a taped conversation

10    where I said I think that's wrong.  I did think that's wrong.

11    There is no drugs.  I've never taken drugs in my life.  I'm in

12    a room full of men every day, 24 hours a day, 90 percent of

13    them are in there for drugs.  I've never touched them once in

14    my life.  And that upset me that they would try to seize the

15    church ministry that we worked so hard to build through all

16    these years.  They just want to come seize it and use drugs

17    laws as their excuse.  I'm embarrassed that our government

18    would do such a thing.

19         Our ministry leaders were instructed clearly to notify

20    them if it were to get more than 10,000.  These were sacred

21    funds.  I felt and still feel to this day that Agent Schneider

22    stole church money and applied it to a tax bill for Kent

23    Hovind.  I think that's wrong.  My state of mind was that he

24    didn't follow due process.  I had a right to file suit, Count

25    58.  That's my understanding that's what I'm supposed to do.

12:36PM 1   How on earth can that be unlawful?  We tried to follow due

2   process.  I felt they were not following due process.  So my

3   state of mind was frustration.  What do I do?  There is no

4   evidence that anything in the suits I filed was false or

5   frivolous.  They were dismissed on procedural grounds because

6   I'm not a lawyer, and I forgot to cross some T's and dot some

7   I's.

8        There is no evidence that I ever threatened anyone.

9   And I never have.  I've been married 34-and-a-half years to the

10  same woman.  I've never hit her one time.  I have thought about

11  it a couple of times, but I never have.  I'm not a violent man.

12  I'm outspoken, I'm stubborn, I'm proud, I admit, but I'm not

13  violent.  I would never harm anyone.  You heard on the tape, I

14  said I'm going to take every lawful means.  That's all I would

15  ever do, Your Honor.  And it bothers me that you kept me locked

16  up for three months away from my grandchildren when I'm not a

17  threat to anybody.  I'm not a flight risk.  I don't understand

18  that.  What the IRS has done has terrorized our ministry staff,

19  it has terrorized our life, but vengeance belongs to God.  I'm

20  commanded to pray for those that spitefully use you.  I feel

21  the IRS has just spitefully used me over the years, and it

22  continues.  I pray for those that persecute me.  I pray for

23  each of you by name every day.  I weep and cry in my jail cell

24  for you.

25        It was mentioned that I destroyed records.  All we do

12:38PM 1   is shred documents that pertain to credit card numbers for

2   people in our ministry.  Sometimes we burn them.  I hope every

3   ministry and business in America does that.  I don't want

4   credit card information to fall into somebody else's hand.

5   This is not unlawful to shred those documents if they contain

6   that information.

7            We call the people missionaries, because that's what

8   they are.  All we do -- many are here today.  They will

9   testify, that's all we do, is try to win souls.  That's all

10  we've ever done.  Putting me in jail will not stop that.  I've

11  been evangelizing in jail.  My staff keeps evangelizing outside

12  of jail.  Prison won't solve this problem.  There is no

13  evidence that either my wife or I have ever willfully violated

14  any laws that I can see.  I would like to go home and hold my

15  new grandson.  I would like to rock my other four

16  grandchildren.  I don't want to fight the IRS anymore.  I

17  mentioned on the tape that if I'm locked up, I intend to sue

18  them the rest of their life.  I changed my mind.  It doesn't do

19  any good.  Nobody is listening.  Nobody on this planet that I

20  have seen is brave enough to stand up to them.  Senators,

21  congressman are afraid of them.  Everyone fears the IRS.  I

22  don't want to fight them.  Somebody else can slay that dragon.

23  Whether I go to jail or not, it is my intention to not sue

24  them, to not file complaints.  I feel like when you wrestle

25  with a skunk, you can win, but it's not worth it.

12:39PM

1    I stand at the mercy of this Court.  The jail chaplain

2    seated in the corner asked me a few days ago, Dr. Hovind, have

3    you repented?  I said, Brother, I wish I knew what to repent

4    of.  I still don't know what law I've broken.  He said you're

5    in jail, aren't you?  I said you're right, the Bible is full of

6    stories of people who went to jail and even were killed, yet

7    had done nothing.  Cain killed Abel.  What had Abel done wrong?

8    Joseph was in Egypt for 13 years in prison.  He did nothing

9    wrong.  The Book of Acts records 50 instances of people were

10   beaten, jailed, threatened for preaching the gospel.  There's

11   nothing wrong.  What was Job's sin?

12       I am guilty of being proud and guilty of being

13   frustrated and guilty of letting that show through my letters

14   and correspondence and my attitude.  And I'm sorry.  Christ

15   examined Jesus and said twice I find no fault in him.  Yet the

16   Bible said he delivered him to be crucified because he feared

17   the people.  When Paul appeared before Felix and King Agrippa

18   three times, they said Paul has done nothing wrong or worthy of

19   death or bonds, but these politicians left Paul in jail for two

20   more years because they feared the people.  When Paul appealed

21   with Caesar, Felix said it's unreasonable to not specify what

22   laws he's broken.  Acts 25.

23       Your Honor, if my wife and I have deliberately and

24   intentionally violated a law worthy of prison, please, have the

25   U.S. attorney show me which one.  I've shown you the statutes I

12:41PM 1   was relying on.  The indictment said in general -- in general

2   employers are required to withhold.  I had shown her a year

3   before the three statutes I was relying on said I am not an

4   employer, I'm not required to withhold.  She never responded

5   other than getting an in general, what law is that?

6       I want to be a peacemaker, so we went to employee

7   leasing.  That resolves Counts 1 through 12.  We began using

8   checks in 2003.  Counts 13 through 57 are resolved.  I still

9   feel the IRS does not follow due process.  And I have not filed

10   a complaint or a suit against them in over two years.  So I

11   think I'm reformed on that count, also.  There is no need for

12   prison.

13       Your Honor, we are godly people.  We just want to

14   bring people to the Lord.  That's all.  Again, I am not a tax

15   protester and never was one.  I don't know who put that label

16   on me.  I wish they would take it off.  If it's just money the

17   IRS wants, there are thousands of people out there willing to

18   pay huge amounts of money to have me out of jail back out

19   preaching.  We could raise a huge amount of money if it's some

20   kind of ransom they want.  I don't know.  They will pay for my

21   release.  I'm willing to make any necessary changes they want

22   me to make just so I can back go out and preach the gospel.

23   That's God's calling on my plate.  I can see several ways you

24   can rule, Your Honor, that would be in favor of me.  One, you

25   can reverse your decision on the acquittal.  I know judges

12:42PM  1   rarely do that, but you could.  And I know the sentencing

2   guidelines are not mandatory.  You don't have to do anything on

3   that page.  You could declare a mistrial for any number of

4   reasons.  You could simply not uphold the jury verdict.  If you

5   do send me to prison, would you please grant release pending

6   appeal?  We certainly will appeal this case.  I don't want to

7   be sitting there waiting for appeal.  I promise, I won't go

8   anywhere.  And, please, Your Honor, if my wife is sentenced to

9   prison, would you please put that on mine?

10          Our ministry needs me out there preaching so we can

11   continue.  I beg you, just let me go home.  I would not flee.

12   I would be a fugitive for 30 years.  I would rather spend five

13   years in jail or whatever and get it over with and be back out

14   preaching.  I don't want to be a fugitive for the rest of my

15   life.  There are senators, representatives and lawyers that

16   support our ministry and love me.  They would not tolerate me

17   being a fugitive.  They would hunt me down.  I have no criminal

18   record.  This is the first time my wife and I have ever been

19   defendants on anything.  I have two traffic tickets.

20          There was no prior warning.  There were no attempts at

21   resolution.  They simply came and arrested me.  The morning

22   they came, my wife was sleeping.  She had just gotten to sleep

23   at 3 o'clock.  Four agents surrounded her bed, told her to get

24   up, handcuffed her in her nightgown, refused to let her get

25   dressed, put a robe on or go to the bathroom, took her to the

12:44PM  1    squad car to haul her down here.  That's her first experience

2    ever with the law.  Who in their right mind would want that to

3    happen to their wife?  I'm embarrassed to be an American

4    sometimes when I see how some of them act.  All prison will do

5    will destroy a family, destroy a ministry.  I'll do whatever

6    you want me to, Your Honor.  Imagine you're Kent Hovind -- I'm

7    sorry.  I'm nearly done.  Imagine you're me, '94 to '95, I sent

8    letters to Agent Powe.  She never answered.  She shows up and

9    steals the cars without due process.  I wrote letters saying

10   what is going on?  My friend paid the money to get them back.

11   He said it's not worth fighting them.  2004 -- '96, I paid to

12   have professionals tell me, am I doing something wrong?  They

13   all said, no, you're doing everything fine.  I paid for that.

14   We're a church ministry.  2002 to 2004, I sent more letters to

15   Agent Schneider, which he never answered.  I begged him to

16   please let me see what law I'm breaking.  I never got one

17   response.  I asked him to verify his authority, which he's

18   required to do and I'm required to ask, according to Ryder v.

19   United States.  I even sent him all the research to make his

20   job easier.  Here's all the statutes.  Which one applies?

21        April 2004, they raided our ministry, seized thousands

22   of dollars in sacred church funds and gave it to a civil tax

23   case, to the civil side on a bill they just created that day.

24   That's not due process.  The next day I prayed for Agent

25   Schneider on the radio, and he says he feels threatened because

12:45PM 1  I prayed for him.  Please read the staff affidavits and see who

2  was threatened that day.  2004, I filed complaints about the

3  IRS not following due process.  I filed a lawsuit, and it's

4  dismissed on procedural grounds.  When I wrote to TIGTA and

5  said would you please send me see a copy of your report, they

6  said no.  I filed for the report.  They finally sent me the

7  TIGTA report on Agent Schneider, and all of it was blacked out.

8  I got 300 black pages.  I still don't know what was in there.

9  2005, they convened a grand jury, but they refuse to indict me

10  on personal taxes.  And all of a sudden, bang, that was

11  ministry taxes, with no warning whatsoever.

12      Our ministry has been demonized through the media.  We

13  spent a fortune trying to fight the most powerful government on

14  earth.  I feel like the mouse.  November 2, 2006, my attorney

15  assures me that no defense is necessary because the government

16  never proved their case.  So we put on no defense.  We were

17  shocked when a few hours later, the jury found us guilty of

18  breaking a law that they never saw and I have never seen.

19  November 2nd to January 19th, I spent two-and-a-half months in

20  jail while my sweet little wife is relieved from playing the

21  piano at the church where David McGinnis sits.  Our ministry

22  struggles to keep going.  And my staff is asking me, Brother

23  Hovind, what did we do wrong?  My speaking schedule has all

24  been cancelled.  Thousands of people will not hear the gospel.

25  My four grandchildren wonder when Grandpa will be coming home.

12:47PM 1  Grandpa is in jail for the first time in his life alternating

2  between winning souls and doing Bible studies and crying

3  himself to sleep at night in a freezing cell.

4          January 19th, today, I stand in court still wondering,

5  what have I done?  If I had known the IRS had a problem, we

6  would have fixed it.  I would have talked to them.  We never

7  knew.

8          Any more Kleenex, Jo?

9          THE COURT:  We're approaching an hour.

10          THE DEFENDANT:  Just one second, Your Honor.

11          Pavlov did an experiment many years ago.  He would

12  ring the bell and feed the dog, ring the bell, feed the dog.

13  Most people don't know what that experiment was really about.

14  After the bell would ring, the dog would begin to get excited,

15  salivate, supper is coming.  Then Pavlov would ring the bell

16  and beat the dog and then ring the bell and feed the dog.  Very

17  erratically, he would go between beatings and feedings until

18  actually when the bell would ring, the dog had no idea what was

19  coming, he would run to the corner and quiver in fear.

20          I feel like that dog today.  I do not know what the

21  IRS wants.  What do you want, Scott?  Do you just need another

22  piece of meat to grind?  Am I the poster boy for this year?

23  Just because I dared to ask you questions and challenge your

24  authority, am I now doomed for persecution forever?  Do you

25  want me to give the IRS all the money and property that

12:49PM 1   belonged to the church for a tax bill for me and be happy about

2   it?  Do you want authority over the church that Congress says

3   you can't have?  Do you want me thank you for raiding our

4   ministry and terrorizing my wife?

5           THE COURT:  Mr. Hovind, this is not an opportunity for

6   you to launch personal attacks.

7           THE DEFENDANT:  I'm sorry.  I don't know, Your Honor,

8   what the government wants.  I don't know what IRS wants.  My

9   grandchildren ask me, why is Grandpa in jail?  What should I

10  tell them?  Do you want me to keep silent and cheerfully accept

11  the prison sentence and not ask why?  Should I just not grieve

12  of the destruction of my family and my ministry that's taking

13  place.  Why do you want us in prison?  Are we a threat?  Who

14  have we harmed?  Do you want truth, or like in the prison, they

15  have an expression, is it justice or just ice?  I fear it's

16  just ice sometimes.  Does the Court want to see remorse?  I

17  would love to be remorseful.  I told the chaplain about repent,

18  please, tell me what I'm supposed to repent of.

19          I've shown you my heart today.  God, what do you want?

20  Why did you give me such a close, loving family only to rip

21  them away from me?  Am I not supposed to have feelings?  Didn't

22  the government see as they investigated thousands of hours of

23  our ministry, can't they see that we're Christians?  Can't they

24  see we're dedicated to the Lord?  All they are doing is looking

25  through all this stuff looking for something I said wrong.

12:50PM
1  Don't they see anything we said right?  I love you, Lord, and I

2  trust you, and I always will, but I don't understand.  And I

3  need your protection right now.  I just want to go home.  I'm

4  tired.  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          Ms. Heldmyer, do you wish to address the Court as far

7  as sentence?

8          MS. HELDMYER:  Your Honor, we spent two weeks at trial

9  rebutting the comments and the ideas that Mr. Hovind still

10 clings to.  The basic information is in the record, and I don't

11 intend to reiterate all of the proof that we so diligently

12 presented to the jury that found Mr. Hovind guilty.  The only

13 fact that I recall Mr. Hovind saying that may not have come out

14 at trial, so I'll put it on the record, Mr. Hovind repeatedly

15 said that there was a grand jury that refused to indict him.

16 That is not true.  There's never been a grand jury that refused

17 to indict Mr. Hovind.  He was indicted the first time the

18 indictment was presented to the grand jury.

19          Other than that, Your Honor, I think that everything

20 he says has been rebutted.  The tape recordings show the lack

21 of sincerity of any statement that Mr. Hovind could make to the

22 Court today saying that he is sorry for anything that he has

23 done.  If he truly were sorry, if he truly wanted an

24 opportunity to make things right, he had more than enough

25 opportunity, and he could most definitely have at least made

12:52PM 1   some effort to pay the bill that he owes, and he has absolutely

2   done none of that.  I think the Court knows what is truly going

3   on here and knows what truly is in Mr. Hovind's heart.  And the

4   fact is that Mr. Hovind has still not learned and he still does

5   not accept responsibility for what he did.  He does not accept

6   responsibility for the harm that he has done, not the

7   government, to his friends and his family.  And we ask that an

8   appropriate sentence be fashioned in accordance with the

9   guidelines.

10       THE COURT:  All right.  You had mentioned earlier an

11   upward departure.  Is that something that you are requesting?

12   And if so, would you address that.

13       MS. HELDMYER:  Your Honor, the information that was

14   presented with regard to the tape recordings that we presented

15   to the Court, there was information there that the Court could

16   use and find it that has not been taken into account in the

17   calculation of the guidelines.  The fact that Mr. Hovind is

18   continuing to try to hide assets so that the IRS can't come and

19   take them, the fact that he continues to threaten lawsuits,

20   that he continues to threaten illegal means as retribution for

21   what he apparently deems to be the wrongs against him, all of

22   those things, particularly the hiding of the assets, Your

23   Honor, you know, the timing of all this, those telephone calls

24   have been over the past couple of months after he found out

25   what his sentence is, that the presentence investigation report

12:53PM 1    says, after he found out about the preliminary order of

2    forfeiture, and he even refers to them on some of the tape

3    recordings, he even actually says on the tape recordings, he

4    wants to do this, he wants to allocute and put all this on the

5    record so that it can be part of his appeal and part of the

6    appellate record, and my suspicion based upon that is the

7    reason why he's addressing the Court in that manner is not for

8    the reasons that he's suggesting to the Court, but is

9    subterfuge because he wants to use that as proof of facts that

10   he wants to appeal down the road.  So I don't even think that

11   that was genuine on his part.

12          I think all these things that we've presented, Your

13   Honor, give the Court the ability to fashion a sentence above

14   the recommended guidelines range pursuant to the presentence

15   investigation report.  And we trust the Court's discretion to

16   fashion a reasonable sentence.

17          THE COURT:  All right.  Is there anything else,

18   Mr. Richey?

19          MR. RICHEY:  No, Your Honor.

20          THE COURT:  All right.  I'm going to take a recess and

21   meet with the probation office.  Mr. Richey, I know you have a

22   plane to catch.  It shouldn't take long, once the court

23   resumes, to pronounce sentence.  I'm going to take 20 minutes,

24   and I think you'll still be able to make it to the airport on

25   time for your flight.

1          MR. RICHEY:  Thank you, Your Honor.

2          THE COURT:  We'll be in recess until 1:20.

3          (Recess.)

4          THE COURT:  Ms. Heldmyer, what is the amount of

5    restitution?

6          MS. HELDMYER:  The restitution, Your Honor?

7          THE COURT:  Yes, the restitution.  I thought there was

8    some change.

9          MS. HELDMYER:  The bill of cost are we talking about

10   now?

11         THE COURT:  No, the restitution.

12         MS. HELDMYER:  We made no change to the restitution

13   amount, just to the government's bill of cost that was filed

14   yesterday.

15         THE COURT:  All right.  What was the change to that?

16         MS. HELDMYER:  The change, Your Honor, first of all,

17   we have -- we were going to be withdrawing the bill of cost

18   regarding Mrs. Hovind, because Mrs. Hovind was not convicted of

19   any tax charge, and that was what prompted us to make a couple

20   of small changes in the bill of cost.  Specifically, there are

21   two sections on page 3 of our bill of cost where we are

22   charging the copies of Jencks material to both defendants.  So

23   we've cut those two amounts in half in paragraph 4 to -- from

24   $50 to $25, and from $2600 to $1300.  So the final amount that

25   we're asking for for the cost is $7,078.24.  7,078.24.

1:44PM    1          THE COURT:  As to the restitution and amount reflected

2    in the presentence report is accurate?

3          MS. HELDMYER:  It is, Your Honor.

4          THE COURT:  Let me address the issue -- the matter of

5    acceptance of responsibility.  In order for someone to be

6    entitled to an adjustment in their offense level for acceptance

7    of responsibility, the person has to truthfully admit the

8    conduct which comprises the offense of conviction.  This has

9    not been done in this case, and it is quite rare for it to be

10   done in any case in which a defendant goes to trial, but I have

11   taken it into consideration.  But after hearing the tapes from

12   the jail, I am -- and also the allocution that was made, I find

13   that Mr. Hovind is not entitled to acceptance of

14   responsibility, that he has not accepted responsibility for the

15   conduct which comprises the offense of conviction, which is

16   what the jury found him guilty of.

17          All right.  Let's then make sure that we are all on

18   the same page as far as the -- excuse me -- the guidelines.

19   The total offense level is a 30, a criminal history category of

20   one.  Guideline range is 97 to 121 months.  Again, the

21   statutory maximum under Counts 13 through 57 has changed, and

22   that is five as opposed to ten years.

23          All right.  Let me make a few things clear before I

24   impose sentence in the case.  First, I want you all to

25   understand and be clear on the fact that this case is not and

1:46PM 1    has never been about religion.  It was Mr. Hovind, not the

2    government, who injected religion into this case during this

3    trial.  And I know the courtroom is full today, it's packed.

4    And most, if not all of you were not here for the trial, I do

5    not believe.  Some of you may have come in and out, but we

6    certainly didn't have this number of individuals in the

7    courtroom every day listening to the evidence as those of us

8    involved in the trial did here.  Churches are not exempt from

9    the withholding and payment of taxes on the wages of employees.

10   Pure and simple.  That is the law.  That is the law in this

11   country, and it is the law that has been upheld by the United

12   States Supreme Court, who in this country has the final word on

13   matters of law and the Constitution.

14          Second, Mr. Hovind is responsible for his actions in

15   this case.  And he, not the government nor the Court, is to

16   blame for what happens to the CSE ministries while Mr. Hovind

17   serves his sentence.  Mr. Hovind is the one who has caused the

18   hurt and confusion that has surrounded these charges by

19   refusing to accept what the law is in this case.  Again, I note

20   that most of you were not here for this trial, and most of you

21   will not like what I am about to say, but I am telling you that

22   this picture that Mr. Hovind painted during his allocution is

23   not the evidence that was heard by the jury in this case.  And

24   we proceed at this sentencing based solely on the verdict of

25   the jury and then what was presented here at the sentencing.

1:49PM 1    Instead, the picture that was presented to the jury at the

2    trial in this case of Mr. Hovind is completely consistent with

3    what you heard today on the tapes made in the jail cell or from

4    the jail, the most recent of which occurred just four days ago,

5    or Monday.

6          Mr. Hovind, you've stood here before the Court, and I

7    listened to you.  You spoke eloquently before the Court and

8    before your family and your friends, and you professed your

9    confusion and frustration over and with the Internal Revenue

10   letters, and you steadfastly insisted today that you are not a

11   tax protester.  The evidence is to the contrary, sir.  I know

12   it.  The government knows it.  Your employees know it.  Your

13   associates know it.  I believe that your wife knows it, and

14   your family knows it.

15         I am not going to reiterate for all of you here what

16   the evidence in this case was, and I don't need to do that for

17   Mr. Hovind.  But the best evidence of that fact of your tax

18   protester status is the fact that you continue to affiliate

19   your ministry and yourself with Glen Stoll and Remedies at Law,

20   in fact, to the point of saying that he is still in charge to

21   this day of your ministry.  You are heard speaking with him on

22   the phone calls that were played here in the courtroom.  And

23   Mr. Stoll, and, again, you indicated just today that he is the

24   one that is in control of your ministry, and someone had to

25   turn that ministry over to Mr. Stoll.  Mr. Stoll didn't start

1:51PM 1   CSE Ministries.  Kent Hovind started CSE Ministries and has run

2   and operated CSE ministries.  And as captain of that ship, you

3   are responsible.  And you turned that ministry over to

4   Mr. Stoll.

5          And Mr. Stoll has been determined by another federal

6   court to have engaged in conduct that interferes with the

7   enforcement of the Internal Revenue letters.  He organizes,

8   promotes and markets a fraudulent tax scheme using corporations

9   sole and ministerial trusts in an attempt to fraudulently evade

10   income and employment tax and to thwart the IRS's ability to

11   assess and collect its customers unpaid federal -- I'm sorry,

12   the customers of remedy sole -- Remedies at Law, excuse me,

13   unpaid federal tax liabilities.  Glen Stoll and Remedies at Law

14   assists customers, of which CSE is a customer, in creating

15   ministerial trusts in which they falsely claim they are exempt

16   from all requirements under the Internal Revenue letters.

17   Remedies at Law advises its customers in using their

18   ministerial trust scheme to stop paying income and employment

19   taxes and to stop filing federal tax returns.

20          The scheme by Glen Stoll and Remedies at Law results

21   in its customers illegally concealing a substantial portion, if

22   not all of their income and business profits which would

23   otherwise have been paid to the customers as wages subject to

24   income as well as employment tax.  They falsely advise their

25   customers with respect to businesses to reclassify and treat

1:53PM  1    themselves and their employees as independent contractors,

2    instead of employees of the business.  They falsely advise

3    their customers that they are not required to issue IRS forms,

4    W-2 or 1099s, both of which report compensation paid to

5    individuals and entities.  They also advise falsely their

6    customers that they are not required to withhold any income or

7    employment taxes on the compensation they pay themselves and

8    their employees, and if they are employed by a third party, no

9    income or employment tax need be withheld on their wages.

10          This is the person that you have turned the ministry

11   over to.  And so, like I said to everyone here in the

12   courtroom, that which happens to CSE Ministries after

13   Mr. Hovind is sentenced today is not the fault of anyone in

14   this courtroom other than Mr. Hovind.

15          Another point I want to make clear as to you,

16   Mr. Hovind, and that is that this nation is not perfect by any

17   means, but in my mind, there is none greater on this earth, and

18   we who live in this country are truly blessed to be here.  Most

19   of us are blessed in that manner simply by virtue of the fact

20   of who our parents are, the fact that we were born here.  We

21   did nothing to earn the privilege of being able to call

22   ourselves American.  And as Americans, we enjoy certain rights

23   and privileges that are embodied within our Constitution, and

24   these are rights and privileges that make each of us sitting in

25   this room uniquely American, and they also make us the envy of

1:55PM  1    the world.  Mr. Hovind, you have enjoyed those rights and

2    privileges throughout your life.  I presume you've lived here

3    and you've enjoyed them, just as most of us have.  And I

4    actually can sit and consider your legal situation now, and I

5    can identify several of those rights that you have enjoyed.

6    You have enjoyed the freedom of speech.  You have certainly

7    enjoyed the freedom of religion.  You have enjoyed repeatedly

8    the right of access to the courts.  You have enjoyed the right

9    to a trial by a jury of your peers.  And you have also enjoyed

10   the right to due process of law.  And as I am confident, there

11   will be an appeal of any sentence that I impose today, you will

12   continue to enjoy the right to due process of law, regardless

13   of your convicted status.

14        You've also enjoyed the benefit of living in a

15   prosperous society where there is food from our farmers, there

16   is protection from our military, there is education from our

17   academic institutions, there is health care from our medical

18   institutions, there is infrastructure from our public works,

19   and the list goes on and on.  And those things are paid for by

20   our taxes, but you have enjoyed all this simply because, again,

21   you are fortunate enough to have been born here.  And as I tell

22   immigrants who stand before the Court to be naturalized, I tell

23   them that with these rights and privileges comes great

24   responsibility, and this is the responsibility that you have to

25   your country, and one of those responsibilities is the payment

1:58PM 1  of taxes.  I can't say it any better or more plainly that has

2  been stated by another judge in another case, the Honorable

3  Frank C. Damrell, and if you'll permit me I'm going to quote

4  from him in a sentencing in which he sentenced someone for tax

5  fraud in his own court.  And what Judge Damrell said was a

6  person who has enjoyed life, a comfortable life in this

7  country, that refuses to take up the obligation of citizenship

8  is completely reprehensible.  We have a social compact in this

9  country, and it is embodied in our Constitution.  It allows us

10  as citizens to live together under one government.  And when

11  someone fails to recognize their obligations to their country,

12  they break that compact that they have with all other citizens,

13  particularly those who have given their life to allow those

14  persons, including you, Mr. Hovind, to pursue the life that you

15  have pursued in this country, and I find that to be a most

16  difficult thing.  Young people willing to sacrifice their lives

17  so that we can live in a secure and free society, and the only

18  obligation for the most part that we're asked of as citizens in

19  order to have the honor of being citizens in this country is to

20  pay some tax so as to allow our government to continue

21  providing security and freedom to us all.  And to me the story

22  is as simple as that, the failure -- your failure to honor your

23  obligation to this country.

24        Judge Damrell in his sentencing referenced the men and

25  women of our Armed Forces and the sacrifices that they have

1:59PM 1    made for us, and I think it's important for you and all those

2    here in the courtroom and elsewhere to realize and appreciate

3    the fact that these men and women, past, present and future,

4    not only fight for your security, Mr. Hovind, and all of our

5    security, but they also fight for your right to practice and

6    preach your Creation Science Evangelism in any way that you

7    choose and even for your right, which is unique in many

8    countries, but even for your right to criticize our government

9    and its tax letters.  But make no mistake, these men and these

10   women are not fighting and are not sacrificing their lives to

11   give you the right to do the sorts of things that you did in

12   this case.  They are not fighting and sacrificing their lives

13   so that you can skirt obligations to this country, obligations

14   to them.  It is our tax dollars that puts food in the mess

15   halls of our military, puts mattresses on their bunks and

16   weapons in their hands so that they can fight to protect this

17   country.  And you may think that my statements are a bit over

18   the top, but I don't.  I think they are right on point.  And

19   that the conduct in this case is extremely serious.

20          I received letters from many of you expressing the

21   view that sometimes those convicted of heinous crimes are

22   subject to less time than Mr. Hovind is facing in this case.

23   This is a serious case, serious charges, serious conduct.  Make

24   no mistake about it.  By your conduct in this case, Mr. Hovind,

25   in my opinion, you dishonored the men and women in our

2:01PM 1   military.  You dishonor your fellow Americans, and you've

2   dishonored the Constitution of the United States.

3          All right.  I'm prepared now to go forward with the

4   sentence.  I have a final order of forfeiture that's been

5   presented by the government, and I have signed that pursuant to

6   the preliminary order of forfeiture that has already been

7   entered, and that is based on the forfeiture finding of the

8   jury in this case.

9          Mr. Hovind, please rise.  All right.  At this time,

10  Mr. Hovind, I do formally adjudicate you guilty of Counts 1

11  through 58 of the indictment, and that is consistent with the

12  jury's finding of guilt as to each of those counts.

13         Pursuant to the Sentencing Reform Act of 1984 and all

14  amendments, it is the judgment of the Court that the defendant,

15  Kent E. Hovind, is hereby committed to the custody of the

16  Bureau of Prisons to be imprisoned for a term of 120 months.

17  That is comprised of 60 months as to Counts 1 through 56, all

18  of which to run concurrent, 57 -- 60 months, excuse me,

19  consecutive as to Count 57, and 36 months concurrent as to

20  Count 58, which results in a sentence of 120 months, which is

21  within the guideline range.

22         I do -- also, I want to note that this sentence is at

23  the high end of the guideline range, and that is due to

24  aggravating factors that I find present in this case, which

25  include, but are not limited to the number of obstructive acts

2:03PM 1   that are involved in this case, which include personal attacks

2   against Mr. Scott Schneider and Ms. Powe, or Powe, I'm sorry if

3   I mispronounced that, the revenue officer.  Your personal

4   attacks against those employees of the Internal Revenue Service

5   were intended as personal attacks, and they are intended to

6   smear their reputation and to ruin their careers.  This type of

7   behavior has continued.  It is reflected in the tapes that we

8   heard played here today.  There is also the continued efforts

9   to obstruct by hiding and concealing your assets in the face of

10   this sentence, which would presumably include fines and most

11   assuredly would include restitution.

12          I do recommend that the sentence be served and that

13   Mr. Hovind be designated by the Bureau of Prisons to a facility

14   for confinement as near his home here in Pensacola, Florida as

15   the Bureau of Prisons can accommodate.  I don't make that

16   decision.  It is out of my hands.  I do recommend, however,

17   that -- and the Bureau of Prisons does take my recommendation

18   into account, but I do recommend that Mr. Hovind be housed, and

19   I will specify Saufley Field here in Pensacola, so that he may

20   receive regular visitation from his family and his friends.

21   But, again, that decision will rest with the Bureau of Prisons.

22          I find that Mr. Hovind does have the financial ability

23   to pay a fine in a modest amount.  Mr. Hovind, you refuse to

24   provide any financial information or financial statement to the

25   Court as required, but based on what I know absent that

2:05PM 1 financial affidavit, I find that you can pay a fine in the

2 amount of $2,000 on a monthly installment payment schedule

3 during your term of supervised release, which I will address in

4 just a moment.  While incarcerated, you will be required to

5 participate in the Inmate Financial Responsibility Program, and

6 this amount will be due and payable immediately.  To the extent

7 that you are unable to pay the amount in full, again, the

8 remaining balance will be collected during the term of your

9 supervised release.

10    Pursuant to law, there is also a $100 special monetary

11 assessment that must be ordered, and that is as to each of the

12 58 counts, for a total of $5800.  That is due, also, and

13 payable immediately.

14    Pursuant to law, specifically 26 U.S.C. 7202, you will

15 be required to pay the cost of prosecution in this case, and

16 that is in the amount of $7,078.24.  And that is under the

17 counts of conviction in Count 1 through 12.

18    Mr. Richey, all of this will be spelled out in a

19 written judgment of conviction.

20    Upon your release from incarceration, Mr. Hovind, you

21 will be placed on a period of supervised release for a term of

22 three years as to Counts 1 through 57, and one year as to Count

23 58, with the terms to run concurrently, one with the other.

24 Supervision will be under the standard conditions adopted for

25 use in this district, together with the following special

2:07PM  1  conditions.  Please listen carefully.  You shall not own or

2  possess, either directly or constructively, any firearm, any

3  dangerous weapon or any type of destructive device, and that

4  also includes any ammunition and would also pertain to hunting

5  weapons as well.  You will be required to cooperate in the

6  collection of DNA, which is required by statute.  Also,

7  pursuant to law, you will be required to make restitution, and

8  that law is 18 U.S.C. 3583(d), in the amount of $604,874.87 to

9  the Internal Revenue Service, Atlanta Service Center, Criminal

10  Investigations Branch, P.O. Box 47-422, Stop 75-B, Doraville,

11  Georgia, 30362.

12          Mr. Hovind is to receive credit for any amount seized

13  by the government.  Restitution shall be paid in monthly

14  installments of not less than $500 per month, and these

15  payments shall commence within three months from your release

16  from imprisonment.  Any unpaid balance of the fine shall become

17  a condition of your supervised release, and you will be

18  required to pay not less than $61 per month towards that

19  balance to commence within, again, within three months.  Any

20  unpaid balance of the cost of prosecution shall become a

21  condition of your supervised release, and you will be required

22  to pay not less than $100 per month to commence within three

23  months of release as to that cost.

24          You will also be required to provide the probation

25  office with access to any requested financial information, both

2:08PM 1    business as well as personal.  You will be required to report

2    the source and amount of personal and/or business income and

3    financial assets to the supervising probation officer as

4    directed.  You shall not incur any new credit charges or open

5    any additional lines of credit without the approval of the

6    probation office unless you have satisfied -- unless and until

7    you've satisfied your financial obligations under the sentence.

8    You shall not transfer or dispose of any asset or interest you

9    may have in any asset without the prior approval of the

10   probation officer unless and until you have satisfied the

11   financial obligations under the sentence.

12          Although mandatory drug testing is required under the

13   law during supervised release, I am going to suspend the

14   requirement for drug testing in your case, Mr. Hovind, because

15   I find that you pose a very low risk, if any, of any substance

16   abuse.

17          In making this sentencing decision, I do want the

18   record to reflect that I did consult the guidelines, I

19   calculated the applicable advisory range of 97 to 121 months

20   based on an base offense level of 22, two points for the

21   pattern of unlawful activity, four points for the role

22   adjustment, two points for the obstruction of justice

23   enhancement, no points for acceptance of responsibility.  The

24   total offense level is 30, criminal history category one.

25          Although the government has requested an upward

2:10PM   1   departure from the guideline range, in other words, a higher

2   sentence than has been imposed, and although I recognize that I

3   have the authority to do that in this case, I find that an

4   upward departure is not clearly appropriate and, therefore, no

5   departure, either upward or downward, will be imposed in this

6   case.

7           Finally, I did consider every one of the factors in 18

8   U.S.C. 3553(a) in arriving at the sentence.  And at this time I

9   do find that a sentence of 120 months in this case is

10  sufficient, but not greater than necessary to comply with the

11  purposes of sentencing set forth under the law.

12          The total sentence is 120 months' imprisonment,

13  followed by three years of supervised release, a $2,000 fine, a

14  $5800 special monetary assessment, restitution in the amount of

15  $604,874.87, and the cost of prosecution in the amount of

16  $7,078.24.

17          Mr. Hovind, do you understand the sentence that's been

18  imposed?  Do you understand it?

19          THE DEFENDANT:  I guess I would need to see it in

20  writing first.

21          THE COURT:  Do you have any questions about what I've

22  said as far as the length of the term of imprisonment, the fine

23  amount?  Do you understand what I said?

24          THE DEFENDANT:  I have a question.  Since I have a vow

25  of poverty, I don't own anything.  The ministry owns

2:11PM 1    everything.  How am I supposed to pay?

2           THE COURT:  That will be -- that will be something

3    that will be determined later whether or not you have the

4    ability to pay or whether or not the government can seize or

5    attach those assets.  That's not a matter for me to determine

6    today.  That may come back before me, but it's not before me

7    today.

8           THE DEFENDANT:  I don't understand how I can do that,

9    so I guess I need to get clarification on that.

10          THE COURT:  Well, there may be -- in some instances,

11   third parties have rights in forfeiture cases, and sometimes

12   third parties file things with the Court, and there is a

13   hearing, and that may be where we get in this case.  I don't

14   know.  None of that is before me right now.  Mr. Richey can

15   advise you further about that.

16          THE DEFENDANT:  Your Honor.

17          THE COURT:  Yes.

18          THE DEFENDANT:  As far as sentencing, if there --

19   obviously this will go to appeal.  If there is any way that can

20   be postponed as far as being implicated until appeal, so I

21   would have that sentence hanging over my head, but could go

22   free on bond or on own recognizance.  I just hope --

23          THE COURT:  Mr. Richey can file something if he deems

24   it appropriate.  I have ruled on your motion for release and

25   addressed in that ruling the issue of release on appeal.  In

2:13PM

1   this case there is one overriding legal issue that I think that

2   Mr. Richey and Mr. Barringer will pursue on appeal.  The law,

3   however, is that even if successful on that portion of the

4   appeal, that would not affect the other remaining counts of

5   conviction for which a sentence of imprisonment is called for.

6   And so, therefore, that issue does not affect the issue of

7   release.

8           THE DEFENDANT:  All three counts, though, will be

9   appealed, and it hasn't been determined yet, so I sure would

10  like to go home until --

11          THE COURT:  I understand.  I understand, Mr. Hovind,

12  that you would like to go home.  I have to follow the law, and

13  the law in this case is that you remain in custody.

14          All right.  Counsel, other than the objections that

15  have been made and are placed and preserved in the record, are

16  there any objections to the Court's ultimate findings of fact

17  or conclusions of law as related to the sentence?  Mr. Richey.

18          MR. RICHEY:  As to the mathematics, no, Your Honor,

19  but there were two just brief issues, and I'll try to be very

20  brief.  In regards to restitution that CR 32(a)(2) says that a

21  victim as an individual as courts have repeatedly found the IRS

22  has no capacity to be sued or to sue, and they are not a real

23  party in interest, which means they cannot be a victim in this

24  case, and under 18 U.S.C. 3583(d), that does not include Title

25  26.

2:14PM 1          THE COURT:  Ms. Heldmyer, do you wish to respond

2    before I proceed?

3          MS. HELDMYER:  If Mr. Davies could respond, Your

4    Honor.

5          THE COURT:  Mr. Davies.

6          MR. DAVIES:  Your Honor, the case law is, in a case

7    such as this, you can make restitution for the Title 26 offense

8    is a condition of supervised release.  As for the -- and

9    that's -- so it is appropriate under Title 18, which you cited

10   in your sentence.

11         MR. RICHEY:  Your Honor, then -- I'm sorry.  In

12   reference to that, you had stated that he must pay $500 a month

13   beginning now, that as he just stated, that would only take

14   place in restitution which begins in supervised release, which

15   would be inappropriate to order him to begin payment on that

16   now.

17         THE COURT:  I would agree with that.  Mr. Davies, I

18   think Mr. Richey raises a valid point.  So the judgment will be

19   amended to reflect that the restitution payments will begin

20   three months following release from incarceration.

21         MR. RICHEY:  One other thing, Your Honor, was on the

22   bill of cost.  There is no receipts included in this to

23   substantiate it.  And, for example, just on number two, they

24   want three -- or five dollars per page on grand jury

25   transcripts, and I believe the figure on that is much less per

2:16PM 1  page.  So I would ask that the government produce receipts in

2  order to substantiate.

3            THE COURT:  Mr. Davies.

4            MR. DAVIES:  Your Honor, we site in the bill of cost

5  the Patti case and also the Dean case.  The Patti case, both of

6  which were in district court, but Patti went up to the Eleventh

7  Circuit and got affirmed, and it specifically affirmed that

8  five dollars per page for the transcript, which is what we are

9  charged for grand jury transcripts without a court reporter,

10 and the 50 cents per page for copies has been affirmed by the

11 Eleventh Circuit.  So you have the discretion according to the

12 Patti -- Eleventh Circuit Patti case, and I think your

13 imposition was correct.

14            THE COURT:  That's the law, Mr. Richey, and that

15 amount won't change.

16            Ms. Heldmyer, any objections from the government?

17            MS. HELDMYER:  No objections, Your Honor.

18            THE COURT:  Mr. Hovind, you do have the right to

19 appeal from this sentence.  If you choose to pursue an appeal,

20 you must file your notice of appeal within ten days of the date

21 of judgment, and this will be in writing, and it will be

22 entered early next week.  So you will have ten days from that

23 date of judgment in which to file your notice of appeal.  If

24 you cannot afford the cost of an appeal, you may file for leave

25 to appeal in forma pauperis or no cost to you.  And upon

2:17PM 1   request, our Clerk of Court would file a notice of appeal

2   immediately on your behalf.  I know Mr. Richey can advise you

3   further about your appeal rights, but please do remember, it's

4   ten days from the date of judgment.

5         MR. RICHEY:  Your Honor, if I may address one thing

6   just quickly on that.  A notice of appeal was filed, and it was

7   paid, but the clerk's office for some reason interpreted it as

8   an interlocutory appeal, even though in the notice of appeal it

9   said judgment and sentence.  And my understanding is even if

10  the notice of appeal is filed prior to the judgment and

11  sentence, it still applies once judgment and sentence is

12  issued.  Do I need to file an amended notice of appeal?

13        THE COURT:  Well, you threw us a curve on that one,

14  Mr. Richey, and we weren't sure.  And I believe we consulted

15  with the Eleventh Circuit and were told it would be treated as

16  an interlocutory appeal, the appeal that you have filed.  So I

17  think -- I'm not here to give advice, but it might be --

18        MR. RICHEY:  May I request that the Court order that

19  it be allowed then to be the final notice of appeal rather than

20  interlocutory?

21        THE COURT:  I don't think I can do that.  It's however

22  the Eleventh Circuit treats it.  Again, I can't give you

23  advice.

24        MR. RICHEY:  I'm moving the Court to do that.

25        THE COURT:  To just file an amended notice of appeal?

2:18PM 1          MR. RICHEY:  To allow me to file an amended notice of

2    appeal, and for that to apply, that the filing fee be already

3    paid.

4          THE COURT:  Mr. Richey, I don't know that I can do

5    that.  I mean, that's not something I can give you an answer on

6    right now.  The judgment of conviction hasn't been entered.  So

7    your time period is not running.  So you don't need to worry

8    about that.  So that's something you'll need to research and

9    see what you can do or the Court has authority to do, and you

10   need to let me know that.  And if I can, I'll be more than

11   happy to treat it as such.  I just don't know that I have the

12   authority to do that, because the judgment has not actually

13   been entered.

14         MR. RICHEY:  And then one last final matter.  I'd

15   request that the Court grant that Mr. Hovind be given credit

16   for the time served from the time of his incarceration after

17   the verdict.

18         THE COURT:  He will be automatically given credit for

19   that time.

20         MR. RICHEY:  Thank you, Your Honor.

21         THE COURT:  All right.  We've rescheduled

22   Mrs. Hovind's sentencing.  I believe the date I gave you was

23   March the 1st.

24         MR. BARRINGER:  That's correct, Your Honor.

25         THE COURT:  All right.  And we will see you and

2:20PM 1  Mrs. Hovind back here at that time, Mr. Barringer.

2  Mrs. Hovind, you are still in pretrial -- well, you're still

3  under supervision on presentence release.  There are terms and

4  conditions, you know, I'm sure, that you must abide by --

5  continue to abide by during this period of your release.  I

6  make one modification to the bond, and that is that you appear

7  for your sentencing here in this Court on March the 1st at

8  9:00 a.m.

9        DEFENDANT J. HOVIND:  Yes, ma'am.

10       THE COURT:  All right.  Court will be in recess.

11      (Proceedings concluded.)

12

13

14          --------------------

15  I certify that the foregoing is a correct transcript from the
record of proceedings in the above-entitled matter.  Any
16  redaction of personal data identifiers pursuant to the Judicial
Conference Policy on Privacy are noted within the transcript.

17

18    s/Gwen B. Kesinger            10-2-07

19   _____     _____

20    Gwen B. Kesinger, RPR, FCRR        Date
     Official Court Reporter
21

22

23

24

25