IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )     CASE NO.  3:06cr83/MCR
vs.                              )
                                 )
KENT E. HOVIND                   )     Pensacola,Florida
and JO D. HOVIND,                )     November 2, 2006
                                 )     8:05 A.M.
                                 )
          Defendants.            )
_____ )


VOLUME IX

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS,
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:          MICHELLE M. HELDMYER, ESQUIRE
                            ROBERT G. DAVIES, ESQUIRE
                            Assistant United States Attorney
                            21 East Garden Street, Suite 400
                            Pensacola, Florida 32502


FOR THE DEFENDANT           ALAN S. RICHEY, ESQUIRE
KENT E. HOVIND:             Alan Richey, P.A.
                            331 Sentinel Firs Road, #A
                            Port Hadlock, Washington 98330


FOR THE DEFENDANT           JEROLD W. BARRINGER, ESQUIRE
JO D. HOVIND:               Jerold W. Barringer,P.A.
                            102 South Pine Street
                            Nokomis, Illinois 62075

Gwen B. Kesinger, RPR, FCRR
Official United States Court Reporter
Pensacola, Florida  32502

7:51AM   1   (Court in session.)

2   (Defendants present.)

3          THE COURT:  All right.  The jury instructions and

4   verdict forms are being printed as I speak.  Let me address a

5   couple of matters before we start.

6          Mr. Richey, the proposed limiting instruction that --

7          MR. RICHEY:  I never even -- I completely forgot about

8   it, Your Honor.  I apologize.

9          THE COURT:  Well, you have until 8:30, if you want to

10  work on something.

11         As far as -- let me turn to Ms. Heldmyer -- the

12  question of the language about churches not being exempt from

13  the requirements, we did research last night and this morning

14  and that is the law.  They are not exempt.  The wages are due

15  to be deducted unless -- or except for in two very narrow and

16  limited circumstances, and that has to do with ordained

17  ministers and their wages and the wages of those in a religious

18  order, neither of which exception applies here.  So I'm going

19  to give the language as proposed yesterday.  There has been

20  enough made and enough focus in this case on CSE being a

21  church, a ministry, with employees being missionaries.  So I

22  think the language is necessary in this case, so as not to have

23  the jury misled.

24         All right.  Ms. Heldmyer.

25         MS. HELDMYER:  I was just going to say, Your Honor, I

3

8:06AM 1    know the Court has ruled.  We did do the research.  And if the

2    court wants the benefit of our research, we can provide that,

3    but it may not be necessary at this time.

4              THE COURT:  The research --

5              MS. HELDMYER:  The research as to withholding by

6    churches.

7              THE COURT:  Is it consistent with what I --

8              MS. HELDMYER:  It is consistent, Your Honor.  We found

9    two cases on point, and we can put them on the record, if the

10   Court would like.  The first case is United States versus

11   Bethal Baptist Church, which is found at 822 F. 2d 1334.  It's

12   a Third Circuit 1987 case, which goes through as a thorough

13   discussion of the statutory scheme, explains about the Social

14   Security Act and how it was made specifically applicable to

15   churches in an amendment in 1983.

16             There is a Supreme Court case United States versus Lee

17   that was even before the 1983 amendments.  That was in 1981, I

18   believe.  And in Lee -- Lee is found at 455 U.S. 252, a 1982

19   case, that also finds the same thing even prior to the

20   amendments of 1983, and then coincidentally enough, the

21   Indianapolis Baptist Temple Case, which was cited by Mr. Gibbs

22   in his testimony, United States versus Indianapolis Baptist

23   Temple, found at 224 Fd. 3d 627, and that is a 2000 case.  That

24   specifically holds that employment taxes, Social Security

25   taxes, Medicare tax and income tax must be withheld from the

8:08AM 1    employees of the church.

2              THE COURT:  Thank you.  All right.  Anything else

3    before we start with the jury at 8:30 and closing arguments?

4              MS. HELDMYER:  If I may ask for some guidance, Your

5    Honor.  Based upon the arguments for judgement of acquittal

6    yesterday, it appears to me that the defense may be trying to

7    argue an incorrect statement of the law, as it comes to the

8    structuring charges, based upon what they said yesterday about

9    having to be over $10,000, et cetera.

10             Would the Court -- is that fair argument in the

11   Court's -- I don't want to object if it's not necessary.  I

12   certainly don't want to object during their closing arguments.

13   But if an incorrect statement of law is provided, or in my

14   opinion, provided to the jury, is that something the Court

15   wants me to object to at that point in time or just argue to

16   the contrary in rebuttal?

17             THE COURT:  I would prefer that you do just as you've

18   done and raise the concern that you have now before the jury is

19   brought in, and that argument will not be permitted.  That is

20   contrary to the law.

21             MR. BARRINGER:  Which argument is that, Your Honor?

22             THE COURT:  The argument about the government having

23   to establish that the $10,000 threshold was triggered by the

24   defendants' conduct, and I ruled yesterday that that's

25   irrelevant as to whether it was triggered or not, and the jury

8:09AM 1    instructions do not provide as such and the case law is

2    actually to the contrary on the structuring charge.  So that

3    argument will not be permitted to be made during closing.

4         MR. BARRINGER:  Let me be absolutely clear about this

5    so that we don't have --

6         THE COURT:  Yes.

7         MR. BARRINGER:  -- problems later on.

8         Each count has to stand on its own; is that right?

9         THE COURT:  Well, each count is charged separately.

10        MR. BARRINGER:  So each count has to fit the elements

11   of the jury instructions itself; is that right?

12        THE COURT:  The elements of the charge.

13        MR. BARRINGER:  Yes, because each count is one check

14   on one day, not all the checks all the time.  That's not how it

15   was charged.

16        THE COURT:  Right.  But the point is, and the ruling

17   that I made yesterday in response to your motion for judgement

18   of acquittal was that it is irrelevant whether that $10,000

19   threshold was ever triggered or not by the defendants' conduct.

20   The only issue is their intent and whether that intent was to

21   evade that reporting requirement.  Not whether the bank had the

22   reporting requirement at a given moment, but whether their

23   intent was to evade it.

24        MR. BARRINGER:  I'm not arguing that the bank had a

25   reporting requirement on any one check.  That's not what I'm

8:11AM 1   saying.  Let me be really clear about this because it is a fine

2   line, I believe.  Each count has to establish structuring in

3   and of itself.  That's how it's charged.  It's not charged as

4   all the checks in structuring.  Each count has to establish

5   structuring by itself.

6           THE COURT:  What do you mean structuring by itself?

7   It has to establish an intent to evade the reporting

8   requirements by the structuring.

9           MR. BARRINGER:  And structuring is defined in the jury

10  instructions.

11          THE COURT:  I believe it is.

12          MR. BARRINGER:  So it has to fit within the category

13  of structuring as defined, and that's all I'm going to talk

14  about.  Do you understand what I'm saying?  I'm not saying that

15  the bank had a duty to do something and didn't do it.

16          THE COURT:  Well, you're free to argue -- you're free

17  to argue that through the evidence the government has not

18  proven -- through the evidence of the structuring, the

19  government has not proven Mrs. Hovind had the intent to evade

20  the requirements.  You're free to make that argument.  But as

21  far as whether or not the bank had the duty or the bank did or

22  did not file the CTR or should or should not have filed the

23  CTR --

24          MR. BARRINGER:  I'm not saying anything about that.

25  As an officer of the court, I'm not going to say what the bank

8:12AM 1    should or should not have done or that the bank didn't do

2    something it was supposed to do or did everything it was

3    supposed to do.  It's not going to be in that area.  But it's

4    going to be with each single count is a single check and each

5    check has to fit the elements of the crime.  And if it doesn't

6    fit the elements of the crime, I'm entitled to point that out

7    to the jury.

8           THE COURT:  The elements of the crime as listed in the

9    jury instructions --

10          MR. BARRINGER:  Yes.

11          THE COURT:  -- that she was aware and he was aware of

12   the reporting requirements --

13          MR. BARRINGER:  The reporting requirements, and that

14   they structured it and with respect to the reporting

15   requirements and then the definition of what structuring is,

16   which sets out what a structure is.  That is each count has to

17   establish that.

18          THE COURT:  I mean, each count has to be proven

19   separately, yes, in any case, in any charge.

20          MR. BARRINGER:  Because I think what's going to

21   happen, and I think it's an improper argument now from the

22   government, is that they are going to be looking at all the

23   checks as if all the checks are one structuring, but they

24   didn't charge it that way and that would be an improper and an

25   illegal argument on behalf of the government to say that; that

8:13AM 1    all the checks demonstrate structuring because we have 9,600 on

2    many separate days, and that's not how they charged the

3    indictment.  So if they argue that way, I may stand up and

4    object.

5           THE COURT:  Well, I think -- the government is free to

6    argue that based on the evidence that's been presented and

7    argue that there is a pattern and that from that evidence the

8    jury can infer that there was intent on a given occasion,

9    that's not improper.

10           MR. BARRINGER:  That's not improper.  But to say that

11    the pattern shows the structuring, that this large number of

12    checks, 45 checks over a year-and-a-half is itself the

13    structuring versus each count being the structuring.  There is

14    a difference, and I'm going to argue it that way to the jury.

15           THE COURT:  You will if I permit you to.

16           MR. BARRINGER:  My apologies, Your Honor.  I believe

17    that I'm within the instructions within the indictment to be

18    able to do that because they didn't charge -- they didn't

19    charge all the checks as one count.

20           THE COURT:  All right.

21           MR. BARRINGER:  If they had, they can make that

22    argument dealing with that subject.  They didn't charge it that

23    way.  We're stuck with how they charged it.  They charged each

24    count is a single check.  They then have to fit that check into

25    the jury instructions to have a verdict of guilty, and that's

8:14AM 1  where we're going to be arguing and that's going to be the

2  issue here.

3          THE COURT:  All right.  Thank you.

4          Ms. Heldmyer, do you wish to respond?

5          MS. HELDMYER:  No, only to say the United States

6  believes it's within its authority to argue that the pattern of

7  structured checks shows knowledge on the part of the

8  defendants, and that's what we intend to use the pattern for.

9          THE COURT:  I think that's permissible.  All right.

10         MR. RICHEY:  Your Honor, and I would also like to say

11  just for clarification, because a minute ago you said the only

12  element at issue is their intent.

13         THE COURT:  It's not the only element.  There are four

14  elements, but that is the primary issue here, and I was making

15  that -- or drawing a distinction between intent being the issue

16  versus the bank's actions and the intent of the defendants

17  versus what the bank did or didn't do or should or shouldn't

18  have done.  I apologize if I left the wrong impression there.

19  That was not my intent.

20         MR. RICHEY:  Thank you, Your Honor.

21         THE COURT:  All right.  Anything else?

22         MS. HELDMYER:  Your Honor, if I may.  I have moved, if

23  the Court permits me to do this, I have moved our screen around

24  because we're going to be doing a Power Point presentation for

25  the closing argument.  And instead of having me turn around and

8:16AM 1  getting away from the microphone to see the big screen, I have

2  turned this computer screen around so that I can just look here

3  at what the jury is seeing there, if that's permitted by the

4  Court.

5          THE COURT:  That's fine.

6          Thank you.

7          MS. HELDMYER:

8          THE COURT:  Mr. Richey.

9          MR. RICHEY:  Two things, Your Honor:  First of all, I

10  don't know if the Court has guidelines as far as how much time

11  for closing.

12          THE COURT:  Well, I know that most judges do.  I don't

13  like to confine you on your closing arguments.  I expect you to

14  be mindful of the time that you're taking.  If you're here to

15  suggest that you want two or three hours for your closing

16  argument, then we need to talk.

17          MR. RICHEY:  No, Your Honor, an hour or less.  I just

18  wanted to make sure.

19          And then the other thing is that I have a number of

20  documents, and I already pulled the ones I plan on using, but

21  for my sake, I have my own copies highlighted.  So I know

22  exactly where to go, but there is just going to be some

23  shuffling back and forth.  Would it be okay with the Court if I

24  have my copies up there and then have the exhibits here?  And

25  then would it also be permissible to have someone put the

8:17AM  1    exhibits on there rather than me walking back and forth?

2                    THE COURT:  Who would that someone be?

3                    MR. RICHEY:  I could have Mr. Hovind do it.

4                    THE COURT:  I don't think we need Mr. Hovind doing

5    that.  Mr. Barringer might be willing to assist you.  I don't

6    know if he would be willing to do that.

7                    MR. RICHEY:  Could I have Mr. Springer?  He's been my

8    helper here.

9                    THE COURT:  I would allow Mr. Springer to do that, but

10   he needs to only be. . .

11                   MR. RICHEY:  Correct, only come up when it's time.

12                   THE COURT:  When it's time.  And then when you're

13   finished, he needs to return to the gallery.

14                   MR. BARRINGER:  One other thing:  Are we allowed to

15   put the instruction on the screen?  Do we refer to it?

16                   THE COURT:  I prefer that you not put it on the

17   screen.  You can refer to it.  It hasn't been given to the

18   jury, but there is nothing improper, certainly, about you

19   arguing what the law is and what the Court is going to instruct

20   the jury on.

21                   MR. BARRINGER:  Thank you, Your Honor.

22                   MR. RICHEY:  Your Honor, would that hold true also

23   with the indictment?

24                   THE COURT:  In terms of?

25                   MR. RICHEY:  Putting it on the screen.

8:18AM 1        THE COURT:  You can put the indictment on the screen,

2    if you feel you need to.

3        MR. RICHEY:  Thank you.

4        THE COURT:  All right.  Let me make sure I have these

5    in order.

6        What you are going to be handed is a copy of the

7    instructions with two separate verdict forms, one for each

8    defendant.  The language that we discussed last evening

9    regarding Count 58 and the statute of limitation question and

10   the timing, that language is in the instruction itself.  It is

11   not on the verdict form, need not be on the verdict form,

12   because the language in the instruction tells the jury that if

13   they find the most recent act -- is there something?

14        THE CLERK:  No.

15        THE COURT:  If they find that the most recent act

16   occurred before, I think it was 2000, July, maybe, 2000, then

17   they should find the defendant not guilty.  And so there is no

18   need to reference that on the verdict form.

19        After closing arguments have been completed, depending

20   on how long you require for closing arguments, I may take a

21   break, a short recess, or I may go straight into the

22   instructions.  It will just depend on whether I feel like the

23   jury needs a break before the instructions.

24        After I've delivered the instructions and the jurors

25   are excused to the jury room, the alternates are excused, I'm

8:21AM 1  then going to ask the attorneys to join with the clerk in

2  ensuring that all of the evidence is here and available and

3  properly maintained before it's taken to the jury.  So I want

4  you to assist her with that in making sure that's all taken

5  care of.

6         And then I'll ask you to remain here at the courthouse

7  for approximately 20 minutes or so.  Sometimes the jury comes

8  back with a question or something right off the bat.  So I'll

9  ask you to remain here for about 20 minutes.  If we don't hear

10  anything from the jury within that 20 minutes, then I will

11  allow you to go about your business as long as you can get back

12  to the courthouse within five minutes or so, five or ten

13  minutes max.  Of course, we'll need to make sure we have a way

14  of contacting you.

15         I'm going to step off the bench.  The jury will be

16  brought in at 8:30, and we'll begin at that time with the

17  closings.

18         (Jury present.)

19         THE COURT:  It feels a little cool this morning.  We

20  had an issue during the evening with our chiller, something

21  with the HVAC system.  I believe they are hard at work trying

22  to correct it, and I do apologize if it's uncomfortably cool in

23  the courtroom this morning, but it should keep you all awake.

24         Ladies and gentlemen, the attorneys are now ready to

25  present their closing arguments to you.  This is an opportunity

8:33AM 1    for the attorneys to summarize for you the evidence that has

2    been presented during the trial and to present to you their

3    respective positions or their arguments about that evidence.

4           Remember, as I told you at the beginning of the trial,

5    nothing that the attorneys have said during the trial,

6    including what they will say during closing arguments, is

7    evidence in the trial.  However, this is a very important part

8    of the trial process.  And for that reason, I do ask for your

9    careful attention to the attorneys and the arguments that they

10   present to you this morning.  All right.

11          Ms. Heldmyer, you may start.

12          MS. HELDMYER:  Thank you, Your Honor.  Counsel.

13          Good morning, ladies and gentlemen.  On behalf of

14   Special Agent Schneider and Special Agent Evans and myself, I

15   want to thank you for all the kind attention that you have

16   given us in the past couple of weeks.  I know that part of it

17   has been tedious, but you have been paying attention, and we

18   truly appreciate all of the attention that you have given us.

19          When we started this trial a few weeks ago, the

20   defendants walked into this courtroom with a presumption of

21   innocence.  That presumption of innocence is now gone.  The

22   United States has established beyond a reasonable doubt that

23   these defendants, both Jo Hovind and Kent Hovind, are guilty of

24   what they have been indicted for.  And what we want to do in

25   the course of this closing argument is to explain to you

8:34AM  1  exactly how we were able to prove to you during the course of

2  the two weeks of evidence that they were in fact guilty.

3  We don't come into this courtroom with no direction at

4  all, the government.  As a matter of fact, the courts and

5  Congress tell us exactly what we have to prove to you in order

6  for you to find them guilty.  These particular things that we

7  have to come in and prove are called elements.

8  Each of the elements is going to be given to you

9  specifically by the Court, but I happen to know what she's

10  going to tell you, or believe that I know what she's going to

11  tell you, and I want to give these to you at this point and

12  then explain to you how the evidence in this trial matched up

13  with each of the elements that the Court is going to tell you

14  that we had to prove in order to show you that we have in fact

15  sustained our burden.  We have proved everyone of these

16  elements beyond a reasonable doubt.  We do not have to prove

17  anything that is not an element that's listed by the Court at

18  the end of the trial.  So if it is not told to you that we have

19  to prove it, we do not have to prove it.

20  This is what we have to prove.  Now, you've been told

21  that there are basically three parts of this indictment.  Part

22  one charges the employment tax issue.  That's Title 26, United

23  States Code, Section 7202.  That's the first 12 counts of this

24  indictment.  And in order for the government to prove that the

25  defendant, Kent Hovind, who is charged in those counts, is

8:35AM
1    guilty of failing to withhold the employment tax, this is what
2    we have to prove to you:  We have to prove that he had a duty
3    to withhold, basically, the income tax, the Social Security tax
4    and the Medicare tax.  That duty arises, as the Court will tell
5    you, based upon the fact that he had an employee-employer
6    relationship with those who were employed and working at CSE.
7    We have to prove that he failed to collect those taxes or pay
8    them over or account for them as a result as having that duty,
9    that he just failed to turn them over.  That's not an issue
10   here because we know from the records that came in from the IRS
11   that he has never filed a section -- I'm sorry -- a Form 941,
12   has never paid employment tax ever.  So that's not a an issue.
13   We have to prove the defendant acted willfully, and that is,
14   with the specific intent to do something that the law
15   prohibits, and we're going to go through the evidence and show
16   you exactly how we were able to show that, that in fact, his
17   whatever belief that he may have with regard to the employment
18   tax issue, it is not a sincerely held belief.  It is not a
19   belief held in good faith.
20          The second set of charges that we have in this
21   indictment are the evading the CTR requirements.  Those are the
22   next 45 counts, Counts 13 through 57.  Both of the defendants
23   are charged in this set of counts in the indictment, and here's
24   what we have to prove in order to show that both of these
25   defendants are guilty individually of each of those 45 counts

8:37AM 1  in the indictment:  We have to prove that they had knowledge of

2  the currency transaction reporting requirement, and we have to

3  show that they knowingly structured or assisted each other in

4  structuring that transaction, those transactions, individually

5  as charged in the indictment, that the purpose of structuring

6  those transactions was to evade the currency transaction

7  reporting requirements and that it involved a domestic

8  financial institution.  That again, is not an issue.  They are

9  all involving AmSouth Bank, and the AmSouth Bank employee

10  testified for you.

11        We're going to go through a little bit of what the

12  witnesses individually testified for you, but before I do that,

13  I want to point out a couple of things we did during the trial

14  to assist you in determining what evidence helps you in finding

15  them guilty of what particular element.  One of the things that

16  we did is when we were numbering these exhibits, we numbered

17  them based upon a system.  You will notice during the trial

18  that all of the exhibits started with some sort of prefix.  We

19  had OBS documents.  We had STR documents, we had TR documents

20  and we had INC documents.  Those are an indication to you that

21  we believed when we introduced those documents that those were

22  the elements of the crime that those particular documents or

23  that particular evidence would assist you in determining -- OBS

24  stands for obstruction.  STR stands for structuring.  PR stands

25  for payroll, and INC stands for income.  So you can take a look

8:38AM

1    at the documents when you're deliberating back in the jury

2    room, and you can tell by the sticker at least what we believed

3    that that particular evidence would help you determine in terms

4    of our elements of proof and what we had to show to you.

5            Ladies and gentlemen, the other thing that we did was

6    we called witnesses and the witnesses testified to you, and

7    this has been a couple three weeks ago now that we started

8    doing this, so I want to give you a little reminder of the

9    kinds of the things that I believe help you in making your

10   determination that we have overcome our burden and proof that

11   the defendants are guilty.

12           The first witness that testified for you and you may

13   recall is a man by the name of Brian Popp.  Brian Popp had an

14   overview of CSE.  Do you remember he's the one that started way

15   back when.  He started with CSE all the way back to the early

16   '90s and worked all the way through until he basically got

17   disgusted with Kent Hovind's nonchalant attitude towards the

18   payment of taxes, et cetera, and he finally left.  There were

19   some very important things that he established for us during

20   the course of this trial, which is not the least important of

21   which was the fact that there was an employer-employee

22   relationship going on at CSE.  You'll recall that he testified

23   that this was a growing business, that this started small in

24   the early '90s and it grew, and it grew, and it grew.  And you

25   saw from the numbers, from all the exhibits that we've entered

8:40AM

1    into evidence, all the charts that Mr. and Mrs. Hovind created

2    that it was, in fact, a growing business, that they were

3    growing all the way up to bringing in $2 million a year.  This

4    was a big money-making business.  That cash, by the way, the

5    cash that was reported on those particular exhibits, on the

6    charts and the evidence that you saw, more than likely does not

7    include any of the cash that Mr. Hovind walked away from his

8    lectures with.  You'll recall that he took in cash.  He took in

9    some cash from the honorarium, from the love offerings.  He

10   took in cash from the sales of the books.  There is an awful

11   lot of cash that you can certainly deduce from the evidence

12   that was not included in any of the reporting, in any of the

13   charts, in any of the financial statements that the agents came

14   up with during the course of this trial.  But in any event, we

15   have what we have.  And what we do have is that this was an

16   immense business, this grew into an immense business making a

17   lot of money.

18         The fact that there was employees was established in a

19   number of ways, not the least of which were Mr. Hovind's own

20   words.  You will notice that there was a document that was

21   entered into evidence that showed specifically that Mr. Hovind

22   himself called his employees, employees.  That document is on

23   the screen for you.  That is a document that was introduced

24   into evidence and created specifically for the employees of CSE

25   by Mr. Hovind.  He called them employees, and he did that until

8:41AM   1    it became obvious to him through all of his anti-tax,

2    anti-government activities that this might be a problem for him

3    because if he called them employees, then he was going to have

4    to start withholding and paying taxes, and he certainly was

5    aware of the obligations because -- for a number of reasons.

6    You saw that he had the Internal Revenue Code in his office.

7    Brian Popp testified to that.  And you heard from all of the

8    witnesses that he specifically told them I'm not going to

9    withhold anything from your wages.  He knew specifically that

10    there was a requirement for him to withhold.  He chose to

11    ignore it, and that's what the evidence in this trial has

12    established during the course of this trial.

13              There were several sources of income for CSE.  You saw

14    that there was a lecture circuit.  There was the immense sales.

15    Eventually there was Dinasaur Adventure Land.  They were even

16    collecting rents as they were buying this property and

17    accumulating all this property all around Dinasaur Adventure

18    Land.  They were renting it out.  They were collecting rent.

19    You saw documents, several documents, that indicated that they

20    were taking in sometimes as much as $500 a month per property

21    that they were renting out that was coming to them without them

22    paying taxes on it.  And of course, that does not enter into

23    any argument about employment taxes, but it does show you that

24    there was money out there.  There was a general attitude by

25    Mr. Hovind that he was exempt from the tax laws just because he

8:43AM 1    didn't want to pay.  It wasn't because he had any kind of

2    sincere belief that he was exempt from the tax laws.  It's

3    because he didn't want to pay.  We're going to continue and

4    show you how we know that was the reason why he didn't pay into

5    the Social Security, Medicare system or withhold income taxes.

6         You remember one of the important things that you

7    heard during the course of this trial is Brian Popp's testimony

8    that he had a conversation in 1998 with Kent Hovind about

9    currency transaction reports specifically, specifically.  And

10   Brian Popp said that Kent Hovind said that they were bad

11   things.  They were bad things.  He knew.  He knew as early as

12   1998, which predates any of the charges in this indictment that

13   there was a requirement that CTRs be filed, and he didn't like

14   them.  He was going to do what he could to ever have a CTR

15   filed.  That's what Brian Popp established for you.

16        Another thing that he testified to was that Kent

17   Hovind was bragging about the fact that he was fighting the

18   IRS, that he was beating the IRS, that he had a nonchalant

19   arrogant attitude towards the IRS, and that he was always going

20   to be on the offensive.  Now, that's a piece of evidence that

21   goes specifically to Count 58, which is the obstructing and

22   impeding the IRS.  All of those lawsuits, all of the

23   information that you heard, all of the evidence that you saw

24   where he was filing hundreds and hundreds of FOIA requests,

25   where he was filing lawsuit after lawsuits, where he was suing

8:44AM 1   the agents and everybody involved and just generally

2   litigating; that that was all part of an overall plan he had to

3   stay on the offensive.  And Brian Popp is not the only one who

4   told you that.  Mr. Gibbs also told you that when he had a

5   conversation back in 2004.  He was still on the offensive.  He

6   was still saying I'm after them.  They won't be after me

7   because I'm after them.  That is obstructive behavior, knowing

8   obstructive behavior.

9           The next witness that testified for you was Diane

10  Cooksey.  Diane Cooksey, too, did her part in establishing the

11  employer-employee relationship.  She had set hours.  She had

12  bonuses.  We saw the time clock.  The time clock is something

13  that was installed, and that is not something that is installed

14  for volunteers or missionaries.  That's something that happens

15  when you have a employer-employee relationship with your

16  workforce.

17          You also -- she also established for you, along with

18  some of the other people that testified that worked for

19  Mr. Hovind, that Mr. Hovind was in charge.  They weren't over

20  there at CSE or Dinasaur Adventure Land doing whatever they

21  wanted to do.  They were taking instruction from Mr. Hovind.

22  And the judge is going to tell you that that's one of the ways

23  that you can tell that there was an employer-employee

24  relationship.

25          You probably are familiar with independent

8:46AM 1   contractors.  An independent contractor is like someone that

2   you hire to come and fix your air conditioning system, because

3   he doesn't work for you.  He works independent.  He's got his

4   own business.  He comes and he does the work.  You don't stand

5   over him and tell him what to do.  You don't say, this wire

6   needs to be connected here and here's the problem.  That's not

7   what you hire him to do.  You hire him because he's got

8   expertise.  That's not the case at CSE.  This was a standard

9   run of the mill employer-employee relationship where they had a

10   structure.  They had a hierarchy.  Mr. Hovind called the shots.

11   They had supervisors.  You saw memo after memo after memo from

12   Mr. Hovind telling these people what to do.  You come to work

13   on time.  I'm going to dock you ten bucks because you were on

14   the phone too long.  Those are the things that employers and

15   employees do.  So that's how you know that he had a duty to

16   collect.  If he was an employer to their employee relationship,

17   then he had a duty to collect, account for, and pay over

18   withheld income tax, Social Security, and FICA.  It's that

19   simple.  The church doesn't enter into it.  There is absolutely

20   no relevance to whether or not CSE was a church.  You may find

21   that they were or you may find that they weren't.  It doesn't

22   matter.  It makes no difference whatsoever.  If that

23   relationship existed, then he had an obligation.  He had a duty

24   to collect, account for, and turn over, and he did not do that.

25            Another thing that Diane Cooksey told us about was,

8:47AM
1    you remember, the non-closure agreement, and you probably

2    remember that there were a number of documents and a number of

3    things that came in where Mr. Hovind was saying, show me.  Tell

4    me.  I'll cooperate with you.  Anything you want, we'll give it

5    to you.  That is ridiculous.  This is a man who, after the

6    search warrant, forced his employees to sign what's called a

7    non-closure agreement, and you'll see that agreement when you

8    get back to the jury room.  But that agreement forbids these

9    witnesses, his employees, from talking to people like Special

10   Agent Schneider and Special Agent Evans.  They were forbidden

11   from doing that, and it was a condition of their employment

12   that they sign a non-disclosure agreement before they could --

13   to continue working at CSE.  Now, how open and honest is that,

14   that he won't even let his own employees talk to the IRS or to

15   anybody else?

16           And you saw another memo that showed specifically that

17   he is telling Special Agent Schneider, you don't talk to

18   anybody here.  You go through me.  How open and honest is that?

19   How obstructionist is that?  That's exactly what that was

20   designed to do, was to obstruct the investigation.  And you saw

21   that Diane Cooksey, who was a very sweet woman, and who still

22   has a lot of respect for Mr. Hovind, obviously, called him a

23   brilliant man.  And she was scared, she said, even today to

24   testify to you under oath because Mr. Hovind forced her to sign

25   the non-disclosure agreement.  Even today she was influenced by

8:49AM 1    that non-disclosure agreement.  That's obstruction.

2           The next witness that testified before you was the

3    revenue officer, Margaret Powe.  Margaret Powe was the one, as

4    you recall, who was assigned the Hovind matter in the mid '90s,

5    who seized the cars, and did a jeopardy assessment because of

6    fear that Mr. Hovind was putting property and income beyond the

7    reach of the IRS.  He owed the money.  And she comes and does

8    her job and tries to recoup some funds for the United States

9    Government on behalf of taxpayers to collect in some way, in

10   some small way, the immense amount of taxes that Mr. Hovind had

11   accrued by that time.  And one of the things that she did was,

12   of course, she took the cars, and she was well within her right

13   to do that.  She established that for you.

14          What did Mr. Hovind do when she did that, when she

15   came and took the cars?  Filed a lawsuit against her,

16   personally, as a matter of fact, filed numerous lawsuits

17   against Special Agent Powe over and over and over again.  And

18   you may recall that there was not one single litigation, not

19   one single lawsuit that was in the least bit successful, all

20   the way back, all the way back to the early 1990s when he

21   started all of this litigation.  He lost every single battle,

22   and he was told specifically over and over and over again by

23   the courts, by his peers, everyone, that what he was doing was

24   wrong, but he continued to do it and that is strong evidence,

25   ladies and gentlemen, that whatever belief that he had, it was

8:51AM 1    not sincere, and it was not in good faith, because he was told

2    over and over and over again that what he was doing was wrong.

3    Yet, he continued to do it.  And why?  We know why because he

4    told Brian Popp why and he told David Gibbs why.  He was

5    staying on the offensive, and he was trying to get IRS to leave

6    him alone so that he just go along and not pay his taxes.

7          Eventually, in order to try -- specifically, in order

8    to try to get these vehicles back, Mr. Hovind filed bankruptcy.

9    In 1996 he filed a bankruptcy petition, and the only reason, as

10    has been established, the only reason why he did that was to

11    try to thwart, to obstruct, to impede the IRS's ability to

12    collect the taxes that Ms. Powe was trying to collect.

13          Mr. Beard testified for you.  He was the expert in

14    bankruptcy that testified for you.  He was the one that

15    actually handled -- he wasn't qualified as an expert.  He was

16    the one that actually handled this particular bankruptcy.  And

17    what he told was that there was insincerity.  There was bad

18    faith, and there was flat out perjury by Mr. Hovind during the

19    course of that bankruptcy.  What he testified for you was that

20    Mr. Hovind filed an application for bankruptcy.  And he

21    showed -- he, under oath, he told a judge, a federal District

22    court judge, that he had no assets, no income, no Social

23    Security number.  And remember what the bankruptcy court said.

24    He was a minister of the gospel, that he had no income and that

25    he answered only to Jesus Christ.  That's what he put on his

8:52AM 1    application.  That was a lie.

2          We have established through the course of this trial

3    that he had a lot of income.  He had income all the way through

4    this and that this was a bad faith filing.  And, in fact, the

5    bankruptcy court made a specific finding that the evidence

6    presented at the hearing points to a clear portrait of a tax

7    protestor.  Now keep in mind that this was all the way back in

8    1996 that Mr. Hovind is specifically being found to be and

9    being told that he is a tax protester whose sole purpose in

10   seeking relief under Chapter 13 was obtain the release of

11   property seized by the IRS.  And the judge goes on to say,

12   notwithstanding the debtor's listing under the penalty of

13   perjury in his schedules and statement of affairs that he has

14   no income, no expenses, no property.  The evidence shows

15   otherwise.  The court found him to have lied.  And it says

16   while in his correspondence to the IRS, he denies being a tax

17   protester, and the evidence overwhelmingly establishes

18   otherwise.  His bankruptcy court filing was thrown out of court

19   for bad faith, bad faith, back in 1996.  Did that thwart him at

20   all?  Did that convince Mr. Hovind that what he was doing was

21   wrong, that perhaps he ought to pay his taxes?  Apparently not,

22   because it didn't change a thing that he did.  He went on.  He

23   went on with an insincere attitude towards the IRS.

24          The next witness that testified for you was Rebecca

25   Horton.  Mrs. Horton was part of the Pensacola Christian

8:54AM

1  College Community, and she testified that she had a

2  conversation, and we're still back in the 1990s, about 1997,

3  early 1997.  Rebecca Horton had a conversation with Mr. Hovind,

4  and if the court, the bankruptcy court in 1996 had not

5  convinced him from a legal standpoint that he was wrong,

6  Mrs. Horton was there to try to convince him from a spiritual

7  standpoint that he was wrong.  Mrs. Horton specifically told

8  him what you are doing is again the scriptures.  She knew that

9  he wasn't withholding taxes.  That was part of what she

10  testified to, that she had had a conversation with Adele.

11  Remember Adele was the name of the employee, that she advised

12  stopped working there because these aren't gifts.  This is

13  income to you.  You're going to get in trouble if you continue

14  to work at CSE.  This is going to cause you trouble because

15  he's going to be in trouble because of his attitude towards

16  taxes, and that attitude involved the way that he was handling

17  his employer-employee relationship, that he was calling his

18  payments to his employees love gifts.  And she said, that's not

19  what love offerings are, and I told him that.

20      So now by 1997, Mr. Hovind has two very influential

21  strong people from different realms, different sides of the

22  fence, telling him what he is doing is wrong, the court system

23  and the spiritual community, telling him what he is doing is

24  wrong.  Did that stop him?  No.  No.  What it did was cause him

25  to change the form of what he was doing.  That's all he ever

8:56AM 1   did was change the form.  We go from Faith Baptist Fellowship,

2   I'm going to get into this in a minute, but Faith Baptist

3   Fellowship, this corporation sole.  He's just trying to change

4   the form.  It was not a sincere belief.  He just didn't want to

5   pay his taxes.

6          Dan Nelson was our next witness who testified.  He was

7   yet another employee.  He had a little twist in what he

8   testified about.  He was told by Mr. Hovind and Mr. Hovind's

9   associate, Mr. John Slobach, that that the way they were going

10  to avert paying taxes was to pay him by way of trust, that he

11  was advised by Mr. Hovind that if he put his money in a trust

12  and then use that trust to pay his bills that it wasn't

13  taxable.  And, of course, that is wrong.  You can't just set up

14  a trust and then have complete control over the trust and use

15  that trust to pay your bills and not pay taxes on it.  It's

16  income to you.  It's a trick.  It's another trick by Mr. Hovind

17  and he sucked Dan Nelson into it.  Dan Nelson did not pay taxes

18  on that money because what Mr. Hovind and Mr. Slobach told him.

19         Mr. Nelson gave us a little further insight into the

20  relationship of Mrs. Hovind with regard also to CSE.  We have

21  established through the documents and through the witnesses

22  that Mrs. Hovind also had a role to play with CSE, that she was

23  in charge of the money, that she was in charge of the finances.

24  And that is borne out in all the evidence that you've seen and

25  all the checks that were written by her and all the cash that

8:57AM 1   were going to get into in a minute that was pulled out of the

2   bank by Mrs. Hovind.  Mr. Nelson testified that Jo Hovind was

3   second in charge and she was handling the money.  That was her

4   job, and that was all borne out by the evidence.

5          You remember the videotape that Rebecca Horton

6   testified about.  The videotape was the videotape that alerted

7   Mrs. Horton that there was a problem at CSE, which led to her

8   the concluding that none of her students should work there.

9          Dan Nelson testified that he witnessed such a tape

10  being created there at CSE.  So for whatever reason, for

11  whatever purpose CSE was created, I imagine from the

12  creationist's viewpoint, this is something that occurred on the

13  premises that was specifically not related to creationism, to

14  the very purpose that Mr. Hovind claims to have created this

15  business.  And admittedly, most of the business that occurred

16  there had to do with creation versus evolution.  This is

17  something different.  This something that was anti-tax and

18  anti-government that Mr. Hovind produced right there on the

19  premises.  What does that tell you?  That tells you that his

20  belief, again, is insincere, whatever belief that he claims to

21  have that caused him not to pay his taxes, to not withhold

22  income taxes and FICA taxes from his employees, is an insincere

23  belief.  It is based on his underlying tax protestor attitude,

24  anti-government, anti-tax.  He just doesn't want to

25  participate, even though he knows the law requires him to do

8:59AM 1  so.  Nobody likes to pay taxes.  Nobody likes to pay taxes, but

2  we do, because it's the law.  And he is not above the law.

3          Darlene Porter came in and testified to you about a

4  transaction that occurred.  She sold the piece of property, you

5  remember, the 5720 property that she sold specifically to

6  Mr. and Mrs. Hovind.  The interesting part about her testimony

7  was this -- she negotiated for the final purchase price of

8  $155,000, I believe.  What was interesting about her testimony

9  is that she said unsolicited by her, Kent Hovind came to her

10  and gave her a down payment, basically, partial payment of the

11  property, and that ultimately, that money, that $30,000 that

12  she got ahead of time was not included in the closing document.

13  That was taken off the top, basically, so that it appears as if

14  when the property was sold, it appears that the property is

15  sold for $125,000 instead of $155,000.  That's just dishonest

16  because what that leads to is lower dock stamps and, et cetera,

17  and it's just dishonest to represent that that property was

18  purchased for $125,000.  But more importantly than that, that

19  $30,000 that was paid, it was paid -- and this is how they did

20  it.  Jo Hovind wrote a check to the bank, not to Darlene

21  Porter, which she could have, but she wrote a check to the bank

22  for cash -- I'm sorry -- to AmSouth.  She cashes that check and

23  buys with it four cashier's checks, four cashier's checks, not

24  one cashier's check for $30,000, four cashier's checks, three

25  of them for $9,000, one of them for $3,000.  Why did she do

9:01AM 1  that?  What logical reason could she have for, "A," just

2  handing a $30,000 check to Darlene Porter or, "B," if she

3  prefers cashier's check, going to the bank and buying a $30,000

4  cashier's check?  Because of the $10,000 rule that was in her

5  head, because she knew, as did Mr. Hovind, that there was a

6  rule regarding $10,000.  And so what they did was they broke

7  that $30,000 up so that there was not one single instrument

8  that she was taking to Darlene Porter that exceeded $10,000.

9          Now, that would not have triggered a CTR anyway

10  because it wasn't a cash transaction.  She may or may not have

11  known that, but what this shows you is an overall attitude, an

12  overall knowledge and intent on the part of Jo Hovind and on

13  the part of Kent Hovind to -- that they were mindful of that

14  $10,000 requirement, and all of their transactions, and we'll

15  see the hundreds of transactions that occurred after that, all

16  of which were under $10,000.  This shows you that knowledge and

17  the intent on Jo Hovind's part regarding that $10,000 limit,

18  and they were very mindful of that.

19          You'll recall that Glen Stoll, who was Remedies at

20  Law, the organization that Mr. Hovind associated with there in

21  the later years, there was a memo that we introduced to you

22  where Remedies at Law actually wrote a memo, told Kent Hovind

23  and Jo Hovind and all of CSE, you tell us before you do

24  anything over $10,000.  Now, why would Glen Stoll advise the

25  Hovinds not to do any transactions over $10,000 without

9:03AM  1   notifying them, without running it through them?  Because

2   everybody here involved was mindful of that $10,000 reporting

3   requirement.

4          You remember the testimony that $10,000 was, in fact,

5   the triggering amount with regard to CTR.  What is a CTR?  It

6   is a report to the who?  To the IRS.  CTRs go to the IRS.  And

7   if you don't want the IRS to know that you're doing cash

8   transactions, then what do you do?  You do not do -- you do not

9   do anything that's going to create a requirement that a CTR

10   must be filed.  They go to the IRS.  That's the whole -- the

11   whole purpose behind 45 counts of the indictment, to prevent

12   the IRS from knowing that they are doing cash transactions, and

13   this was evidence of that.

14          Pastor Tom Pope was our next witness.  Remember Pastor

15   Pope was the person who ran for, I think, it was about a year,

16   Dinasaur Adventure Land, and he was one of the people that

17   created those charts involving Dinasaur Adventure Land, report

18   to Mr. Hovind, the financial situation, the financial condition

19   of Dinasaur Adventure Land.  And of course, Mr. Hovind was very

20   concerned about how much money Dinasaur Adventure Land was

21   making.  He indicated that by the time he got there, which was

22   2003, I believe, that Kent Hovind told him that his pay was a

23   love gift, that he was not going to withhold taxes from his

24   love gifts.  You remember that Tom Pope disagreed with that and

25   said he was an employee.  Now, these are people who were coming

9:05AM 1    in at regular hours, again, using a time clock.  He was

2    promoted to supervisor.  This was employee structure.  He knew

3    that wasn't right.  As a matter of fact, he went ahead and he

4    paid the taxes.  He paid the taxes, not only his own taxes, but

5    he also paid what Kent Hovind was supposed to pay, because you

6    recall that when we're talking about Social Security and

7    Medicare withholding, there is supposed to be basically a

8    matching fund.  The employee pays half of it and the employer

9    pays half of it and then it's turned over to the government.

10   They match the funds, 6.45 percent from Social Security comes

11   from the employee, 6.45 percent comes from the employer, and

12   Medicare, 1.45 percent comes from the employee and 1.45 comes

13   from the employer.  Mr. Hovind failed to pay the employer's

14   share.  And when he does that, that triggers a responsibility

15   on the part of the employee.

16          MR. RICHEY:  Objection, Your Honor.  There is no

17   evidence as to this.

18          THE COURT:  Overruled.

19          MS. HELDMYER:  That triggers the responsibility on the

20   part of the employee to pay it, and that's what Tom Pope

21   testified that he did.  He paid all those taxes.

22          You'll recall specifically as regards to Dinasaur

23   Adventure Land, that this was a theme park of some sort that

24   had specific prices to get in.  These were not donations.

25   These were not, you know, you can come in and there is a little

9:06AM 1    donation box on the side like some of the public museums.

2    That's not what it was at all.  You have to pay to get in.  One

3    of the ways we know that is because there was a sign when you

4    come into Dinasaur Adventure Land, and Tom Pope showed you

5    that.  Yes, it costs money.  It's $7 for the park admission.

6    It's $100 for birthday parties.  Was there some exceptions to

7    that?  Yes.  This was not a donation.  These were prices that

8    you had to pay to get in.  If you want a birthday party, you

9    pay $100.  Did some people get in for free?  I'm sure they did,

10   but that's not the point.  The point is this was designed to

11   make money, and that's what it did.  It made money.  They sold

12   food.  They sold novelty toys.  All of those things are

13   indicative of a business.

14           One of the things also that Tom Pope testified to was

15   that he did work, this was interesting, when he testified that

16   he did work for the business, but he did it to the benefit

17   personally of the Hovinds.  You'll recall he was being paid

18   through CSE, but there was an occasion where he was, while he

19   was being paid for the work that he was doing for CSE, he did

20   personal work on a deck.  He testified that he helped build a

21   deck for one of the Hovinds' children on their own personal

22   residence.  It had nothing to do with CSE, but it was all

23   commingled.  They were benefiting personally.  The Hovinds were

24   benefiting personally from the work that Tom Pope and others

25   were doing there at CSE, even though they were being paid

9:08AM 1  through CSE.

2       All right.  Anne Dyson, we talked a little bit about

3  Anne Dyson and the CTR.  She's the one from AmSouth Bank that

4  explained to you.  First of all, they are a domestic financial

5  institution, which is one of the requirements that we have to

6  prove.  But she also testified about CTRs.  They are reports

7  that have to be filed with the IRS.  Eventually, they go to the

8  IRS for any transaction, for currency, cash, more than $10,000.

9  And that's in a 24-hour banking period.  Interestingly enough,

10  she also said that posted throughout AmSouth Bank are notices

11  that there is a 2:00 p.m. cutoff, that that's a business day.

12  That's typical for a banking day.  There is a 2:00 p.m. cutoff,

13  that any transactions that occur before 2:00 p.m. are counted

14  on that business day.  Anything that happens after 2:00 p.m.

15  are counted as transactions the following business day.  But

16  she also says in the case of CTRs and cash transactions, at the

17  end of the day, they get a report, and if they see something,

18  even though it may have straddled that 2:00 p.m. time, if they

19  say something that should have triggered a CTR, they may go

20  ahead and file one anyway.  That's what happened here, which

21  you're going to see in just a moment.  She also said that on a

22  regular basis, the bank employees inform their customers when a

23  CTR is being filed.

24       Pastor Fox was our next witness.  And Pastor Fox was

25  one of the people that hired -- or that invited -- their church

9:09AM 1    invited Kent Hovind to do a speaking engagement at his church

2    in Indiana.  You'll recall significantly that there was an

3    argument that ensued because Pastor Fox decided to withhold

4    income tax from the honorarium that was being paid by his

5    church to Mr. Hovind and that there was a tremendous battle

6    back and forth after he did this.  Mr. Hovind objected

7    vehemently to any taxes being withheld.  Although Pastor Fox

8    knew that he was correct, he eventually after eleven months

9    decided to go ahead and wash their hands of Mr. Hovind and go

10   ahead and pay.  You saw that there was evidence that other

11   churches had done that, too.  We introduced evidence of other

12   1099s that we took from Mr. Hovind's possession during the

13   search warrant that you saw where other churches had done that,

14   too.  They withheld.  There was even the church of Satsuma.

15   You'll recall there was a letter to the IRS that Mr. Hovind was

16   copied on that was a very significant letter where they were

17   saying, please, we've tried our best to get Mr. Hovind to do

18   the right thing.  He won't do it.  We're doing the best we can.

19   We've decided to go ahead and pay them, and here's the evidence

20   that what we did was correct.  So there was an ongoing battle,

21   obviously.  Mr. Hovind didn't want one penny taken out of his

22   honorarium to go to taxes, period, because he didn't want to

23   pay them.

24           David Gibbs was the next witness that testified.

25   David Gibbs was the one -- he is the Christian organization

9:11AM

1   attorney that had the conversation with Mr. Hovind, and he was

2   quite educated in the matters involved in this trial, and he

3   had this conversation in 2004 right after the hurricane of 2004

4   had a conversation with Mr. Hovind significantly about this

5   conversation.  Mr. Hovind told him some things about the way

6   that he had been operating his business for the past several

7   years.  He said that he uses cash only because cash can't be

8   traced, that if you can't trace it, it's not taxable.  Now,

9   what kind of good faith belief is that, that he's using cash

10  just so it won't be traced just so the IRS won't know about his

11  transactions?  He compared himself to the Vatican, or the

12  Embassy, in not paying taxes.  Whether they pay taxes or not, I

13  don't know.  But he compared himself to that.  He said the tax

14  code doesn't apply to him.

15          Mr. Gibbs told him he was wrong.  Mr. Gibbs told him

16  that you're not a church, that you have a responsibility.  You

17  have to withhold.  The IRS does not care whether your income is

18  with love or without.  You still have to pay.  You still have

19  to withhold.  He's telling him this.  And Mr. Hovind is the one

20  that sought out his advice because Mr. Gibbs is the foremost

21  attorney authority in this issue, yet, he wouldn't listen to

22  Mr. Gibbs.  What does that show you that his belief was in fact

23  held in bad faith?  It was not a sincere belief.  Because here

24  again is yet another authority.  The courts have told him.

25  Rebecca Horton has told him.  The IRS told him.  And yet,

9:13AM 1    here's another authority telling him he's got to withhold.

2    He's got to pay taxes.  Mr. Gibbs, very significantly, even

3    offered to help him structure his business so that he would be

4    obeying the law.  Here's a man offering his assistance,

5    offering his assistance to Mr. Hovind to legally structure his

6    business and he refused.  What does that tell you?  That his

7    belief was not held in good faith.  The people that he chose to

8    believe, the people that he chose to follow are people who are

9    under indictment, people who had injunctions filed against

10   them, not one local attorney, not one local CPA is there any

11   evidence that he asks whether he has to withhold or pay taxes,

12   not one.  He sought out the people who agreed with him only,

13   not the people who knew better like Mr. Gibbs.

14        And very significantly, there was another conversation

15   that Mr. Gibbs had with the people that Mr. Hovind is saying

16   that he's relying upon for advice and that's Glen Stoll.  What

17   did Glen Stoll tell David Gibbs on the phone?  Yeah, we know.

18   Oh, 90 percent of all the lawyers and all the CPAs in the

19   country agree with you.  But you know what, we're flying under

20   the radar.  We're flying under the IRS's radar.  Is that good

21   faith?  Mr. Gibbs says just because you can get away with it

22   doesn't make it right.  And that's what Mr. Hovind needs to

23   learn.  Just because you may be able to get away with it

24   doesn't make it right.

25        You saw that even after the conversations that

9:14AM 1    Mr. Gibbs had with Mr. Hovind, Mr. Hovind continued to lie

2    about the authority and his beliefs and how you know that is

3    because there was a series of affidavits that Mr. Hovind

4    provided to the grand jury.  Do you remember he found out that

5    the grand jury had been convened to investigate his tax

6    liabilities and his possible criminal liabilities.

7              In all of those letters, Special Agent Schneider

8    testified that there were a number of things that he was trying

9    to tell the grand jury to influence them that just simply were

10   not true.  One of the most significant things that he told the

11   grand jury that wasn't true was he said repeatedly that every

12   lawyer and every expert that he had consulted were basically

13   telling him that he was doing the right thing.  Was that true,

14   when he said that to the grand jury?  What about his

15   conversation with Mr. Gibbs?  What about all the judges that

16   have told him that what he was doing was wrong time after time

17   after time?  What about Mrs. Horton?  What about the IRS?  What

18   about all those authorities that told him repeatedly, all the

19   way up to 2005, that what he was doing was wrong?  That is bad

20   faith.  And that is purely lie, that he's telling -- trying to

21   tell the grand jury simply to try to get away with not paying

22   his taxes.

23             One of the things that you can take a look at to show

24   that his beliefs were not sincerely held was what he did in

25   reaction to what the IRS did.  You've heard testimony, and it's

9:16AM

1    been kind of scattered.  So we want to put it together for you.

2    You've heard testimony that he changed his corporate structure

3    on a number of occasions to try to avoid, try a new plan to try

4    to avoid paying his taxes.  The first thing that he did was

5    this Faith Baptist Fellowship, which isn't a church, doesn't

6    have a building, has no structure, and simply was designed by

7    anti-tax people to try to avoid paying taxes, period.  That was

8    the first thing that he tried.  And that kind of -- after the

9    several litigations, several things that occurred during the

10   course of the investigation.  He changed it in around 1999.  He

11   started with the unincorporated business trust, and you know

12   that from the corporate documents, by the way.  There are

13   several corporate documents.  I apologize if I'm in your way.

14   There are several corporate documents that indicated that he

15   incorporated and bought property under the name of an

16   unincorporated business trust organization, which doesn't

17   exist.  Then he changed the Faith Baptist Fellowship umbrella.

18   And when that didn't work, he then changed to the corporation

19   sole, which is the organization from Glen Stoll.  So if he had

20   a good faith belief, if he had a firmly held, sincerely held

21   belief, he would have held that belief in one structure that,

22   you know, the unincorporated business trust organization is it.

23   That's where my sincere belief is, and I'm going to stick with

24   that.  But he didn't do that.  He changed.  And every time that

25   somebody told him that what he was doing was wrong, all he did

9:18AM 1   was change the structure, changed the way that he was

2   organizing his business, changed the way that he was holding

3   property.  That's all he did.

4          You heard a lot of testimony during the course of the

5   trial, particularly in summary form from Special Agent

6   Schneider about property acquisitions, and this is important

7   because this is money -- the businesses -- the way that he was

8   holding the property, the names that he was using to hold the

9   property, very significant.  And you'll see the records if you

10  care to when you deliberate.  But another significant fact that

11  you can take from the property acquisition is all of the money,

12  all of the cash that was spent just to acquire property.  It's

13  about control with Mr. Hovind.  It's all about control.  And he

14  was buying himself the entire area out there.  That was his

15  goal.  You saw letters where he was trying to acquire property.

16  And you saw several property acquisitions totaling $649,000.

17  Most of it was in cash and most of it was paid for up front.

18  And anything that wasn't paid for up front, large payments were

19  made until it was paid for.  So this is all money that was

20  income to CSE that he was using for his own personal benefit to

21  buy property where he could rent it out, where he could give it

22  to his children, and he did give a lot of this to his children.

23  So it was all for the benefit of the Hovind family, and this is

24  all income, money that had come into CSE that could have been

25  used to pay employment taxes, among other things.

9:19AM 1          And we've been talking all the way through this about

2    whether or not Mr. Hovind's belief, whatever that belief might

3    be, is a sincerely held believe and the answer is affirmatively

4    no, that there is absolutely nothing sincere about anything

5    Mr. Hovind did in relation to taxes.

6          There are a number of things that you'll be able to

7    see when you're deliberating, starting with the bankruptcy

8    court ruling, going through the conversation with Mrs. Horton

9    talking about the letter he got from the IRS director,

10   significantly, a letter from Senator Bob Graham.  And you may

11   recall in redirection examination of Special Agent Schneider,

12   we went through the very letter, back in 1998, he got a letter

13   from Senator Graham, another authority, telling him to pay his

14   taxes.  And in that long piece of research that he provided,

15   that Senator Graham provided to Mr. Hovind back in 1998, it

16   cited specifically the Internal Revenue Service Code sections

17   that were applicable to him and the Supreme Court law,

18   legislative actions, everything that he could possibly want to

19   establish that he was liable for taxes, that he was within the

20   jurisdiction of the Internal Revenue Code, yet another

21   authority telling him that he was supposed to pay his taxes.

22         The Eleventh Circuit court of appeals specifically

23   held in 1999, I believe, that it was a taxpayer, called him a

24   taxpayer.  Had no effect on Mr. Hovind, none.

25         Senator Bill Nelson also wrote to Maury Adkins, who

9:21AM  1  was working at CSE, this letter was in the possession of

2  Mr. Hovind.  The fact that he continued to try to pigeon hole

3  his business in such strained analogies such as we're a church.

4  We're like the Vatican.  We're an unincorporated business

5  trust, when all this entire time he's avoiding the obvious.

6  He's even called his own employees at one point, but all he's

7  doing is trying to avoid and trying to evade the payment of his

8  taxes.

9          We also showed you through the documents and through

10  the evidence and through the summaries that he had the ability

11  to pay his taxes, because I would imagine that would be an

12  important aspect of your determination.  He most certainly had

13  the ability to pay his employment taxes.  You saw a running

14  bank balance from all of his accounts during the relevant

15  period of time.  You'll see that there were numerous times that

16  his bank balance exceeded $200,000.  That's just his bank

17  balance.  That doesn't include the assets that he had.  That

18  doesn't include the property that he had and that doesn't

19  include the cash that he may have acquired when he was on those

20  speaking engagements, which he said was two or 400 a year.

21  This is just the running bank balance that he could have drawn

22  from to pay his employment taxes.  He certainly had the ability

23  to pay.  Instead of doing that, what he was doing was, as we

24  said, acquiring real property.  He was also spending an awful

25  lot of money, he and Mrs. Hovind, on their children.  You saw

9:23AM  1    that there were numerous checks that were written to their

2    children and to their children's spouses.  There are a couple

3    of interesting points to make, in terms of the checks to the

4    children, these exhibits were introduced that show that instead

5    of just writing a check to the children, what Mrs. Hovind

6    chose, to write a check for cash, take it to the bank and then

7    buy cashier's check for her own children.  Now, why would you

8    do that?  The children wouldn't accept a check?  Probably not.

9    Again, to try to prevent anyone from detecting what the money

10   is being spent for.  That's the real reason why going through

11   this system of going to the bank and cashing checks and buying

12   cashier's check to avoid the paper trail.  Clearly there is a

13   paper trail because we've got these documents, but it was a lot

14   more difficult to show where that money was going than had the

15   check been written out to the children.  This is money that is

16   being funneled from the business of CSE directly for their

17   personal use and their personal benefit.  Keep in mind that

18   during this time Mr. Hovind is telling the grand jury in the

19   letters that he's writing to the grand jury that he has taken a

20   vow of poverty, a vow of poverty.  How could he possibly tell

21   the grand jury that he has taken a vow of poverty with the way

22   that he was living.

23            His children went to private schools.  They went to

24   Pensacola Christian College.  They went to a school up in

25   Tennessee.  The checks written for the tuition right off the

9:25AM 1  business checks.  These are business checks.  We didn't

2  introduce anything that had to do with the checks written on

3  the personal accounts.  These are the business accounts, and

4  they are paying these personal expenses out of the business

5  account, $25,000 for music expenses for music purchases through

6  Reynolds Music.  Mrs. Hovind is a piano teacher.  Clearly, that

7  doesn't have anything to do with CSE, but these a more

8  expenditures, more money that was being spent by the Hovinds

9  instead of paying their employment taxes, instead of paying

10  their share of Social Security and Medicare.  They are

11  benefiting personally.  There is no poverty here.

12       They had a lot of capital improvements going on.  You

13  saw several checks that show the capital improvements,

14  blacktopping and obviously the acquisition of the property and

15  automobile, and vehicle purchases.  You'll also see checks for

16  those, for their own personal use and possibly for the use of

17  the business, again, money that should have been used to pay

18  his employment taxes.

19       There is an allegation in Count 58 that Kent Hovind

20  acted to obstruct and impede the IRS.  We talked about that all

21  the way through this.  Again, there were several things that he

22  did, the lawsuits, Number One, the bad faith, five bankruptcy

23  filing, being on the offensive is evidence that all of this was

24  designed for a specific purpose.  He didn't care whether he won

25  or lost.  He was trying to tie up the IRS so they couldn't do

9:26AM

1    his case and might be scared away and not try to collect the

2    taxes.  Letters to the financial institutions, telling the

3    financial institutions not to honor the summonses that were

4    coming their way.  He filed a false TIGTA complaint saying that

5    Special Agent Schneider had stolen $42,000, when in fact he

6    knew that the search warrant itself specifically authorized

7    Special Agent Schneider to take, to seize cash as evidence.

8    And of course, all the letters to the grand jury were also all

9    acts to impede and obstruct the investigation.

10          Now, Mrs. Hovind as we said before has been charged

11   specifically in the 45 counts of evading the CTR requirements.

12   The evidence that came in throughout the trial that showed that

13   she is in fact guilty of these, that information stretched all

14   the way through the trial as well.

15          In summary, what we saw specifically was that she was

16   in charge of the finances of CSE.  That was her job.  That

17   during the course of her job there at CSE, she wrote over 200

18   checks to cash between 1999 and 2003.  Each and every one of

19   those checks was under $10,000.  The significant part of that

20   overall pattern is that it shows a knowledge on the part of Jo

21   Hovind that there was in fact a reporting requirement of

22   $10,000.  There is no other explanation for why she would

23   repeatedly go to the bank several times a week, sometimes more

24   than once in a day to cash checks under $10,000.  It's not like

25   that's all she had in the bank, that's all she could take out.

9:28AM 1    It's not like she couldn't have anticipated a need that she was

2    going to have in the future for more than $10,000, the only

3    reasonable explanation for having gone to the bank and pulled

4    out in one year over $500,000 in cash and each and every one of

5    those checks being under $10,000 is because of the knowledge of

6    the reporting requirements in an attempt to not -- to evade

7    that reporting requirement.  That is the only logical

8    explanation.  There was no pattern.  Other than the amount of

9    the checks, there is no pattern to the amounts of checks that

10   were being written.  It wasn't like she was going in every

11   third day.  It wasn't like she was going in only on paydays.

12   It wasn't like she was going in only when she had an expense

13   that she had to get.  These were obviously designed

14   specifically to get out a certain amount of money, but to get

15   it out in increments under $10,000.  The total checks that she

16   cashed was over $1.5 million between 1999 and 2003.

17          The four CTRs were filed with regard to her

18   specifically and not being accidentally triggered, and when I

19   say accidentally, what I mean is there is no way for her to

20   know that a CTR was going to be triggered because there were

21   times when she would go in with a $9,600 check, and then the

22   other employee, Maury Adkins, would come in and cash a larger,

23   another check, and push the whole amount, total amount, over

24   $10,000.  So what that's showing you is that those CTRs were

25   filed but not because she had any intent to make sure that they

9:30AM 1   were filed.  They happened accidentally -- they were filed

2   certainly intentionally by the bank but accidentally triggered

3   by her because of the checks to Maury Adkins.  But the ones --

4   she was involved in both of them.  Each and every one of those,

5   she was going to the bank twice in one day, but each and every

6   time she did that, she went before 2 o'clock and she went after

7   2 o'clock, and that is because, ladies and gentlemen, there is

8   a 2 o'clock cutoff in a banking day, and she knew that.  It was

9   posted.  So she would go before 2 o'clock and cash a check and

10  then wait until after 2 o'clock and cash another check

11  believing that no CTR would be filed because we're talking

12  about two different banking days.  On these particular

13  occasions at the end of the day, obviously, the bank caught it

14  and filed the CTR, but that's the only reason.  But it shows

15  again her knowledge, her knowledge, that the CTRs were required

16  for transactions over $10,000 and her attempt to evade having

17  any of those filed.

18         We also saw regarding her admitting only to show

19  knowledge and intent was a county filing that occurred well

20  before any of these structuring charges.  And what you'll see

21  when you see this back in the jury room is that this is classic

22  tax protester information.  This is her and her husband, Jo and

23  Kent Hovind, filing something with the county court rescinding

24  their signature, rescinding their Social Security number.  It's

25  pure tax protestor stuff.  They filed that prior to all this.

1   This shows her knowledge and intent that she was in fact not an

2   active member -- I wouldn't begin to argue that -- that she was

3   an active member of the tax protestor movement, but she

4   certainly was involved, and this shows that she had the same

5   mindset as her husband with regard to the power of the

6   government and their intent not to obey governmental rules,

7   particularly the IRS.

8        You'll see when you get the indictment that the

9   indictment has specifically charged in Counts 1 through 12,

10  which is the employment taxes charges, specifically charged

11  there are dollar figures, and the dollar figures represent the

12  total amount of money that should have been withheld in terms

13  of the income tax, the FICA taxes, from the employees.  Those

14  are the numbers.  That's what's charged, not withholding, and

15  those are the numbers that you're going to see in the

16  indictment.

17       We have put up here on the screen for you, the three

18  columns from the three exhibits that Special Agent Evans

19  testified about.  Those are the columns that are going to match

20  up to the 12 counts in Counts 1 through 12 of the indictment.

21  So when you see those, you will know where those figures came

22  from when you see the indictment and you're making your

23  decisions as to those counts.  Remember in 2002, Special Agent

24  Evans testified that he had the total amount from the year

25  correct, and he calculated backwards from there and then later

9:33AM 1    found some more specific documents so that he could break it

2    down into periods.  You'll see that the numbers then slightly

3    changed on a quarter basis for 2002.  The indictment charges

4    the approximate amount.  So the indictment is still properly

5    charged because it says in the approximate amount charged, but

6    these are the numbers that you're going to see in the

7    indictment and these are the figures.  These are the numbers

8    that were not withheld, purposely not withheld by Kent Hovind

9    and the numbers for you to find him guilty for.

10          You will see and we argued -- the testimony came in

11    during the course of the trial that the total amount of

12    employment taxes that were evaded during this period of time

13    from July of 1999 through March of 2004 was $845,327.  That

14    figure represents all those years, July '99 to March 2004, and

15    also includes the matching portion that he should have added to

16    the withheld taxes, employment taxes, and paid over to the

17    government.  This is how much money the government was harmed

18    right here, $845,327.

19          The total amount of currency that was structured to

20    evade reporting requirements in 1999 to 2003 was $1,570,000.

21    The total amount of FOIA requests, you saw that we introduced a

22    huge package of FOIA requests that had been filed as part of

23    the obstructionist behavior by Mr. Hovind, the total amount of

24    the FOIA requests, there were 246 FOIA requests that he filed

25    for period of March 2002 to January of 2006.  And if you care

9:35AM 1  to go through them when you're back in the jury room, you'll

2  see that many of them are repetitive.  Many of them could have

3  all been done in one FOIA request.  There is nothing illegal

4  about a FOIA requests, but it is illegal when you do it

5  specifically for the purpose of impairing and obstructing the

6  IRS's investigation, and that's exactly what we proved

7  happened.  There is nothing illegal about FOIA requests, per

8  se, and there is nothing illegal about filing lawsuits, but it

9  is illegal when you do it specifically, as the Court will

10  charge you, to impair or impede the IRS.  That's everything

11  that he did, the purpose, the goal, the obsession for Kent

12  Hovind was to impair and obstruct the IRS.  169 hours of man

13  hour time wasted with those FOIA requests.

14         On the other side of the coin, Mr. Hovind filed

15  lawsuits from 1996 to 2004 requesting, demanding 36-and-a-half

16  million dollars in damages for what he claimed the IRS did to

17  him.

18         All of these things, ladies and gentlemen, all of this

19  evidence is overwhelming that the Hovinds, both of them, had

20  the purpose and had the knowledge and had the intent to

21  obstruct the IRS by filing, by the structuring that they did,

22  that Mr. Hovind by the lawsuits that he filed, by all of the

23  behavior that he exhibited, that they -- that he knew of his

24  duty to withhold and he just chose not to because he doesn't

25  like the government and he doesn't like the IRS, not because he

9:36AM 1  had any sincerely held beliefs.  And we ask you to find him

2  guilty of all the charges in the indictment.

3           Thank you so much for your attention.

4           THE COURT:  Thank you.  Mr. Richey.

5           MR. RICHEY:  Yes, Your Honor.  It will take just a

6  minute.

7           THE COURT:  Mr. Richey, you're going to be assisted by

8  your associate Mr. Springer?

9           MR. RICHEY:  Yes, Your Honor.

10          May it please the Court.

11          THE COURT:  Yes, sir.

12          MR. RICHEY:  Thank you Your Honor.

13          Counsel, Agent Evans, Agent Schneider, Counsel

14  Barringer, Mr. Hovind, Mrs. Hovind, ladies and gentlemen here

15  of the public, ladies and gentlemen of the jury, thank you so

16  much for taking this time out of your schedules, out of your

17  lives and coming here to hear about this trial.

18          As attorneys, we've done our best to do what we do.

19  And as you've noted and as you will be instructed, the burden

20  has always rested with the government.  They have the duty, the

21  responsibility.  The law requires them to prove every single

22  element, and if they don't, then you must find Mr. Hovind and

23  Mrs. Hovind not guilty.  So now the burden shifts from the

24  government really to you.  Everything rests upon you and your

25  decision.  And it's not something to be taken lightly, and we

9:39AM

1    really, really appreciate you.

2              What you have to do now is probably one of the most

3    difficult things you'll ever do in your life, and that is to

4    hold the lives of someone else, their liberty at stake.  But,

5    see, our founding fathers had great confidence in the people of

6    this nation.  They knew that the government could exceed their

7    bounds.  They knew that the government could violate your

8    rights.  They knew that the government could make all kinds of

9    accusations, but they also believed that to pull 12 individuals

10   from the community who could see, see beyond just the mere

11   allegations and the dirt slinging and the misinterpretations.

12   They knew that you could protect the other citizens of this

13   nation.  And so our founding fathers found it very important,

14   do not lead the life of an individual charged with a crime.

15             Now, you've heard the government accuse them of doing

16   many wrong things, and you might look at those and you might

17   say, gee, that is wrong.  That's kind of dumb.  But there is a

18   difference between wrong and committing a crime, and you can do

19   all the wrong things that you want to and still not commit a

20   crime.  And what they are charged with is actually committing

21   58 crimes.  That's what my client is charged with.  And I'll

22   submit to you, ladies and gentlemen of the jury, that there is

23   no way that the government has proven that my client committed

24   58 crimes just by following his religious belief.

25             Now, there are places, even today, where everything

9:42AM 1    which is not permitted is forbidden.  There are places where

2    whatever is permitted is mandatory by the government, and so

3    citizens, individuals, are shackled in their very actions by

4    the universal passions of that banning government.  But, ladies

5    and gentlemen, fortunately for us, the United States is not

6    such a place.  And with you, we can plan to keep it that way

7    for ourselves, for our children and for our grandchildren.  If

8    the government wants to forbid something, Congress can forbid

9    it.

10           If the government wants to mandate something, Congress

11   can mandate it.  So Congress can forbid and mandate all it

12   wants and the Supreme Court and the courts are here to protect

13   that they don't go beyond the Constitution and require citizens

14   and individuals to do things that would just make the

15   government's job easier.  See, because after our founding

16   fathers wrote the Constitution, the people said, we will not

17   uphold that constitution.  We will not give the government

18   those powers until it is absolutely established that we protect

19   our Bill of Rights.  So we won't give the government any power

20   until they absolutely promise to protect these rights.  And as

21   long as we go about not breaking the law, it doesn't matter

22   what things we do wrong.  It's not a crime and we can live in

23   our society, thinking and believing and saying whatever we

24   want.

25           The First Amendment itself guarantees that the

9:44AM

1    government cannot interfere or establish a religion, but you

2    heard elder -- you heard Agent Schneider on that stand say that

3    the IRS has things that they look at to determine if it's a

4    religion, if it's a church or not.  And he made the decision,

5    although he wouldn't admit it.  He wouldn't come forward and

6    say, I didn't make the determination.  But someone did.  That

7    it's not a ministry.  That it's not a religion.  He called it a

8    creationist themed business.  He testified before that it was a

9    sole proprietor business.  And how precious is your right to

10   believe in religion?

11          The First Amendment also guarantees the freedom of

12   speech.  And we heard testimony about how Mr. Hovind has a

13   radio program that he does.  And you heard elder -- Agent

14   Schneider on that seat build up about how he had listened to

15   this taping, and how it was so anti-governmental, and about how

16   he made threats against the agents, and then you and I, we

17   listened to that.  We listened to nearly 45 minutes of that

18   tape.  That was not what we heard.

19          Now, you also heard testimony from Agent Schneider

20   sitting on the stand that when Mr. Hovind said that he had

21   prayed for them, that was a threat to him.

22          Ladies and gentlemen, if we go home tonight and over

23   the telephone, which the government can wiretap, if we get on

24   the Internet and send an e-mail saying pray for our president,

25   maybe we've just threatened him under their theory.  And what

9:47AM 1    is a crime about that?

2              Ladies and gentlemen, you have also heard testimony

3    about the many times when Mr. Hovind believed that his rights

4    were violated.  You heard testimony about Agent Schneider

5    seeing a posted notice not to come onto the premises unless you

6    had prior authority.  Why?  Even our founding fathers said that

7    the government cannot intrude into your place unless they first

8    have a warrant.  Agent Schneider saw the stand -- or the sign.

9    He didn't have a warrant.  He didn't think it applied to him.

10   And so under again, the First Amendment, our founding fathers

11   and the citizens of this country determined that you have a

12   right to petition the government for a redress of grievances.

13   That means if you think that your rights have been violated,

14   you are guaranteed a right to go to court and we saw in the

15   documents, the very documents attached to the very summons that

16   Agent Schneider delivered, that it said he had a right to come

17   to court and file a petition to quash, and, yet, they are

18   claiming that that is a crime.

19             Ladies and gentlemen, you will note very specifically

20   and very carefully the wording in the jury instructions that

21   are given.  And for example, in Count 58, it says that in order

22   to find Mr. Hovind guilty of that count, you must find that he

23   corruptly endeavored to impede or obstruct the due

24   administration of the Internal Revenue laws, and what you heard

25   from the government even right here this morning was not

9:50AM

1    corrupt.  You heard it impeded.  It obstructed.

2          You heard Agent Schneider when he was on that stand

3    when he swore to testify to the truth, the whole truth and

4    nothing but the truth so help him God that he felt that he was

5    impeded or obstructed.  But you never heard any testimony that

6    it was corrupt because he had a right to go to court and

7    protect his rights when he thought he was violated and the

8    government did not prove that element.  So you cannot find

9    Mr. Hovind guilty of Count 58.  You must find him not guilty.

10   None of those actions he took was corrupt.

11         They also failed to prove that he had the intent to

12   corruptly impede and obstruct.  His intent was to get back his

13   rights.  If Agent Schneider came on his property without

14   permission, what's the value of that?  Can you place any

15   monetary value on that?

16         I'm not going to ask you to close your eyes, if you

17   want to you can, you can keep them open, but I want you to

18   think, think about this:  Gentlemen of the jury, you have to

19   leave and go to another state for your work.  While you're in

20   the other state, ladies think about this, you're in the shower,

21   your children come in and say, mom, the police are out and have

22   surrounded the yard.  So you jump out of the shower and come

23   running and look and they are hauling off every one of your

24   cars, and you don't have a clue as to why.  And you call your

25   husband and he says, they can't do that.  Well, they are doing

9:52AM 1  it.  Yeah, but they can't.  They don't have a right to do that.

2  But they are doing it.  And then gentlemen, you come back after

3  a couple of days and you go and try to get your cars back, and

4  they say we're not giving it back until you pay us almost

5  $11,000.  Well, where is the bill?  When did you tell me I owed

6  it?  Well, we performed a jeopardy assessment, so we don't have

7  to tell you that.  And you struggle and you don't have the

8  money yourself and you don't have any vehicles and you can't

9  drive, and you saw yourselves that those were older vehicles.

10  These weren't lavish vehicles.  They weren't brand new

11  vehicles.  They didn't even have the money to go pay the 10,000

12  or $11,000.  So someone else came forward.  You saw that in the

13  evidence and the documents.  Someone else came forward and

14  said, I will pay it for you.  And that was a crime under the

15  government's theory.

16          Now, imagine this, again, gentlemen, you're there at

17  your home, you're doing things, and all of a sudden, 30, 40

18  police officers come in, again no notice.  You come in and you

19  see the first one and you say, gee, I sent you these letters

20  and you never say anything.  And he says, I'm here with a

21  warrant.  Again, you have to go get your wife out of bed.  They

22  force everyone into a room.  Other people start coming in, and

23  they grab everyone and force them into a room and hold them

24  until they can interrogate them.

25          You heard Agent Schneider's testimony that he is a

9:54AM 1    military interrogation specialist.  And yet, when he was asked

2    about that further, well, I really didn't have much training,

3    although he was the commander of his unit.  I really didn't

4    have much training in that, he said.  Many times when he was

5    questioned, he had such a great recollection of things that

6    happened until myself or Mr. Barringer questioned him.  And

7    then, well, I can't recall.  I don't remember.  And yet, he

8    swore to tell the truth, the whole truth and nothing but the

9    truth.

10          You saw, ladies and gentlemen of the jury, a document,

11   83-C where multiple times my client, Mr. Hovind, sent to the

12   government asking for information, which is completely within

13   his right, and you saw in the very documents that the

14   government produced, there were things left out.  And where did

15   they get it from?  From the IRS itself.  There were things in

16   there that they must not want you to know.

17          We saw many other documents where it said see attached

18   to Exhibit 1 and 2, and those were not there.  Now, the

19   government bore the entire burden in this case.  And yet, Agent

20   Schneider testified that on the raid, they took 30 to 40 boxes

21   worth of documents, but for today, for this trial, he

22   handpicked less than two, and some of it he said was relevant

23   to the commission of a crime or their investigation was, but

24   some of it wasn't, but he still wouldn't return it.  It was

25   things he had no right to take, things he had no right to keep.

9:57AM  1    He said the warrant only gave him authority to take those

2    things that showed or which was pertinent to his investigation

3    that a crime had been committed.  He couldn't even tell what

4    crime.  He couldn't even tell Mr. Hovind what crime he had been

5    accused of.  He was just investigating.  And his own testimony

6    was that some of those things were not pertinent to the crime,

7    but he still has them today and won't give them back.  And when

8    Mr. Hovind sued to try to get things back, he was just out

9    procedured by U.S. attorneys who know how to file things and

10   got the case dismissed, not because it had no merit because he

11   doesn't know what he's doing in court.

12          You even heard Mr. Beard, I believe it was Mr. Beard,

13   and if I got his name incorrect, I apologize.  But Mr. Beard

14   who was the bankruptcy attorney and he even admitted that

15   Mr. Hovind hired an attorney and that that attorney filed some

16   things which he said were just baseless.  So if an attorney did

17   that, then how can we hold Mr. Hovind accountable and allege

18   that he committed a crime for doing something that he's not

19   even schooled and educated in, and yet, that's what they want

20   you to believe.

21          We also saw and the evidence showed that Mr. Hovind

22   wrote to the IRS multiple times.  He even wrote to Agent

23   Schneider at least four times.  Agent Schneider, who could go

24   to an attorney at any time asked and, as he testified, the

25   attorney told him, don't write back.  Agent Schneider's

10:00AM 1  statement was that no answer would be good enough.  No answer

2  would be good enough.  Maybe it was no answer, that's good

3  enough.  Is that the kind of government that we want to live

4  under?  Is that the kind of government that we want for our

5  children and grandchildren that you can write to them and ask

6  them questions and they just won't answer?  They don't care.

7  They are just going to keep coming whenever they want because

8  they have a badge, and they can come on your place whenever

9  they want because they said so.

10         And we saw Agent Schneider can carry a weapon.  We

11  also heard testimony that Mr. Hovind had a permit from the

12  government to have even a concealed weapon.  And yet, when it

13  came down to it because they felt threatened whenever they

14  talked to him or met him, he willingly gave up that right

15  that's guaranteed under the Second Amendment, to have and bear

16  arms.  He gave it up because they felt threatened.  But I

17  guarantee you, they would not give up their right, their

18  privilege, if he felt threatened or if you felt threatened.

19  How would you protect your family?

20         Here is a man who his entire life, he's devoted to one

21  thing and one thing only, to what he believes is the gospel of

22  Jesus Christ, what he believes is the creationist.  God did it.

23  And that's all he preaches.  That's all he teaches about and

24  how that's been corrupted and changed by various means, not

25  just by religions, not just by men, but by governments.  And he

10:02AM  1   speaks out about it and he talks about it, as he's guaranteed

2   under the First Amendment.  He's so devoted to that.

3          We never saw any lavish furnishings.  We never saw a

4   lavish grand mansion.  We never saw expensive cars or boats or

5   yachts or airplanes or anything.  He is gone more than half of

6   the year, sometimes 250, almost 300 days out of the year

7   preaching what he believes is the gospel of Jesus Christ.  He

8   believes it so much that his family lives right there.  Now,

9   they are claiming it's not a church.  They are claiming it's

10  not a religion.  They are claiming it's not a ministry.  And

11  yet, we heard, we heard from Diane Cooksey that she has worked

12  out in what she calls the secular world.

13          MS. HELDMYER:  Objection, relevancy, Your Honor.

14          THE COURT:  Overruled.

15          MR. RICHEY:  We heard her say that she had come in and

16  to her that this was a ministry.  It was furthering the

17  preachings.  It was furthering the gospel of Jesus Christ, and

18  she could distinguish the difference.  She felt the difference.

19  You heard testimony that they didn't believe it was a church

20  because there was no place where they worshiped, but you also

21  heard testimony from the witnesses.  Even on the very day of

22  the raid, April 14, 2004, that they were meeting for prayer and

23  for devotion.  Is that a religious service?  They are saying

24  it's not.

25          You saw in the documents where memos were sent about

10:04AM

1    how much the lives of the individuals were being changed

2    because of the preaching of the gospel and those people there

3    felt it.  Brian Popp, who was the very first one you heard from

4    said that he was a missionary.  He said he was not an employee;

5    that he had worked other places in a corporation and he was not

6    subject to those same restraints.  He believed and everyone

7    else there believed that they were promoting the gospel of

8    Jesus Christ, that they were missionaries and they were serving

9    in the ministry.  He also testified that he did not believe

10   that he was doing anything wrong.  He even testified that

11   Mr. Hovind didn't believe he was doing anything wrong.

12        You heard from, again, Diane Cooksey, from Dan Nelson,

13   from Thomas Pope, all individuals who were there, all of them

14   testifying that it was a ministry.  In fact, Thomas Pope, he is

15   even an assistant minister today.  That's what he does, and he

16   says that everything he did there, even though he worked at

17   Dinasaur Adventure Land in the playground park, he said he

18   still taught the children based on Biblical beliefs and he said

19   everything there was Christian based and he said that he

20   himself considered himself, while he was there at Dinasaur

21   Adventure Land, a minister.  You heard it from their lips.  You

22   heard it from them.

23        Most telling about what this case is all about came

24   from the very lips of Mr. Gibbs, when he was being questioned,

25   he said that he could not show Mr. Hovind what law he was

10:06AM 1    violating, but it is a sin not to pay taxes.  Those were the

2    very words out of his mouth.  It is a sin not to pay taxes.

3    This whole case is about religion and taxes, as I told you at

4    the very beginning, and you have seen through the course of

5    this trial, those elements coming in and conflicting, hitting

6    and merging in some ways.

7            We heard from Mrs. Horton and Mrs. Horton certainly

8    believed that Mr. Hovind was also committing a sin, but we

9    heard something very interesting from Mrs. Horton.  We heard

10   that they also had a church.  We heard that the government, the

11   IRS had granted them privileges, but then there came a time

12   where the government came in and said, you're too big.  We're

13   going to look at you now, and they decided she said it took

14   about five years for the government to decide, for the IRS to

15   decide, oh, yeah, you owe a lot of money now.  You should have

16   been paying, even though we didn't tell you, you should have

17   been paying and so we're going to give you this bill now of

18   about $5 million.  Well, wasn't that nice that the government

19   at least let her know.

20           You have heard testimony even from Mr. Evans that he

21   is claiming that Mr. Hovind owes, what was it, $845,000.  Guess

22   how many notices they've sent?  Zero.

23           You saw a document, OBS-17, on page 15, and this is

24   something that the government introduced and right there it

25   says the Supreme Court has held that the use of an

10:09AM 1   administrative summons to obtain a taxpayer's records is not in

2   violation of the Fourth Amendment Right to be free from

3   unreasonable searches and seizures.  However, the IRS must

4   issue such a summons in good faith for use in determining the

5   taxpayer's civil liability for income taxes rather than the

6   taxpayer's criminal liabilities.

7          And you heard Agent Schneider say that the summons

8   that he issued were for a criminal investigation.  He said he

9   was not doing an assessment.  He said he was not doing

10  collections.  He was doing a criminal investigation.  Now,

11  could Mr. Hovind rely on what the Supreme Court said?  Did he

12  believe that he had a right to challenge that?  And yet, when

13  he did challenge it, they are saying it impeded him and

14  obstructed him, not corruptly, just impeded and obstructed, for

15  an investigation that he was using summonses for to determine

16  criminal liability.

17         This continues.  The IRS follows a set pattern of

18  procedures, set, established, for assessing a deficiency in

19  income taxes and collecting those assessed taxes.  If a

20  taxpayer is determined to have underpaid his income taxes, the

21  IRS will issue a notice of proposed assessment, giving the

22  taxpayer an opportunity to seek administrative review of the

23  determination within the next 30 days.  If the taxpayer fails

24  to request administrative review or if the review sustains the

25  liability, a notice of deficiency is issued.

10:12AM 1          Now, we heard testimony that on about June 3, Agent

2    Schneider sat in a car and there were four other agents and a

3    revenue officer who delivered by hand, a notice of deficiency

4    and dropped it on the ground.  But we did not hear that there

5    was a notice of proposed assessment before that.  We didn't

6    hear anything about that.  We heard that the agents were so

7    afraid of Mr. Hovind that when Agent Schneider sat in the car,

8    they had a wire so he could listen.  They were there with an

9    armed escort.  They were so afraid of Mr. Hovind.

10          This notice of deficiency permits the taxpayer to

11   petition the United States tax court for a redetermination of

12   the assessed deficiency without first paying the taxes

13   allegedly due.  If no petition is filed by taxpayer within the

14   90 days from the issuance of the notice of deficiency, the tax

15   court loses jurisdiction over the case.  At that time the IRS

16   issues a demand for payment of the tax.  Now the taxpayer must

17   legally pay the tax.  And if the taxpayer fails to do so, the

18   IRS may collect the tax through judicial proceedings or through

19   its power of levy and distraint.  So this shows a clear

20   procedure that the IRS has to follow.

21          Now, what happened with Mr. Hovind?  We heard

22   testimony from Agent Powe back in 1996 that they just showed up

23   and took his vehicles.  He didn't receive a notice of proposed

24   assessment.  He didn't receive a notice of deficiency.  He

25   didn't get to go to court and contest it.  So what did he try

10:14AM

1    to do?  File in bankruptcy court.  And they claim that was in

2    bad faith because he wanted his cars back.  He didn't list any

3    creditors because he didn't have any others.  He listed the IRS

4    because they took his property and he still couldn't get it

5    back.

6            Agent Evans testified this is the very first time

7    Mr. Hovind has ever heard that he's supposed to pay $850,000,

8    the very first time.  They never gave him an assessment.  They

9    never gave him a notice of deficiency.  They want you to find

10   him guilty so they can take the money.  Again, when he showed

11   up, when the agents showed up, 30 or 40 of them, on April 14,

12   2004, he had a warrant.  The Fourth Amendment guarantees the

13   right of the people to be secured in their persons, houses,

14   papers and effects against unreasonable searches and seizures.

15   That right shall not be violated and no warrant shall issue but

16   upon probable cause supported by oath or affirmation.

17           What did Mr. Hovind ask for?  He asked for a copy of

18   the warrant.  Now, Agent Schneider first said, well, I gave it

19   to him, and he said, well, I'm not sure what I did with it.  I

20   may have laid it down somewhere.  You heard testimony that

21   Mr. Hovind that same day came here to get a copy and wanted to

22   see what Agent Schneider's affidavit said.  He wanted to know

23   what the probable cause was.  He wanted to know what he was

24   accused of.  They wouldn't tell him.  He thought he was

25   protecting his rights guaranteed under the amendments of the

10:17AM

1    Constitution, the foundation of this country.  And yet, they

2    claim that it's a crime that he committed.

3         You heard testimony from Agent Schneider that the

4    warrant gave him the right to take any money and they found

5    over $42,000.  If the warrant gave him the right, he could have

6    taken it, but he called his supervisor.  He called someone

7    else, and he said, can I take it?  Yes.  So they take it and

8    they put it in a safe at his office in the criminal

9    investigation division of the IRS.  That was on April 14, 2004.

10   What happened to that $42,000?

11        We have Exhibit PR-44.  This is an official record

12   from the Internal Revenue Service.  On this document, it shows

13   that on June 3, 2004, almost two months later, they make a

14   subsequent payment of 42,819.73, a subsequent payment for what,

15   for what?  He took it because he said he took it because it was

16   evidence of a crime, evidence of a crime, $42,000 was evidence

17   of a crime.  What, drug dealing, money laundering?  No.  For

18   what?  Supposedly failing to pay a tax that he had never been

19   assessed and never had been given a notice of deficiency?  He

20   had never been -- done, given anything, but he should have.

21   But they made a subsequent payment under a jeopardy assessment.

22        And if we look back, again, at the prior document,

23   again on page 15.  This is OBS-17.  It says at the bottom, the

24   power of levy and distraint gives the IRS the ability to seize

25   the assets of a taxpayer and sell them, applying the proceeds

10:20AM 1    to the outstanding tax liability.  The Supreme Court has held

2    that the exercise of these powers is constitutional and that

3    such extra judicial seizures and sales do not violate the

4    protections of the Fourth Amendment against unreasonable search

5    and seizures because the taxpayer will already have ample

6    opportunity for judicial review of the deficiency.  Then the

7    next paragraph it says, the Supreme Court has noted some

8    constitutional limitations on the exercise of the government's

9    power of levy and distraint.  In GM Leasing, the Court held

10   that the IRS could not make a forced entry onto the taxpayer's

11   premises in order to seize property without a court order.

12   However, the agents could take the taxpayer's property which

13   was not in an enclosed area.  Now, the vehicles, ladies and

14   gentlemen, were on the property and they did not have a

15   warrant.

16        MS. HELDMYER:  Your Honor, I need to object.

17        THE COURT:  Sustained.

18        MR. RICHEY:  In some limited circumstances, the IRS

19   will levy upon the property of the taxpayer --

20        MS. HELDMYER:  Same objection, Your Honor.

21        THE COURT:  Mr. Richey.  Please approach.

22        (At the bench:

23        THE COURT:  It is very rare for this to happen in my

24   courtroom when the attorney gets called to the bench in

25   closing.  I don't think anything you're arguing is relevant at

10:22AM 1   all.  Frankly, your argument about the church is not relevant,

2   but I allowed you to continue because there is evidence in the

3   trial about this.  This is not, and you and I have been back

4   and forth about this, about whether or not the IRS officials

5   had the authority to do what they did.  You have to tie this to

6   their belief.  We're not going through this closing, every

7   single action they took and whether it was in violation of some

8   rule and regulation of the IRS.  We're not doing it.

9            MR. RICHEY:  I'll tie it in.

10            MS. HELDMYER:  Can I ask for a corrective instruction

11   from the Court?

12            THE COURT:  Not now.  I'm not going to give an

13   instruction.

14            (Bench conference concluded.)

15            THE COURT:  You may proceed.

16            MR. RICHEY:  Then in this last paragraph, it says, the

17   last sentence, this emergency procedure is known as jeopardy

18   assessment and has been sustained by the Supreme Court against

19   the Fourth Amendment challenge.  But it also says just prior to

20   that the IRS is authorized by statute to dispense with these

21   procedures and immediately seize the property if it believes

22   that the taxpayer intends to remove or hide himself or his

23   property in order to defeat the collection of the tax.  And you

24   heard Agent Schneider testify that he was not collecting a tax.

25   You heard him testify that there was no way that Mr. Hovind

10:23AM 1    could get to the money there.

2              MS. HELDMYER:  Same objection.

3              THE COURT:  Sustained.

4              Mr. Richey, Special Agent Schneider's conduct is not

5    at issue here.  Please move on.

6              MR. RICHEY:  So under Mr. Hovind's belief, did he

7    believe then that his rights were being violated?  Looking back

8    then again at Exhibit PR-44-E, it shows that nearly a year

9    later on April 7, 2005, a substitute for a return was made and

10   the assessment there is zero, and please note above that that

11   it's for U.S. individual income tax return, Form 1040.

12             Ladies and gentlemen of the jury, we also saw as

13   evidence on, again, OBS-17, on page 9, where it says the U.S.C.

14   is divided into 50 titles.  And then we saw two documents,

15   OBS-11 and OBS-48 that the government sent, that the IRS sent

16   Mr. Hovind, both of them, as Agent Schneider compared them,

17   were nearly identical in wording, both of them saying there

18   were 60 titles.  Is it reasonable to believe that Mr. Hovind

19   could rely on what little bit the IRS did tell him?  Well, they

20   didn't tell him.  Mr. Hovind believes that he's entitled to all

21   these notices.  He believes that before he can be found of

22   willfully violating the law, that the government should answer

23   his questions.

24             You will note, ladies and gentlemen, that Mr. Hovind

25   is also charged with committing 12 other crimes.  These crimes

10:26AM 1    are willfully failing to deduct, collect, truthfully account

2    for and pay over to the IRS federal income tax and FICA tax

3    from the total taxable wages of CSE employees, and you heard

4    and saw testimony -- I'm sorry.  You heard testimony and saw on

5    OBS-44 and this is an affidavit that Mr. Hovind signed and this

6    contains his beliefs, ladies and gentlemen, and his beliefs

7    consists of, on page 3, down at the bottom begins there, when a

8    state imposes sensor ship on school textbooks which forbid the

9    teaching of any models of creation and only the evolutionary

10   theories may be taught uncensored, then we have the state

11   promoting the religion of atheism.  And then on the next one,

12   he says I have included with this affidavit copies of my

13   published works on this subject.  And yet, once again, we see

14   that there were no copies attached to this.

15        He also, ladies and gentlemen, in this trial you did

16   not have the opportunity to hear from Mr. Hovind from the

17   stand, but I would submit to you that you did hear from him.

18   You heard from him on the CD that was played.  You've seen

19   various letters that he's sent in and here's his affidavit.  If

20   you want to know what he believes, you can read it back there.

21        But he goes through and talks about the ministry and

22   what he believes he was doing.  He sets forth on page 6, and

23   again, we saw the numerous times he sent for his FOIA and one

24   of the things that Agent Schneider testified about was his

25   individual master file in this second full paragraph, he says I

10:29AM 1  also contacted the IRS to get a copy of my IMF, individual

2  master file, and had it decoded.  I was shocked to discover

3  that someone in the IRS had lied to the IRS computer and put

4  false data into my file.  They had me coded as an underground

5  coal miner in the Virgin Islands.  Now -- now, whether it's

6  true or not, Mr. Hovind believed that this is what's in his

7  file at the IRS, and this is the only evidence you have about

8  that, that that's his belief.

9           He continues on the next one.  I continued to forge

10  ahead with the Creation Science ministry God had called me to.

11  I believe it was about the year 2002 when I began receiving

12  letters from the IRS again.  I always answered their letters

13  right away and asked them several questions like which tax am I

14  liable for?  Which form should I fill out?  I also sent them

15  copies of the letters that I had received from the tax

16  professionals saying I was not obligated to file a tax form or

17  pay a tax, since I was not involved in a taxable activity.

18  They never responded to my questions or my letters and still

19  did not today.  Getting no response from Agent Schneider or of

20  anyone else from the IRS, I considered the matter closed and

21  went about preaching the gospel has as I had been doing for

22  many years.

23           Then he goes on to explain on page 7 his understanding

24  of why he wasn't liable, and you'll note that he cites to

25  specific provisions of the Internal Revenue Code and he

10:31AM

1   believes such, for example, under Section 1402 that his

2   performance of service as a duly ordained commissioned or

3   licensed minister of a church in the exercise of his ministry

4   or by a member of a religious order in the exercise of duties

5   required by such order did not fit within the term trade or

6   business.

7           He then discusses other code sections, one of which

8   was Section 3121, which again, for him, he believed that it

9   said that he was not in the course of employment because it

10  says employment, defines that, except such term shall not

11  include, 8-A, service performed by a duly ordained,

12  commissioned or licensed minister of a church in the exercise

13  of its ministry or by a member of a religious order in the

14  exercise of duties required by such order.

15          Now, again, ladies and gentlemen, you heard Diane

16  Cooksey.  You heard Mr. Popp.  You heard Mr. Pope testify that

17  they believe they were not employees, that they were

18  missionaries, that they were part of the ministry in fulfilling

19  and moving forward the gospel of Jesus Christ.

20          On the next page, page 8, again, Mr. Hovind includes

21  what he believes in Section 3401 of the Internal Revenue Code,

22  which defines wages and ends, except that such term shall not

23  include remuneration paid nine for services performed by duly

24  ordained or commissioned licensed minister of a church in the

25  exercise of his ministry or by a member of a religious order in

10:33AM 1   the exercise of duties required by such order.

2           Then he cites to Section 508, which is mandatory

3   exceptions for churches, their integrated auxiliaries and

4   conventions or associations of churches and goes on to state

5   that he believes that Creation Science Evangelism, and

6   specifically on page 9, he says since I am a minister, I have

7   taken a vow of poverty as a dependent of the church and

8   received no monetary income for measurably equivalent value for

9   calculating income tax.  And you saw testimony or heard -- saw

10  evidence and heard testimony, that there were not checks made

11  out to Kent Hovind or Jo Hovind, and that they lived there in

12  the ministry.  And you heard testimony from Agent Schneider

13  that his investigation was about personal income tax of

14  Mr. Hovind.

15          MS. HELDMYER:  Objection, Your Honor, relevance as to

16  personal income tax.

17          THE COURT:  Overruled.

18          MR. RICHEY:  So this entire time that a criminal

19  investigation is going on as Agent Schneider said it was

20  primarily for the personal income tax of Mr. Hovind and

21  Mr. Hovind testified that that's what he believed the

22  investigation was about.  And now ladies and gentlemen of the

23  jury, you've been asked to find that Mr. Hovind has committed

24  12 crimes, 12 crimes of failing to withhold income tax from

25  employees and Mr. Hovind has not been given any notice of that.

10:35AM 1   He didn't even know that those were the crimes that he's being

2   investigated of.  Mr. Schneider never informed him of that.

3   This is the first time.

4         And, ladies and gentlemen of the jury, you will be

5   instructed of what the elements for that particular crime is.

6   You will be instructed regarding that, that Mr. Hovind, in

7   order to find him guilty, you must find that he acted

8   willfully.  To find that he acted willfully, you must find that

9   he had a specific intent to do something that the law forbids,

10  to disobey or disregard the law.  You must find that the

11  government showed beyond a reasonable doubt that the law

12  imposed a duty on Mr. Hovind.  You must find that Mr. Hovind

13  knew of this duty and that he voluntarily and intentionally

14  violated that law.

15        And, ladies and gentlemen of the jury, the government

16  has presented no evidence that they ever told him what his duty

17  was and that he was violating it.  They just brought him here

18  for you to find him guilty, also to find that he willfully

19  violated this law, which, ladies and gentlemen of the jury, I

20  submit to you that for him to have known what that duty is, he

21  would have had to have known what law he was breaking.  And I

22  would ask you to think, did the government show you what the

23  law was?  I mean, they spoke in general terms, but he's accused

24  of violating a law, that there was a law that Congress passed

25  that imposed a duty.  And the only way that you can find that

10:38AM 1  he willfully violated that law is that he knew of that duty, he

2  knew that there was a law that he was breaking.  And you just

3  saw from his affidavit, the laws that he cited, he doesn't

4  believe he's breaking any law.  So to find that he willfully

5  violated that duty, that known legal duty, you have to find

6  that he didn't act in good faith.  That his belief was not

7  sincere, that he intentionally went against that.  The

8  government must proof beyond a reasonable doubt that he did not

9  act in good faith, and you heard everyone who testified that

10  those are his beliefs.  You even heard Agent Schneider testify,

11  it didn't matter what he told him, he wasn't going to change

12  his mind.  He believed it so firmly, so much, that again, he's

13  devoted his whole life to it.  The whole place where he lives

14  and works and does everything, and his family, he's combined

15  them and he's brought in other people to serve in this ministry

16  that he believes is for the gospel of Jesus Christ.  He

17  believes it so much that he's willing to sit here today, not

18  being told for coming here what he had done wrong.  That's how

19  much he believes.

20        You will also be instructed that Congress' purpose for

21  requiring proof of willfulness in these types of tax cases was

22  to avoid penalizing taxpayers who make innocent mistakes caused

23  by the complexity of the tax code.  And for this reason, you

24  cannot find willfulness if his actions were taken based upon

25  accident, mistake, inadvertence or due to a bonafide good faith

10:40AM 1  misunderstanding of the law.  No one has told him that his

2  understanding of the law is in error.

3        Now, they might say, it's wrong, but you heard even

4  Mr. Gibbs' testimony that he couldn't point him to any

5  particular provision.  You even heard that when Mr. Gibbs was

6  on the phone with him, he had to have some other tax attorney

7  in there to answer questions because he, himself, didn't know.

8        So if he honestly held that belief, you cannot find

9  willfulness and you must find him not guilty of those 12

10 charges.

11       Now, Mr. Hovind is also charged, along with his wife,

12 of 44 times violating the law, committing a crime 45 times, and

13 those crimes were, as we saw, checks that were written out.

14 And to find that Mr. Hovind violated the law 45 times, you must

15 find that he knowingly and with the purpose to evade the

16 currency transaction reporting requirement did four things:

17 That he had knowledge of the currency transaction reporting

18 requirement.

19       Now, there was testimony from Mr. Popp about a

20 currency transaction report, and you saw a couple of those

21 forms.  But you also heard the banker say they don't say when

22 they file one, that there is no notice there of what the

23 requirements are.

24       Now, maybe he knew that there was a currency

25 transaction report.  There was some form.  That doesn't mean

1  that he knew what the requirements were for that.  You have to

2  find that he knew the requirements, not just that there was a

3  form.  And the banker testified that they don't tell people

4  what the requirements are, that it's part of the bankruptcy --

5  or Banking Secrecy Act, that they are secrets that no one even

6  knows about.  You also have to find that Mr. Hovind knowingly

7  structured and assisted in structuring the currency

8  transactions.

9        Now, ladies and gentlemen of the jury, you will see,

10  and you saw in the exhibit that was prepared by Mr. Evans or

11  prepared, he ask that it be prepared, all those checks.  And

12  you remember that many of those checks, all of them that are

13  charged in these 45 counts, were signed by Mrs. Hovind, and

14  there were also during that time period, checks signed by

15  others, Martha Harris and Tanya Hovind, that those aren't

16  crimes, not according to the government.  Only if Mrs. Hovind

17  signed the check was it a crime.  That's their allegation.  But

18  you'll note that Mr. Hovind's signature doesn't appear

19  anywhere.

20        You will also be instructed that in order to find them

21  guilty, you must find that they structured the transaction, and

22  to structure a transaction means to deposit or withdraw or

23  otherwise participate in the transfer of a total of more than

24  $10,000 in cash, more than $10,000 in cash.

25        MS. HELDMYER:  Objection, Your Honor.  This is what we

10:45AM 1    took up before.

     2              THE COURT:  Sustained.

     3              MR. RICHEY:  Your Honor, could I be heard on this?

     4              (At the bench:

     5              MR. RICHEY:  Your Honor, I'm merely reading from the

     6    jury instruction.  Now, if you're not going to put this in the

     7    jury instruction, then I can't say it, but if it's in the jury

     8    instruction, I can say it.

     9              THE COURT:  What's the objection?

    10              MS. HELDMYER:  Your Honor, it's the same objection I

    11    had before.  The implication is they can't find him guilty

    12    unless the transaction itself was more than $10,000.  That's

    13    not the case, and I have case law to that effect.  This is the

    14    case law that I brought up earlier that he was going to argue

    15    that each transaction has to be more than $10,000.  This is

    16    beyond just giving a definition.

    17              THE COURT:  Well, these are the instructions that are

    18    going to be given.  If he's reading from the instruction --

    19    what are you going to do beyond that?

    20              MR. RICHEY:  I would merely point to the evidence,

    21    then.

    22              MS. HELDMYER:  The law is very clear that the

    23    transaction can be in any amount.  So if he argues anything

    24    about how much the transaction has to be in order to find them

    25    guilty, that's my objection, and that's where he's going, I

10:47AM 1   think.

2          THE COURT:  If that's where you're going, you have to

3   adhere to the jury instructions to make it clear.  That's not

4   the law.

5          MR. RICHEY:  I'm reading from the jury instructions.

6          THE COURT:  And you can continue to read from the jury

7   instruction.  What I don't want you to do from there is argue

8   something that you know the law is not.  Okay.

9          MS. HELDMYER:  And I might add, Your Honor, there have

10   been a number of things that he has said that I have not

11   objected to that I think are way off base and I may have to --

12   at some point in time, I may want some time to ask for a

13   corrective instruction on some of the other things that he's

14   been arguing during closing argument.  So we may need a little

15   time.

16          THE COURT:  Well, I have to wait and let him finish

17   his argument, and we'll discuss it.

18          Go ahead, Mr. Richey.

19          MS. HELDMYER:  Thank you.

20          (Bench conference concluded.)

21          THE COURT:  At this point the objection is overruled.

22   Mr. Richey, you can continue from the instruction.

23          MR. RICHEY:  So again you will be instructed that to

24   structure a transaction means to deposit or withdraw or

25   otherwise participate in the transfer of a total of more than

10:48AM
1    $10,000 in cash.  And ladies and gentlemen of the jury, you're

2    being asked to find that my client committed 45 crimes, many of

3    which when he wasn't even in town, and when you go back there

4    and look, you will be given the jury instructions.  You will

5    also be given the actual indictment, the charges, and you will

6    see that in the charges, each charge lists an amount of $9,500.

7            MS. HELDMYER:  That's my objection, Your Honor.

8            THE COURT:  All right.  I'm going to let him finish.

9            MR. RICHEY:  I'm sorry, Your Honor.

10           THE COURT:  You may proceed.

11           MR. RICHEY:  You will see that the indictment charges

12   each charge, it lists a count.  It begins with Count 13.  It

13   lists the date of the check, July 20, 2001, and it says amount

14   withdrawn, $9,500.  There are 45 counts that you're being asked

15   to find my client guilty for structuring.

16           You will also be told that in order to find Mr. Hovind

17   guilty of those counts, that he was aiding and abetting,

18   because he wasn't here because his signature isn't on those.

19   And so to find that he is guilty of those 45 counts, you will

20   be instructed that he willfully associate in some way with a

21   crime and willfully participate in it.  And again, you will be

22   instructed that willfully means that he did it with the

23   specific intent to do something the law forbids.

24           Ladies and gentlemen, what the testimony showed was

25   that they went to their own account and took out their own

10:51AM 1    money, their own money, and you heard testimony from Agent

2    Evans that these 9,500, 9,600 was just too egregious.  Now,

3    when there were other transactions of 7,800, they are not

4    egregious enough to be a crime.

5            Ladies and gentlemen of the jury, compare the charges

6    and compare the instructions that the judge -- that this Court

7    will give you.  And I submit to you that you cannot find

8    Mr. Hovind guilty of those 58 -- or sorry, 45 counts.

9            Ladies and gentlemen, there is many more documents I

10   could go through, but I don't want to take up any more of your

11   time.  I appreciate you so much.  Mr. Hovind appreciates you

12   taking this time to consider his liberty and his interests.

13           Ladies and gentlemen, if you truly look at his

14   beliefs, if you truly look at the evidence that's submitted and

15   if you truly compare that to the instructions that you will be

16   given, you will find that Mr. Hovind is not guilty on every

17   count.  And you are the foundation of holding up his rights,

18   your rights, everyone's rights, and telling the government when

19   enough is enough.  This isn't about the money.  It's about his

20   religious beliefs and keeping him quiet.  This isn't about the

21   money.  If it was, there are other procedures the IRS can take.

22   This isn't about giving the government money that they are

23   owing.  There is other ways they can get the money.

24           What this case is about is whether Mr. Hovind is found

25   guilty and sentenced for committing 58 crimes that he never was

10:54AM  1  told he was committing.

2          Ladies and gentlemen, how would you like to leave here

3  and be driving your cars, the speed limit is 55 and you're

4  going 53, and you're pulled over because you were too close to

5  the speed limit and you must have been committing a crime, or

6  better yet, how about if you just get in the mail or the police

7  come and arrest you and bring you to court and say we know you

8  committed a crime and here's what you did.  When?  How?  Where?

9  When was I ever given notice of that?  That's what you have to

10  decide.  Ladies and gentlemen, you cannot find Mr. Hovind

11  guilty on any of the counts.  Thank you.

12          THE COURT:  Thank you.  We're going to take a recess.

13          Mr. Barringer, I apologize, but it's time.

14          We'll be in recess, ladies and gentlemen.  We're going

15  to take ten minutes and come back and finish up with this.

16          The ladies and gentlemen here observing in the gallery

17  area, I would ask please that you return as well at ten after.

18  I don't want the attorneys interrupted in their closing

19  arguments.  So please do take care of your immediate business

20  and return promptly at 11:10.

21          Ladies and gentlemen, please don't discuss the case

22  amongst yourselves during this brief recess.  Also, the trial

23  is not yet completed and you have not heard all the arguments

24  yet and you have not received your instructions.  So please

25  don't attempt to form an opinion about the merits of the case,

10:56AM  1    not yet.  You will be excused until 11:10.

2                     (Jury out.)

3                     THE COURT:  Ms. Heldmyer, do you wish to be heard now?

4                     MS. HELDMYER:  I do, Your Honor, on a number of

5    points.  That had to have been one of the most disingenuous

6    closing arguments that I've ever heard in my life.  There was

7    so many misrepresentations of the evidence and the law, I don't

8    even know where to begin.  One of the things that I would ask

9    for a corrective instruction on is Mr. Richey's disingenuous

10   representation to this jury that Special Agent Schneider did

11   not have the authority to seize the cash under the search

12   warrant.  He's got a copy of that search warrant.  He knows

13   full well that that search warrant included the authority and

14   the direction of the Court to seize that cash, and I think that

15   that may have resounded with the jury because we didn't put

16   that search warrant into evidence because we normally don't do

17   that, but I either want the opportunity to put the search

18   warrant or the inventory into evidence, or I ask for a

19   corrective instruction that Special Agent Schneider did, in

20   fact, have the authority to seize the cash that he seized.

21                    THE COURT:  All right.  Mr. Richey.

22                    MR. RICHEY:  Yes, Your Honor.  Once again, I believe

23   it's a misrepresentation by the government.  I fully stated

24   that the warrant said he had the authority and he took it as

25   part of his criminal investigation.  That's what he testified

10:57AM  1    to, but then he said that he turned it over to the IRS

2    afterwards.

3           THE COURT:  I'll review the instruction on the break

4    and if you, in fact, did make that representation, Mr. Richey,

5    then a curative instruction will be in order.  If you did not,

6    then no instruction will be given.

7           All right.  Ms. Heldmyer.

8           MS. HELDMYER:  I'm trying to do this in order of

9    importance.  I think the next misrepresentation by Mr. Richey

10   was the implication to the jury that the government has some

11   requirement that we notify the defendants that they are

12   breaking the law before they are indicted.  That's certainly

13   something that was boldly stated and implied on a number of

14   occasions, and there is a difference between having to prove

15   that the offense was committed willfully and having to notify

16   the defendant beforehand that he was committing a crime before

17   indicted him for the crime, and I would like a curative

18   instruction on that.

19          THE COURT:  I'm not going to give a curative

20   instruction there, Ms. Heldmyer, but you are certainly free to

21   argue strenuously in your rebuttal that the law does not

22   require in the criminal context any prior notice.  In fact, the

23   indictment is notice under the law.

24          All right.  Next.

25          MS. HELDMYER:  Yes, Your Honor, may I have just a

10:59AM 1    moment to review my notes?  Obviously, I would renew my motion

2    for curative instruction regarding the law as it pertains to

3    structuring or I would ask that actual law pertaining to

4    structuring be added to the jury instructions, based upon the

5    strong implication by Mr. Richey that we can only charge these

6    defendants in cases where the structuring itself involved more

7    than $10,000 because that is not the law, and I can provide the

8    Court case law, and I think that that implication, even though

9    he was stopped from directly saying it by the Court at the

10   bench conference, I think that implication is out there, and I

11   would like that to be corrected.

12           THE COURT:  Mr. Richey.

13           MR. RICHEY:  Well, Your Honor, as you know, I

14   specifically read from the jury instruction.  The jury

15   instruction specifically says and this was taken from the

16   pattern instructions, and we spent a lot of time going over

17   this, and the government had no objection to the pattern

18   instruction, had no objection to what it states as the law and

19   the pattern instruction says to structure a transaction means

20   to deposit or withdraw or otherwise participate in the transfer

21   of a total of more than 10,000 in cash.  I was clearly within

22   what the jury instruction says.  I then specifically went to

23   the charging document, and it's not my burden to show that the

24   government met their burden.  The government can show that it

25   met its burden, but this is what the jury instruction says.

11:01AM 1    This is what the Court has determined that the law is going to

2    say.  This is, in fact, what this circuit has determined the

3    law says, and I'm clearly within my right to defend my client

4    to state what the jury instruction says.

5            THE COURT:  All right.  Is this your intended

6    argument?

7            MR. BARRINGER:  Yes, Your Honor.  And let me be a bit

8    more specific from where Mr. Richey was at.  It's not like I'm

9    going to give away what I'm going to say because we've already

10   done this a little bit this morning.  What the problem is that

11   the indictment was written wrong.  The indictment doesn't set

12   forth the elements of a crime in each particular Count 13

13   through 57.  It tries to do it -- and you've heard how Ms.

14   Heldmyer did it.  All these checks show a pattern, but each

15   count is one separate check.  Each count has to meet the

16   requirements of the instructions.  She doesn't get to say all

17   of them and then point to each one and say guilty there.

18   That's how the problem has been structured ever since we

19   started on this.  That's what we were talking about yesterday.

20   She has a problem with how the indictment is written.  The

21   problem is that it doesn't state a cause of action with how the

22   instructions are written and you can't change the instructions

23   now to try to fit where the government's position is.  I think

24   that's a mistrial position.

25           THE COURT:  Ms. Heldmyer.

11:02AM 1           MS. HELDMYER:  Well, Mr. Barringer and Mr. Richey are

2      both wrong on the law.  That's the bottom line.  The indictment

3      is not written incorrectly.  I can cite the case of United

4      States versus Cassano, C-a-s-s-a-n-o.  It is 2004 case found at

5      372 Fd. 3d 868, and what it specifically says is a person

6      structures a transaction if that person acting alone or in

7      conjunction with or on behalf of other persons, conducts or

8      attempts to conduct one or more transactions in currency in any

9      amount at one or more financial institutions on one or more

10     days in any manner for the purpose of evading the reporting

11     requirements under Section 103.22 of this part.  In any manner

12     includes but is not limited to the breaking down of a single

13     sum of currency exceeding $10,000 into smaller sums.  The

14     transaction or transactions need not exceed $10,000 reporting

15     threshold at any single financial institution on any single day

16     in order to constitute structuring within the meaning of this

17     definition.  And that's exactly what they are arguing, Your

18     Honor, that is wrong with this indictment, and they are going

19     to argue for acquittal and in contrary to the law, as it's

20     stated in that case.

21           MR. RICHEY:  Your Honor, just for clarification, as

22     Counsel noted, it said that there were a series of

23     transactions, one or more.  It said that each individual one

24     did not have to cross the threshold.  The problem is that the

25     law as instructed by this Court and as this circuit has found

11:04AM 1    requires.

2          THE COURT:  What circuit case are you referring to?

3          MR. RICHEY:  The pattern jury instruction.

4          THE COURT:  The pattern jury instructions are not the

5    law.  They are something, a guide, something for this Court to

6    look to, and I do in almost every circumstance consult the

7    pattern jury instructions, but they must be based on the law.

8    They in and of themselves are not the law.

9          So I'm going to look at this Cassano case.  I am

10   highly reluctant to change the jury instructions at this point.

11   We've gone through them.  There was no objection to the

12   instruction.  And I'm not so sure the instruction is wrong or

13   Ms. Heldmyer's objection is as to the instruction as much as it

14   is to the argument from the instruction.  I don't know whether

15   the instruction differs with Cassano, but let me review Cassano

16   and let you know.  Is Cassano an Eleventh Circuit case?

17         MS. HELDMYER:  It's a Seventh Circuit case, Your

18   Honor.  And I'm not arguing that the jury instruction as

19   written is wrong.  What I'm arguing is the argument of counsel

20   pursuant to that jury instruction and the implication they are

21   making to the jury is wrong.

22         THE COURT:  All right.  I'll give you notice -- yes.

23         MS. HELDMYER:  I have one other point.

24         THE COURT:  Yes, Ms. Heldmyer.

25         MS. HELDMYER:  There are several factual arguments

1   that I will make.  Obviously, those are just incorrect

2   statements as to what the witnesses testified to.  But the

3   other big concern I have is a continuing implication that

4   Special Agent Schneider and Revenue Agent Powe did not have the

5   authority to do what they did.  That was again pervasive

6   throughout the argument of Mr. Richey and impermissible, and I

7   would ask for a curative instruction with regard to that.

8          THE COURT:  I believe my comment to Mr. Richey is

9   sufficient.

10          MS. HELDMYER:  Well, Your Honor, the problem with the

11   comment is that -- the comment that you made was that --

12   basically that it's irrelevant.  And the implication being that

13   it's irrelevant whether or not Special Agent Schneider or

14   Revenue Agent Powe broke the law or did something improper, and

15   that's what I'm trying to avoid is the implication that they

16   did because there is no indication, as the Court has already

17   found, that they did anything improper.  So I believe because

18   apparently Mr. Richey certainly argued and apparently Mr.

19   Barringer is going to argue the same thing, that it is time to

20   inform the jury that there is no evidence that there was any

21   wrongdoing or any violation of any legal duty on the part of

22   Revenue Agent Powe and Special Agent Schneider.

23          THE COURT:  I'm hoping Mr. Barringer is not going to

24   do that.  I don't think he has a horse in this race, in any

25   event.  But I've told Mr. Richey on numerous occasions during

11:07AM

1    the trial that he should not and could not continue to argue

2    somehow as a defense to the Count 58 charge that Revenue

3    Officer Powe or Agent Schneider somehow technically violated

4    the regs or the law or didn't have the authority to do what

5    they did because there is absolutely no evidence of that.

6    However, I also told Mr. Richey that he could suggest and try

7    to show through the evidence that that was what Mr. Hovind

8    believed, and I suppose argue that somehow that justified

9    Mr. Hovind's actions and the actions that he took, and I, you

10   know, continued to adhere to that.  With that said, there

11   hasn't been any evidence in the case of any wrongdoing by Agent

12   Schneider or Revenue Officer Powe and no evidence that they did

13   not have the authority to take the action that they took, and

14   so I am going to give an instruction to the jury that tells

15   them that, but also tells them that they can consider the

16   evidence that has been introduced during the trial as evidence

17   of Mr. Hovind's state of mind and leave it at that.

18          MS. HELDMYER:  That's acceptable, Your Honor.  I do

19   have another couple of citations on the structuring if the

20   Court wishes to write those down.

21          THE COURT:  Yes.

22          MS. HELDMYER:  United States versus Macpherson,

23   M-a-c-p-h-e-r-s-o-n.

24          THE COURT:  All right.

25          MS. HELDMYER:  424 Fd. 3d 183, and the applicable CFR

11:09AM 1    is 31 CFR 103.11.

2              Well, we obviously won't be ready for the jury at

3    11:10.  We cannot proceed until this is resolved.  We'll be in

4    recess.

5              (Recess.)

6              THE COURT:  All right.  As to the jury instructions

7    and Counts 13 through 57, I've reviewed the case law and I've

8    indictment and I've reviewed the CFR.  I am going to add a

9    sentence to the instruction from the CFR, and I am going to

10   allow the defendant's argument to stand, Mr. Richey's to stand

11   and Mr. Barringer to make his argument.

12             The sentence that I have added is as follows, and it

13   will go in the structuring section of the instruction.  The

14   transaction or transactions need not exceed --

15             MR. RICHEY:  I'm sorry, Your Honor.  Would you tell us

16   on what page?

17             THE COURT:  I'm on page 20 of the instructions.

18             MR. RICHEY:  Okay.  Thank you.

19             THE COURT:  The transaction or transactions need not

20   exceed the $10,000 reporting threshold at any single financial

21   institution on any single day in order to constitute

22   structuring within the meaning of this definition.  However,

23   again, I think the argument from the defense, it is at least

24   fair for them to make the argument based on the way the

25   indictment reads.  So I'm going to allow that.

11:54AM 1              Mr. Richey.

2              MR. RICHEY:  Yes, Your Honor, if I may.  I'm going to

3    object to any changes at this time.  Obviously, we've gone over

4    these jury instructions a number of times.

5              THE COURT:  Mr. Richey, did you just hand me a

6    limiting instruction to give to this jury during this last

7    recess that I asked you to come up with yesterday?

8              MR. RICHEY:  Yes, Your Honor, but on this particular

9    one, we've gone over a number of times and she's never voiced

10   an objection.

11             THE COURT:  Your objection is noted.  I've got to move

12   on with today's proceedings.  Your objection is noted.

13             Mr. Barringer, you can join in it if you wish.  I

14   assume that's why you're standing.

15             MR. BARRINGER:  Yes, Your Honor.

16             THE COURT:  All right.  Your objection is noted and

17   you're joining in it.  It's on the record and it's preserved.

18   And we're moving on.

19             All right.  I did review the transcript of

20   Mr. Richey's closing argument and Mr. Richey did state, quote,

21   if the warrant gave him the right, he could have take it, but

22   he called his supervisor, clearly implying that Agent Schneider

23   did not have the right to take the money under the warrant, and

24   I am going to give a limiting instruction that Agent Schneider

25   acted under authority of a lawful court order, via the search

11:55AM 1   warrant at the time he entered the Hovind's property to execute

2   the search.  And any suggestion that he did not have such

3   authority must be disregarded.

4           Second, I am going to instruct the jury that there has

5   been no evidence that Agent Schneider and/or Revenue Officer

6   Powe lacked authority to take the actions they did, and

7   therefore, any suggestion that they did not have proper

8   authority must be disregarded.  However, you may consider

9   Mr. Hovind's beliefs about their authority or lack, thereof, in

10  deciding whether he acted willfully.

11          I've been given a proposed limiting instruction from

12  Mr. Richey regarding testimony sometime ago about John Slobach,

13  Fred Ortiz and Glen Stoll.  The government objected to the

14  instruction.  It is my understanding the government objected to

15  the instruction.  I am going to give part of the instruction

16  that has been proposed.  I am going to advise the jury that

17  they may not consider any actions against these individuals in

18  deciding the guilt or innocence of the defendants, but I am not

19  going to give anything further as far as the defendants

20  reliance on those individuals.  There's been no testimony that

21  Mr. Hovind relied on any advice of these individuals

22  specifically.

23          MR. RICHEY:  Actually, Your Honor, there was a

24  document that was admitted where he says that he received

25  advice from them and relied on them and also further in the

11:57AM
1    closing argument, Ms. Heldmyer referred specifically to these

2    individuals and the actions that were taken against them.

3            THE COURT:  And I am going to instruct the jury that

4    they may not consider any of those actions in making their

5    decision as far as the criminal liability of these defendants.

6    I think that's a proper instruction.

7            Is there anything else?

8            MR. RICHEY:  Just briefly, Your Honor.  I'm going to

9    move for a mistrial, in that the jury instructions have now

10   been changed and altered after my closing argument.

11           THE COURT:  Denied.

12           Mr. Barringer.

13           MR. BARRINGER:  Could you read back one more time what

14   you're going to add in the 13 or 15 through 57.

15           THE COURT:  The transaction or transactions need not

16   exceed the $10,000 reporting threshold at any single financial

17   institution on any single day in order to constitute

18   structuring within the meaning of this definition.

19           MR. BARRINGER:  Then I also have to move for mistrial,

20   Your Honor, because that changes what we've already agreed to

21   as far as the instructions.  It changes in fact the entire case

22   from my position since I've known what this instruction has

23   been looking like for more than a week now, I move for a

24   mistrial as well.

25           THE COURT:  You haven't had my final decision on the

11:59AM 1   instructions until, I believe, last night.

2          MR. BARRINGER:  The language as far as structuring is

3   concerned has not changed since at least the end of the first

4   week.  That paragraph on structuring has always been the same

5   except for changing it from less than 10,000 to 10,000 or less,

6   remember that, that was the entirety of any discussion as far

7   as structuring is concerned.  Now we've changed and are

8   changing that around.

9          THE COURT:  Ms. Heldmyer, is it worth it to you based

10  on these motions for mistrial to have these single sentence

11  inserted?

12         MS. HELDMYER:  It is, Your Honor, if they intend to

13  represent to this jury that they have to acquit because these

14  individual accounts are under $10,000.  That's an incorrect

15  statement of the law.  The law has not changed, Your Honor.

16  The law has been the same throughout the trial and for many

17  years.  Because of Mr. Barringer's misunderstanding of the law,

18  that doesn't give him a right to come in and ask for a mistrial

19  based upon the jury instructions.  If it's a correct statement

20  of the law and the need for this jury instruction is based upon

21  an incorrect argument that he intends to make.  If he gets up

22  and he argues to the jury, as I believe Mr. Richey did, that

23  they have to acquit because the $10,000 limit hasn't been

24  reached per count, then, yes, it is worth it.  If he doesn't

25  make that argument, then no.

12:00PM 1              THE COURT:  Well, do you think that this one sentence

2  that I've just alluded to, that that addresses your concern as

3  far as the argument --

4              MS. HELDMYER:  It does, Your Honor.

5              THE COURT:  -- because I'm going to allow them to make

6  the argument.

7              MS. HELDMYER:  If you're going to allow them to make

8  the argument, then I believe that we have to do that because

9  that does address that concern, because then I can argue what

10  the law really is and that is that it doesn't make any

11  difference that the individual counts involve less than

12  $10,000.  That's a correct statement of the law.  They are

13  going to be arguing an incorrect statement of the law to the

14  jury if they argue otherwise.  It is not my place, of course,

15  to give the jury the law.  So even if I stand up and say no,

16  he's wrong, that doesn't hold the weight because I can't -- I'm

17  not allowed to give them what the law is.  That's the problem.

18              THE COURT:  Well, I think that Mr. Barringer's

19  argument is based on the drafting, framing of the indictment,

20  not so much -- I don't know that either of you disagree about

21  the law as much as he disagrees that the way the indictment is

22  drafted can support a conviction.

23              MR. BARRINGER:  That's correct, Your Honor.

24              MS. HELDMYER:  That's a legal argument, Your Honor.

25  That's the problem.  It's not a factual argument.  He's about

12:01PM 1    to give the jury an incorrect statement of the law.  That's my

2    problem.

3            MR. BARRINGER:  The factual argument is that each

4    count is a separate and distinct act that must fit all the

5    elements of the instructions that we've been dealing with for

6    roughly a week now including this issue of structuring.  Each

7    count has to fit that.  I didn't write the indictment.  Your

8    Honor didn't write it.  But we have to deal with what it says,

9    and each count is a separate fact in and of itself.  The

10   instruction you're now giving alters that immeasurably and

11   changes the fact of the entire instruction on pages 19 and 20

12   and negates anything that I would he say.  It's ineffectively a

13   directed verdict.

14           THE COURT:  I disagree with that.  I don't think it

15   changes at all the instruction as it currently exists.  It adds

16   and it explains, but it doesn't change it, and you're still

17   free to make the argument as far as the overall total or amount

18   and it may -- I don't have time right now for this argument.  I

19   have a jury -- we have a jury, a very patient jury, who is

20   sitting in the jury room just waiting for us to bring them back

21   in so that they can participate in this trial.  I am going to

22   move this trial on.  I am going to add this language, and I'm

23   going to allow you to make your arguments, and if you want to

24   raise legal arguments after the jury has fulfilled and

25   completed its duty, I will certainly consider your legal

12:03PM 1   arguments at that time, but right now, we are going to move on

2   and allow the jury to do its duty in this trial.

3          Mr. Richey, if you wish, sir, we have -- well, if you

4   wish to argue to the jury again, if you wish to come back up to

5   the podium and address this one sentence and present argument

6   to the jury about it since it is something that you did not

7   have the benefit of at the time you made your argument, then

8   you are free to do so.

9          Ms. Heldmyer, I will certainly give you all the time

10  you need in rebuttal, if you wish to address this additional

11  sentence.

12          MS. HELDMYER:  That's acceptable, Your Honor.

13          MR. RICHEY:  Your Honor, I'm going to let my argument

14  stand.

15          THE COURT:  All right.  Very well.

16          Please bring in the jury.

17          Mr. Barringer, you're up.

18          (Jury present.)

19          THE COURT:  Ladies and gentlemen, we apologize for the

20  delay.  We are now ready to proceed with the continuation of

21  the closing arguments in this trial.

22          Mr. Barringer.

23          MR. BARRINGER:  Thank you, Your Honor.  May it please

24  the Court.

25          THE COURT:  Yes, sir.

12:05PM 1              MR. BARRINGER:  Counsel, Counsel.

2              I actually have to say good afternoon, ladies and

3     gentlemen.  We've been here for almost two weeks of evidence in

4     the process of how this trial works, and I also really

5     appreciate your efforts and really appreciate your attention

6     and your interest in what's going on here.

7              This touches you only in this period of time and then

8     afterwards, as you think about it, but it touches everybody

9     else here for perhaps the rest of their lives.  So it's always

10    my desire always to thank you for what you do.

11             I represent Mrs. Hovind.  We've heard lots of talk

12    about Mr. Hovind and not so much about Mrs. Hovind.  As an

13    example, the FOIA request that dealt with Mr. Hovind were 710

14    pages alone that the government entered that didn't include all

15    the attachments that came back.  It might have been 2,000 pages

16    worth of material.  That is just one part of what the

17    government was bringing against Mr. Hovind.

18             But Mrs. Hovind, it's only in the STR-exhibits, the

19    STR-structuring exhibits, checks, and only for a limited period

20    of time in those checks and then in the summary that Agent

21    Evans put together afterwards.

22             So what do we have?  The government has said that

23    Brian Popp had testified about CTRs is a bad thing.  I don't

24    recall whether he said it or not, maybe you do as well, but it

25    was allegedly said to Mr. Hovind who said it to Mrs. Hovind.

12:07PM
1    In the process of writing these checks to cash for years and

2    years and years and the government didn't say when it stopped,

3    their exhibits stopped at the end of 2003.  Did it continue on

4    after that?  How long before 2000 because the first check we

5    have is in 2000, how long before that was it going on and what

6    were the size of those checks?  The government didn't bring any

7    of that evidence in.

8            What you saw was a ramping up for a couple of years

9    before you get to a 95- or 9,600 number.  Who ever told Mrs.

10   Hovind about the currency transaction reports?  Did you hear

11   any witness say that?  The answer is no.  Did you see any

12   document that said that?  And the answer is no, including the

13   Remedies at Law thing that says before you cash checks or do

14   something with $10,000, contact us.  Even that doesn't say

15   anything about a currency transaction reporting requirement.

16   That's actually the bank's requirement.  It doesn't say

17   anything about -- that Mrs. Hovind knew of that -- any statutes

18   behind that or any regulations behind that.  It doesn't say any

19   of that.  And the only other two witnesses that talked about

20   currency transaction reports, aside from Mr. Evans, Agent

21   Evans -- I'm sorry -- aside from Agent Evans were the two bank

22   officials, Anne Dyson the first week and Jennifer Johnson

23   yesterday.  Jennifer Johnson said currency transaction reports

24   were dealt with with respect to what Mr. Hovind did in 2004.

25   She didn't say that she sent those to Mr. Hovind in 2004, but

12:09PM

1    2004 is beyond the time of Counts 13 through 57, which only run

2    from 2001 through 2002.  Think about this.  We saw several

3    checks come in through the STR-exhibit.  And I'll hold them

4    here briefly STR-17-A.  Remember this one?  This was for 2000,

5    not 1999.  It begins in 2000, STR-217-B for 2001.  You get to

6    get all these, STR-217-C for 2002 and STR-217-D for 2003.

7    That's all.  186 checks.  You will note as you look at these

8    exhibits that the total number of checks that were written

9    during that period of time were probably more than 4,000.

10   We're dealing with 186 checks total.  But here's the other

11   thing as well, Mrs. Hovind didn't write them all.  Remember how

12   when Agent Evans was testifying, he would point out in

13   different places, he would say.

14          Thank you, Your Honor.

15          It says up there, some of them are Martha Harris'

16   some of them are Jo Hovind's.  Years later -- I won't put them

17   up -- but again, Martha Harris, Jo Hovind, and then we have

18   Tanya Hovind on a number of checks.  Of the 186 checks total,

19   only 45 of which have been charged of the 186 total, Mrs.

20   Hovind didn't write them all.  There are checks in this

21   breakdown here, and I will put up this one page, and you will

22   notice that in this period of time, there are checks by Jo

23   Hovind that were charged and checks by Tanya Hovind that

24   weren't.  Same time period.  And the only reason I guess is

25   because Jo Hovind didn't sign them.  They weren't as far as the

12:12PM
1    government was concerned a crime in that instance.  And you'll

2    see on there as you get down into September where it makes that

3    change.  Do you remember what Agent Evans said?  Well, 9,600,

4    well, that's too close to the line.  7,800, well, that's not as

5    egregious.  Where is the line?  The line is 10,000.  How high

6    do you have to go before you're supposed to know the line?

7         Think what the government is saying.  A person who has

8    a signatory authority over an account, takes money out of that

9    account, and it's a crime.  They do it lots of times and they

10   call it a pattern.  That's what you're seeing there.  Those

11   checks are out of that CSE account Mrs. Hovind had authority to

12   write checks on.  The government brought in those exhibits to

13   show that she has that authority.  And so as we go through this

14   process, beginning on this page and this is in 2001, where it

15   starts at is each separate check is a count in the indictment,

16   not all the checks together in one count, each check is a

17   count, which means that each check has to fit all the elements

18   of the crime.  None of them do.

19        When you look at this, when you see what's going on --

20   I kept waiting to see what checks would be there on the same

21   days.  Nothing came out.  I kept waiting to see what was going

22   to be discussed in terms of the overall activities around this

23   account.  Nothing came out.  In the exhibits that came in for

24   this account, we have no other checks but what the government

25   brought in the STRs.  The 4,000 checks are there in the listing

12:14PM  1   in the bank statement, but those checks weren't brought in.

2   Agent Evans didn't know anything about any other checks, just

3   these ones and they pick and choose in the process which ones

4   they think are criminal and which ones they think aren't.

5   Which ones they think are too egregious and which ones aren't,

6   in the process they say of evading the reporting requirements

7   that nobody has testified Mrs. Hovind knew about.

8        Anne Dyson said that those CTRs weren't sent to the

9   individuals.  She didn't say that everybody knows that bank's

10   business is done at 2:00.  What it says, what most notes say,

11   what it says in my bank is that the checks after that period of

12   time may not be accounted -- may not be placed in your account

13   until the next day.  On Saturdays they may not make it there at

14   all.  That's how it works in banks.  It's not the same as

15   saying, hey, at 2 o'clock, the CTR can be created.  Pay

16   attention to this.  That's not what it says.  Yet, that's what

17   the government is telling you is going on.

18        Do you see the difference between the theory and

19   what's reality?  They are saying the pattern are all the

20   checks, but they charge each check individually.  It would

21   appear that they are trying to keep on the counts.  When I

22   first got a copy of the indictment, I wondered how many pages

23   it would be.

24        MS. HELDMYER:  Objection as to what Mr. Barringer

25   thought or believed, Your Honor.

12:16PM 1                    THE COURT:  Sustained.

2                    MR. BARRINGER:   It is not just 13 through 57,

3       everything.  And yet, you get 45 counts of this, each check

4       being a separate charge.  Here is the first one, STR-27.  That

5       little piece of paper is one count.  We go through the process

6       all the way up until August of 2002, the same way.  Each little

7       check is one count.  Each little check has to meet all the

8       elements of the crime.  You heard Mr. Richey describe to you

9       what those elements were.  Each little check doesn't make it

10      there and then we have this issue about intent.  What was known

11      by Mrs. Hovind?

12                   Now, Ms. Heldmyer suggested that Mrs. Hovind was,

13      well, if not an active tax protester, at least supported what

14      her husband said.  And therefore, apparently on that theory,

15      that thought process enabled them to say that Mrs. Hovind knew

16      about CTRs, knew about reporting requirements, knew about what

17      to do with staying under the radar with reporting requirements,

18      except nobody testified to that and no facts were brought in.

19                   What was testified to by Dan Nelson is that Mrs.

20      Hovind in fact did not necessarily agree with her husband's tax

21      issues, was telling him to stop doing that because she thought

22      it might be a problem in the house.  Surprisingly, here we are.

23      But she didn't agree, and how do you go -- if she doesn't agree

24      to that, now she understands everything about CTRs that she was

25      never told about.  Do you see where the problem is?  The

12:18PM 1    government wants you to assume too much.  The government wants

2    you to assume that everybody knows what a CTR is.  The

3    government wants you to assume that if you write checks to

4    cash, and with her testimony that the employees were being paid

5    in cash, that the employees -- the payroll was going up.

6    You've got the payroll charts in there as well that shows the

7    payroll was increasing.  Is it a big surprise that the checks

8    are going to get bigger, too?  Agent Evans says I can't see any

9    pattern.  I'm calling it a pattern for the overall structuring,

10   but I can't see any pattern with what's going on with the

11   checks.  Do you see how it doesn't add up?  Agent Evans

12   answered a question from me says that each check stands on its

13   own.  It doesn't require the one in front and it doesn't

14   require the one behind it.  Each one stands on its own, which

15   means that a pattern has to be within each check, not the

16   group.  And do you see how the process begins to unfold for the

17   government?  Their argument doesn't work if you can't see all

18   the checks together.  If you look at each individual check, you

19   see that there is no intent on any one check.  You see that

20   there is no evasion process or the evasion, which you have to

21   define what evasion is.  You have to see what you think it

22   means.  But to evade, to evade with knowingly and purposefully

23   evade those reporting requirements.  Where is the evidence?

24          It's clear.  It's clear from the CTRs, and I had,

25   Agent Evans read from parts of STRs and instructions that go

12:19PM 1  along with it, it's clear that the number is 10,000.  So in

2  order to avoid -- in order to evade the CTR requirement, in

3  order to evade it, Mrs. Hovind could have written a check for

4  $10,000.  It would have been okay.  It still would not have

5  triggered a CTR.

6        Now, he says egregious is at 9,600, but it's not so

7  egregious at 7,800.  What's the pattern?  What's the logic

8  there?  Do you see where the problem is?  Do you see how the

9  government's case is based upon you assuming that writing lots

10  of checks are bad and, therefore, each check is bad.  Lots of

11  checks, bad for you.  One check must be bad as well.  In fact,

12  from cross-examination from Mr. Richey, Agent Evans was talking

13  about the differences between five or six checks of 5,400 or

14  6,200.  Do you remember that testimony?  Versus four or five

15  checks of 9,600.  As you look up here on the 2002 year, the

16  checks actually increase and the amount of money increases.

17        As you get down into September and October, you see

18  that there is more checks there than the months before.  But if

19  you do the math, more money is coming out, but that's not a

20  crime.  It's not egregious enough.  What does that mean?  So

21  surprising, so shocking, so remarkable, that, oh, my gosh,

22  $9,600.  It must be a crime.  You have to find the evidence

23  that shows there is any intent, and there is no evidence that

24  shows that.

25        We heard talk that, well, from Agent Schneider that,

12:22PM
1  well, we gave a criminal summons to Mr. Hovind, therefore, they

2  changed their pattern.  Criminal summons, and I know the

3  testimony has been a little varied, but the end of June, July,

4  beginning of July, but July of 2002 is the summons.  When does

5  it change?  September.  It doesn't add up.  Agent Schneider

6  said they opened up that other bank account, the AmSouth

7  account specifically to pay the employees.  I think it was

8  AmSouth.  Maybe it was Regions, Regions account, to pay the

9  employees, and that was an implication that is an indication

10 that they changed.  When was that?  November of 2002.

11      Agent Evans testified about that yesterday.  That

12 account didn't open up until November.  July to November shows

13 intent to change because you know you've done something wrong.

14 Do you see how when you really look at the facts, it doesn't

15 make sense?

16      We heard testimony about whether or not Glen Stoll had

17 told them something when he sent that one note, not dated, that

18 described that $10,000 amount.  We don't know when it was.

19 Agent Schneider thinks it was in 2003.  That shows a pattern.

20 That shows intent.  That shows knowledge that you're doing

21 something that the law says you shouldn't do.  On this concept

22 of evasion, knowingly and purposely evading a CTR reporting

23 requirement, on a particular form, Form 4789, that doesn't show

24 it.  If you're paying your employees in cash, that doesn't show

25 it, what's up there on the screen.  These exhibits that show

12:23PM

1   lots of checks were written doesn't show a pattern of evasion,

2   knowingly and purposely evading that request requirement if

3   you're paying your employees.  It just doesn't get there.  And

4   when you look at it in each count by itself, has to standby

5   itself, how do you pick and choose where the knowledge is if

6   you're trying to find something?  You can't.  There is no

7   knowledge there.  So for each count, starting with Count 13

8   with Mrs. Hovind, it's not guilty.  You check not guilty.

9   That's what you need to do, check not guilty, because she's not

10  guilty of knowingly and purposely evading this reporting

11  requirement.  Count 14, Count 15, Count 16, all the way through

12  count 57, each one a separate check, not guilty, because that's

13  all there is.  That's all there is.

14       Mrs. Hovind is a housewife.  Mrs. Hovind, the

15  business, the CSE has invaded her house.  You heard Mr. Gibbs,

16  the attorney that the government has said is so knowledgeable

17  on taxes commented on what Mrs. Hovind was doing.  Do you

18  remember?  While he was trying to deal with Mr. Hovind, she was

19  trying to entertain the children, the grandchildren, making

20  everybody feel welcome in her home.  She's a music teacher.

21  She's a mother.  She's a grandmother.  And the government has

22  her here saying she committed 45 acts of evasion with knowing

23  purpose on these CTR reports, 45 acts, each one a separate

24  check.  Each count is not guilty.  There is no doubt about it.

25       Now, I could spend a lot of time telling you all kinds

12:25PM

1   of other stuff, but that's the bottom line here.  The

2   government, however, gets two cracks at the defendants, one is

3   as being principal to each one, the other one is aiding and

4   abetting.  Aiding and abetting has a willfully thrown in it,

5   that you're willfully intending to violate a law.  Two cracks

6   within this same count against Mrs. Hovind.  But on each count,

7   on each crack at it, still not guilty, because when get to the

8   point of saying she was knowingly and intending to evade the

9   law, that means that she is all this time saying, IRS I'm going

10  to write this check and I'm knowingly evading it if I am the

11  aider and abettor.  I'll do it every time.  Double dog dare you

12  to come get me.  That's what she's basically is saying.  I know

13  what the law is.  I don't care what it is.  I'm going to do it

14  anyway.

15          Folks, that's just not right.  That's not what the law

16  is.  That's not what the facts are.  Either as a principal or

17  an aider and abettor on these counts.  It's not guilty as to

18  each one.

19          As you sit and deliberate, think about how this is

20  structured.  Think about how the indictment is written.  Look

21  at it and apply it to the instructions themselves.  Look at

22  what it says.  The indictment versus what the instructions say.

23  Can't treat it as a pattern for all 45 counts, because then you

24  would be looking at it as if it was one count, which is what

25  the government is hoping you'll do.  Look at it as just one big

12:27PM

1  operation, not 45 little individual acts, but each individual

2  act has to be within the framework of those instructions, and

3  then you go from the 45, go from the big one down to the 45

4  individual acts.  It's not guilty.  Remember, don't be swayed

5  by the government on the big picture that they are trying to

6  paint on this pattern.  Don't get lost in that area because

7  Ms. Heldmyer gets to come back up here and talk to you again.

8          Remember what I'm telling you about what the

9  indictment says, take a look at the indictment and look at what

10  the instructions say, and you'll see that it's clear that on

11  Counts 13 through 57, Mrs. Hovind is not guilty.  And as to

12  each count, that's what I'm asking you -- that's what I'm

13  telling you to do is not guilty because that's what the law

14  requires.  Thank you.

15          THE COURT:  Ms. Heldmyer.

16          MS. HELDMYER:  Thank you, Your Honor.

17          Let me start by saying I know everyone is hungry,

18  myself included, and I'm going to try very hard to be very

19  brief.  The reason that I get a second crack, as Mr. Barringer

20  said, is because that's the law, that I get to come back up

21  here.  It's not a favor.  It's the way that the law is written.

22  And that is a perfect example of the misrepresentation that

23  Mr. Barringer just made to you about the law regarding CTRs.

24          Let me just try to clarify this.  Each and every count

25  that's charged in the indictment is charging Mrs. Hovind and no

12:29PM 1    one else in terms of the checks that was written.

2              MR. RICHEY:  Objection, Your Honor, misstatement.

3              THE COURT:  Overruled.

4              MS. HELDMYER:  That she wrote each of those checks.

5    We didn't charge her with Martha Harris' accounts.  We didn't

6    charge her with Martha Harris' checks.  We didn't charge her

7    with Tanya -- I'm not even sure if Mr. Barringer is asking why

8    we didn't do that because it seems obvious that if someone else

9    wrote the check, then we wouldn't be charging Mrs. Hovind with

10   it.  I'm a little confused as to whether he thinks we ought to

11   charge more counts or less counts.  But the point is -- and he

12   beat up Special Agent Evans pretty badly about the selection.

13   It wasn't even Special Agent Evans' choice.  But in any event

14   the grand jury returned this indictment.  It returned an

15   indictment of 45 individual checks that were written, each one

16   of those checks was written for the $9,500 or $9,600.

17             The Court is going to instruct you on the law.

18   Mr. Barringer tried to do that.  He cannot do that.  The judge

19   is going to tell you exactly what the law is.  And what the

20   judge is going to tell you is that each of these individual

21   checks can in fact be an individual crime.  The check itself

22   does not have to be over $10,000.  As a matter of fact if it

23   were, then it wouldn't be structuring.  What we have charged,

24   and I'm going to try to simplify it because Mr. Barringer has

25   really complicated this, each individual check was written

12:31PM

1    knowing that when she wrote the check and she cashed it, she

2    knew there was a reporting requirement, and she wrote the check

3    for less than $10,000 for the purpose of evading the CTR

4    requirement.  In other words, when she wrote each of those

5    checks, she had in her mind that she did not want to trigger

6    the CTR requirement and that's why she wrote each of these

7    checks for the $9,600.  There is no requirement that we put a

8    witness on the witness stand, as Mr. Barringer implied, to

9    testify that, well, I told her there is a CTR.  We don't even

10   have to prove that she knew it was illegal when she did it.

11   She had to have been doing that with the purpose and the intent

12   to evade the reporting requirement and that's it.  So each time

13   she did that, each time she wrote a check for under $10,000 and

14   took it to the bank and cashed it, that individual check is a

15   count in the indictment.

16          Now, there were other factors that came into play in

17   choosing which of the 45 counts are going to be charged, the

18   greater amounts, 45 counts I would think would be enough for

19   Mr. Barringer, but the 45 counts that were charged were the

20   ones that you'll see in the pattern were the ones that happened

21   in the statute of limitations and it happened with Jo Hovind's

22   signature, that Jo Hovind cashed, that were 9,600 or 9,500

23   amounts.  The smaller amounts were not charged.  Could they

24   have been charged?  Yes, probably so.  It's just as illegal if

25   you're structuring to write a 3,000 check as it is to write a

12:32PM

1    9,600 check, but what we did -- what the grand jury did is

2    return the indictment on 45 $9,500 and $9,600 checks, each one

3    of those is a separate crime.  So hopefully, things make a

4    little bit more sense as to why those particular counts are

5    charged.  You can look at the chart.  That's why we created it

6    them, so you can take a look the individual checks and you can

7    see for yourself the ones that were chosen and indicted by the

8    grand jury.

9         The reason why both of those defendants are charged --

10   both of the defense attorneys mentioned the fact that both

11   defendants are charged in the structuring.  The reason is

12   because of something that's called aiding and abetting, and

13   you're going to see in the indictment that Section 2 of Title

14   18 is charged as well in that charge.  And aiding and abetting

15   is a legal definition that the Court is going to tell you

16   about.  So listen carefully to what the Court tells you about

17   aiding and abetting, but what she is going to tell you is that

18   the guilt of a defendant in a criminal case may be proved

19   without evidence that the defendant personally did every act

20   involved in the commission of the crime charged.  The law

21   recognizes that ordinarily anything that a person can do for

22   ones self may also be accomplished through the direction of

23   another person as an agent or by acting together with or under

24   the direction of another person or persons in a joint effort.

25   That's what Mr. Barringer just referred to as my second crack,

12:34PM
1    but what it is is the law, which is what the Judge is going to

2    tell you.  It simply means that you do not have to necessarily

3    be present when a crime is committed, but if you acted together

4    with another person to have that crime committed, then you can

5    be held and will be held criminally responsible for that.

6           The evidence has been overwhelming that Kent Hovind

7    ran the show.  He is the director of CSE, he had the

8    responsibilities, whereas Jo Hovind's responsibilities were,

9    despite the fact that she may have been a housewife and she may

10   have been a mother, does not abrogate the fact that she was

11   also working the finances of CSE, and it was for that action,

12   not that she's a grandmother or a mother or a piano teacher

13   that she was indicted.  She was the financial -- she was

14   obviously running the finances of CSE.  And together, the

15   evidence is very clear, you will see where Kent Hovind signs

16   off on all the financial documents of this business.  There

17   will be a chart and note on there and Kent Hovind would sign of

18   on it, and the evidence -- you can infer from the evidence, it

19   is not an assumption, it is not a speculation, you can infer

20   from the evidence that the two of them -- Kent Hovind was aware

21   and helped direct the action that Jo Hovind took, that the two

22   of them acted together when they committed the structuring

23   crimes, the 45 counts of structuring.  And if they acted

24   together, then you can find and should find both of them guilty

25   of the structuring counts.  That's why both of them are

12:35PM

1    charged.  It doesn't matter that Mr. Hovind may not have been

2    in town when some of these checks were cashed.  If Mrs. Hovind

3    was acting under the direction of or together with Mr. Hovind

4    when she was doing that and the evidence is overwhelmingly so,

5    then both of them can and should be held criminally liable for

6    the structuring, CTR evasion counts.

7                 There were -- you could probably tell when Mr. Richey

8    was speaking that I had some difficulties with some of the

9    things that he was saying.  There were a number of things that

10   Mr. Richey represented to you that were testified to in this

11   Court, and clearly, your memories of what happened in this

12   courtroom prevails.  I can tell you that I strongly disagree

13   with just about everything that Mr. Richey represented to you

14   that was testified to, and I certainly disagree with most of

15   his legal analysis with regard to his client.  Some of what I

16   think were the more egregious representations that he made to

17   you regarding the facts are things like Anne Dyson testified

18   that the bankers don't tell their clients about the CTRs.

19   That's not true.  Anne Dyson testified that they tell customers

20   on a regular basis when CTR's are filed.  He even said

21   something about the bank secrecy act implying that there was

22   something about that that would prevent them from telling

23   customers about filing a CTR.  That's absolutely not true.  He

24   said that Scott Schneider testified that he was only

25   investigating the personal income taxes.  That's not true

12:37PM

1    either.  Scott Schneider testified that he opened his

2    investigation regarding the employment taxes as well as the

3    personal income taxes.  He claimed that the testimony was that

4    when Mr. Hovind said that he was praying for these witnesses,

5    these agents, that that was the threat.  That wasn't a threat.

6    The threat was when he said, and I know God knows how to take

7    care of people who interfere with his ministries.  You heard it

8    on the tape, on the Truth radio program when he said it would

9    be okay with him if God dealt harshly with the agents who

10   served a lawful search warrant on his premises.  He said the

11   Ms. Cooksey testified that she was a missionary.  She said

12   quite the opposite.  She said Mr. Hovind called her a

13   missionary, but she was an employee.

14        He said that Kent Hovind gave up the right to bear

15   arms.  Where did that come in?  The weapons that were found in

16   Mr. Hovind's house was quite formable.  Where he got there is

17   any giving up of any right to bear arms, I don't know.  He said

18   that there were some things that were missing from the FOIA

19   request, obviously things the government didn't want to know.

20   On several occasions he implied that the government was hiding

21   things from you.  Well, ladies and gentlemen, Mr. Richey has

22   the same subpoena power in this courtroom than I do.  He can

23   subpoena anything and anybody to this courtroom if he chooses.

24   If he thought that there was anything missing from any of these

25   documents, if he thought that there was anything was

12:39PM 1  significant that was seized in service of that search warrant

2  that would have a benefit to his client, then he had every

3  right and every ability to bring it here before you and he did

4  not.

5          The implication that Mr. Hovind didn't know what was

6  happening, that he was in the dark about all of the IRS

7  actions, the first thing he knows, close your eyes and imagine

8  that you're out of town and you get a call from your wife out

9  of the blue that people are taking your cars, that's

10  ridiculous.  You heard Special Agent Powe testify that it was a

11  last resort, that they already had to file -- he never filed a

12  tax return.  What could he expect?  He he's never filed a tax

13  return.  Special Agent Powe testified it was a last resort.

14  They already had to file substitute returns on his income tax.

15  They had already done a notice of deficiency.  He had already

16  turned down the summons.  Ms. Powe had already been knocking on

17  the door.  And he ignored all that.  So in order for that

18  scenario to be true that Mr. Richey gave you, you have to add

19  in all those factors, imagine that you are out of town and you

20  get that phone call, but you know you haven't ever paid income

21  taxes, you've never even filed a return.  You know that you've

22  turned away summonses.  You know that you've turn away notices

23  of deficiencies.  All of these things, they are ongoing.  The

24  same thing with Special Agent Schneider, first he complains

25  that he comes on the property without a warrant, and then Agent

12:40PM 1    Schneider comes on the property with a warrant, and that's

2    wrong, too.  You can't have it both ways.  Special Agent

3    Schneider tried to get information from him lawfully.

4           And the lawfully part, let me just address this for a

5    minute.  You're going to see in all the lawsuits, in all the

6    paperwork, that time after time after time, the courts when he

7    would challenge these actions from the revenue officers and

8    revenue agents and special agents, that time after time after

9    time the courts have said that what they did was perfectly

10   lawful and legal.  There is absolutely no evidence before you

11   that Special Agent Schneider, Special Agent Evans, Revenue

12   Agent Powe, or anybody else at the IRS has done anything

13   unlawful.  Quite to the contrary.  The Court orders are very,

14   very clear, and I take exception to Mr. Richey saying they were

15   all dismissed on technicalities because he didn't know what he

16   was doing.  That's also ridiculous.  You're going to see that

17   almost all of them, save I think one, were dismissed because

18   they were frivolous.  They were dismissed because they were

19   filed in bath faith and they were dismissed because he was

20   wrong.  You know what, he didn't care.  That's not why he filed

21   those.  He filed them to obstruct the IRS.  And it's clear from

22   his pattern of behavior all the way through these years that

23   that's exactly why he was doing it.  He even said it.  He said

24   it, do you remember at the end of the tape, the end of the

25   Truth radio, what did he say?  He said I have all kinds of

12:41PM

1    interesting things planned for the IRS.  I have all kinds of

2    interesting things planned for them.  And he did, all to

3    obstruct their ability to collect lawful taxes from him.

4         David Gibbs couldn't cite the statutes.  That's

5    another thing that Mr. Richey said.  I think it was very clear

6    from Mr. Gibbs' testimony that he was very knowledgeable in all

7    of these actions, whether or not he could while he was walking

8    around Dinasaur Adventure Land pull out a statute book from his

9    pocket and say here's your obligation is irrelevant.  He knew

10   what the law was.  He explained the law to him and then offered

11   to come back and help him set up legally, and he turned him

12   down, as I mentioned before, an absolutely irrefutable proof

13   that Mr. Hovind had no intent to follow the law, and it's

14   absolutely completely untrue that the government did not put

15   Mr. Hovind on notice of these taxes, absolutely untrue.

16   Certainly, there was no notice to Mr. Hovind that he was about

17   to be indicted.  There is no law.  There is no regulation,

18   there is no benefit to telling somebody, and it doesn't happen

19   to telling somebody that they are about to be charged with a

20   crime.  That just doesn't happen, but he was certainly on

21   notice, and if you don't think so.

22        Let me just point out one little fact to you.  The

23   fact is that Mr. Hovind sent an in ordinant amount of time not

24   preaching the gospel, not preaching creationism, but trying to

25   evade taxes.  And one of the things that he did to try to evade

12:43PM

1    taxes is create schemes and create false documents and false

2    labels that show that he did not have employees.  Do you

3    remember the timecards?  These were timecards, for heavens

4    sake, that he put stewardship labels on them.  That's

5    ridiculous.  They were timecards.  He goes out of his way to

6    change what were obviously employees, to missionaries, giving

7    them love gifts.  Why would he do that if he was not aware of

8    his obligation to withhold income taxes and FICA taxes?  There

9    is no reason for him to do that if he did not understand his

10   obligation, and his obligation is explained in documents that

11   we've put into evidence.  And there isn't a letter in evidence

12   that you will see that Mr. Hovind ever wrote to the IRS and

13   said what are my obligations under withholding?  What are my

14   obligations for employment taxes?  Not one, not once did he

15   ever ask.  He knew.  He says on a number of occasions, I've

16   read the law.  I've studied the law, you've heard that several

17   times during the course of the two week trial, several times.

18   He just didn't want to comply, period.  That's it.  He didn't

19   want to pay his taxes.  What did he spend the money on instead?

20   Himself, CSE, his control.

21          This case has nothing to do with evolution versus

22   creation, nothing to do with it.  There is nothing that would

23   happen to him if he had paid his taxes.  That's all the IRS

24   ever asked of him.  That's all.  If he paid his taxes, they

25   would have left him alone.  That's what this case is about.  He

1    had a duty as a citizen of United States of America, which he

2    claims he's not, but he had a duty as a citizen of the United

3    States of America to pay his taxes just as the government

4    doesn't send letters out to people saying, by the way, it's

5    illegal to rob a bank, so if you're thinking about robbing a

6    bank, don't do it.  It's the same theory.  He had an

7    obligation.  It's the law to pay his taxes and he knew it, and

8    he didn't do it.  That was willful, and he had absolutely no

9    good faith reason to pay his taxes.  That's all they ever

10   asked.

11          Regarding the representations that he's made, and

12   you'll see in his affidavit that Mr. Richey depends upon as

13   Mr. Hovind's testimony, there is lie after lie after lie in

14   those affidavits that he sent to the grand jury, to a legal

15   body, the grand jury, making misrepresentations to them over

16   and over and over again, even calling himself a doctor when

17   he's not.  And you'll see his resume and his little synopsis of

18   his background, there is nothing that indicates that he's a

19   doctor.  It's part of the pattern for him, that he's above the

20   law, and that's what he believes.  That's what he believes.

21   And that was the whole purpose behind every single one of the

22   58 crimes that are charged.

23          How much of a legal education do you need, ladies and

24   gentlemen, to tell the truth?  He never did tell the truth.

25   And whether he had legal representation or not when he filed

12:46PM 1   his bankruptcy, when he filed his affidavit, whether he had

2   legal representation or not, it doesn't matter.  It doesn't

3   take legal representation to know you have got to tell the

4   truth when you sign under the penalty of perjury.  Both of

5   these individuals were individuals who just didn't want to pay,

6   and you could tell -- we introduced evidence regarding

7   Mrs. Hovind and her intent and her knowledge.  And in addition

8   to the information that we've already talked about, you may

9   recall that there was an application to the Baptist church

10   along the same lines as things that Mr. Hovind filed, asking to

11   do his legal proceedings in forma pauperis, which means he's

12   claiming to be poor.  He wants the normal cost, the normal cost

13   that any citizen would pay to file a lawsuit, he wants those

14   waived because he's poor.  He's using the system.  And Mrs.

15   Hovind, at the same time that she was putting $100,000 aside to

16   buy Darlene Porter's property, what did she do?  She wrote to

17   Baptist Hospital asking for charity, claiming she didn't have

18   any money, wanting charity from the hospital, at the same time

19   she's putting $100,000 aside.  Now, what does that tell you?

20   That we're dealing with a mindset here that is antigovernment

21   and antitax, and that is all that motivated them when they

22   committed all 57 crimes.

23         I really do appreciate your patience and I ask you to

24   find both of these defendants guilty as charged in the

25   indictment.  Thank you so much.

12:49PM

1    THE COURT:  All right ladies and gentlemen on behalf

2    of our court and myself personally, I do want to thank you for

3    your participation thus far in this trial and the advanced

4    participation you have yet to complete.  It has been obvious to

5    the Court that you have been a very conscientious jury, and I

6    know you have all taken your individual obligations and duty

7    very seriously.

8         In just a moment, I am going to give you your final

9    instructions on the law as promised, and they will appear for

10   you on the overhead screen.  Ms. Simms will assist me by

11   placing them on the projector.  You can follow along or you can

12   sit and listen, but you're free to follow along.

13        Before I give you your final instructions, however, I

14   do want to give you three additional limiting instructions,

15   you've had some limiting instructions thus far in the trial,

16   I'm going to give you three additional ones, so just listen

17   carefully.

18        First, you are instructed that Agent Schneider acted

19   under authority of a lawful court order, via the search

20   warrant, at the time he entered the Hovind's property to

21   execute the search, and any suggestion that he did not have

22   such authority must be disregarded.

23        Second, there has been no evidence that Agent

24   Schneider and/or Revenue Officer Powe lacked authority to take

25   the actions that they did, and therefore, any suggestion that

12:50PM

1   they in fact did not have proper authority must be disregarded.

2   However, you may consider Mr. Hovind's beliefs about their

3   authority or lack thereof in deciding whether Mr. Hovind acted

4   willfully.

5            Third, you heard testimony during the trial regarding

6   three individuals, John Slobach, Fred Ortiz and Glen Stoll, and

7   you heard testimony that certain actions were taken against

8   these individuals by courts or the IRS at certain times.  I'm

9   instructing you now that you may not consider any actions

10  against any of these individuals in determining the guilt or

11  innocence of either of the defendants in this case.  Do you all

12  understand those three instructions?

13           Members of the jury, it is now my duty to instruct you

14  on the rules of law that you must follow and apply in deciding

15  this case.  When I have finished you will go to the jury room

16  and begin your discussions or what we call your deliberations.

17           It will be your duty to decide whether the government

18  has proved beyond a reasonable doubt the specific facts

19  necessary to find the defendant's guilty of the crimes charged

20  in the indictment.

21           You must make your decision only on the basis of the

22  testimony and the other evidence presented here during the

23  trial and you must not be influenced in any way by either

24  sympathy or prejudice for or against the defendants, either

25  defendant or the government.

12:52PM

1    You must also follow the law as I explain it to you

2    whether you agree with that law or not and you must follow all

3    of my instructions as a whole.  You may not single out or

4    disregard any of the Court's instructions on the law.

5    The indictment or formal charge against any defendant

6    is not evidence of guilt.  Indeed, every defendant is presumed

7    by the law to be innocent.  The law does not require a

8    defendant to prove, excuse me, to prove innocence or to produce

9    any evidence at all; and if a defendant elects not to testify,

10    you cannot consider that in any way during your deliberations.

11    The government has the burden of proving a defendant guilty

12    beyond a reasonable doubt.  If it fails to do so, you must find

13    that defendant not guilty.

14    Thus, while the government's burden of proof is a

15    strict or heavy burden, it is not necessary that a defendant's

16    guilt be proved beyond all possible doubt.  It is only required

17    that the government's proof exclude any reasonable doubt

18    concerning the defendant's guilt.

19    A reasonable doubt is a real doubt based upon reason

20    and common sense after careful and impartial consideration of

21    all of the evidence in the case.

22    Proof beyond a reasonable doubt therefore is proof of

23    such a convincing character that you would be willing to rely

24    and act upon it without hesitation in the most important of

25    your own affairs.  If you are convinced that a defendant has

12:53PM

1  been proved guilty beyond a reasonable doubt, say so.  If you

2  are not convinced, say so.

3          As I said earlier, you must consider only the evidence

4  that I have admitted in the case.  The term evidence includes

5  the testimony of the witnesses and the exhibits that were

6  admitted into the record.  Remember, that anything the lawyers

7  say is not evidence in the case.  It is your own recollection

8  and interpretation of the evidence that controls.  What the

9  lawyers say is not binding upon you.  Also, you should not

10 assume from anything that I may have said that I have any

11 opinion concerning any of the issues in this case.  Except for

12 my instructions to you on the law, you should disregard

13 anything that I may have said during the trial in arriving at

14 your own decision concerning the facts.

15          In considering the evidence, you may make deductions

16 and reach conclusions which reason and common sense lead you to

17 make and you should not be concerned about whether the evidence

18 is direct or circumstantial.  Direct evidence is the testimony

19 of one who asserts actual knowledge of a fact, such as an

20 eyewitness.  Circumstantial evidence is proof of a chain of

21 facts and circumstances tending to prove or disprove any fact

22 in dispute.  The law makes no distinction between the weight

23 you may give to either direct or circumstantial evidence.

24          Now, in saying that you must consider all of the

25 evidence, I do not mean that you must accept all of the

12:55PM

1   evidence as true or accurate.  You should decide whether you

2   believe what each witness had to say and how important that

3   testimony was.  In making that decision, you may believe or

4   disbelieve any witness in whole or in part.  Also, the number

5   of witnesses testifying concerning any particular dispute is

6   not controlling.

7          In deciding whether you believe or do not believe any

8   witness, I suggest that you ask yourself a few questions:  Did

9   the witness impress you as one who was telling the truth?  Did

10  the witness have any particular reason not to tell the truth?

11  Did the witness have a personal interest in the outcome of the

12  case?  Did the witness seem to have a good memory?  Did the

13  witness have the opportunity and ability to observe accurately

14  the things that he or she testified about?  Did the witness

15  appear to understand the questions clearly and answer them

16  directly?  Did the witness' testimony differ from other

17  testimony or evidence?

18         You should also ask yourself whether there was

19  evidence tending to prove that a witness testified falsely

20  concerning some important fact or whether there was evidence

21  that at some other time a witness said or did something or

22  failed to say or do something which was different from the

23  testimony the witness gave before you during the trial.

24         You should keep in mind, of course, that a simple

25  mistake by a witness does not necessarily mean that the witness

12:56PM

1   was not telling the truth as he or she remembers it because

2   people naturally tend to forget some things or remember other

3   things inaccurately.  So if a witness has made a misstatement,

4   you must consider whether it was simply an innocent lapse of

5   memory or an intentional falsehood and the significance of that

6   may depend on whether it has to do with an important act or

7   with only an unimportant detail.

8          Charts or summaries have been prepared by certain of

9   the parties and have been shown to you during the trial for the

10  purpose of explaining facts that are allegedly contained in

11  books, records, or other documents, which have been admitted as

12  evidence in the case.  These charts or summaries have been

13  admitted into evidence.

14         You may consider the charts and summaries as you would

15  any other evidence admitted during the trial and give weight or

16  importance if any as you feel they deserve.  To the extent that

17  you determine that the charts or summaries in whole or part are

18  not an accurate summary of evidence already in the record, you

19  may disregard the charts or summaries in whole or in part.

20         During the course of the trial, as you know from the

21  limiting instructions that I gave you at that time, you heard

22  evidence of acts of the defendants which may be similar to

23  those charged in the indictment but which were committed on

24  other occasions, more specifically this evidence consisted of

25  testimony from a witness Darlene Porter regarding actions

12:58PM

1    allegedly taken by the defendants as part of a real estate

2    transaction and testimony from Special Agent Schneider

3    regarding action allegedly taken by Mrs. Hovind, jointly with

4    her husband, to file in federal court, a motion to quash

5    several administrative summonses issued by the Internal Revenue

6    Service and to file a document with the Escambia County Clerk's

7    Office entitled power of attorney and revocation of signature.

8         As I instructed you during the trial, the defendants

9    are not charged with any crime in this case in connection with

10   this real estate transaction and Mrs. Hovind is not charged

11   with any crime in connection with the filing of the motion to

12   quash in federal court and or the filing of the document

13   entitled power of attorney and revocation of signature with the

14   Escambia County Clerk's Office.  And specifically, she is not

15   charged in Count 58 with obstructing or impeding the due

16   administration of the Internal Revenue laws.  Therefore, you

17   must not consider any of this evidence in deciding whether the

18   defendants have committed the acts that have been charged

19   against them in the indictment.  However, as I have instructed

20   you, the government must prove all of the elements of the

21   crimes charged against each defendant beyond a reasonable

22   doubt, which on Counts 13 through 57 includes among other

23   things the requirement to prove that the defendants acted with

24   a purpose to evade the transaction reporting requirements at

25   the time they engaged in certain financial transactions.

12:59PM

1  Therefore, if and only if you decide from all the other

2  evidence in the case beyond a reasonable doubt that the

3  defendants did commit the acts charged in Counts 13 through 57.

4  You may consider these prior activities for the limited purpose

5  of deciding whether the defendants had the requisite intent or

6  purpose to commit the acts charged in Counts 13 through 57.

7  You may consider this other evidence only for this limited

8  purpose and no other.

9       In this case, you have been permitted to take notes

10  during the course of the trial, and most of you, perhaps all of

11  you, have taken advantage of that opportunity and have made

12  notes from time to time.

13       You will have your notes available to you during your

14  deliberations, but you should make use of them only as an aid

15  to your memory.  In other words, you should not give your notes

16  any precedence over your independent recollection of the

17  evidence or the lack of evidence; and neither should you be

18  unduly influenced by the notes of any other jurors.  I

19  emphasize that notes are not entitled to any greater weight

20  than the memory or impression of each juror as to what the

21  testimony may have been.

22       Now, I would like to take up the specific charges that

23  are set out in the indictment in this case.  Please remember,

24  as I have told you, the indictment is not part of the evidence

25  in this case.  It is merely an accusation and you must not draw

1:01PM 1    any inference of guilt from it.

2              In this case, as you know, the indictment charges 58

3    separate offenses which are called counts.  I will not read the

4    indictment to you at this time because you will be given a copy

5    of the indictment for reference during your deliberations.

6              However, in summary Counts 1 through 12 charge that

7    during the years 2001 through 2003, defendant Kent E. Hovind

8    willfully failed to deduct, collect, truthfully account for and

9    pay over to the Internal Revenue Service, federal income tax

10   and Social Security Medicare or FICA tax, from the total

11   taxable wages of Creation Science Evangelism employees.  Counts

12   13 through 57 charge that during the years 2001 and 2002

13   defendant Kent E. Hovind and defendant Jo D. Hovind knowingly

14   for the purpose of evading currency transaction reporting

15   requirements, structured, assisted in structuring and caused to

16   be structured, transactions involving cash withdrawals from

17   AmSouth Bank.  In addition, each of these counts charge

18   defendant Kent E. Hovind and defendant Jo D. Hovind with aiding

19   and abetting the commission of this offense.

20             Count 58 charges that between 1996 and 2006, the

21   defendant Kent E. Hovind corruptly endeavored to obstruct and

22   impede the due administration of the Internal Revenue Laws.

23   Counts 1 through 12 of the indictment charge Kent E. Hovind

24   with willfully failing to collect and truthfully account for

25   and pay over federal income tax and Social Security Medicare or

1:02PM 1  FICA tax in violation of Title 26 of the United States Code,

2  Section 7202.  Each count in Counts 1 through 12 relates to a

3  separate tax quarter and thus, each is charged as a separate

4  offense.

5         Title 26 of the United States Code, Section 7202 makes

6  it a federal crime for an employer or one having the duties of

7  an employer to either fail to collect, account for, or pay over

8  taxes required of the employer.

9         The defendant can be found guilty of the offenses

10  charged in Counts 1 through 12 of the indictment only if all of

11  the following facts are proved beyond a reasonable doubt:

12  First, that the defendant was an employer or otherwise was a

13  person who had the duty to collect, truthfully account for and

14  pay over federal income or Social Security, Medicare, FICA

15  taxes, that the defendant was required to withhold from the

16  wages of the employees for the calendars quarter charged in the

17  respective counts of the indictment; second, that the defendant

18  either, one, failed to collect, two, truthfully account for,

19  or, three, pay over federal income tax or Social Security

20  Medicare or FICA tax that the defendant was required to

21  withhold from the wages of the employees for the calendar

22  quarter charged in the respective counts of the indictment, and

23  third, that the defendant acted willfully.

24         The law requires every employer of labor to deduct and

25  withhold income taxes from the wages paid to employees.  The

1:04PM  1   law also imposes on the income of every individual a tax equal

2   to a specified percentage of his or her wages received with

3   respect to employment as a contribution to his or her insurance

4   under Social Security, Medicare and related programs.  The

5   employer is required under the law to collect this tax by

6   deducting the amount of taxes from the wages as and when paid.

7           Every employer, therefore, must deduct and withhold

8   federal income taxes and Social Security Medicare or FICA taxes

9   from the wages of its employees and is required to file for

10  each quarter a Form 941, employer's federal quarterly tax

11  return, reflecting such withholding of income and Social

12  Security Medicare or FICA taxes, and said return must be filed

13  on or before the last day of the first calendar month following

14  the period for which it is made.  For example, a return for the

15  first calendar quarter of a year would cover the period from

16  January 1 through 31, and must be filed on or before April 30.

17  Churches are not exempt from these requirements and must deduct

18  and withhold income and Social Security, Medicare, and FICA

19  taxes from the wages of their employee.  An individual is

20  required to collect, truthfully account for, and pay over

21  federal income tax and Social Security Medicare FICA tax, if he

22  was an officer or employee of a corporation in a manner such

23  that he was in a decision-making role and had the authority to

24  ensure that withheld income taxes and Social Security Medicare

25  or FICA taxes were paid.  The test as to whether one is

1:05PM 1    responsible or not ultimately becomes one of whether the

2    defendant on behalf of the employed entity had significant

3    control over the financial decision-making process within the

4    employment entity as would give him the power to determine who

5    would get paid and who would not.  An individual may be a

6    responsible person regardless of whether he did the actual

7    mechanical work of keeping records, preparing returns or

8    writing checks.

9          Counts 1 through 12 require you to consider whether

10    the government has proven that the defendant Kent E. Hovind

11    acted willfully.  An act is done willfully if it is committed

12    voluntarily and purposely with a specific intent to do

13    something the law forbids, that is, with bad purpose, either to

14    disobey or disregard the law.  In order to prove the element of

15    willfulness in charges 1 through 12, the government must show

16    beyond a reasonable doubt that the law imposed a duty on the

17    defendant, that the defendant knew of this duty, and that the

18    defendant voluntarily and intentionally violated the duty.

19          If you find beyond a reasonable doubt that the acts

20    constituting the crime charged were committed by the defendant

21    voluntarily as an intentional violation of a known legal duty,

22    that is, with the specific intent to do something the law

23    forbids, then the element of willfulness as defined here in

24    this instruction has been satisfied, even though the defendant

25    may have believed that the conduct was religiously required or

1:07PM

the ultimate good would result in such conduct.  On the other hand, if you have a reasonable doubt as to whether the defendant acted in good faith sincerely believing himself to be exempt by the law from the withholdings of the income taxes, then the defendant did not intentionally violate a known legal duty, that is, the defendant did not act willfully, and that essential part of the offense would not be established.  The defendant, however, does not need to prove to you that he acted in good faith, but that the government must prove beyond a reasonable doubt that the defendant did not act in good faith.

Congress' purpose for requiring proof of willfulness in these types of cases was to avoid penalizing taxpayers who make innocent mistakes caused by the complexity of the tax code.  For this reason willfulness is not established if the action taken was placed upon accident, mistake, inadvertence, or due to a bonafide good faith misunderstanding as to the requirements of the law.  A defendant has a bonafide good faith misunderstanding if he honestly believed that he was acting within the law or that his actions comply with the law.  You do not need to find that the defendant's belief was objectively reasonable, but only that it was honestly held.  However, although you cannot question the reasonableness of the defendant's belief in determining if his actions are willful, you may consider the reasonableness of the defendant's belief in determining if the defendant honestly held that belief in

1:09PM 1    good faith and would act upon it.  The more farfetched a belief

2    is, the less likely it is that it was actually held.  However,

3    no matter how farfetched a belief is, you are not precluded

4    from finding that it was honestly held.

5          Further, willfulness is not negated if the defendant

6    believes, regardless of whether the belief is honest, that the

7    law itself is unconstitutional or that the law should not apply

8    to them.  A defendant who knows what the law is and if he

9    disagrees with it does not have a bonafide good faith

10   misunderstanding defense even if the defendant believes that

11   his disagree with the law is mandated by his religion or faith.

12   A persistent refusal to acknowledge the law does not constitute

13   a good faith misunderstanding of the law.  One is not immune

14   from criminal prosecution if he knows what the law is but

15   believes it should be otherwise and therefore violates it.  It

16   is the duty of all citizens to obey the law whether they agree

17   with it or not.

18         In determining the issue as to willfulness, you are

19   entitled to consider anything done or admitted to be done by

20   the defendant and all facts and circumstances in evidence which

21   may aid in the determination of his state of find.  It is

22   obviously impossible to ascertain or prove directly the

23   operations of a defendant's mind but a careful and intelligent

24   consideration of the facts and circumstances shown by the

25   evidence in any case enables one to infer what another's

1:10PM

1    intentions were in doing or not doing things.  With the

2    knowledge of definite acts, we may draw definite logical

3    conclusions.  Knowledge and belief are characteristically

4    questions for the fact finders and in this case that means you,

5    the jury.

6         Counts 13 through 57 of the indictment charge

7    defendant Kent E. Hovind and Jo D. Hovind with evading a

8    currency transaction reporting requirement.  Title 31 of the

9    United States Code, Section 2324(a)3 makes it a federal crime

10   or offense for anyone under certain circumstances to knowingly

11   and purposefully evade a currency transaction reporting

12   requirement.

13        With respect to currency transaction reporting

14   requirements, Title 31, United States Code, Section 5313(a) and

15   the regulations of the Treasury Department under that section

16   require domestic financial institutions and banks with certain

17   stated exceptions that are not relevant here in this case to

18   file reports with the government, called currency transaction

19   reports, Form 4789, disclosing all deposits, withdrawals,

20   transfers or payments involving more than $10,000 in cash or

21   currency.

22        The defendants can be found guilty of this offense or

23   offenses, Counts 13 through 57, only if all of the following

24   facts are proved beyond a reasonable doubt:  First, that the

25   defendants had knowledge of the currency transaction reporting

1:11PM 1   requirements; second, that with such knowledge the defendants

2   knowingly structured or assisted in structuring a currency

3   transaction; and third, that the defendant's purpose in

4   structuring the transaction was to evade the transaction

5   reporting requirements; and fourth, that the structured

6   transaction involved one or more domestic financial

7   institutions.  To structure a transaction means to deposit or

8   withdraw or otherwise participate in a transfer of a total of

9   more than $10,000 in cash or currency by or through a financial

10  institution or bank by setting up or arranging a series of

11  separate transactions, each involving $10,000 or less

12  individually, thereby, intentionally evading the currency

13  reporting requirement that would have applied if the

14  transaction had not been so structured.  The transaction or

15  transactions need not exceed the $10,000 reporting threshold at

16  any single financial institution on any single day in order to

17  constitute structuring within the meaning of this definition.

18       Knowledge as it is used in these counts does not

19  require that the government prove that the defendant knew that

20  the action taken was illegal.  The government must prove,

21  however, that the act was done with the intent to evade the

22  reporting requirements.

23       Counts 13 through 57 charge the defendants Kent E.

24  Hovind and Jo D. Hovind with aiding and abetting the unlawful

25  structuring of financial transactions in violation of Title 18,

1:13PM

1  United States Code, Section 2.  The guilt of a defendant in a

2  criminal case may be proved without evidence that the defendant

3  personally did every act involved in the commission of the

4  crime charged.  The law recognizes that ordinarily anything a

5  person can do for ones self may also be accomplished through

6  the direction of another person as an agent or by acting

7  together or under the direction of another person or persons in

8  a joint effort.  So if the acts or conduct of an agent or

9  employee or other associate of the defendants are willfully

10 directed or authorized by the defendant or if the defendant

11 aids and abets another person by willfully joining together

12 with that person in the commission of a crime, then the law

13 holds the defendant responsible for the conduct of that other

14 person just as though the defendant or person engaged in such

15 conduct.  However, before any defendant can be held criminally

16 responsible for the conduct of others, it is necessary that the

17 defendant willfully associate in some way with the crime and

18 willfully participated in it.  Mere presence at the scene of a

19 crime and even knowledge that a crime is being committed are

20 not sufficient to establish that a defendant either directed or

21 aided and abetted the crime.  You must find beyond a reasonable

22 doubt that the defendant was a willful participant and not

23 merely a knowing spectator.

24       The word willfully as that term is used in this

25 instruction means that the act was committed voluntarily and

1:14PM 1  purposefully with the specific intent to do something that the

2  law forbids, that is, with bad purpose to either disobey or

3  disregard the law.

4        The defendant Kent E. Hovind is charged in Count 58 of

5  the indictment with corruptly endeavoring to obstruct or impede

6  the due administration of the Internal Revenue laws.  Title 18

7  of the United States Code, Section 7212(a) makes it a federal

8  crime or offense for anyone to corruptly endeavor to obstruct

9  or impede the due administration of the Internal Revenue laws.

10        The defendant can be found guilty of that offense only

11  if both of the following facts are proved beyond a reasonable

12  doubt:  First, that the defendant knowingly endeavored to

13  obstruct or impede the due administration of the Internal

14  Revenue laws as charged, and second, that the defendant did so

15  corruptly.

16        To act willfully means to act knowingly and

17  dishonestly with the specific intent to secure an unlawful

18  benefit for ones self or another.  To endeavor to obstruct or

19  impede means to engage in some act or to take some step in a

20  conscious intent to obstruct or impede.  And to obstruct or

21  impede means to hinder or prevent or delay or make more

22  difficult the due administration of the Internal Revenue laws.

23  However, it is not necessary for the government to prove that

24  the administration of the Internal Revenue laws was in fact

25  obstructed or impeded in any way, only that the defendant

1:16PM

1    corruptly endeavored to do so.  Neither is it necessary that

2    the government prove all of the alleged ways and means of

3    committing the charged offenses as stated in the indictment.

4    It would be sufficient if the government proves beyond a

5    reasonable that the defendant committed any of one of those

6    alleged ways and means with the corrupt intent to obstruct

7    impede the due administration of the Internal Revenue laws,

8    provided, however, you must unanimously agree upon which of

9    those alleged ways and means the defendant corruptly committed.

10           If you find the defendant has corruptly obstructed or

11   impeded the due administration of the Internal Revenue laws but

12   that the most recent act the defendant took to obstruct or

13   impede occurred prior to July 11, 2000, then you must find the

14   defendant not guilty of the charge in Count 58.

15           You will note that the indictment charges that the

16   offenses were committed on or about a certain date.  The

17   government does not have to prove with certainly the exact date

18   of each alleged offense.  It is sufficient if the government

19   proves beyond a reasonable doubt that each offense was

20   committed on a date reasonably near the date alleged.

21           The word knowingly as that term has been used in the

22   indictment or these instructions means that the act was done

23   voluntarily and intentionally and not because of mistake or

24   accident.

25           A separate crime or offense is charged against each of

1:17PM 1   the defendants individually in Counts 13 through 57 of the

2   indictment.  Each charge and the evidence pertaining to it

3   should be considered separately.  Also, the case of each

4   defendant should be considered separately and individually.

5   The fact that you may find either one of the defendant's guilty

6   or not guilty of any of the offenses charged should not affect

7   your verdict as to any other offense or any other defendant.

8          I caution you members of the jury that you're here to

9   determine from the evidence in this case whether each defendant

10  is guilty or not guilty.  Each defendant is on trial only for

11  the specific offenses alleged in the indictment.

12         Also, the question of punishment must never be

13  considered by the jury in any way in deciding a case.  If the

14  defendant is convicted, the matter for punishment is for the

15  judge alone to determine at a later time.

16         Any verdict that you reach in the jury room whether

17  guilty or not guilty must be unanimous.  In other words, to

18  return a verdict, you must all agree.  Your deliberations will

19  be secret.  You will never have to explain your verdict to

20  anyone.  It is your duty as jurors to discuss the case with one

21  another in effort to reach an agreement if you can do so.  Each

22  of you must decide the case for yourself, but only after full

23  consideration of the evidence with the other members of the

24  jury.  While you are discussing the case, do not hesitate to

25  reexamine your own opinions and change your mind if you become

1:19PM 1  convinced that you were wrong, but do not give up your honest

2  beliefs solely because the others think differently or merely

3  to get the case over with.  Remember that in a very real way,

4  you are the judges now.  You are the judges of the facts.  Your

5  only interest is to seek the truth from the evidence in this

6  case.

7         When you go into the jury room, the first thing you

8  should do is to select one of your members to act as your

9  foreperson.  The foreperson will preside over your

10  deliberations and will speak for you here in open court.

11         A verdict form has been prepared for your convenience

12  for each of the two defendants.  This verdict form tracks the

13  counts as alleged in the indictment and you should refer to the

14  indictment in matching the counts on the verdict form to those

15  in the indictment.  For each count the verdict form lists the

16  substantive offense alleged in that count, the defendant

17  charged in that count, and then a space for you, the jury, to

18  mark your verdict of guilty or not guilty.  Please clearly mark

19  your verdict as to each count and use the same marking for each

20  count.

21         And these are the two separate verdict forms, and you

22  will see each count is listed separately.  This is the verdict

23  form for Mr. Hovind and it contains 58 counts.  You'll see that

24  the verdict for Mrs. Hovind is limited to Counts 13 through 57

25  because those are the counts that she's been charged with in

1:20PM 1   the indictment.

2          You will take the verdict form to the jury room and

3   when you have a reached unanimous agreement, you will have your

4   foreperson fill in the verdict form and date and sign it and

5   then notify the court security officer that you have reached a

6   verdict.

7          If you should desire to communicate with me at any

8   time, please write down your message, have your foreperson do

9   so and notify the court security officer that you have a

10  question, and he will then bring the matter to my immediate

11  attention.  I will then respond as promptly as possible.  I'll

12  either respond in writing to you or I may have you return here

13  to the courtroom so that I can address you orally.  I do want

14  to caution you, however, with respect to any message, note,

15  question, that you may send out, you should never tell me what

16  the numerical division is.  If you are divided and there is a

17  division, please do not ever indicate to me what that division

18  is numerically.  In other words, we simply do not need to know

19  whether you are divided ten to two, anything like that, six to

20  six, no numerical division mentioned.

21         All right.  And lastly, Ms. XXXXX and Mr. XXXXX, when

22  the jury was selected you were designated as the alternates in

23  this case, and under the law, only 12 jurors actually retire to

24  consider a verdict.  So when the others retire to the jury

25  room, I would ask that you please keep your seat.  However, if

1:22PM

1    you have a purse or personal belongs in the jury room, you may

2    take just a moment to go to the jury room to retrieve that

3    item, but then please do return back here to the courtroom

4    because I have some additional instructions for each of you.

5            Let me ask, counsel, other than previously discussed

6    are there any objections to the instructions as given?

7            MS. HELDMYER:  No objections.

8            MR. RICHEY:  No, Your Honor.

9            MR. BARRINGER:  No, Your Honor.

10           THE COURT:  All right.  Now, ladies and gentlemen, out

11   of respect for the serious responsibility that you are about to

12   undertake, I'm going to remain standing and direct that all

13   those in the courtroom rise as you retire to consider your

14   verdict.

15           (Jury out.)

16           THE COURT:  We'll wait one moment.

17           (Alternates present.)

18           THE COURT:  I never know whether this is good news or

19   bad news.  I can share with you that it's my least favorite

20   part of the trial because it usually is disappointing to jurors

21   to find out they are alternates because you have been here

22   every day for every minute just as everyone else has been

23   paying careful attention to the evidence and I know very

24   mindful of your duty and we do appreciate that.

25           I do want you to know that it is the law that only 12

1:24PM 1    retire, but I also want you to know that there was no

2    consideration of you individually in terms of designating you

3    as the alternate, no consideration of any responses that were

4    given.  I can't remember if either of you ever even spoke at

5    the jury selection process, but no consideration by anyone

6    about that.  It's simply a function of the number that you had

7    on that day of jury selection and where that number -- where we

8    ended up when the attorneys got to the selection of alternates,

9    so there was no consideration that we didn't want you as it

10   wasn't because we didn't want you as a juror or anything like

11   that.  Please understand that.

12           Also, you do play an important role in this process

13   because if one of the other jurors had become ill or had some

14   emergency and could not continue to participate, then you would

15   have been placed there and you would be in the jury room now,

16   and that does happen and it can still happen, although it's

17   very rare that that would happen at this point.  Because it is

18   very rare that that would happen, we do not require you to

19   remain here at the courthouse and you're going to be free --

20   you will be excused and free to leave now and go about your

21   daily affairs or your business.  And for that reason, maybe

22   this is good news because you're now free and entitled to leave

23   and go about your daily affairs.  Again, though, please do let

24   us have your cell phone number.  I'm sure we already have that,

25   but just in case a rare circumstance does arise, someone

1:26PM 1   becomes ill and needs to leave, but again it's rare, so don't

2   let it be a burden to you.

3          You will be excused now with our sincere thanks for

4   your participation.  And also, I do want you to know that you

5   are excused from further federal jury service for the next two

6   years.  Maybe that's good news as well.  It doesn't mean you're

7   not welcome back if you chose to come back.  If not, if you do

8   receive a notice of summons to return for jury service, all you

9   have to do is call the number on the form and notify the clerk

10  of your service here over the last several weeks, and you will

11  be excused.  And again, that does extend for the next two

12  years.

13         All right.  So with our sincere thanks, you'll be free

14  to go.

15         Ms. Simms, do you have telephone numbers?

16         And we do have a certificate for each of you to remind

17  you of all the fun you've had over the last couple of weeks.

18         Ms. XXXXX, thank you.

19         And, Mr. XXXXX, thank you.

20         (Alternates out.)

21         THE COURT:  Counsel, I do want to let you know that

22  the indictment that will go back to the jury room with the

23  instructions has been redacted as to the forfeiture language.

24  I don't know if I mentioned that to you before that it has been

25  redacted.

1:27PM 1        Now, if you would please join with Ms. Simms in making

2   sure that the evidence is presented.  I have some matters to

3   attend to on the bench, otherwise, you're all free to be

4   excused.  Counsel, just remain for the next 20 minutes, please,

5   in the courthouse.

6        MR. RICHEY:  Your Honor --

7        THE COURT:  Wait just a minute.  Mr. Hausner.

8        MR. RICHEY:  Yes, Your Honor.  I wasn't aware that you

9   were going to remove a portion of the forfeiture.  I would just

10  say that that is in effect an amendment and a retraction of the

11  indictment to send it back without that in it.

12       THE COURT:  Well, it's actually for your client's

13  benefit, Mr. Richey, but I don't know if you're making a motion

14  for a mistrial or not.

15       MR. RICHEY:  I'm just objecting.

16       THE COURT:  Well, the objection is overruled.  The

17  indictment forfeiture language never was given to the jury.  In

18  fact, the jury has no idea that if they return a guilty verdict

19  that that will be asked to consider the matter of forfeiture.

20  They don't have any idea about that.  And again, that's more

21  for the protection of your client.

22       All right.  You'll all excused.  I'm sorry.  Like I

23  said, I have some paperwork to take care of up here.

24       (Recess.)

25       THE COURT:  All right.  We have been advised that the

4:10PM 1   jury has reached a verdict in the case.  I'm going to call the

2   jury in in just a moment.  But before I do, I need to first

3   discuss with the attorneys the supplemental instructions.  In

4   the event there is a guilty verdict on Counts 13 through 57, we

5   will need to proceed immediately into that supplemental

6   proceeding.

7          Ms. Heldmyer, have you had an opportunity to review

8   the instructions?

9          MS. HELDMYER:  I have, Your Honor.

10          THE COURT:  Any objections?

11          MS. HELDMYER:  None, Your Honor.

12          THE COURT:  Mr. Richey?

13          MR. RICHEY:  Yes, Your Honor, I did have an

14   opportunity to review it, and based on that quick review, I

15   don't have an objection.

16          THE COURT:  Mr. Barringer.

17          MR. BARRINGER:  I also don't have an objection, Your

18   Honor.

19          THE COURT:  Thank you.  I do want to have just a word

20   with all those present in the courtroom.  The jury will be

21   brought in the courtroom in just a moment and the verdict will

22   be announced here in open court.  I do not want there to be any

23   show of expression or display of emotion verbal or otherwise by

24   anyone in the courtroom either approving of or disapproving of

25   the jury's verdict until after the jury has left the courtroom,

4:11PM 1    so I would like to ask everyone now to please examine your own

2    conscience and ask yourself whether you can sit in silence and

3    listen to the jury's verdict without any display of emotion.

4    If you decide that you cannot, then I would direct and ask that

5    you now please leave the courtroom.  Should there be any

6    display of emotion, you will be removed from the courtroom.

7    The jury and its verdict will be respected and honored in this

8    courtroom.  And this jury will not be made to feel good or bad

9    either way about their verdict.  All right then.  If you would

10    bring them in.

11            (Jury present.)

12            THE COURT:  Ladies and gentlemen have you reached a

13    verdict in the case.

14            PROSPECTIVE JUROR:  Yes, we have, Your Honor.

15            THE COURT:  All right.  If you would, please, sir,

16    come get the verdict and hand it to the security officer,

17    please.

18            All right.  There are two separate verdicts, verdict

19    forms, and I will ask the clerk to read the first verdict form

20    as to Mr. Hovind and then announce the jury's verdict as to

21    Mrs. Hovind.

22            All right.  Mr. Hovind, if you would please rise.

23            THE CLERK:  In the United States of America -- excuse

24    me.

25            In the United States District Court for the Northern

4:14PM   1   District of Florida, Pensacola Division, United States of

2   America versus Kent E. Hovind, Case Number 3:06cr83/MCR.

3   Verdict:  We, the jury, unanimously find -- return the

4   following verdict.  Count 1, guilty.  Count 2, guilty.  Count 3

5   guilty.  Count 4, guilty.  Count 5, guilty.  Count 6, guilty

6   Count 7, guilty.  Count 8, guilty.  Count 9, guilty.  Count 10,

7   guilty.  Count 11, guilty.  Count 12, guilty.  Count 13,

8   guilty.  Count 14, guilty.  Count 15, guilty.  Count 16,

9   guilty.  Count 17, guilty.  Count 18, guilty, count 19, guilty.

10   Count 20, guilty.  Count 21, guilty.  Count 22, guilty.  Count

11   23, guilty.  County 24, guilty.  Count 25, guilty.  Count 26,

12   guilty.  Count 27, guilty.  Count 28, guilty.  Count 29,

13   guilty.  Count 30, guilty.  Count 31, guilty.  Count 32,

14   guilty.  Count 33, guilty.  Count 34, guilty.  Count 35,

15   guilty.  Count 36, guilty.  Count 37, guilty.  Count 38,

16   guilty.  County 39, guilty.  Count 40, guilty.  Count 41,

17   guilty.  Count 42, guilty.  Count 43, guilty.  Count 44,

18   guilty.  Count 45, guilty.  Count 46, guilty.  Count 47,

19   guilty.  Count 48, guilty.  Count 49, guilty.  Count 50,

20   guilty.  Count 51, guilty.  Count 52, guilty.  Count 53,

21   guilty.  Count 54, guilty.  Count 55, guilty.  Count 56,

22   guilty.  Count 57, guilty.  Count 58, guilty.

23           So say we all the second day of November 2006, in

24   Pensacola, Florida, signed XXXXXX XXXXXX, foreperson.

25           THE COURT:  Mr. Hovind, you may be seated.

4:18PM 1          Mrs. Hovind, would you please rise.

2          THE CLERK:  In the United States District Court for

3   the Northern District of Florida, Pensacola Division, United

4   States of America versus Jo D. Hovind, Case Number

5   3:06cr83/MCR.  Verdict:  We, the jury, unanimously return the

6   following verdict:  Count 13, guilty.  Count 14, guilty.  Count

7   15, guilty, Count 16, guilty, count 17, guilty, count 18,

8   guilty.  Count 19, guilty.  Count 20, guilty.  Count 21,

9   guilty.  Count 22, guilty.  Count 23, guilty.  County 24,

10  guilty.  Count 25, guilty.  Count 26, guilty, count 27, guilty.

11  Count 28, guilty.  Count 29, guilty.  Count 30, guilty.  Count

12  31, guilty.  Count 32, guilty.  Count 33, guilty.  Count 34,

13  guilty.  Count 35, guilty.  Count 36, guilty.  Count 37,

14  guilty.  Count 38, guilty.  County 39, guilty.  Count 40,

15  guilty.  Count 41, guilty.  Count 42, guilty.  Count 43,

16  guilty.  Count 44, guilty.  Count 45, guilty, count 46, guilty.

17  Count 47, guilty.  Count 48, guilty.  Count 49, guilty.  Count

18  50, guilty.  Count 51, guilty.  Count 52, guilty.  Count 53,

19  guilty.  Count 54, guilty.  Count 55, guilty.  Count 56,

20  guilty.  Count 57, guilty.

21          So say we all dated the second day of November, 2006

22  in Pensacola, Florida, XXXXXX XXXXXX, foreperson.

23          THE COURT:  All right.  You may be seated.

24          Ladies and gentlemen, I have an additional question

25  for you, and that is whether the verdicts that you've just

4:20PM 1  heard read by the clerk are in fact your verdicts individually

2  as well as the verdict of the jury as a whole.

3           Let me start here with you, ma'am, and all you need to

4  do is answer yes or no.

5           JUROR:  Yes.

6           JUROR:  Yes.

7           JUROR:  Yes.

8           JUROR:  Yes.

9           JUROR:  Yes.

10           JUROR:  Yes.

11           JUROR:  Yes.

12           JUROR:  Yes.

13           JUROR:  Yes.

14           JUROR:  Yes.

15           JUROR:  Yes.

16           JUROR:  Yes.

17           THE COURT:  Thank you.  I'd ask counsel to approach

18  for just a moment, please.

19           (At the bench:

20           THE COURT:  Would you propose to argue now, is that --

21           MS. HELDMYER:  I'm going to take three minutes for my

22  argument, Your Honor.  I mean, it's short.

23           THE COURT:  All right.  I'm trying to decide if I want

24  to instruct them first and let you argue, but --

25           MS. HELDMYER:  Obviously, you're going to need to tell

4:22PM  1    them that their service isn't completed.

2         THE COURT:  I'll just briefly mention to them that

3    there is another proceeding that has to be presented to them,

4    and then I'll let you argue, and then I'll finish with the

5    instruction.

6         (Bench conference concluded.)

7         THE COURT:  All right.  Ladies and gentlemen of the

8    jury, your verdict in this case does not yet complete your jury

9    service, as it would in most cases because there is another

10   matter that you must now consider and decide, and that is

11   whether the defendants, Kent E. Hovind and Jo Hovind, should

12   forfeit certain money or property of the United States as part

13   of the penalty for the crimes charged in Counts 13 through 57

14   of the indictment to which you have returned guilty verdicts

15   on.

16        In a portion of the indictment that was not previously

17   discussed or disclosed to you, it is alleged that certain money

18   or property was involved in the commission of the offenses that

19   are charged in Counts 13 through 57.  And in view of your

20   verdict, finding the defendant's guilt at this of those

21   offenses, you must also decide under the law that I will

22   instruct you on in just a moment, whether such money or

23   property should be forfeited to the United States.  There is

24   not going to be any further evidence presented to you on this

25   matter.  However, the attorneys are permitted to make argument

4:23PM 1  and it should be brief argument to you on this matter.  So bear

2  with us and we appreciate your patience.

3           And with that, I will call on Ms. Heldmyer.

4           MS. HELDMYER:  The podium, do you want me to speak

5  from here or do you want me to move the podium back?

6           THE COURT:  Let's move the podium back, please.

7           MS. HELDMYER:  Thank you, Your Honor.

8           Ladies and gentlemen, as the Court said, you do have

9  one more duty to perform.  The judge is going to give you some

10  instructions on what forfeiture is, but basically, it is part

11  of the charges included in this indictment and the United

12  States is entitled to ask you and you're entitled to return an

13  amount of money that should be forfeited by the defendants

14  because of the crimes that were charged in the currency

15  transaction report evasion counts, which are counts 13 through

16  57.  What we are asking for you to do is determine an amount of

17  money that is equitable to be forfeited to the United States

18  based upon those particular convictions.

19           What I suggest to you, the counts if you add up the

20  amount of money that was laundered in those counts, excuse me,

21  not laundered, but that were charged in Counts 13 through 57

22  you come up with a figure $430,400.  We would ask that you

23  return a forfeiture judgement against the defendants for that

24  amount of money.  Thank you very much.

25           THE COURT:  Mr. Richey.

4:25PM  1          MR. RICHEY:  Yes, Your Honor.  Thank you.

2          Ladies and gentlemen in order to establish forfeiture,

3    the government has to prove and the Court will instruct you

4    that you have to be able to find that the funds that were used

5    in Counts 13 through 57 are in fact traceable to a specific

6    property or to a specific object.  And so you need to then look

7    at all the evidence that was presented and we would submit to

8    you that there was no evidence presented that the monies used

9    was in fact used for any specific property the evidence was

10   presented for.

11         You have to be able to trace it from the time that it

12   was cashed to where it went and what it was used for and much

13   of the testimony that was given had to do with what the funds

14   were used to then pay those who were working at Christian

15   Science Evangelism.  So you have to be able to trace the funds

16   from the time it was cashed to where it went, and I would

17   submit to you that -- I don't know.  You'll have to evaluate

18   the evidence to determine that on your own.  Thank you for your

19   time.

20         THE COURT:  Mr. Barringer.

21         MR. BARRINGER:  Thank you, Your Honor.

22         Good afternoon again, ladies and gentlemen.  You found

23   them guilty on 13 through 57, but, as Mr. Richey just told you

24   it's clear that the money went to the employees.  It went to

25   wages.  It didn't go to purchasing the property.  It didn't go

4:28PM  1    to those directions like that.

2            Even on a test -- and the Court will instruct you on

3    what the test is, there is no evidence to show that it went to

4    purchasing the property.  As a result, the amount will be

5    justified in terms of the forfeiture to be given to the United

6    States.  That's what you have to look at, not whether a certain

7    amount of checks were cashed, not whether or not a certain

8    amount of money was cashed in those checks, because you've

9    heard what the discussion was, and you heard the testimony and

10   you've already reached your verdict for the purposes of that.

11   You must pay in cash to employees.  If it's cash to employees,

12   it's not buying property, and therefore, no money as far as the

13   forfeiture is concerned.  Thank you.

14           THE COURT:  Ms. Heldmyer, anything further?

15           MS. HELDMYER:  Nothing further, Your Honor.

16           THE COURT:  All right.  Ladies and gentlemen, the term

17   forfeited simply means for someone to be divested or deprived

18   of the ownership of something as part of the punishment allowed

19   by the law for the commission of certain criminal offenses.  In

20   deciding these forfeiture issues, you should consider all of

21   the evidence you've already heard during this trial, plus any

22   additional evidence.  Actually, there was no additional

23   evidence presented to you.  If there had been, you would have

24   been permitted to consider that, but there's been no additional

25   evidence.

4:29PM 1      In order to be entitled to the forfeiture of the money

2  or property, the government must have proved by a preponderance

3  of the evidence the following:  That the money or property to

4  be forfeited was involved in an offense charged in Counts 13

5  through 57 of the indictment or is traceable to property

6  involved in said offense.

7      A preponderance of the evidence simply means an amount

8  of evidence, which is enough to persuade you that a claim or

9  contention is more likely true than not true.  To be traceable

10  to something means that the money or property under

11  consideration must have followed an ascertainable course or

12  trail and successive stages of developmental or progress from

13  the original source.

14      While deliberating concerning the issue of forfeiture,

15  you must not reexamine your previous determination regarding

16  the defendant's guilt.  However, all of the instructions

17  previously given to you concerning your consideration of the

18  evidence and credibility of witnesses, your duty to deliberate

19  together, your duty to base your verdict solely on the evidence

20  without prejudice, bias or sympathy, and the necessity of a

21  unanimous verdict will continue to apply during the

22  supplemental deliberations.

23      You will have this instruction with you during your

24  deliberations.  There is also a separate verdict form that will

25  need to be filled out pertaining to this forfeiture verdict.

4:30PM  1    And also, you will have a copy of the -- an unredacted copy of

2    the indictment that does contain the forfeiture allegations at

3    the end of the indictment.

4         Ladies and gentlemen, you may now retire to consider

5    your verdict on the forfeiture proceedings.

6         (Jury out.)

7         THE COURT:  We'll be in recess awaiting the jury's

8    verdict on forfeiture.  I do want you all to remain here at the

9    courthouse.

10        (Recess.)

11        THE COURT:  We've been advised the jury has reached a

12   verdict on the forfeiture proceeding.

13        Would you please bring the jury in, please.

14        (Jury present.)

15        THE COURT:  Has the jury reached a verdict?

16        FOREPERSON:  Yes, we have, Your Honor.

17        THE COURT:  Would you please retrieve the jury's

18   verdict?

19        Would the defendants please rise.

20        Would you publish the verdict?

21        THE CLERK:  In the United States District Court for

22   the Northern District of Florida, Pensacola Division.  United

23   States of America versus Kent E. Hovind and Jo D. Hovind, Case

24   Number 3:06cr83/MCR.  Verdict:  We, the jury, in the above

25   entitled and numbered case unanimously find by a preponderance

5:48PM 1    of the evidence as to the defendants Kent E. Hovind and Jo D.

2    Hovind, $430,400 was involved in the evasion of the currency

3    transaction reporting requirements charged in Counts 13 through

4    57 of the indictment or is traceable to property involved in

5    said offenses.  Yes.

6         So say we all, dated this second day of November 2006,

7    in Pensacola, Florida, signed XXXXXX XXXXXX, foreperson.

8         THE COURT:  All right.  Please be seated.  All right.

9         Ladies and gentlemen, based upon your guilty verdicts,

10   the defendants will be taken into custody.  I will order an

11   individual presentence report to be ordered in this case.  It

12   will be returnable on Friday, January 19, 2007.

13        Both Mr. and Mrs. Hovind, you will be required to

14   cooperate with the probation office in the preparation of that

15   presentence report and provide any and all information that you

16   have to them to assist them in preparing that report.

17        You will reappear Friday, January 19, 2007, at

18   9:00 a.m. for sentencing, and you will remain in the custody of

19   the marshals awaiting sentencing at that time.

20        Ladies and gentlemen of the jury, I do want to thank

21   you all very much for your time and participation in this case

22   and your service is now complete.  I do want to advise you also

23   of certain privileges that are enjoyed by jurors.  One of those

24   privileges is that no juror can ever be required or forced to

25   talk about the discussions that took place in the jury room

5:50PM 1    except by way of a court order and that is very, very rare.

2            For many centuries, we have relied upon juries just

3    such as yourselves for consideration of cases like this and we

4    have recognized for hundreds of years that a jury's

5    discussions, the jury's votes, their deliberations, their

6    comments should remain their private affairs so long as they

7    wish it to be so.  Therefore, the law gives you the unique

8    privilege of refusing to speak to anyone about your work here

9    on this trial as a juror.  On the other hand, our Constitution

10   does provide for the freedom of speech and you can talk about

11   your own personal participation if you wish to do so.  At the

12   same time, you must protect and respect the privacy of your

13   fellow jurors and I would ask that you do that if you decide to

14   speak about your own personal participate.

15           Also, because of your service here over the past

16   several weeks, a few weeks, you are excused from further

17   federal jury service for the next two years.  That does not

18   mean you won't be requested to return.  That's done by random,

19   that big computer that we have no control over, so you may get

20   a notice or summons to return.  If you do and you elect not to

21   return, all you have to do is notify the clerk by contacting

22   the number on the form and notify them of your service here

23   during this trial, and again, you would be excused and that

24   does extend for the next two years.  Is that does not excuse

25   you from further state jury court jury service, just federal

5:52PM 1    jury service.  Of course, we would love to have you back if you

2    are summoned and if you wish to return, you're certainly

3    welcome to return.

4         One thing I did not do and I should do before I excuse

5    you is to inquire once again about the verdict that was just

6    read by Ms. Simms as to the forfeiture provision.  So do let me

7    ask you if the verdict that you heard read was your own verdict

8    as well as the jury as a whole before I excuse you?

9         JUROR:  Yes.

10        JUROR:  Yes.

11        JUROR:  Yes.

12        JUROR:  Yes.

13        JUROR:  Yes.

14        JUROR:  Yes.

15        JUROR:  Yes.

16        JUROR:  Yes.

17        JUROR:  Yes.

18        JUROR:  Yes.

19        JUROR:  Yes.

20        JUROR:  Yes.

21        THE COURT:  All right.  Thank you very much.  All

22   right.  With our many many thanks and sincere appreciation for

23   your service during this trial, you will be dismissed at this

24   time.  I would ask that you step into the jury room for just a

25   few moments for some final instructions, and then you'll be on

5:53PM 1    your way.  All right.  Thank you.

2                    (Jury out.)

3                    THE COURT:  Counsel, anything else before we adjourn?

4                    MR. RICHEY:  Yes, Your Honor, I'd like to again renew

5    my motion for mistrial.

6                    THE COURT:  On what ground?

7                    MR. RICHEY:  On the grounds of the change of the jury

8    instruction that created prejudicial error.

9                    THE COURT:  All right.  The motion will be denied,

10   Mr. Richey.

11                   MR. RICHEY:  And then -- Your Honor, just to let you

12   know, I have another trial that we're trying to schedule in

13   January, and I haven't heard back from the clerk, and I know

14   the 19th was one of those dates.  So I'm going to inform them

15   that this Court already has one set.  But if I find out they've

16   already set it, I'll see if they can reschedule that, and I'll

17   let this Court know if that's a problem.

18                   THE COURT:  It's easier to move a sentencing than a

19   trial.  So if you have a conflict, just let us know about that

20   as soon as possible and I can reschedule the sentencing.

21   Again, it's easier for me to do that than for a court to move a

22   trial.  But, Mr. Richey, don't wait.

23                   MR. RICHEY:  No.  I should -- I'm hoping to know

24   either today or tomorrow.

25                   And then the other thing I just want to clarify, Your

5:54PM   1   Honor, are you ordering them incarcerated at this time?

2        THE COURT:  I am, based on the statute, yes.

3        MR. RICHEY:  Then, Your Honor, I'm just going to, just

4   to let the Court know, I'm going to ask that they remain on

5   bond based on the fact that there isn't a flight risk, and

6   there is no threat to public and they have appeared at every

7   hearing.

8        THE COURT:  Mr. Barringer, do you have the same

9   request?

10       MR. BARRINGER:  Yes, both as to the mistrial and as to

11   the motion for the bond, to stay on that at this time.

12       THE COURT:  The motion for the mistrial will be

13   denied.

14       Ms. Heldmyer, the government's position?

15       MS. HELDMYER:  Your Honor, we believe that Mr. Hovind

16   needs to be detained for the reasons that we believe that he

17   does pose a danger to the community and that he is a flight

18   risk.  He's got assets that we can't account for.  The evidence

19   has been very clear that when these type of government actions

20   happen that they hides assets and that he now has a $430,000

21   forfeiture judgement against him.  And I believe that creates a

22   situation where he cannot show this Court by clear and

23   convincing evidence that he should be remaining on bond.  In

24   the matter of Jo Hovind, I would leave that to the Court's

25   discretion.

5:56PM 1          THE COURT:  All right.  As to Mr. Hovind, the motion

2    to continue on bond will be denied at this time.  If you wish

3    to file a motion for release, I will consider that.  I would

4    likely set it for hearing and would consider that and set it

5    for hearing and you will have the burden at that hearing.  It

6    will be up to you if you wish to file that motion.  Again, I

7    will consider it and set it for hearing.

8          MR. RICHEY:  Thank you, Your Honor.

9          THE COURT:  But as to now, he will be taken into

10   custody.

11          Mrs. Hovind, I have received information from pretrial

12   services as to your compliance with the conditions of your

13   bond, and hearing from Ms. Heldmyer, I will allow you to

14   continue to remain out on bond until your sentencing under the

15   same conditions that exist now on your bond with an additional

16   modification and requirement that you appear here on the date

17   indicated, January 19, 2007, at 9:00 a.m. for your sentencing.

18          Again, you will be expected to cooperate with

19   probation in the preparation of that presentence report.

20          Also, please remember and I'm sure that Judge -- I

21   believe it was Judge Davis who set the terms initially on your

22   bond, but if you should violate any of those terms or

23   conditions or commit any law violation, you would be

24   immediately arrested and you would be detained at that point.

25   You could also face separate charges for any law violation.

5:57PM 1          Any questions about the conditions of your bond or

2    what is required?

3          DEFENDANT JO HOVIND:  No, ma'am.

4          MR. BARRINGER:  Thank you, Your Honor.

5          THE COURT:  Anything else?

6          MS. HELDMYER:  No.

7          THE COURT:  All right.  Then, Court will be adjourned.

8

9      (Proceedings concluded at 5:57 p.m.)

10

11                    ---------------------

12   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.  Any
13   redaction of personal data identifiers pursuant to the Judicial
     Conference Policy on Privacy are noted within the transcript.

14

15     s/Gwen B. Kesinger                    12-31-07

16     _____      _____

17     Gwen B. Kesinger, RPR, FCRR           Date
       Official Court Reporter

18

19

20

21

22

23

24

25